**John H. Thaler, SBN 150290**
c/o HARRIS/THALER LAW
18034 Ventura Boulevard, #289
Encino, CA 91316
Tel. 818-206-4402
jhtlaw@msn.com

**John Stanley, SBN 2020723**
John J. Stanley & Associates
Lankershim Blvd Suite 850
North Hollywood, CA 91601
818-769-5200
js@johnstanleylaw.com

FEDERAL DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN H. THALER, an individual, | CASE NO. |
| Plaintiffs, | COMPLAINT FOR DAMAGES AND FOR INJUNCTIVE RELIEF: |
| v. | |
| BRITTANY RAE THALER, an individual, DAWNA RAE CHAVEZ, an individual, LAWRENCE CAIRO, an individual, JOHN RICHARD CHAVEZ, an individual, SHAUNA MAJOR, an individual, JASON LAFLESCH, an individual, BARBARA KIFFMEYER, an individual, GREG DAVIS, an individual, ERICA GADBERRY, an individual, MADISON HUGHES, an individual, MARVIN J. DAVIS, an individual, JACOB G. ROESSLER, an individual, CHRISTOPHER FALBO, an individual. NICOLETTA FALBO, an individual, BRIAN BULLOCK, an individual, MARK LAMMERS, an individual, DAVID FERER, an individual, CHRIS WAKEFIELD, an individual, COUNTY OF MARICOPA, a County in the State of Arizona, CITY OF PHOENIX, a chartered city in the | 1. VIOLATIONS OF 42 U.S.C. §1983<br><br>2. VIOLATIONS OF 42 U.S.C. §1997<br><br>3. CONSPIRACY TO VIOLATE 18 U.S.C. §241<br><br>4. CONSPIRACY TO VIOLATE 18 U.S.C. §242<br><br>5. VIOLATION OF 42 U.S.C. §14141<br><br>6. VIOLATIONS OF SUBSTANTIVE DUE PROCESS<br><br>7. VIOLATIONS OF PROCEDUREAL DUE PROCESS<br><br>8. VIOLATION OF EQUAL PROTECTION |

**County of Maricopa, State of Arizona, CITY OF MESA, a chartered city in the County of Maricopa, State of Arizona, TOWN OF GILBERT, a chartered city in the County of Maricopa, State of Arizona, JETCLOSINGS, INC., a Corporation in the State of Washington, and DOES 1 through 150, inclusive, Defendants.**

**9.  CONVERSION**

**10.  CONSPIRACY TO DEFRAUD;**

**11.  INVASION OF PRIVACY;**

**12.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**

**13.  INTERFERENCE WITH BUSINESS;**

**14. ABUSE OF PROCESS.**

## GENERAL ALLEGATIONS

COMES NOW PLAINTIFF WHO ALLEGES THE FOLLOWING:

### Parties

1.      At all relevant times mentioned herein, Plaintiff John Harris Thaler was and is a resident of the State of Arizona and a resident of the State of California with a law practice based in the State of California.

2.      At all relevant times mentioned herein, Defendant Brittany Chavez a.k.a. Brittany Rae Chavez a.k.a. Brittany Thaler a.k.a. Brittany Phillips a.k.a. Brittany Harris a.k.a. Brittany Miller a.k.a. Bianca Chavez a.k.a. Brittany Johnson aka Brittany Leonard and other aliases ("Brittany")

was and is a resident of the County of Maricopa, City of Mesa, Arizona. Brittany currently remains the spouse of Plaintiff. A dissolution of marriage/annulment is pending.

3.      At all relevant times mentioned herein, Defendant Dawna Chavez a.k.a. Dawna Chavez, aka Dawna Marie Chavez, aka Dawna M. Chavez a.k.a. Dawn Chavez a.k.a. Daniel Chavez ("Dawna") was and is a resident of the county of Maricopa, City of Mesa, Arizona.

4.      At all relevant times mentioned herein, Defendant John Chavez was and is a resident of the County of Maricopa, City of Gilbert, Arizona

5.      At all relevant times mentioned herein, Defendant Jacob G. Roessler was and is a resident of Maricopa County, Arizona and is employed as a police officer with the City of Mesa Police Department.

6.      At all relevant times mentioned herein, Defendant Brian Bullock was and is a resident of Maricopa County, Arizona and is employed as a police officer with the Town of Gilbert Police Department.

7.      At all relevant times mentioned herein, Defendant David Ferer was and is a resident of Maricopa County, Arizona and is employed as a police officer with the Town of Gilbert Police Department

8.      At all relevant times mentioned herein, Defendant Chris Wakefield was and is a resident of Maricopa County, Arizona and is employed as a police officer with the Town of Gilbert Police Department

9.      At all relevant times mentioned herein, Defendant Lawrence Cairo was and is a resident of the County of Maricopa, City of Mesa, Arizona.

10.     At all relevant times mentioned herein, Defendant Christopher Falbo was and is a resident of the County of Maricopa, City of Gilbert, Arizona.

11.     At all relevant times mentioned herein, Defendant Nicoletta Falbo was and is a resident of the County of Maricopa, City of Gilbert, Arizona.

12.     At all relevant times mentioned herein, Defendant Jason LaFlesch was and is a resident of the County of Maricopa and is licensed as a real estate agent with the Arizona Department of Real Estate.

13.     At all relevant times mentioned herein, Defendant Gregory R. Davis was and is a resident of the City of Gilbert, Maricopa County, Arizona and is an attorney licensed in the State of Arizona.

14.     At all relevant times mentioned herein, Defendant Erica Gadberry was and is a resident of Maricopa County, Arizona and is an attorney licensed in the State of Arizona.

15.     At all relevant times mentioned herein, Defendant Shauna Major was and is a resident of Arlington, Texas.

16.     At all relevant times mentioned herein, City of Mesa is a city Incorporated within the State of Arizona.

17.     At all relevant times mentioned herein, Town of Gilbert is a city incorporated in the State of Arizona.

18.     At all relevant times mentioned herein, City of Phoenix is a city incorporated in the State of Arizona.

19.     At all relevant times mentioned herein, Maricopa County is a recognized county in the State of Arizona.

20.     At all relevant times mentioned herein, Barbara Kiffmeyer is a licensed social worker (LMSW) operating as a Court Appointed Advisor for the County of Maricopa Superior Court system.

21.     At all relevant times mentioned herein, Madison Hughes was and is a resident of the County of Maricopa and is employed as a Judge's Assistant to Judge Marvin L. Davis in the Maricopa County Superior Court.

22.     At all relevant times mentioned herein, Marvin L. Davis was and is a resident of Maricopa County, Arizona and is a Judge of the Maricopa County Superior Court.

23.     At all relevant times mentioned herein, JetClosings, Inc. was and is a corporation in the State of Washington doing business in Arizona and in multiple other states.

24.     At all relevant times mentioned herein, Shauna Major was and is a resident of Arlington, Texas.

25.     At all relevant times mentioned herein, DOES 1 through 10 are residents of the State of Arizona and employees of the State of Arizona whom Plaintiff is not able at this time to identify by name. At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

26.     At all relevant times mentioned herein, DOES 11 through 20 are residents of the State of Arizona and employees of the State of Arizona whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

27.     At all relevant times mentioned herein, DOES 21 through 30 are residents of the State of Arizona and employees of the County of Maricopa whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

28.     At all relevant times mentioned herein, DOES 31 through 40 are residents of the State of Arizona and employees of the City of Mesa whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

29.     At all relevant times mentioned herein, DOES 41 through 50 are residents of the State of Arizona and employees of the City of Gilbert whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

30.     At all relevant times mentioned herein, DOES 51 through 60 are residents of the State of Arizona and employees of the City of Phoenix whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

31.     At all relevant times mentioned herein, DOES 61 through 100 are residents of the State of Arizona whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

32.     At all relevant times mentioned herein, DOES 101 through 150 are residents of the County of Los Angeles, State of California. State of Arizona whom Plaintiff is not able at this time to identify by name. At such time that Plaintiff is unable to make such an identification, he shall seek leave to amend this Complaint.

33.     At all relevant times mentioned herein, Defendants and each of them acted in concert and conspiracy so that the acts of each Defendant were on behalf of all Defendants.  Thus, each Defendant is liable for the acts of the others.

## Subject Matter Jurisdiction

34.     Plaintiff Thaler is an investigative attorney with thirty years of investigating "white collar" crime including racketeering, embezzlement, tax evasion and money laundering schemes.

35.     This action concerns Defendants' participation in a series of racketeering enterprises, Plaintiff's discovery of the same, and thereafter Defendants' efforts to conceal evidence of the rackets while discrediting Plaintiff.  In so acting, Defendants conspired to violate and violated Plaintiff's rights:

   a.   Violations of 42 U.S.C. §1983 by individuals, government employees and agencies covering up racketeering activities described in detail hereinbelow.

   b.   Violations of Equal Protection and Substantive and Procedural Due Process Rights as set forth in the Fifth Amendment of the U.S. Constitution and applicable to the States through the Fourteenth Amendment of the U.S. Constitution by state and local governments and their agencies.

   c.   Violations of 18 U.S.C. §241 relating to actions by all Defendants.

   d.   Violations of 18 U.S.C. §242 relating to actions by employees of state and local government agencies.

e.   Violations of 18 U.S.C. §14141 by state and local government agencies engaging in certain practices that have resulted in violating Plaintiff's civil rights and the rights of others similarly situated.

f.   Fourth, it concerns a series of criminal multi-state racketeering enterprises (described in greater detail hereinbelow) existing for more than twenty (20) years, and Defendants' participation in some or all of them at all times or various relevant times described herein. In addition to said named Defendants, the enterprises concern the participation of numerous employees of state and local government agencies including law enforcement agencies, court personnel and judges.

g.   Violations of the Uniform Child Custody Jurisdiction and Enforcement Act leading to the use and abuse of McKinley Harris Thaler, the three-year-old son of Plaintiff and Brittany.  Said abuse includes the abduction of McKinley by Defendants, Dawna (Brittany's mother) and Larry (mother's boyfriend), with the aid of the other named Defendants and having Brittany to stage a contrived custody battle with perjured testimony and falsified evidence to accomplish the following: a) extort Plaintiff into halting his investigating and/or reporting Defendants' activities to appropriate law enforcement; b) divert Plaintiff's attention from the criminal enterprises; c) damage Plaintiff's reputation with false abuse claims against his child and Brittany so as to damage his credibility; d) drain Plaintiff's financial resources through said custody battle and through phony support orders.

36.   Additionally, this matter concerns:

a.   Actions of the Court-Appointed Advisor re: custody, Barbara Kiffmeyer, and Greg R. Davis wherein Kiffmeyer agreed to falsify her "Court Appointed Advisor" reports in favor of Davis' clients in exchange for payment and other considerations.  With respect to the Thaler dissolution, Kiffmeyer and Davis conspired to falsify her report to the Court and to refrain from reporting Brittany and Davis' perjurious statements to the Court in unserved briefs.

b.  The corrupt activities of Judge Marvin L. Davis

c.   and other Maricopa County Judges in permitting participants in the scheme to use their authority including to create fake orders in the name of said Judges in furtherance of the criminal enterprises.

d.  Extortion by means of fraudulent and fake default judgments, including an extortion attempt against Plaintiff that began in 2014 through a phony California judgement.

e.  Election fraud including fraud during the November 3, 2020 election.  Specifically, it includes placing candidates into certain elected offices to perpetuate and/or protect the criminal enterprises through creating phony ballots and then using the County computer system to change results.

37.    Said acts confer jurisdiction under the following statutes: 42 U.S.C. §1997 (unlawful for state or local enforcement agencies to allow officers to engage in a pattern or practice of conduct the deprived persons rights); 18 U.S.C. §241 and §242 (deprivation of rights under color of law by willfully depriving or causing or to have caused to be deprived from any person rights their privileges or immunities protected by the Constitution); 18 U.S.C. §14141 (unlawful for any government authority or agent or person acting on behalf of the government authority engage in a pattern or practice of conduct that's a price versus rights privileges or immunities secured or protected by the Constitution).

38.    Also, this Court has jurisdiction to adjudicate issues concerning the actions described herein below as they constitutes racketeering defined in 18 U.S.C. §1961 (murder, kidnapping, robbery, bribery, extortion, or dealing in a controlled substance or listed chemical) and defined in: 18 U.S.C. §201 (relating to bribery), §224, §659 (relating to theft from interstate shipment), §664 (relating to embezzlement from pension and welfare funds), §891–894 (relating to extortionate credit transactions), §1028 (relating to fraud and related activity in connection with identification documents), §1341 (relating to mail fraud), §1343 (relating to wire fraud), §1344 (relating to financial institution fraud), §1503 (relating to obstruction of justice), §1510 (relating to obstruction of criminal investigations), §1511 (relating to the obstruction of state or local law enforcement),

§1512 (relating to tampering with a witness, victim, or an informant), §1513 (relating to retaliating against a witness, victim, or an informant), slavery, and trafficking in persons, §1831 and §1832, §1951 (relating to interference with commerce, robbery, or extortion), §1952 (relating to racketeering), §1956 (relating to the laundering of monetary instruments), §1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), §1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire),  any offense involving fraud connected with a case under title 11 including importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in §102 of the Controlled Substances Act), punishable under any law of the United States.

39.     Further, this Court has jurisdiction pursuant to Rule 4 of the Federal Rules of Civil Procedure, diversity of parties in multiple states.

**In Personam Jurisdiction**

40.     This Court has personal jurisdiction over the Defendants, and each of them, conspired with each other to commit criminal acts in multiple States including the States of California and Arizona.  Moreover, multiple Defendants committed the acts alleged herein while residing in the State of California or while in said State.  Finally, as part of the cover-up of their criminal wrongdoing, Defendants and each of them have committed acts to damage Plaintiff's California based law office.

**Venue**

41.     Pursuant to 28 U.S.C. §1391, venue is appropriate in the Central District of California as the originating fraudulent scheme against Plaintiff and against the Los Angeles County Superior Court as described in greater detail herein was orchestrated and carried out in Los Angeles, California and within this district and at a time when Plaintiff Thaler was a co-resident of California.  All Defendants have acted to harm Plaintiff Thaler's law practice in California.  Multiple criminal enterprises or portions of the enterprises discussed in detail herein were and are being carried out in Southern California and especially in Los Angeles County.  Many of the witnesses reside in California.  Multiple Defendant parties reside in Southern California. Moreover, the public

corruption set forth in detail in this complaint in the State of Arizona and especially in the County of Maricopa, which includes the corruption infecting the State's judiciary including judges, lawyers, clerks, court reporters and other court personnel prevents Plaintiff from obtaining a fair hearing in the State of Arizona.

## GENERAL ALLEGATIONS

42.    This case concerns extortion.  In early 2018, Plaintiff discovered that his wife and his wife's family were participants in several racketeering enterprises that included tax evasion and money laundering.  By October 2019, Plaintiff had discovered that the size and scope of the racketeering activities, as set forth in more detail infra, concerned multiple enterprises and ran into the hundreds of millions of dollars. By December 2019, as many of the defendants named herein were acting to cover up their participation, they set forth a scheme to extort Plaintiff by threatening to withhold custody of Plaintiff and Brittany's then two -year-old child if Plaintiff proceeded to investigate their activities or took any action thereon.  When Plaintiff failed to succumb to the pressure, they acted on the extortion.  The details are as follows:

**The Criminal Enterprises**

43.    In 1990, Dawna suffered a neurological incident that was nearly fatal. The disability it created prevented her from working in her previous role as a secretary at Boeing Corporation. It also meant that she could not contribute financially to the household.

44.    Meanwhile, John Chavez refused to take medication for bipolar disorder. This failure led to John spending monies the family did not have. And that led to near poverty and starvation at times.

45.    Though Dawna and John had participated in criminal enterprises operated by other family members, the lack of money and lack of Dawna's ability to earn an income from regular employment resulted in the decision to participate in the extended family's criminal enterprises and to enhance or create their own enterprises.  Said enterprises are discussed in detail infra.

46.    The poverty greatly affected Brittany, especially during her teen years. Brittany became so afraid of poverty that in addition to assisting in the criminal enterprises, Brittany also engaged in

prostitution and engaged in sexual performances in videos and in photographs to earn additional money.

47.     After two bouts with pre-cancerous HPV cervical cysts and their removal in 2011 and in 2013, Brittany focused her attention primarily on the family's criminal enterprises until shortly after becoming engaged to Thaler.  However, after their son, McKinley, was born, Brittany's irrational fear of poverty caused her to return to the enterprises and to other illegal forms of earning money.

48.     Said enterprises include:

A.   <u>Money Laundering/Tax Evasion Schemes</u>

49.     At the heart of the enterprises is money laundering and tax evasion through true and phony sales of real property, generally single-family residences in new construction developments, mostly in Arizona, California, New Mexico, Texas and Colorado.  These schemes are used by the participants of the criminal enterprises listed hereinbelow and by family and friends of Brittany and Dawna.

50.     The money laundering is also accomplished through non-profit organizations included schools and section 501(c)(4) companies such as mutual benefit organizations. Some of these companies operate in a legitimate environment but place students on the rolls who do not exist. The school is then "paid" tuition dollars which in fact are illegally earned monies being laundered. By example, the Conservatory for Recording Arts & Sciences in Gilbert, Arizona has phony students on its rolls.

51.     Other schools exist only on paper.  Such is the case with Jeb's Boxercise for Kids, a non-profit LLC.  Another faux business includes B's Learn N' Play Childcare, LLC.  The "school" consists of an old house is the west portion of Phoenix.  Listed occupants include Brittany Chavez and Ricky Glenn Goodwin. As described more fully infra, in November 2018, as part of another racketeering scheme, Brittany filed a fraudulent Chapter 7 bankruptcy with Ricky Glenn Goodwin as husband and wife.  Additional documents capture Brittany as being married to Justin Chavez and to Justin Thomas Leonard.

52.     Several other fraudulent businesses also are listed at the Childcare location including Alicia's Houses, LLC and Jeb's Upgrades and PC Repair.  Since 2010, the house has been owned by a series of LLC's created by Brittany.

53.     These businesses, and more than one thousand like them, are used to clean the illegally obtained cash.  Moreover, the LLC "owners" include "foreign" corporations except that the Certificate of Good Standing from the State of Incorporation is fraudulent.  Such is the case with SFR Investments I, LLC.

B.  Insurance Fraud

54.     The second enterprise concerns insurance fraud. The insurance fraud concerns payment to nonexistent parties for personal injury claims made under med pay provisions of homeowners' policies and automobile policies. The med pay provision in these policies concerns provisions that include no-fault payment of up to $5,000 for medical treatment for an individual other than the policyholder.

55.     Simply put, if an individual visits another's home and slips and falls in that home, his medical treatment up to $5,000 could be paid by the med pay provision without fault and without any increase in premium to the homeowner.

56.     Since at least the mid-1970s, members of the Chavez family have been active participants and in control over this enterprise.

57.     During the mid-1980s the volume of fraudulent claims through Defendant Dawna's control increased until 1990 and then tapered off until it picked up again in about 2002 to the present with Brittany and Dawna in control over it.

58.     Arizona law provides for the recording of medical liens.  The recording of the liens was designed to give hospitals the ability to recoup costs for treatment.  For this scheme, the medical liens recorded as AHCCCS LIEN designation with the County Recorders' Office of Maricopa County.

59.     Said fraud has netted more than $50 million in the past 15 years. It relies on phony medical bills plus the recording of the treatment lien. A coded bill with a copy of the lien is then sent to the

insurance company who then provides a check, believing that the check is being sent to the medical provider. However, the liens are all fraudulent and fake and are signed and executed by Dawna Chavez using an assumed name and by either Dawna Chavez or by Brittany Chavez as a fake notary under an assumed name.

60.     Thereafter, the proceeds of the insurance payments are laundered through property purchases. These property purchases involve certain real properties that exist and certain real properties that do not. To perfect this part of the scheme, Brittany creates multiple limited liability companies that appear to be a mortgage company, a title company, an escrow company, and inspection company, and a real estate agency.

61.     All of the normal paperwork involved in the purchase of a single-family residence is prepared and executed. However, the buyers and sellers are the signatures of Brittany and Dawna or other participants. On most occasions the notarization is executed by Dawna or Brittany using the name or a hybrid of the name of an existing notary to give the appearance that the actual notary who is licensed with the State of Arizona has certified documents. The fraudulent documentation is then recorded with the county recorder's office.

62.     In addition to Arizona, said Defendants created similar schemes in California by illegally taking over law offices using the names of retired or deceased lawyers to create or continue "tort mills" where phony claims to insurers are mixed among a smattering of real claims.  One such office includes the Law Offices of James Tenner located in North Hollywood, California.

   C.  Public Corruption: Skimming Government Funds

63.     The third criminal enterprise concerns skimming money from State Programs including collections programs such as child support. Monies from this and other similar programs, especially from monies that have been owed for a period of at least several years, are diverted when paid into holding accounts and then transferred out of the holding accounts into accounts listed as being held by corporations or limited liability companies. Those monies are then used in the same laundering operation as are the insurance monies described above.

64.     By example, with respect to stealing money from the Arizona State Child Support Fund, clerks in the office of the court clerk set aside certain case numbers for the purposes of Brittany and others filing phony dissolution of marriage cases and phony paternity/child support cases. The phony party is ultimately stipulated to a judgment that includes the payment of child support from father to mother. Mother then provides the order to the appropriate County Office where it is processed and provided to the State Office for payment and for collection from the father—except there is no father and no child or children.

65.     Currently, for Maricopa County, case numbers ranging from 098400 to 098499 are being selected at random and used to foster this crime.  Plaintiff is informed and believe and thereon alleges that other series of numbers are being used in other Counties within the State of Arizona in a similar fashion and are also being used in multiple Counties within the State of California including San Diego County, Orange County, and Los Angeles County.

   D.   Narcotics Sales

66.     The fourth prong of the enterprise concerns the sale of narcotics especially prescription and designer narcotics that are moved from Mexico through Calexico to Brawley to Salton City to Twenty-Nine Palms to Bullhead City, Arizona, to Kingman, Arizona, to Flagstaff, to Phoenix, to Casa Grande, and then to Tucson, Arizona.

67.     On or about December 20, 2014, Brittany met in Orlando, Florida with Roberto Lopez, who is known to the Drug Enforcement Administration as a significant importer and distributor of crystal methamphetamine. Though the scheme has existed for more than a decade, shortly after meeting with Mr. Lopez, in or about January 2015 Brittany assisted in revitalizing the scheme by placing individuals in residences in certain cities listed above including Brawley and Kingman. Thereafter, in or about January 2017, Brittany once again assisted in perfecting the scheme by using laundered monies received from drug sales to purchase properties in Twenty-Nine Palms and in Bullhead City under assumed names.

68.     Many of the operatives hired are current or retired military non-commissioned personnel who are discharged with transportation and/or logistics training.  Many are recruited from Camp Pendleton Marine Base and from Twenty-Nine Palms Marine Air Ground Combat Center.

69.      Other pharmaceuticals are moved from Miami, Florida to Orlando, Florida where they are then transported through Benton, Arkansas, Albuquerque, New Mexico, through Phoenix, Arizona to Southern California. Plaintiff is informed and believes and thereon alleges that recruiting for these transportation jobs comes mostly from the Naval Air Warfare Center in Orlando, Florida.

70.     The cash collected from the drug sales is sent in whole or in part to Brittany and put through the same money laundering system as described above.  Additionally, the houses are purchased with laundered money or for the purposes of laundering money through said purchases are constructed or modified with drop boxes set forth in the walls of the residents. These drop boxes are hidden and are nearly impossible to find on inspection. To give the appearance of legitimacy, these houses are put through phony sale transactions possibly every two to three years. The drop boxes are routinely serviced with portions of the cash being returned to the drug suppliers, with portions becoming capital contributions for the setup of the limited liability companies in subsequent schemes, and portions becoming investment capital for seemingly legitimate investments.

71.     An example of a drop box house includes 6211 W. Indianola Avenue, Phoenix where B's Learn N' Play Childcare is located.

72.     Plaintiff is informed and believes and therefore alleges that a drop box configuration was constructed into the family residence purchased by Thaler and Brittany in September 2015. Further, Plaintiff is informed and believes and thereon alleges that during the course of their relationship, Brittany utilized the drop boxes consistently after making cash pickups from local drug dealers and others for whom she had set up laundering and tax evasion schemes including for friends and family.

73.     Additionally, Brittany set up a computer server and router scheme using pornography as a cover for the transfer of money.  One such site is under the URL "bigbootyhoes420.com." The site

contains short pornographic videos that in several of which Brittany appears to perform sexual acts with a male performer.  To launder money, said videos were/are made available for sale through debit card transactions from accounts holding illegally obtained money, mostly from the sale of drugs.  Through the "purchases" of these videos, said money is laundered and made clean.

E.  Public Corruption: Creating and/or Modifying Public Record

74.    In effecting the schemes set forth above, Defendants created or obtained access to the Arizona State database and the Maricopa County database. By doing so, Defendants are able to insert backdated records, remove records and modify existing records to meet their needs. these records include the typical documents recorded with the Maricopa County Recorder, court records, arrest records, and collection records concerning State Programs including the family support program.

75.    In the matter of court records, Brittany and Dawna and the Defendants herein have participated in extortion of individuals who might prove harmful to the continuing of their enterprises by creating false arrests or created and invented charges and fraudulent civil judgments. With respect to Plaintiff, they have attempted to do both.

F.  Public Corruption: Bribing Public Officials

76.    Also, in effecting the schemes set forth above, Defendants have placed into positions of hiring authority, individuals who, for compensation, have been placed into various government positions. Persons who can assist in the criminal schemes. This includes judges, police officers, State police officers, judicial assistants, inspectors, assessors, and accountants.

G.  Corruption: Private Parties

77.    In addition to public officials, monies are used to bribe licensed officials such as real estate agents, real estate brokers, and Court approved "experts."

78.    These enterprises existed long before Plaintiff and Brittany met, continued through their relationship, unbeknown to Plaintiff, and have continued to date.

//

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

H.  <u>Bankruptcy Fraud</u>

79.     With the assistance of lawyers such as Michael Agruss (licensed in California and in Illinois) and Brian Blum (licensed in Arizona), Defendants Brittany and Dawna along with John and Johnny and Fritz and Laura have engaged for more than ten years in creating fraudulent Chapter 7 Bankruptcy filings and phony creditor claims within Chapter 11 filings and phony adversary actions within Chapter 7 filings.

80.     With respect to Agruss and his Chicago-based law firm, he and his firm, working with Brittany and Dawna, have filed multiple phony creditor claims on behalf of themselves and other members of the Chavez family in Chapter 11 reorganization cases.

81.     One example is the Super Two Financial Services Corporation Chapter 11 filing bearing case number 17-10659 (JLG) in the Southern District in New York where "Dawn M. Chavez", "Monica Chavez" and "Vianey Chavez" made false creditor claims through the Agruss office.

82.     Additionally, nearly one thousand Chapter 7 filings have been made throughout the country under the "Agruss" firm name for phony Chapter 7 filings for fake "Chavez's."

83.     As to the phony Chapter 7 claims, the scheme has worked as follows: phony identities are created for real individuals and phony identities are created out of whole cloth from stolen medical records files stored in a medical records storage facility in San Diego, California. Using real Social Security numbers of the individuals whose identity has been stolen, new credit is obtained and used.  Then a bankruptcy is filed to wipe out the debt.

84.     Worse, if any creditor acts to collect in violation of the Federal Debt Collection Practices Act, the Agruss firm either sues in Federal Court on behalf of the individual or sues on behalf of an alleged "class" with the phony individual serving as the named class "member."

85.     Plaintiff Thaler is informed and believes and thereon alleges that during 2019 through 2020, on at least three separate occasions, Agruss illegally obtained Thaler's credit information and then manipulated the same to reduce severely Thaler's FICO credit score in order to damage Thaler's ability to obtain credit for him and for his office all to Brittany's benefit during the dissolution of marriage proceedings in Arizona.

86.    With respect to Brian Blum, during the period of 2013 through 2016, Blum assisted Brittany in filing Chapter 7 bankruptcy cases for individuals he knew were fake and helped her to file phony adversary actions within the very Chapter 7 cases he and she had filed.

87.    The purpose of these phony filings and phony adversary actions were intended to clear assets that otherwise could be claimed in whole or in part by unsecured creditors. One such case includes the matter of Heidi Lee Boltz and Jeffrey Lee Boltz, case number 2:15-bk-17870-DPC. Neither "parties" exist. Instead, property, real and business personal are placed in their names. Credit is obtained and then essentially converted to other uses. When creditors attempt to collect, a Chapter 7 bankruptcy is filed.

88.    In the case of the "Boltz" couple, when the trustee refused to allow for the couple to retain a particular asset and instead intended to sell it to pay creditors, Brittany and Brian created a fake adversary (internal lawsuit) action against the couple—essentially suing themselves so that the fake adversary party, by its actions, would cause a halt in the sale process and then provide a way for the phony adversary to obtain control over the asset.

89.    The plan worked. The entirety of the bankruptcy discharge was set aside and the bankruptcy case dismissed. The asset was preserved.

90.    As stated above, another phony bankruptcy concerns Brittany and Ricky Glenn Goodwin where a Chapter 7 filing was made on or about November 2, 2018, Case No. 2:2018-bk-13500 (azb), with 341a hearing heard at 10:00 a.m. on December 13, 2018.  Brittany attended but did not announce her attendance when creditors appeared to ask questions of the alleged debtor couple.

I.    Election Fraud

91.    Defendants have access or have otherwise infiltrated the Maricopa County database and the State of Arizona database. Defendants conspired with other accomplices to fix elections within Maricopa County and within the State of Arizona through the creation of fake ballots and computer ballot counting manipulation.

92.    Said election fixing included various offices on the November 3, 2020 ballot including the seat for Maricopa County Recorder.

J.   <u>Extortion by Computer Virus and Identity Theft</u>

93.   Defendants conspired with other accomplices to create crypto-viruses and infect the computer systems of businesses and thereafter providing the encrypting code only after a ransom was paid.  Further, defendants have stolen private and confidential information from computer systems of individual and from systems of lawyers and law firms, including public defender and federal defender systems.

K.   <u>Fake Employees on the Payroll Systems</u>

94.   Defendants engaged in placing the names of phony individuals on the employment roles so that they could collect the paychecks and benefits.

**Creation of Fake Employees, including Attorneys**:

95.   To operate these schemes, Defendants created fake state and local government employees in California and in Arizona.  They also created fake "individuals" licensed through state agencies. For example, in California, "Arlene Chavez" was created as a real estate agent with an office allegedly located in La Mirada.  "Paul Tokeshi" was created as a fake attorney with an office in Santa Anita, California. His profile and "history" was uploaded into the State Bar computer to give the appearance of existence.

96.   In Arizona, several attorneys were created and placed into the State Bar database as a fake attorney operating out of Tucson, Arizona. Moreover, almost every "Brittany Chavez" other than Defendant Brittany is a fake individual.

97.   Plaintiff is informed and believes and thereon alleges that in addition to fake individuals presumptively operating under legitimate licenses, each State has real individuals operating under licenses that were never properly licensed through the state or local government agency or who failed to pass examinations or otherwise meet the requirements necessary for licensure.

**State of Arizona 2010-2011 Investigations**

98.   From 2010 through 2011, State of Arizona conducted an investigation of public corruption. In doing so, the State hired outside accounting agencies and forensic accountants to perform an analysis on the income and expenses of certain public agencies. The investigative reports

concluded that many of the State Agencies had been corrupted through Russian organized crime. There were a number of targets of the investigation including individuals who are involved in phony real estate transactions of the same type and kind as set forth herein concerning the Defendants.

99.    Moreover, said individual, targets of the investigation, and specifically Cynthia Peterson aka Cynthia Valencia aka Cynthia Saenz aka Cyndi Beaman, has also been a participant with these Defendants in the insurance fraud and in the mortgage fraud and money laundering enterprises.

100.   At the same time the State of Arizona was conducting its investigation, Plaintiff was investigating Russian organized crime involvement in the smuggling of illegal goods into the United States and the storage of the same in California prior to shipping said goods to those criminals who effected the initial importation.

101.   Unbeknownst to Plaintiff, one of the shipping companies out of Ontario, California was owned legally and beneficially by Brittany.  Said company was disbanded in late 2019 shortly after Brittany filed for divorce from Plaintiff.

102.   With the investigation, arrests and convictions resulting from the State investigation, Brittany decided she wanted to terminate her participation in the schemes. Her exit strategy entailed getting married and having a child.

**The Death of Jeffrey Phillips and Ensuing Cover Up**.

103.   To that end, Brittany joined various on-line dating services.  On May 25, 2012, Brittany began to date Jeffrey Phillips, a high school dropout with a volatile temper.  Mr. Phillips was used as a "bodyguard" to prevent her family from coercing her into continuing to participate in the criminal enterprises.

104.   In November 2013, Brittany terminated the relationship.  Thereafter, she searched for a "husband" without success.

105.   However, in or about May 2014, in need of cash, Brittany rekindled the relationship in order to convince Phillips and a friend to participate in a criminal enterprise concerning the importation of illegal prescription drugs to be sold to individuals and to low end medical clinics.

106.    Meanwhile, Plaintiff is informed and believes and thereon alleges that Brittany concocted her own extortion scheme against Plaintiff.  Said scheme is the subject of litigation in Los Angeles County Superior Court and is discussed in more detail hereinbelow.

107.    During the Summer of 2014, Brittany and her former boyfriend, Jeffrey Phillips, formed a New Mexico corporation with a third party.  Thaler is informed and believes that the purpose of the corporation was to sell illegal prescription narcotics imported from outside the United States with Brittany laundering the money earned through fake property transactions.

108.    On or about August 2, 2014, Brittany met with Phillips and the third individual to discuss the operation and put it into effect.  Brittany then prepared written agreements for the three and a standard form written agreement for medical clinics to which the pharmaceuticals would be sold.

109.    Plaintiff is informed and believes that Brittany and Phillips took large cash advances to make the purchase of the drugs.

110.    However, shortly after meeting Thaler, Brittany informed Phillips and the other partner that she would no longer participate in the scheme.  On or about October 26, 2014, Brittany met with Phillips at his residence in Phoenix.  At that time, she reiterated to Phillips that she had no interest in continuing with the partnership.

111.    Phillips became angry and threatened Brittany with bodily harm and threatened to tell Thaler about Brittany's history of illegal activities.  For the next five months Phillips continued to threaten Brittany with multiple voicemail messages and with multiple text messages.  Brittany felt so threatened that she maintained recordings of the voicemail messages and provided them to her friend, Shane, instructing him to give them to the police in case anything should happen to her.

112.    Despite Brittany ignoring the threats, Phillips continued. On or about April 14, 2015, Brittany's birthday, Phillips again threatened to turn over information to state and local authorities regarding her illegal activities over the past decade if she did not return to the partnership.

113.    Within weeks of these threats, Brittany moved into Plaintiff's residence using Plaintiff as a shield from Phillips.

114.   Brittany avoided Phillips for the next eight months.  After Brittany and Plaintiff moved into their new residence in Gilbert, Arizona, Brittany expressed to Plaintiff that she was terrified of Phillips and feared he would come to their residence.  But she refused to inform Plaintiff of the reason other than stating that Phillips was jealous.

115.   In or about late August 2016, Brittany became pregnant.  She discovered the same in or about mid-September 2016.  At that same time, Brittany and Phillips had additional vocal altercations with more threats from Phillips regarding exposure of criminal history.

116.   At the end of September 2016 and before Brittany could tell Plaintiff about the pregnancy, Brittany had a miscarriage.

117.   On October 2, 2016, Brittany arranged to meet with Phillips late that night on the guise of working out their differences and have her rejoining the partnership.  In fact, Brittany did meet with Phillips. Brittany met him, picked up Phillips from his residence in Phoenix, and drove North toward Sedona. During the drive, Brittany provided to Phillips a beverage that she claimed was iced coffee.  While the beverage contained iced coffee it also contained a combination of narcotics intended to cause Phillips' death.

118.   Without realizing that the beverage had been poisoned, Phillips drank from the container. He lost consciousness and shortly thereafter died.

119.   In the days prior to picking up Phillips, Brittany prepared a location off the Interstate 17 where she intended to bury Phillips' body.  After poisoning Phillips, Brittany in fact drove to the location intended for disposal and disposed of Phillips body.

**Defendant Brittany creates a scheme to extort money from Thaler**

120.   Court records for Los Angeles County Superior Court show that on or about May 31, 2012, an alleged judgment was taken in the Superior Court for the State of California, County of Los Angeles, limited jurisdiction, under case number 11E11652. The application for the judgment purports to be signed by an attorney named Paul Tokeshi. The judgment appears to have been executed and entered by Judge Leland Harris.

121.   <u>These records were falsified. There is no one named "Paul Tokeshi." The judgment is a fake. On March 17, 2021, Judge Harris confirmed that there is not now nor has there ever been a judgment and that no such case was ever assigned to his courtroom.</u>

122.   Parts of the proposed judgment, which also purport to have been prepared by Mr. Tokeshi, have places to fill in the various figures making up the total of the judgment. Those blanks are filled in by hand printing.  All of the hand printing on the judgment and on the certification belongs to Brittany.

123.   These judgment documents were then used to apply for a sister State judgment in Maricopa County, Arizona Superior Court as a "foreign State judgment." Said term is similar to a sister State judgment in California.

124.   At the time of the entry in California, which purports to be in June 2012, Plaintiff resided in Phoenix, Arizona. Phoenix is within Maricopa County.

125.   The State of Arizona requires that any application for entry of a foreign State judgment be mailed to the last known address of the judgment debtor. In this case, that did not occur. Though Plaintiff was living in Phoenix, Arizona, none of the documents were mailed to Plaintiff's residence. Further, the documents were not mailed to Plaintiff's business address and were not mailed to Plaintiff's previous address in Tarzana Falls.

126.   Many of the documents used to obtain the default and default judgment are fraudulent.  For example, the proofs of service show that the documents were mailed to a residence in Tarzana CA that Plaintiff had not lived in since 2007.  In addition to being mailed to the wrong address, the proof of service also show Plaintiff's name is misspelled as T-H-A-Y-L-O-R.

127.   Why Plaintiff? As set forth in detail below, Brittany knew that Plaintiff had been married to Dyan Reilly, a woman he had known for nearly thirty (30) years at the time of the wedding. Brittany knew that Plaintiff had discovered that Dyan suffered from schizo-affected disorder and that Dyan and members of her family had been involved directly in a criminal enterprise related to her money laundering and fake identity enterprises.

128.   Brittany also knew that upon discovering the same, Plaintiff protected Dyan and her two children, his stepchildren, from legal action and from harm threatened by those for whom Dyan and her family had performed such services.  Brittany surmised that she could form a social relationship with Plaintiff that would lead to marriage and having a child, that she could hide behind Plaintiff and his reputation until that time and thereafter; if necessary, after marriage and child, if she confided in Plaintiff, he would afford to her the same protection as he had Dyan.

129.   Brittany then set up a scheme to meet Plaintiff and to engage him in a social relationship.

130.   On or about October 13, 2014, Plaintiff and Brittany first communicated. On or about October 22, 2014, they met in person and had dinner together. Unbeknownst to Plaintiff and described in detail hereafter, Brittany already knew who Plaintiff was in great detail, as earlier in the year she set up a scheme with others to extort money from him by creating a phony judgment in The Los Angeles County Superior Court and then having the same entered in Maricopa County, Arizona as a foreign State judgment.

131.   In or about late July 2015, as is described more fully below, Plaintiff learned about the sister State judgment in Arizona while selling Plaintiff's residence in Phoenix. The title company handling the transaction at that time called to inform Plaintiff that a judgment had been recorded. It had no other information other than the name of the case and the Maricopa County case number.

132.   Upon confirming the entry of the foreign State judgment and its origins, Plaintiff immediately sent a letter to the attorney in Arizona, Marc Lammers, who had been retained to enter the judgment and collect on it.  Mr. Lammers' office is in Tucson, Arizona.

133.   While it seemed curious that no effort had been undertaken to collect on the judgment in 2014 or through the first half of 2015, Plaintiff never considered it to be significant.

134.   On or about August 4, 2015, Plaintiff sent to Lammers a request for information regarding the application and application documents along with any and all papers related to the entry of the judgment in California.

135.   With respect to Tarzana Falls, in March 2011, a dispute arose between Plaintiff  and the HOA regarding its failure to make needed and necessary repairs from rain damage occurring in

February and March 2011. During the course of the dispute, Plaintiff discovered that the books and records of Tarzana falls were fraudulent and that the annual pro formas provided to owners were entirely fiction. Plaintiff also discovered that numerous annual special assessments not only were fraudulent, but the monies paid by the residents could not be traced to any Tarzana Falls account.

136.   Because Plaintiff was in the process of moving to Phoenix, Arizona, Plaintiff did not press the matter other than to demand repair of Plaintiff's unit so that it could be prepared for sale, while refusing to pay a new special assessment and demanding refunds for past special assessments. The HOA, having failed to undertake the repairs, made it impossible for the unit to sell as a portion of it had become uninhabitable. To this date, the repairs still have never been made to that unit.

137.   As is discussed more fully below, in late 2017, Plaintiff received documents from a resident of Tarzana Falls who was involved in a legal action on the same failure to repair issues. Those documents clearly show that the board members of the HOA and property management company owners of Ross Morgan (who are named as Defendants herein) embezzled more than $4 million over the period of 2001 through 2018.

138.   The documents also confirm that the special assessments were fraudulent and the monies collected were diverted.  More on these issues is described below.

139.   Despite sending the letter on or about August 4, 2015 to Lammers, Plaintiff did not receive a response from his associate, Sarah Epperson, until November 4, 2015.  She stated simply that the judgment in California was valid and that her firm had been hired to collect. No comment was made on the failure to serve the application properly or the plethora of issues that were materializing about the validity of the judgment.

140.   The failure to mail the application to the correct address is a fatal flaw in Arizona.  No comment was made as to whether the Arizona firm had verified any of the judgment or any information before receiving it. In fact, it was unclear how the information got to Lammers.

141.   One exception to the one judgment rule in California is judicial foreclosure where one judgment concerns the foreclosure and a second judgment, which must be obtained within 90 days

of the foreclosure, concerns any additional monies owed under the judgment that were not collected in the foreclosure sale.  The phony judgment covers the foreclosure sale and specifically provides for the judgment creditor to apply for the required deficiency hearing per the applicable statute.  The failure to apply within the 90 days permanently extinguishes the debt.

142.    As no application was ever made, even if the judgment were valid, the debt was extinguished by September 2012.  As a result, the application for a sister state/foreign state judgment constituted a fraud on the Maricopa County Superior Court.

143.    It turns out that even the method by which the alleged judgment got to Tucson was fraudulent. Lammers received a letter allegedly from board member/attorney Defendant Steven Buchwalter stating that he was writing the letter on behalf of the board and not in his capacity as an attorney. It stated that he and the board determined Plaintiff owned property in Maricopa County and wanted him to take all necessary steps to collect on this judgment.

144.    Conspicuously absent was any board resolution or board authorization to pursue this judgment. There was a reason for that. When title to the unit was transferred on or about June 12, 2012, all issues regarding any unpaid assessments by Plaintiff were resolved in a deal made by the HOA with the buyer.

145.    In fact, The Tarzana Falls Ledger for June 30, 2012 confirms that no debt was owed by Plaintiff to the Tarzana Falls HOA as of that date. On the continuing ledgers thereafter the same zero balance is stated. Even Defendant Tony Donato has stated openly that all matters regarding Plaintiff's unit and any monies owed to the HOA, were resolved in June 2012.

146.    With the fraudulent Arizona judgment in Arizona holding up the sale of Plaintiff's property, Plaintiff filed a motion challenging the entry of the foreign State judgment. When it became obvious that the alleged California judgment was fraudulent, Lammers and Plaintiff agreed to stay all proceedings in Arizona to determine what exactly had occurred in California.  A bogus second lawsuit filed in Arizona in late December 2015 for fraudulent conveyance along with a lis pendens filed and recorded with it was dismissed by Lammers at that time.

147.    In California, procedurally this started with a motion to set aside the California judgment. But, as the Court knows, discovery is not available to a Defendant litigant after a judgment has been taken. As a result, with the limited information available at the time, any full explanation was not available and hence the motion was denied.

148.    Thereafter, the litigation was filed. Because of the sensitivity of the matter, which at that point included the belief (later proved to be true) that no one named Paul Tokeshi Plaintiff ever applied for the California judgment, previous judges sitting in this Court delayed the requirement of serving the named Defendants so that further unfettered investigation could occur.

149.    Meanwhile, in late 2014, Plaintiff became engaged to Brittany Rae Chavez.  In April 2015 Plaintiff and Brittany made a deposit payment on a home to be built in Gilbert, Arizona. The home was completed in September 2015 wherein they made the requisite down payment and took out a mortgage. The sale of Plaintiff's residence was incident to this purchase.

150.    During the course of the litigation, a number of irregularities came to light concerning Brittany's activities. Evidence now exists that implicates Brittany in insurance fraud, money laundering, extortion, embezzlement, tax evasion, tampering with official records and documents, bankruptcy fraud, creating fake and phony judgments for the purposes of carrying out the extortion schemes and related racketeering activities. Brittany's family has been involved in such activities since at least 1986.

151.    Brittany is an experienced trial paralegal, having performed such services in more than 23 major trials and arbitrations over the past 10 years. She is fully versed in legal procedure in both California and in Arizona. She has prepared numerous documents for filings in both States.

152.    In addition to creating phony judgments, Brittany has been part of a network of individuals involved in the aforementioned criminal enterprises that has paid off court officers, officials and employees, including lawyers, paralegals, clerks of the court, court reporters, judges, and in Arizona, judge's assistants.

153.    At her last three law office employers, Poli & Ball, Andante Law Group, and Struck, Love et al., Brittany has used the resources of the firms to carry out portions of the criminal enterprises.

For example, at Poli & Ball, Brittany manufactured evidence through manipulated court transcripts.  at Andante, Brittany filed phony Chapter 7 bankruptcies on behalf of phantom individuals with the intent of stealing assets from creditors. At Struck Love, Brittany falsified evidence in favor of individuals employed by certain Counties and States in exchange for their assistance in the criminal enterprises.  With the latter, it led to Brittany being fired from her job in January 2019.

154.   Even worse, Brittany's co-conspirators include computer engineers who designed, created and continue to maintain State and County databases within Arizona and Maricopa County.  This permits the participants to enter said databases and then add/enter or subtract information. Arizona and Maricopa County have made data breaches easy by using only one central database for all State programs and only one database for all County programs.

155.   But Arizona is not the only State where the systems have been breached.  Other States include Florida, New Mexico, Texas, Pennsylvania, Ohio, Michigan, Maryland, Minnesota, Wisconsin, and California.

156.   In these States, participants have put into employment or otherwise paid off court clerks and court reporters and have infiltrated the California State Bar computer system.  To that end, the ability to upload to the attorney rolls phantoms names of individuals who do not exist and of course are not attorneys. Paul Tokeshi is one of these phantom attorneys.  Partners at Wolf, Rifkin confirm that no one named Paul Tokeshi was ever employed at the firm.

157.   The California State Bar has been aware of this phantom problem since 2011. It is one of the reasons why the State Bar of California instituted in 2018 the fingerprint program using LiveScan for all active attorneys.

158.   Unfortunately, because the State Bar did not keep the original fingerprint cards at the time of admission, the newly obtained prints cannot be used to compare previously received fingerprint cards.

159.   In Arizona the problem is far worse. As stated above, the access into the computer databases concerns the entirety of the State of Arizona which operates through one singular database and the

County of Maricopa which also operates off of only one singular database. This has permitted real individuals to obtain licenses in fields where they do not have and have never had the requisite degrees or training.

160.   Simply, one could become a licensed social worker having never actually gone to college or attended any courses in social work. Since the State University database operates through the State system and database, it is likely that individuals are receiving degrees that they never earned or at least receiving credits for classes never attended.

161.   Within the Court system, this has meant that judge's assistants, who essentially act as paralegals to the judges and act as calendar clerks, thus controlling all paperwork (which is electronically filed), can change or remove motions or oppositions to motions and can edit or create court judgments without the judge having any knowledge of the same.

162.   This scheme had mostly been used in criminal cases either to prosecute those who might become enemies of the individuals involved in the criminal enterprises or to remove charges or lessen the severity of charges on those who have been arrested for crimes relating to these enterprises.

163.   To say this is something of a disaster and a total meltdown of trusted institutions is being kind. But it gets worse.

164.   In reviewing phony documents executed by Brittany and recorded with the Maricopa County Recorder, Plaintiff discovered that certain signatures used by Brittany on documents recorded with the Maricopa County Recorder's Office contain a signature matching the Paul Tokeshi signature on the Request for Entry of Default and Application for Default Judgment. Obviously, the name is not Paul Tokeshi.  But the signatures are a spot-on match, so much so that the signatures used to apply for the California judgment allegedly in 2012 can be overlaid on the signatures on the documents recorded in Maricopa County. **They are identical**.

165.   Though the California State Bar has an address for a Paul Tokeshi, it does not have a telephone number or a fax number or an email address and no one has been able to actually locate

Paul Tokeshi. The only consistent handwritings are those on the default and default judgment applications.

166.   In fact, the United States Census Bureau reports that there is no one now or who has ever lived in the United States under the name Paul Tokeshi.  And to add to the insult, Wolf, Rifkin partner/founding member Daniel C. Shapiro founded the firm the same year Tarzana Falls was built and has a long friendship with Ross Morgan founder, Brian Davidoff.  Go figure.

167.   Plaintiff met Brittany for the first time in October 2014. One month earlier, the foreign State judgment had been perfected in Maricopa County. Documents from the Los Angeles Counties' database show that the judgment was certified in early 2014 so that it could be entered as a foreign state judgment in Arizona that year.

168.   As Plaintiff said above, referring to the judgment application documents in California, spaces are left blank to fill in handwritten numbers making up the total of the proposed judgment. The printing of the numbers belongs to Brittany. The alleged signature of Judge Harris is not a signature but rather a handprinted signature version. The hand printing belongs to Brittany.

169.   Moreover, Judge Harris has confirmed that he did not enter any judgment in any such case and that, in addition to the form of the proposed and entered judgment being prepared in an unacceptable manner, he has never hand printed or had a clerk hand print his name on a judgment ever in his entire career. He confirms that the entirety of the judgment is phony. Judge Harris, who is now retired, is willing to testify and to provide declaration upon request.

170.   With all of that said, here is what actually happened:

171.   Beginning in 1986, Russian organized crime created a presence in Southern California. Most of its operations concerned the movement of smuggled materials, any smuggled materials.  If you got it into the country, this group would hide/store it and then ship it to its final destination. The operation was assisted by brokers working out of the Lee & Associates commercial brokerage office in Sherman Oaks, California who bought and were the "legal" owners of multiple storage facilities throughout Southern California where the smuggled materials would be placed.  The design and set up and algorithms used to determine the storage locations of the goods were created

by Atomic Computers in Canoga Park, California and assisted throughout the country by BCS Recycling which also has its headquarters in Canoga Park, California.

172.   Tarzana Falls was built in 1986 with monies provided through Defendant Brian Davidoff. At that time, he was an accountant.  His client supplying the money was the Russian organized crime operation.  During construction, Davidoff was given a seat on the original board.  When enough buyers had completed their purchases, Davidoff resigned and formed Ross Morgan & Company.  He took with him a property management contract that remained until the 2018 coup. Ross Morgan, which has grown by leaps and bounds over the past 34 years, was designed to launder proceeds of the criminal enterprise.

173.   But as the profits grew, Ross Morgan could not handle the large cash flow alone.  So Brittany's family and their criminal associates got the job.

174.   When Plaintiff discovered the fraud and its extent, Ross Morgan was threatened with exposure.  Hence the reaction and lawsuit.  Also threatened with exposure was the manner in which fake identities of existing and non-existing individuals were being created as part of the money laundering schemes.  That method concerns at least one IT head for a major hospital chain based in Arizona and its electronic storage facility based in San Diego, California.  Working together, private patient data and information is siphoned off and used to create new identities. The "directors" working for the department head of IT worked with Brittany in the Geek Squad of Best Buy from 2004 through 2007.  Brittany's relationship with them continues as evidenced by their presence on her LinkedIn profile through 2018.

175.   In 2018, Plaintiff discovered the link between Brittany and the IT employees and the medical records storage facility while investigating an unrelated case where a connection to the storage facility had arisen.  Having investigated the Russian organized crime situation in California in 2015 and having discovered the link in 2018 between the hospital IT department and storage facility and Russian and Armenian organized crime, Plaintiff revisited the Tarzana Falls situation from that perspective to find that the Tarzana Falls judgment and Brittany in fact had

some link.  Earlier this year, when the Tokeshi signature matched a series of signatures from Brittany, Plaintiff could be sure the matters were directly linked.

176.    There are conflicting possibilities as to why the judgment was fraudulently taken and then entered in Maricopa County but the most likely scenario is not what one might expect:

177.    In 2010, the State of Arizona commissioned a private accounting firm to conduct an audit of State government agencies that indicated significant corruption. The report released in or about 2011 provided evidence of the corruption and of Russian organized crime involvement in money laundering schemes where officials were being bribed in a manner that permitted the laundering to go on unfettered by State and local government agencies.

178.    The report included facts concerning the laundering activities of exactly the same modus operandi as is the situation that is currently going on by Brittany, her family and their associates. The report led to numerous arrests and convictions.  Documents provided by investigators and experts prove the connection between Brittany and at least one family member to the participants in the Russian money laundering and corruption scheme.

179.    Though she was not charged in 2011, these events scared Brittany who decided she wanted out.

180.    From 2012 through 2013, Brittany broke from her family and greatly reduced her involvement in the criminal enterprises.  Because of her relationship with the IT employees, she was aware that Plaintiff had been integrally involved in investigating the link between Russian organized crime and redirected hospital records during 2011 through 2012.  Searching for a more permanent way to avoid participating in criminal activity, Brittany believed that the prospect of dating and marrying Plaintiff (and with that, the prospect that Plaintiff might catch on to the criminal enterprise) would prevent anyone from requiring her involvement in the criminal schemes.

181.    As insurance, Brittany had a backup plan.  By setting up one of her "extortion" schemes using a phony judgment, Brittany could steer Plaintiff into discovering, at her whim and on her timetable, evidence of the larger criminal fraud. By having a child with Plaintiff after getting

married, she calculated that Plaintiff would not press charges against her but instead would do so against others.

182.    And that is what she did.  In or about late April 2018, Brittany could not back out of a certain series of criminal enterprises without dire consequences. So she began providing to Plaintiff evidence of the criminal schemes including the genesis of the Tarzana Falls phony judgment.

183.    The Tarzana Falls action was filed after ignoring the Davis-Stirling pre-requites.  It was intended to prevent Plaintiff from discovering the money laundering operation.  That lawsuit was filed in November 2011 and was never served.   The proofs of service show invalid service on their face and contain phony and fraudulent signatures under the name of an actual registered process server.  The phony proofs of service do not show service in Arizona.

184.    When the deal was made with the purchaser of Plaintiff's unit in early June 2012 concerning any and all dues the HOA claimed were owed, apparently the legal action was supposed to be dismissed.  Maybe it was; maybe it wasn't.

185.    With the ability to remove documents from databases both in Arizona and in California, it appears the dismissal was removed and instead, it was substituted with the application for judgment which more than likely was prepared and reset into the database in early 2014, but showing a date of May 31, 2012—just before the ownership transfer of the property less than two weeks later.

186.    On or about October 13, 2014, Plaintiff and Brittany first communicated.

187.    On or about October 26, 2014, they had their first "date." On or about November 17, 2014, having researched Plaintiff, his family, and his previous relationships, including his relationship with his first wife, Melinda, with whom Plaintiff has a 19 year old son, Brittany began planning to wed Plaintiff and to have a child with him. This was less than one month into their relationship and more than one month prior to the couple becoming engaged.

188.    At that time, Brittany's desires to get married and have a child at that time were not known to Plaintiff. In fact, at no time has Brittany ever admitted to the fact that she planned on a wedding

1    date of April 16, 2016 on November 17, 2014.  However, on that date she prepared a small poster

2    containing these anticipated dates and events.

3    189.   In or about February 2015, the engaged couple decided to sell their respective residences

4    and purchase a residence together in Gilbert Arizona. To that end, they went house hunting. In or

5    about early April 2015, they agreed to purchase a residence to be custom built - Plaintiff's

6    Meritage homes in the Gilbert complex known as The Bridges.

7    190.   The Initial deposit of $400 to reserve the home site was paid for by Plaintiff. The couple

8    agreed that they would pay a total of 20% down in order to secure the lowest possible interest rate

9    without any private mortgage insurance. They further agreed that Brittany would pay

10   approximately $25,000 and Plaintiff would pay approximately $35,000.  In fact, Brittany paid

11   approximately $27,000 and Plaintiff paid a total of $38,400.00 inclusive of the initial deposit.

12   191.   However, when Plaintiff was in escrow with a buyer, he was informed by the title company

13   of the California judgment perfected in Arizona in the amount of approximately $12,000.

14   192.   Plaintiff was not concerned at the time about selling his residence because the amount of the

15   judgment fell far below the protected homestead exemption. But Brittany did not want or intend

16   for Plaintiff to be on title to the property, as she intended to use laundered money for her portion

17   of the down payment.

18   193.   To ensure Plaintiff could not sell his residence to obtain the down payment, Lammers was

19   instructed to file a second lawsuit against Plaintiff alleging fraudulent conveyance for a transfer in

20   2014 of Plaintiff's Phoenix home from himself, individually, to his revocable living trust.

21   194.   This lawsuit constituted an abuse of process, in that transfers from individuals to revocable

22   living trusts do not constitute, by express statutory terms, fraudulent transfers. In addition to filing

23   a second lawsuit, Lammers improperly recorded against Plaintiff's property a lis pendens

24   preventing Plaintiff from selling his property with clear title.

25   195.   That lawsuit ultimately was finally dismissed in March 2016 only after Plaintiff threatened

26   civil litigation against Lammers and his law firm.

27

28

196.   Plaintiff and Defendant Brittany were married on April 13, 2016 in Antigua. Immediately upon returning home, Brittany demanded that the couple start trying to have a child.

197.   In or about September 2016, Brittany discovered that she was pregnant. However, Brittany had not been taking her psychotropic medication since February 2016. Instead, she was taking MDNA to control her antisocial behaviors and phentermine to control her weight and reduce her bulimia.

198.   As a result of her drug taking, Brittany had a miscarriage. Although her OB GYN records reflect this fact, Brittany failed to inform Plaintiff at the time and still fails to discuss it with him.

199.   Brittany became pregnant again on or about April 1, 2017.

200.   Again during the pregnancy, Brittany relied on MDNA and other drugs instead of taking her psychotropic medication. To pay for the drugs, and to do so in such a way that her mother would not detect it, Brittany purchased groceries using her debit card and then provided some said groceries to her friends in exchange for cash.

201.   In early 2018, shortly after McKinley was born, Plaintiff decided to create an estate plan in case anything should happen to Plaintiff or to Brittany. In doing so, he looked up the deed Brittany had executed for their purchase of the Joshua Tree Lane property. In doing so, he found multiple deeds with Brittany's name on them. Many of these deeds showed her as being married to various individuals.

202.   Additional research showed a plethora of irregularities in the deeds for her parents and other family members.

203.   Finally, Plaintiff's research showed that Brittany had signed deeds in other names and had notarized a plethora of deeds in other names. Most of the activity came between 2008 and 2012 but stretched from 2003 to that time.

204.   Thereafter, in examining the properties which were the subject of the deeds, Plaintiff found numerous mortgage companies and escrow companies and title companies listed. A review of those companies with the Arizona Corporations Commission found that Brittany had prepared the paperwork and filed the documentation necessary to create said companies

205.   Having found a plethora of irregularities, Plaintiff attempted to discuss these findings with Brittany, however, Brittany refused comment or otherwise denied having knowledge of the documents.

206.   By October 2018, Plaintiff had discovered Brittany's signature on hundreds of deeds, either as buyer or seller or notary or all three. He also found hundreds of corporations and limited liability companies involved either in home construction or residential finance created by Brittany designed to aid in the money laundering and tax evasion schemes.

207.   Further, by October 2018, Plaintiff discovered that Brittany had lied about the extent of her personal and business relationships with certain individuals, including Jeffrey Phillips. Specifically, as to Phillips, Plaintiff had discovered that Brittany and Phillips and a third individual had set up a New Mexico corporation for the distribution of imported foreign made prescription drugs illegal in the United States.  The intent was to sell the drugs to medical clinics.

208.   Plaintiff discovered further that the corporation had received cash advances from clinics and during September 2014 through October 2014 Brittany had spent more than $35,000 of the money to cover significant debt she had run up on her credit cards.

209.   Plaintiff discovered Brittany had created a complex money laundering and tax evasion scheme for Eric Whittaker, a well-known pornographer (who named his most famous cite, "Back Room Casting Couch after her—Brittany Rae Chavez) and a real estate investor.  Even though Brittany had stated that Whitaker was an insurance agent, which he was not, and that she had broken off their social relationship in early 2005, in fact, Brittany had created at least four separate limited liability companies for Mr. Whittaker from December 2004 through 2008 and had continued to maintain the corporate and company books and records for those companies through to that date.

208. But that wasn't all. The manner in which she had set up the companies for Whitaker evidenced a money laundering scheme. Moreover, Brittany had set up similar schemes for friends and relatives.

209.    At this time, Plaintiff Thaler had no idea that Brittany's involvement in organized crime and these criminal enterprises had anything to do with the 2010 / 2011 investigation, nor did he have any idea of her involvement in laundering money for drugs suppliers and dealers or for a massive insurance fraud operation or for public corruption and graft.

210.    In or about early November 2018, Thaler Discovered that Brittany had charged over $43,000 of household goods and services to two credit cards. Among the expenses between the credit cards and her Wells Fargo debit card were $800 per week in groceries, Target and Amazon charges. Brittany's apparent manic spending also included thousands of dollars in Starbucks gift card purchases and other related gift card purchases. Yet, their household did not show evidence of this volume of purchases.

211.    So Plaintiff confronted Brittany, but Brittany refused to have any rational explanation for her behavior. At that point, Plaintiff brought the credit card bills and ATM debit card charges to the attention of Dawna (Brittany's mother) one afternoon while Dawna was babysitting McKinley. Plaintiff asked Dawna if she knew why Brittany was manically spending money. Dawna reviewed the documents and then in an angry voice told Plaintiff that Brittany was her daughter and she would take care of the problem. Dawna then left the couples' residence and refused thereafter to have any conversation about the charges.

212.    What Dawna knew, but refused to tell Plaintiff, was that Brittany was overcharging her credit cards to get goods and cash in exchange for the purchased goods to pay off others who had participated in the death of Phillips and others who were participating in the criminal enterprises she had devised.

213.    Immediately thereafter, Dawna confronted Brittany with the financial documents.  Dawna told Brittany that because of her conduct and the suspicions that were growing with Plaintiff, she would have to file for dissolution and terminate the marriage.

214.    Dawna told Brittany that if she failed or refused to terminate the marriage, Dawna would cut Brittany off from her money and refuse any financial support from criminal charges or from

any custody issues that would likely arise once Brittany's activities became known.  Also, Dawna took control over Brittany's credit cards to ensure she could not pay others in secret.

215.   Brittany, afraid she would lose her child and be penniless, agreed to her mother's demands. However, Brittany then began stealing Plaintiff's credit cards and debit cards and using them to pay others and for others through their use.  This included gas and grocery and even parking for Chase Field (for a Diamondbacks games) on April 12, 2019.  Said scam involved stealing a card from Plaintiff's wallet and then providing the same to another party who used it for these expenses before returning it to Brittany who then returned it to Plaintiff's wallet.

216.   When in early April 2019 Dawna discovered Brittany was using Plaintiff's credit and debit cards, Dawna devised a plan intended to disrupt further investigation by Plaintiff and to create scenarios to discredit Plaintiff so that he would not be believed even if he did discover their participation in the criminal enterprises.  The plan included the following actions:

    a.   In or about early April 2019, Dawna and Brittany placing a GPS device on Brittany's vehicle, but under an account in Plaintiff's name, in order to make a false claim of stalking.

    b.   During 2019, Brittany purposefully misrepresented to Plaintiff the times she would be home to take care of McKinley and purposely made herself unavailable to take care of McKinley so as to increase the number of hours Plaintiff was required to take care of McKinley, hours where he could not service his clients.

    c.   Also, during 2019 taking items that Brittany knew Plaintiff required for business trips to Los Angeles and to Las Vegas and thereafter withholding them for several hours with the intent of causing Plaintiff to be late to attend meetings and court dates.

    d.   Also, during 2019, consistently hacking into Plaintiff's cell phone and into his business computers, and thereafter erasing files and moving files, with the intent of disrupting his office. Said activities also included removing documents that Plaintiff was required to file by certain deadlines so that Plaintiff would miss the deadlines.

e.   On April 20, 2019, strategically cutting the right front tire of Plaintiff's rental automobile for the purpose of causing Plaintiff to have a severe incident, that at the very least would cause him to miss an important client meeting and thus lose the income from the same.

f.   Brewing iced tea and then placing pharmaceuticals and illicit narcotics in the same before serving it to Plaintiff for the purpose of trying to secure a positive blood test for the upcoming plan to take full custody of McKinley.

g.   On July 7, 2019, placing significant amounts of pharmaceuticals and illicit narcotics, including PCP, the same concoction she had given to Phillips on October 2, 2016, in a thermos of brewed iced tea and then providing it to Plaintiff just as he was leaving by vehicle to travel to California for a hearing involving the Tarzana falls litigation.

h.   In or about August 2019, moving Defendant Cairo into Dawna's residence to prevent Plaintiff from taking McKinley from Dawna's residence once Brittany and Dawna implemented their plan to steal him, meanwhile preparing to move Brittany into Cairo's residence once the fake sale of Brittany and Plaintiff's residence was completed.

i.   On October 7, 2019, the day Plaintiff intended to file a police report regarding the stolen credit cards and debit cards, Brittany filed a fraudulent police report, wherein Brittany made false claims that Plaintiff was acting "manic and erratic" during the early morning hours.

j.   In or about late November 2019, stealing Plaintiff's cell phone and having it forensically mapped and cloned.

k.   Engaging in sexual acts with other men and women for money during the time of the marriage and then ensuring that Plaintiff found evidence of the same just before stealing McKinley on December 12, 2019.

l.   On December 12, 2019, obtaining by fraud, an order of protection, based on the alleged manic and erratic behavior that never occurred.

m. By that order, requiring Plaintiff to leave the residence with the additional purpose in mind of removing a computer server used for money laundering, a drop box where cash that was collected from drug sales was kept, and planting drug paraphernalia so that false claims of drug use against Plaintiff could be made in the future, if necessary.

n. Also, by that order, stealing confidential client files and other related confidential documents from the designated office section of the family residence and then using the same in document disclosures and in briefs, all in violation of Arizona State Law.

o. Stealing McKinley on December 12, 2019, his 2nd birthday, and then hiding behind the phony order of protection to prevent Plaintiff from seeing his son that day.

p. Failing and refusing thereafter, until December 21, 2019, to allow Plaintiff to see or talk to McKinley.

q. Having forensically mapped and cloned Plaintiff's cell phone, Brittany sending text messages to herself , but making it appear to have come from Plaintiff's cell phone and thereafter filing a plethora of fraudulent police reports claiming falsely that Plaintiff was violating the OOP order.

r. On December 25, 2019, allowing McKinley to visit with his father for Christmas, but with the real intent of providing gifts from McKinley to his father that contained traces of CBD oil, yet again to try to perfect a positive blood test, and thereafter gain sole custody of McKinley.

s. Refusing Plaintiff any overnight visits with McKinley for approximately one month and then attempting to limit Plaintiff time with McKinley to less than 25%.

t. On February 20, 2020, committing perjury at the time of the child custody hearing by making false claims that Plaintiff was being an uncooperative parent and by falsely stating that Plaintiff was using illicit drugs.

u. Also on February 20, 2020, Dawna committing perjury by falsely claiming that in May 2019, she witnessed a drug transaction between Plaintiff and a friend.

v.   Also on February 20, 2020 at the time of the custody hearing, Dawna voluntarily agreeing to act as Facilitator of the 50/50 custody exchanges between the parties when in fact what she intended to do, and did in fact do, was conspire with Brittany as set forth herein below to prevent Plaintiff from being with his son.

w.   On or about February 21, 2020, Brittany filed a fraudulent police report claiming that she had discovered two glass pipes under Plaintiff's sink in the master bathroom.

x.   On or about April 3, 2020, falsely claiming that Plaintiff had travel on an airplane, and therefore was required (which he was not required to do) to quarantine for 14 days, Brittany withheld McKinley and refused to make exchanges in violation of the February 20, 2020 court order.

y.   From February 20, 2020 to the present, failing and refusing to include Plaintiff in any parenting decisions regarding education or medical care for their child, and in fact, despite a 50/50 custody order, failing and refusing to provide any information regarding the medical care McKinley has received.  Said failures also include failing to provide instructions for use of medications that have been prescribed by McKinley's pediatrician.

z.   In or about late April 2020, after Brittany violated the Court's custody order, Dawna obtained, under false pretenses, an order of protection so that the next time Brittany violated the order, Dawna would be able to hold McKinley at her house without Plaintiff being able to obtain him, all in violation of her agreement to act as facilitator.

aa.   Preventing McKinley and Plaintiff from being together on Plaintiff's birthday, on Father's Day, and on the Jewish New Year (Rosh Hashanah).

bb.   After failing to change the custody order on June 10, 2020, inventing false charges against Plaintiff, that Plaintiff was abusing McKinley in some unspecified manner, as a pretext for violating, yet again, the February 20, 2020 temporary child custody order.

cc. On September 19, 2020, refusing to make the exchange and thereafter, refusing to make any exchanges with Plaintiff in violation of the February 20, 2020 temporary child custody order.

dd. Filing on September 21, 2020, a brief stating falsely that the Court Appointed Adviser agreed with Brittany that Plaintiff was unfit to parent McKinley and that Brittany was justified in refusing to make the September 19, 2020 exchange.

ee. On or about September 25, 2020, making false charges with the Gilbert Police Department that Plaintiff was in some manner, again unspecified, abusing McKinley as a way of justifying her violation of the Court's order.

ff. Thereafter, Dawna failing and refusing to act as facilitator and instead, using the cloned phone of Plaintiff and a cloned phone of Brittany, sending through Plaintiff's cloned phone to Brittany's cloned phone, harassing messages and then reporting them as having come from Plaintiff, in order to have false charges filed against Plaintiff.

gg. From September 19, 2020 to the present, holding McKinley hostage under the demand that Plaintiff recant any and all statements he has made regarding the illegal activities that are set forth in this complaint, under the threat that he will never see his son again if he does not do so.

hh. On December 12, 2020, failing and refusing any and all communications between Plaintiff and his son to wish his son a happy birthday, having refrained from permitting any communication since beginning of October 2020 and continuing to refuse to do so to this date.

ii. Beginning in 2018 and continuing to the present, hiding assets including cash from Plaintiff, while running up significant credit card expenses and then trying to claim falsely that Plaintiff must reimburse her for 1/2 of said expenses.

217. When all of the above failed to deter Plaintiff, Dawna and Brittany and Lawrence devised a scheme with law enforcement personnel employed by the City of Mesa including Defendant Roessler.

218.    The scheme included using the cloned phones and the fraudulently obtained OOP orders to prevent Plaintiff from furthering his investigation or discovering the extent of the crimes and the individuals and institutions involved, and Defendants, each of them, created a scheme against Plaintiff or otherwise conspired that caused Defendants, and each of them, to disrupt Thaler's law practice and his finances.  These actions violate multiple federal statutes and regulations including and especially Plaintiff's civil rights.  Said statutes include:

a.      42 U.S.C. §1983 (civil rights violations)

b.      42 U.S.C. §1997 (unlawful for state or local enforcement agencies to allow officers to engage in a pattern or practice of conduct the deprived persons rights);

c.      18 U.S.C. §241 (deprivation of civil rights protected by the Constitution);

d.      18 U.S.C. §242 (deprivation of rights under color of law by willfully depriving or causing or to have caused to be deprived from any person rights their privileges or immunities protected by the Constitution); and

e.      18 U.S.C. §14141 (unlawful for any government authority or agent or person acting on behalf of the government or for them to engage in a pattern or practice of conduct that's a price versus rights privileges or immunities secured or protected by the Constitution).

219.    Using the resources already being utilized in the corruption of the Criminal Court system, Dawna, Brittany and Cairo set out to use them to meet Dawna's goal of using McKinley by keeping him and Plaintiff apart to extort Plaintiff into stopping his investigation.

220.    Said resources and actions include: access to County Database.  Part and parcel to the criminal activity has been access to the State run database and to the County run database for Maricopa County. For at least the past five years, Brittany has had unfettered access to said databases.  This access has allowed Brittany and others to backdate documents and insert them into the databases, create false documents and insert them into the databases, and remove documents already in said databases.

221.    With respect to the Maricopa County Criminal Court system, the entire system has been corrupted and infiltrated in furtherance of the criminal enterprises in multiple ways. Example:

when a Defendant is arrested who is part of the criminal enterprises, evidence is misplaced or lost thus preventing prosecution.  In the case of drug possession, the middle name or middle initial of the Defendant is switched on the City or County criminal complaint filing, so that it appears that the individual arrested has never had any prior arrests. Thereafter, requests are made to the Court for diversion, which are then granted. Further, when an individual appears to have gained knowledge of the database access or other aspects of the criminal activities, he or she is falsely arrested with their fingerprints used to set them up for other crimes never committed.

222.   In the matter of bar, on or about December 12, 2019, Gadberry filed with the court clerk a dissolution of marriage petition on behalf of Brittany. She then took emergency orders to the assigned courtroom. Brittany, Dawna, and Gadberry intended to obtain various restraining orders against Plaintiff that would include forcing him out of the family residence. But the Court was not available to review the orders at that time. So, on the afternoon of December 12, 2019, Brittany filed for an Order of Protection on her behalf and on behalf of McKinley. Brittany failed to tell the Court that a dissolution of marriage action was already pending and that these motions were already pending before the Court assigned to the case.

223.   Every single "fact" set forth in Brittany's Order of Protection request was/is false and known to Brittany as being false at the time that she wrote them. Of course, the OOP judge had no way of knowing that the facts were false or that a petition for dissolution had been filed earlier that day. The order was granted as to Brittany, but denied as to McKinley.  Thereafter, Brittany returned to her mother's home and remained there while failing to communicate in any manner with Plaintiff.  And despite it being McKinley's birthday, Brittany failed and refused to permit any communication between Plaintiff and McKinley.

224.   Just after midnight, Brittany entered into the database and changed the date on the dissolution filing To December 13, 2019 so that it would appear that the Order of Protection was filed prior to the dissolution of marriage petition. That explains why the Order of Protection case number is a higher number than the dissolution of marriage case number.

225.    The result of which is that the Order of Protection obtained by Brittany is null and void as the Order of Protection Court never had subject matter jurisdiction since jurisdiction had already been conferred on the Family Court.

226.    But it doesn't end there. In late December 2019 Brittany's original emergency motions were denied in favor of a fully noticed motion hearing.  And early January 2020, Brittany brought a series of additional motions including a January 3, 2020 motion for the drug testing of Plaintiff after having placed CBD oil and other narcotics in Christmas gifts delivered by her "on behalf of McKinley" on December 25, 2019.  These motions also were denied.

227.    At the conclusion of the February 20, 2020 custody hearing, commissioner Russell ruled that Plaintiff and Brittany should have equal 50/50 custody of McKinley. Unhappy with that order, Commissioner Russell was unceremoniously removed from the Department and replaced with newly appointed Judge Marvin L Davis.

228.    The placement of newly appointed Judge Marvin L. Davis and the removal of Commissioner Andrew Russell was intentional and engineered.

229.    Judge Davis had been appointed Commissioner of a Criminal Court in January 2017. At the same time, Madison Hughes, who had assisted Brittany and Dawna, and other Defendants in the insurance fraud enterprise, by coding phony medical bills and who had no college degree or background in law or any other qualifications for the job, was hired to act as commissioner Davis' Judge's Assistant. That gave Defendant Hughes control over all documents coming in and out of the Court, including falsified documents.  Moreover, Ms. Hughes provided to Brittany and Dawna, and the other Defendants, login information so that they could change and affect a change to various Criminal Court orders, as needed, to affect the criminal operations.

**City of Mesa/Town of Gilbert Corruption: Failing to Investigate/Spoliation of Evidence**.

230.    On or about December 12, 2019, Plaintiff contacted the Gilbert Police Department to report that Brittany had cut his tire on April 20, 2019 or had directed someone to do it.  He also reported her actions on July 7, 2019 in poisoning the thermos of iced tea.  And Plaintiff reported the bank card thefts occurring since January 2019.  The matter was assigned to Detective Brian Bullock.

Detective Bullock, on instruction, never investigated any of the allegations.  Thereafter, he falsified an investigation report claiming that Plaintiff was acting in a manic and erratic fashion during the telephone interview.  The result was a deliberate spoliation of the evidence.

231.   When Plaintiff discovered that Detective Bullock had not investigated the incidents reported, he supplied evidence of the same including a report he had obtained from an expert that the tire in the April 20 incident had been deliberately cut.

232.   The reported issues were then reassigned to Detective Chris Wakefield who also failed to investigate so that any videotape evidence would be spoliated.  Thereafter, in or about late March 2020, Detective David Frerer falsely claimed that there was insufficient evidence for his department to draw any conclusion as to who had committed the tire cut, the poisoning or the bank card fraud and therefore the investigation was concluded.  Thereafter, Gilbert detectives refused to review any further evidence or explain why they had failed to gather any evidence or investigate or why they permitted evidence to spoliate.

233.   But that did not stop Detective Brian Bullock from filing a series of false reports with the Gilbert City Attorney attempting to have Plaintiff charged falsely for violating Brittany's void restraining order.

234.   In or about August 20, 2020, the Gilbert City Attorney filed one charge of Plaintiff violating the phony December 12, 2019 restraining order obtained by Brittany under a phony unassigned case number.  The information in the charge alleged that on December 31, 2019, Plaintiff had texted Brittany.  It failed to mention that on that date, Plaintiff was at Banner Heart Hospital having an angiogram from an extreme high blood pressure incident caused by poisoning.

**Poisoning to achieve a positive drug test**.

235.   From birth to the date Brittany and Dawna stole McKinley, Plaintiff assumed the role of McKinley's primary caregiver.  In fact, for every 40 hours of the work week, Plaintiff spent 35 hours caring for his son.  After the failure of the poisoning on July 7, 2019, Brittany and Dawna devised a plot whereby Brittany would place small amounts of narcotics and CBD oil into brewed iced tea that she would serve Plaintiff and would add into other liquids such as Maple syrup and

SodaStream syrups. The purpose was to make false claims of manic and erratic behavior prior to stealing McKinley and then obtain an order for a drug test which would come back with a false positive result.

236.    In furtherance of the scheme, Brittany placed small amounts of narcotics and CBD oil in said syrups and in the brewed iced tea and thereafter provided them to Plaintiff.  Without knowing that his wife was poisoning him, Plaintiff ingested that which Brittany provided.

237.    Having done so for several months, and although not obtaining any effect other than an allergic reaction and blood pressure spikes, nonetheless on October 7, 2019, at 6:30 AM, Brittany contacted the Gilbert Police falsely claiming that Plaintiff was acting manic and erratic and that he was yelling at her while "spinning" around their bedroom.

238.    In fact, at the time Brittany contacted the Gilbert police, Plaintiff was in the master bed half asleep . At the time that the Gilbert police officers arrived at the house Plaintiff was holding McKinley while giving him some breakfast.

239.    Later that day, and on the following day, Brittany admitted that Plaintiff had not acted in any threatening manner, nor had he acted in a manic or erratic manner. In fact, Brittany apologized for her actions in calling the Gilbert Police Department.

**Attempted Murder**.

240.    Prior to cutting Plaintiff's tire and prior to the poisoning of Plaintiff in July 2019, Brittany insisted on Plaintiff obtaining a $200,000 life insurance policy.  Plaintiff did so.  Though the policy was bound in February 2019, Brittany had not seen the confirming paperwork. On or about July 2, 2019, Brittany insisted that Plaintiff show her the documents proving that the policy was in effect. On July 6, 2019, Brittany hacked into Plaintiff's business computers and stole all passwords to all password protected websites including but not limited to Plaintiff's personal and business banks and bankcards companies.

**Fraudulent Home Sale**.

241.    In late February 2015, Brittany suggested to Plaintiff that they purchase a residence in Gilbert, Arizona. At the time, Plaintiff did not yet know about the Tarzana Falls judgment lien.

242.    Brittany intended to collect between $10,000 and $15,000 on the assumption that Plaintiff needed to sell his Phoenix home to have money for the down payment needed for a new home and that he would be forced to pay the fake lien in order to complete the sale and a new purchase. In April 2015, Plaintiff and Brittany chose to purchase a house together in Gilbert, Arizona. Plaintiff paid the deposit of $400.00. In late July 2015, while selling his Phoenix house, Plaintiff discovered the lien. However, he had other resources from which to provide the down payment monies.

243.    In August, as the house was being built in the Bridges Meritage Homes development section, Plaintiff paid an additional $38,000.00 toward the down payment.  But still trying to scam her fiancé, Brittany falsely represented to Plaintiff that he should remain off of the deed of trust and that his contribution needed to be classified as a "wedding gift."

244.    Meanwhile, also unknown to Plaintiff was that Brittany's purchase of her Scottsdale home came from illegally earned monies being laundered through the transaction.  The proceeds coming from the alleged sale in May 2015 were then used along with an additional $10,000 of illegally earned monies to provide her share of the down payment on the Gilbert house.

245.    Brittany and Plaintiff agreed that the loan and trust deed would remain solely in Brittany's name but that once the "judgment" issue was resolved, a new deed would be executed that placed both names on title as joint tenants.  In August 2018, Brittany executed a deed placing both names on the title as joint tenants.

246.    Upon filing the dissolution of marriage in December 2019, Brittany falsely claimed that she was the sole owner of the property. In late January 2020, Gadberry asked Plaintiff if he would agree to a stipulation to sell the Gilbert house with the proceeds being held by her firm until otherwise decided by the Court.  Plaintiff agreed with the modification that the monies would remain with escrow for 90 days and then be transferred to the Berkshire Client Trust Account.

247.    The stipulation was a fraud. The scheme was a pretense. Brittany intended to steal the equity and launder money through a phony transaction wherein the "buyers" who were/are well acquainted with Defendant Cairo would pretend to make the purchase, but in fact, would rent the property. Dawna would then use monies appearing to have come from the sale to pay off her

residence on Olla Court in Mesa, Arizona.  LaFlesch would be paid a fee for assisting in the transaction and Gadberry and Berkshire would be paid through a fraudulent application for $25,000 in attorney's fees.

248.    The remainder of any monies that might otherwise go to Plaintiff would be removed through additional phony fee orders based on overinflated and falsified billing statements so that no one would ever have to account for the money.

249.    The Gilbert house was then placed for sale by Defendant LaFlesch.  But in fact, the house was not actually for sale.  In fact, despite asking repeatedly for a copy of the listing agreement, Plaintiff never received the same. As a result, Plaintiff did not see that the listing price was approximately $25,000 below market value and that the Commission being paid to LaFlesch was at least 1/2 percentage point higher than the standard rate for real estate agents.

250.    Within 10 days of the house allegedly being listed, Plaintiff was informed that a purchase offer had been received for the full amount of the listing price. Plaintiff was further informed at that time that the buyers were requesting a series of repairs and were requesting that all closing costs be paid by seller.

251.    In fact, Dawna and Brittany did conspire with Gadberry and with LaFlesch to launder money through the phony sale with Plaintiff. JetClosings handling the fake escrow and title insurance.  In fact, Defendants Christopher Falbo and Nicoletta Falbo, friends of Defendant Cairo, did pretend to purchase the property, but in fact were and are renting the house with Brittany and Dawna pocketing the proceeds to which Plaintiff is entitled to one half.

252.    In order to make the sale look real to Plaintiff, JetClosings had Plaintiff execute a warranty deed in favor of the alleged buyers.  However, the Defendants involved in the scheme had no intention of ever recording Plaintiff's warranty deed.  Rather, they intended to deny that any such deed was ever executed or recorded.  However, in June 2020, Plaintiff checked with the County Recorder's Office to discover that all necessary documents had been recorded to effect the phony sale, except for his warranty deed, which somehow never got recorded despite the fact that

Plaintiff traveled to the JetClosing's office in Phoenix and executed the papers with a notary public present.

253.    Upon informing JetClosings of the intended error, the representative for JetClosings stated that the same would be corrected immediately. But, in fact, it was not corrected immediately because the deed executed by Plaintiff had been destroyed.  To make up for this, Dawna prepared a phony warranty deed where she signed as the notary public under a phony name and then lifted a signature belonging to Plaintiff, placing same on the signature line for him on the warranty deed.  That deed was then recorded.

**Stealing Funds Through Frivolous Motions and Fake Orders**.

254.    In or about late May, 2020, Gadberry filed a motion with the Court seeking payment of the $25,000 in attorney's fees to come from any proceeds that might otherwise have gone to Plaintiff.  The same was opposed by Plaintiff whose opposition was never seen by the Court, because Defendant Hughes made sure that it wasn't. Not a single factual allegation in the motion was true and correct especially since no sale of the house had ever occurred.

255.    On or about June 10, 2020, Judge Davis heard arguments regarding child support and regarding attorney's fees. Approximately two weeks later, a written decision was issued providing $25,000 in attorney's fees to the Berkshire firm and providing child support to Brittany based on the false statements made in the Gadberry brief. The signature on the order in fact is not that of Judge Davis, but is that of Dawna Chavez. The decision fails to state any of the issues raised by Plaintiff at the time of the hearing.

256.    Having reviewed the decision, but not having realized at the time that the decision was fraudulent and not issued by the Court, Plaintiff immediately filed a motion for reconsideration pointing out to the Court that the legal and factual bases of its ruling and Order were incorrect.  To date, the Court has never issued a ruling on this motion for reconsideration. In fact, Defendant Hughes hid it from the Court to ensure that Judge Davis did not see the motion, no opposition was filed by Gadberry or subsequently by Greg Davis.

257.    In or about mid-June 2020, Gadberry filed a motion with the Court seeking to have the Court order the $1000 payment to retain Barbara Kiffmeyer as the Court Appointed Advisor come from the proceeds of the house sale.  Once again an order was issued appearing to have come from the Court for payment of the $1000 from the proceeds to Kiffmeyer.  In or about late June 2020, Kiffmeyer acknowledged to Plaintiff that she had received the retainer from Gadberry.

258.    However, yet again the Court order contained a phony signature, yet again that of Dawna Chavez.

259.    In or about early September 2020, Plaintiff sent a letter to attorney Davis asking him to confirm that he had received from The Berkshire Law Office the proceeds of the house sale held in trust per the terms of the stipulation between the parties. in response, Davis falsely represented that his firm had received the monies held in trust less $25,000 paid to The Berkshire Law Office and less $1000 paid from the proceeds held in trust to Barbara Kiffmeyer.

260.    Since receiving that response from Davis, Plaintiff has continually requested written confirmation that Davis' office in fact, has the proceeds, and is holding them in trust. Plaintiff has also continually requested an accounting of the same.  However, for nearly four months, Davis has refused to provide an accounting or provide a written confirmation that he has the proceeds.

261.    Moreover, in or about late December, 2020, Plaintiff requested from Gadberry and Berkshire, confirmation that they had received the proceeds of the sale per the terms of the stipulation and had turned over the same to the Davis office.  Rather than confirm these facts, Berkshire represented that his office had never received any of the proceeds from the sale of the property, thereafter refusing to make any further comment on the matter whatsoever.

262.    Plaintiff then demanded that Kiffmeyer confirm that she received the sum of $1000 from Gadberry and that she provide all documentation evidencing said confirmation.  Not only has Kiffmeyer refused to provide any information or even respond to the question, but instead, Kiffmeyer complained to the Court, falsely, that Plaintiff was harassing her while failing to mention that she was refusing to provide said relevant and material information.

**Stealing a Child, Part 1**.

263.    On or about March 28, 2020, Thaler Reminded Brittany and Dawna that per the terms of the custody schedule Thaler had custody of McKinley on Brittany's birthday. knowing that Brittany would want to spend time with their son on her birthday, Thaler sent to Brittany and Dawna a modified schedule so that Brittany could have McKinley beginning at noon on her birthday until noon the following day. Thaler Never received a response. Instead, on April 3, 2020, Dawna sent a text to Thaler stating that he was required to self-quarantine for the next 14 days to ensure he had not contracted Covid-19 because he had flown on a plane.

264.    In fact, Thaler had not flown on a plane and had not been in any location where quarantine was necessary. Moreover, pursuant to Arizona law and local rules neither Brittany nor Dawna had any authority whatsoever to impose a quarantine on Thaler.

265.    Brittany and Dawna pulled this stunt, which included holding McKinley for two weeks, for four reasons: the first was to provoke Thaler into violating Brittany's (void) restraining order; the second was to secure McKinley for Brittany's birthday; the third was to cause Thaler severe emotional distress; and the fourth was to test the system for the kidnapping yet to come in September.

266.    To ensure that Brittany could bring McKinley to Dawna's residence without Thaler interfering or removing his son during his custody time, Dawna obtained a fraudulent order of protection where every factual statement was false and known to her to be false. Simply, Dawna committed perjury just as she had done while testifying at the February 20, 2020 hearing.

267.    But that wasn't all.  With the use of the cloned phones Dawna intended to send and did send to herself various incendiary messages making them appear to have come from Thaler's phone.  Beginning in or about August 2020 in anticipation of kidnapping McKinley in September 2020, Dawna repeatedly sent rude text messages to Thaler.  In some of these she complained about him and in some of these she complained about Brittany.  Generally, Thaler tried to calm her down from what appeared to be genuine upset.

268.    But thereafter, Dawna used the cloned phones to send messages from Thaler's cloned phone to her phone.  Thereafter, Dawna contacted the Mesa Police Department and filed complaints

falsely alleging that Thaler had contacted her in violation of the order of protection. Each time Dawna made one of these false reports, she failed to mention to the Mesa police that she was the facilitator of communications and of exchanges for McKinley and that the Family Court order superseded restrictions in the Order of Protection with respect to effecting these issues.

269.    Through September 2020, this got Dawna one single charge filed against Thaler. That was not enough. So Dawna stepped up her campaign of sending phony messages through the cloned phone to her phone shortly before she had Brittany kidnapped McKinley on September 19, 2020.

**Stealing a Child, Part 2**.

270.    On September 19, 2020 Brittany failed and refused to make the exchange of McKinley citing unspecified "issues" she had with McKinley's care while in the presence of Thaler.

271.    In fact, the problem was not with Thaler, but rather with Brittany, who was deeply embedded in an episode from Deficit Schizophrenia.  Simply, the pressures put on her by her own actions and by the actions of her mother had worsened her paranoia and her misperceptions.  And it had clouded her own judgment concerning McKinley.

272.    By early October, 2020, Brittany's state of mind had become, and remains, so precarious that she reported her sense of some unspecified abuse to McKinley's Pediatrician, doctors at Phoenix Children's Hospital, the Department of Child Protective Services, and the Gilbert Police Department.

273.    All four individuals/agencies investigated these non-specific claims and all concluded that the claims were either the product of Brittany's mental illness or were fabricated.

274.    In fact, the Gilbert police told Brittany she needed to return McKinley immediately. She refused.

275.    Meanwhile, despite denying the phony fraudulent perjurious brief filed in secret by Defendant Attorney Davis attributing false statements to Defendant Kiffmeyer that Kiffmeyer had told Brittany that she was justified in keeping McKinley, Defendant Judge Davis failed and refused to execute multiple requests for an order requiring local law enforcement to obtain McKinley.

276.   Even worse, Defendant Officer Roessler not only refused to file custodial Interference reports, but also prevented Thaler from physically being able to see his child.  When Thaler complained about his conduct, Officer Roessler then set up a fake arrest of Thaler at his residence in Gilbert. Using the text messages being sent by Dawna from the cloned phone of Thaler to her phone that he knew were fake, Roessler falsely claimed them as having been sent by Thaler and falsely claimed that Thaler had admitted to the same.

277.   In addition to causing Thaler to spend a night in the Mesa jail, Roessler ensured additional phony charges were filed against Thaler, charges which remain today.

**False Reports to DCPS**:

278.   As part of the strategy to steal McKinley, Dawna and Brittany used state and local agencies including the Department of Child Protective Services. In or about early July 2020, Brittany falsely reported unspecified abuse was occurring during the time that Thaler had McKinley with him.  DCPS investigated the charges and interviewed Thaler and McKinley together at Thaler's home.  DCPS concluded that it was unable to substantiate even a single allegation made by Brittany.

**False reports to the Gilbert Police Department**.

279.   Brittany also made false reports to the Gilbert Police Department, again charging some unspecified abuses committed by Thaler.  This time, the detective in charge called in a forensic psychologist to interview McKinley. After conducting the interview, the detective called Thaler and apologized to him profusely for ever having believed any of the statements that Brittany had made. The detective stated that the interview found no evidence of any kind of any abuse and that she believed McKinley's relationship with his father was a productive and healthy one. She then informed Thaler that she would contact Brittany and tell her the results of the analysis and order her to return McKinley to Thaler forthwith.

280.   In fact, the detective did make the call.  But Brittany refused to return McKinley.

**The Kiffmeyer/Greg R. Davis Scam**.

281.   As part of the February 20, 2020 order, Commissioner Russell requested the appointment of a Court Appointed Advisor with the limited role of determining whether any changes should be made to his physical custody order of 50/50 parenting time.  Barbara Kiffmeyer was assigned to the position.

282.   Ms. Kiffmeyer purports to have a Masters degree in social work and is on the approved panel of Court Appointed Advisors.  So is Defendant Greg R. Davis.

283.   Plaintiff is informed and believes that over the past ten years, Davis and Kiffmeyer have had a personal social relationship and a business relationship wherein Davis compensated Kiffmeyer to fix reports to the Court in favor of Davis' clients.

284.   After Kiffmeyer's appointment, Brittany determined that Kiffmeyer was susceptible to bribes through Attorney Davis.

285.   In July 2020, Brittany replaced her attorney with Greg R. Davis.  Thereafter, Brittany and Dawna arranged through Davis for payment to Kiffmeyer for Kiffmeyer to do two things: a) allow Brittany and Davis to make false statements to the Court alleging that Kiffmeyer had concerns about Plaintiff's parenting skills when in fact she had no such concerns, and b) issue a report that omitted pertinent information about Brittany including her criminal conduct and mental health issues and omitted any positive information concerning Plaintiff, of which there was plenty, including that Plaintiff has a twenty year old son whom he successfully co-parented with his ex-wife.

286.    On September 19, 2020, Brittany refused to exchange McKinley claiming, in part, that Kiffmeyer had told her not to make the exchange. Brittany's statement was false and remained false when she and Davis filed a brief with the Court on September 21, 2020 stating the same.

287.   Subsequently, Kiffmeyer admitted that she had not told Brittany to refuse the exchange, but Kiffmeyer refused to report the same to the Court.

288.   Thereafter, Kiffmeyer authored a report that omitted the following:

a.   Plaintiff has a nineteen year old son, with whose mother he co-parented successfully (who provided a declaration stating the same). Matthew attends University of Colorado in Boulder Colorado, where he is a Deans List candidate and a Premed Major.

b.   Plaintiff was McKinley's primary care giver from birth to the time he was stollen on December 12, 2019 and then again from late January until the time he was stollen on September 19, 2020. Until September 19, 2020, neither Brittany nor her mother, Dawna, ever complained once about the care McKinley received from Plaintiff.

c.   During the first half of 2019, Brittany encouraged Matthew to attend the University of Arizona, so that he could join her, Plaintiff and McKinley on weekends.

d.   Plaintiff was married to Melinda (Matthew's mother) for seventeen years. They coparented Matthew from the time he was seven years old. They maintained residences approximately a quarter of a mile apart, and stayed in constant communication on all issues regarding their son. Moreover, Plaintiff and Melinda maintain a friendship to this day.  Melinda has met McKinley on several occasions, including having him over for dinner with Plaintiff in her home in Tarzana, California.

e.   The report omits Brittany's violation of the custody order on April 4, 2020 wherein Brittany withheld McKinley from Plaintiff for fourteen days.

f.   Report omits that Brittany violated the custody order a second time when she refused to make the exchange with McKinley on September 19, 2020. Since that time she has not permitted McKinley to see or talk to his father.

g.   The report omits that in their Brief dated September 21, 2020, which was kept from Plaintiff, Attorney Davis and Brittany lied to the Court when stating and implying that Ms. Kiffmeyer told Brittany several days earlier that she was within her rights to withhold.

McKinley from the September 19, 2020 exchange and that she should refuse to make the exchange.

h.   The report further omits that DCPS interviewed Plaintiff with McKinley and concluded that there was NO evidence of any kind to support a single allegation made by Brittany.

i.   At no time did Ms. Kiffmeyer interview either parent with McKinley, despite being asked to do so on numerous occasions by Plaintiff.

j.   Lastly, Ms. Kiffmeyer omits the forensic psychologist examination of McKinley on behalf of the Gilbert Police Department where it was found that Brittany was either lying or paranoid.

**The Corruption of the Maricopa County Superior Court**.

289.   As set forth above, the evidence implicates multiple judges and Judge's Assistants in Criminal and Family Courts as aiding and abetting the criminal enterprises.  More significantly, it implicates those involved in the nominating process for judges and in the hiring process for judge's assistants.

**The Participation of Judge Marvin L. Davis and his Judge's Assistant, Madison Hughes**

290.   At the time the Petition for Dissolution of Marriage was filed on December 13, 2019, Marvin L. Davis was a Commissioner of the Criminal Court in Maricopa County.  He was neither a judge nor adjudging Family Law cases.

291.   The initial judge did not favor Brittany or her multitude of "emergency motions" denying all of them.  Before the initial custody hearing, she was replaced with Commissioner Andrew Russell.

292.   At the February 20, 2020 custody hearing Commissioner Russell awarded joint physical custody.  He set a follow up motion for April 30, 2020.

293.   Prior to said hearing, Commissioner Russell was replaced with newly appointed "Judge" Marvin L. Davis.

294.   During the period from his appointment to the present, Judge Davis has allowed his Courtroom to be taken over by Brittany and Dawna by and through Davis' "Judge's Assistant," Madison Hughes, who has provided Court database access to Brittany and Dawna.

295.   As a result of said access, at least nine "orders" were created that contain forged signatures of Marvin L. Davis.

296.   Further, as a result of said access, multiple motions filed by Plaintiff were ignored and received no ruling.  Meanwhile, oppositions to motions filed by Brittany and Greg R. Davis were ignored.

297.   Moreover, Judge Davis wrongfully denied writs of habeas corpus and ignored requests for contempt citations for Brittany and Dawna's wrongful acts in refusing to make exchanges or even allow Plaintiff to speak to McKinley.

298.   Finally, on or about January 8, 2021, a phony Divorce Decree complete with forged signatures of Marvin L. Davis was mailed to Plaintiff.

## FIRST CAUSE OF ACTION

*(Violations of 42 U.S.C. §1983 v. All Defendants)*

299.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 298 of this complaint as if fully set forth hereat.

300.   All Defendants named herein conspired with each other to violate Plaintiff's civil rights and did violate said rights as follows:

   a.   As to Dawna, Brittany and Cairo: they conspired to cause bodily injury to Plaintiff to prevent him from discovering the criminal enterprises; they conspired to steal money from Plaintiff by staging a phony sale of the family residence incident to the dissolution of marriage filed by Brittany; they then schemed to kidnap McKinley and to cover up their actions by making false accusations of abuse against Plaintiff; then they obtained, through fraud and perjury, restraining orders against Plaintiff to prevent him from retrieving his son; having cloned Plaintiff's cell phone, they sent text messages to Brittany's cell phone and to Dawna's cell phone falsely claiming the messages came from Plaintiff and then demanded the City Attorneys of Mesa and Gilbert file false charges against Plaintiff for violating the illegally obtained restraining orders; and they filed phony complaints with the State Bar of Arizona and State Bar of California often pretending to be Plaintiff's former clients in order to damage Plaintiff's reputation and to try to have his license suspended.  Also, said Defendants took over the courtroom

where Marvin L. Davis presides. With the assistance of Madison Hughes and Marvin L. Davis, they infiltrated the Court's digital files and prepared fake orders all designed to remove Plaintiff's custody of his son and to steal money from him through phony support orders and attorneys' fees orders.

b.  As to Marvin L. Davis and Madison Hughes, they provided access to the Court's electronic file in case number FC2019-098211 with Davis allowing Brittany and Dawna to create fake court orders however they saw fit.  That included nine separate orders and a phony divorce decree.  Moreover, Davis failed to rule on multiple motions including writs of habeas corpus and contempt citations directed at Brittany for her refusal to make custody exchanges.

c.  As to Shauna Major, she assisted Brittany and Dawna in orchestrating the September 19, 2020 kidnapping of McKinley and aided and abetted their plan to discredit Plaintiff by assisting Brittany in making fake claims with the Gilbert Police that Plaintiff was taking illicit drugs and that drug paraphernalia found in the family residence belonged to Plaintiff.  In fact, the paraphernalia belonged to Brittany.

d.  As to Greg R. Davis and Barb Kiffmeyer, they conspired to falsify the custody report Kiffmeyer provided to the Court regarding McKinley and they conspired to have Kiffmeyer ignore false statements made by Davis and Brittany in briefs filed with the Court all to impact negatively Plaintiff's custody rights. Further, Davis committed perjury and suborned perjury from Brittany as a means to prevent Plaintiff from having custody of his son.  Further, Davis misrepresented having possession of the  monies from the sale of Plaintiff's and Brittany's residence to cover up the fraudulent sale of said property.

e.  As to the Falbos, LaFlesch, Gadberry and JetClosings, these Defendants aided and abetted in the fraudulent sale of Plaintiff and Brittany's residence designed to steal the equity from Plaintiff.  With respect to the Falbos, they acted as "buyers."  With respect to Gadberry, she secured the stipulation between Plaintiff and her client for the sale of

the property.  As to LaFlesch, he acted as real estate agent and broker.  He set up the phony sale with the phony buyers and reported the same to Plaintiff.  He also instructed Plaintiff to sign the warranty deed after falsely representing that the sale had been funded by a loan secured by deed of trust obtained by the buyers.  JetClosings handled the phony escrow also falsely representing to Plaintiff that the "buyers'" loan had been funded and that Plaintiff was required to execute a warranty deed to complete the transaction.

f.   As to Gadberry, she set up the phony sale of the family residence by falsely representing to Plaintiff that if he signed a stipulation for said sale her firm would hold the money pending further order of the Court.  But there was no sale and would not be a sale and the "profits" from said sale would be displaced by requests for fees and costs and child support made to Marvin L. Davis once he could be put in charge of the divorce case. Gadberry knew that Plaintiff would never see a dime of the money owed him and that she and her firm would receive at least $25,000.00 for their "work."

g.   As to Lammers, he aided and abetted Brittany's 2014 extortion plan by having a phony California judgment created by Brittany entered as a foreign state judgment in Maricopa County. Then in 2015, Lammers applied for and received judgment debtor examination notices and tried to serve them on Plaintiff so that he and Brittany could discover all of Plaintiff's assets and their locations.  On December 31, 2015, having been unsuccessful serving the judgment debtor examination notices, Lammers filed a frivolous fraudulent transfer action in order to record an illegal lis pendens on the Phoenix residence owned by Plaintiff and thus prohibit its sale in furtherance of the extortion scheme.  To date, Lammers has refused to dismiss the phony judgment.

h.   As to John Chavez, to prevent Plaintiff from discovering his involvement in the criminal enterprises, on November 3, 2020 he communicated with Plaintiff promising Plaintiff that if Plaintiff stopped investigating his family Plaintiff would be permitted to see his son.  But in fact, it was a ruse to determine Plaintiff's location by using the IMEI

identification number of Plaintiff's cell phone so that the Mesa and Phoenix police could

harass Plaintiff to try to force him out of the State.

i.   As to the City of Mesa and Jacob G. Roessler, by policy design, both violate the

Uniform Child Custody Jurisdiction and Enforcement Act by refusing to enforce

custody orders such that if one party refuses to exchange a child, police departments of

these cities will not remove the child to effect any exchange.  Further, said police

departments state openly that they would refuse a direct court order demanding they

enforce custody rights.  In the matter at bar, on at least 12 separate occasions during

2019 through 2020, Plaintiff reported to the Mesa Police Department that Brittany had

refused to exchange McKinley.  In addition to failing and refusing to take action to

enforce the custody order of February 20, 2020, the Mesa Police Department ignored

reports made by Plaintiff that Brittany, Dawna and Larry were interfering with

Plaintiff's custody.  Said department failed and refused to file criminal charges for

custodial interference. These failures and refusals were carried out by Officer Jacob G.

Roessler who Plaintiff is informed and believes had been receiving compensation from

Dawna and Brittany to protect the criminal enterprises and specifically received

compensation to not write reports and to not provide information to the City Attorney.

Meanwhile, Roessler physically prevented Plaintiff from seeing his son or making an

exchange on October 3, 2020 and then, after Plaintiff complained to the department

about Roessler's conduct, on October 11, 2020, Roessler effected a false arrest of

Plaintiff at his residence in Gilbert using as the pretense of fake text messages from the

cloned phone into Dawna's cell phone.  Thereafter, the City of Mesa filed nine separate

charges of Plaintiff violating Dawna's illegally obtained restraining order all taken from

the phony text messages.  Plaintiff is informed and believes that members of the City

Attorney's office knew that the text messages came from a cloned phone but filed them

anyway to a) stop Plaintiff from pursuing the criminal enterprises; b) damage Plaintiff's

reputation so that he would not be believed if he reported the criminal enterprises and

the City of Mesa's involvement in them; and c) either convict Plaintiff or having Plaintiff plead guilty to misdemeanor charges that cumulatively might result in felonious conduct thus requiring Plaintiff to serve time in jail and lose his license to practice law.

j.   As to Town of Gilbert, Bullock, Ferer, and Wakefield, Plaintiff provided credible reports and evidence that during 2019, Brittany stole credit and debit cards belonging to Plaintiff and his law office corporation and then gave them to others to use. He also provided evidence of an attempt to kill him or cause him bodily harm on April 20, 2019 when a strategic cut was made in the tire of his rental car, a cut that could have resulted in catastrophic failure of the tire. In furtherance thereof, Plaintiff provided an expert report regarding the tire cut and how it was made and how such a cut clearly was intended to cause Plaintiff grave bodily harm. And he provided credible evidence that on July 7, 2019, Brittany attempted to poison Plaintiff by giving him iced tea laced with chemicals. Officer Bullock ignored the reports and instead filed false charges that Plaintiff violated Brittany's illegally obtained restraining order on December 31, 2019. These alleged violations occurred while Plaintiff was receiving an angiogram as an in-patient at Banner Heart Hospital. Bullock knew Plaintiff was in the hospital and receiving an angiogram, but intentionally left that information out of his report. As to Ferer and Wakefield, they intentionally failed and refused to investigate and allowed for spoliation of the video surveillance evidence, at the locations where the fraudulent use of the debit and credit cards occurred.

k.   As to the County of Maricopa and State of Arizona, employees of said County, including those who built the County's computer database, which controls all information in the court systems, civil and criminal, the Recorder's Office, the Assessor's Office, and all social welfare and benefits programs, infiltrated the system in furtherance of the criminal enterprises. Also, Brittany and other non-employees used the backdoor infiltration in furtherance of the criminal enterprises. This included placing phony pleadings under phony case numbers such as the 2014 foreign state

judgment extortion scheme against Plaintiff and then falsifying court orders regarding child custody of McKinley along with child support to be paid to Brittany and attorney's fees and costs to be paid to Brittany and/or her attorneys to cover up the fact that no sale of the family residence had occurred.  The State of Arizona has known since at least 2010 that its computer system and database had been infiltrated by organized criminals and employees of the State that also work for said criminals.  The State of Arizona has also known since 2010 that the computer database infiltration includes county databases including Maricopa, Pinal and Pima Counties. Despite the knowledge of this situation, and knowledge that the illegal infiltrations have resulted in the mass violations of civil rights of the victims of the criminal enterprises.  Yet, the County of Maricopa and the State of Arizona have failed and refused to make the necessary changes or act to protect the public and have failed to protect Plaintiff from the aforementioned violations of his civil rights.

l.  As to Dawna, Brittany, Shauna Major, and Roessler, these Defendants have engaged in a pattern of witness intimidation by directly threatening witnesses and third parties who have relevant information favorable to Plaintiff.  Said intimidation includes threatening to expose embarrassing information about the witness or, specifically in the case of Michael Grigsby, threatening his employment as an ordained minister.  Further, these defendants have used legal processes, including third party civil litigation on unrelated matters to disrupt the lives of potential witnesses.

301.   As a result of the violations by these Defendants, Plaintiff has been damaged in an amount at or exceeding $250,000.00 in losses from the fraudulent sale of his and Brittany's residence, from damage to his law practice, and damage to his reputation in an amount according to proof at time of trial.

302.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

303.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## SECOND CAUSE OF ACTION

*(Violations of 42 U.S.C.§1997 vs. City of Mesa, Town of Gilbert,*

*City of Phoenix and County of Maricopa, State of Arizona)*

304.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 303 of this complaint as if fully set forth hereat.

305.   The within Defendants as government agencies with independent police departments, City of Mesa, Town of Gilbert and County of Maricopa are obligated to prevent officers from engaging in a pattern or practice of conduct the deprive a person's right

306.   On April 4, 2020 and September 19, 2020, the State of Arizona was a signatory to the Uniform Child Custody and Jurisdiction Enforcement Act ("UCCJEA").

307.   Per the terms of said Act, which is effective in 49 states, Family Courts and law enforcement agencies are required to enforce custody orders.

308.   Defendant City of Mesa and Defendant Town of Gilbert, for at least the past five years, have chosen deliberately to ignore their obligations to enforce custody orders.  In simple terms, when a parent refuses to exchange a minor child, per the terms of a child custody order, the Mesa Police Department and the Gilbert Police Department refuse to intervene in the absence of visible and obvious physical harm to the child.

309.   Moreover, that refusal includes a stated policy wherein even if a Maricopa County Superior Court Judge specifically orders officers to remove the child, officers will refuse the court order.

310.   Additionally, the Maricopa County Superior Court honors the policies of Gilbert and Mesa by and through its judges who refuse to execute additional orders to enforce custody rights when one parent refuses to make an exchange.

311.   Thus, any parent residing in Mesa or Gilbert can refuse to exchange a child with total impunity from these Defendants.

312.   Said policy and its implementation violate the UCCJEA as codified in A.R.S. §25-1001 et seq.  Further, they violate 42 U.S.C. §1997 in that said local enforcement agency officers have engaged in a pattern and practice of conduct the deprives parents with custody rights.

313.   Said conduct further violates the rights of children per the terms of custody orders that remain unenforced.

314.   With respect to Plaintiff, Defendants named herein and/or their agents conspired to deprive Plaintiff of his son, McKinley, for three reasons: first, to cover up their involvement in the criminal enterprises; second, to create a pretense for contrived violations of illegally obtained restraining orders by Brittany and Dawna in order to discredit Plaintiff; third, to carry out an extortion attempt wherein if Plaintiff stopped his investigation into the criminal enterprises, Defendants would ensure custodial time with McKinley; and fourth, to cause Plaintiff to fear for his safety and thereby cause Plaintiff to leave the State - with the added benefit of Plaintiff being unable to appear personally at hearings on the phony violations and charges thereon.

315.   With respect to Defendant Roessler, most of the acts alleged in this cause of action were performed by him to the intended benefit of Brittany and Dawna.  Said acts include: a) taking reports of restraining order violations by Brittany and Dawna that he knew were false while hiding Plaintiff's reports that Brittany and Dawna had violated the February 20, 2020 temporary custody orders on many occasions; b) refusing to enforce child custody order by refusing to return McKinley to Plaintiff; c) harassing Plaintiff by refusing to take reports of Brittany's custody violations and refusing to perform welfare checks on Brittany and McKinley; and d) mischaracterizing in official police reports text messages Plaintiff allegedly sent to Dawna regarding her refusal and Brittany's refusal to return McKinley as Plaintiff "harassing" Dawna in violation of the restraining orders when he knew the texts pertained to the kidnapping of McKinley and violation of the custody order; and e) falsely arresting Plaintiff on October 11, 2020 after

conspiring with Dawna to send messages to her phone from a cloned cell phone—thus giving the appearance that Plaintiff has sent the messages.

316.   Plaintiff is informed and believes that Defendant Roessler had been a participant in the criminal enterprises by providing cover and misdirection from police investigations and that he fabricated evidence or destroyed evidence to prevent discovery of the enterprises and Brittany and Dawna's participation in them.

317.   As to the Mesa City Attorney's office, they failed and refused to prosecute Dawna with felony interference with child custody.

318.   Said actions in allowing Brittany and Dawna to file false police reports alleging phony violations of the restraining orders were intended to deprive Plaintiff of his civil rights including those rights he had as a father and those rights as a parent granted to him by the Court on February 20, 2020.

319.   Thus, Plaintiff is entitled to an award of specific damages at or exceeding $250,000.00 for all losses of income suffered in an amount according to proof at time of trial.

320.   Additionally, the violations alleged herein have caused Plaintiff general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

321.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**THIRD CAUSE OF ACTION**

*(Conspiracy to Violate 18 U.S.C.§241 vs All Defendants)*

322.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 321 of this complaint as if fully set forth hereat.

323.   The within Defendants are subject to 18 U.S.C. §241 which provides that where two or more individuals conspire to threaten or intimidate, injure or oppress another, they are guilty of civil rights violations.

324.   Said statute also provides that where two or more individuals appear at the premises of another for the purposes of threatening or intimidating, injuring, or oppressing, or kidnapping another, they are guilty of criminal civil rights violations.

325.   The acts of all of the Defendants as alleged herein constitute a conspiracy to deprive Plaintiff of his civil rights.

326.   Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

327.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

328.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

//

//

//

**FOURTH CAUSE OF ACTION**

*(Conspiracy to Violate 18 U.S.C.§242 vs Marvin L. Davis, Kiffmeyer,*

*Hughes, Roessler, City of Mesa, Town of Gilbert, County of Maricopa)*

329.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 328 of this complaint as if fully set forth hereat.

330.   These within Defendants are parties subject to the terms of 18 USC §242 which provides in pertinent part that "whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person… to the deprivation of any rights, privileges, or immunities…" is guilty of a criminal act.

331.   The acts set forth in this complaint and specifically set forth in paragraph 317 violate said statute and are criminal.

332.   Thus, Plaintiff Thaler is entitled to an award of specific damages for all losses of income suffered in an amount according to proof at time of trial.

333.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

334.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**FIFTH CAUSE OF ACTION**

*(Violations of 42 U.S.C. §14141 vs all Defendants)*

335.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 334 of this complaint as if fully set forth hereat.

336.   As set forth hereinabove, said individual Defendants and government entity Defendants have engaged in a pattern and practice of conduct designed to deprive individuals of their rights and privileges protected by the Constitution.

337.   With respect to Plaintiff, as alleged herein, said Defendants intentionally created schemes to deprive him of his rights and his liberties to cover up and conceal racketeering activities as set forth in 18 U.S.C.§1951, 1952, 1956, 1957 and 1958.

338.   Said schemes included falsifying court orders to deprive Plaintiff of his son and to steal his money, hacking into Plaintiff's business computers to damage his law practice and his clients,

hacking into his clients' computers to disrupt their businesses, filing phony charges of violating illegally obtained restraining orders to discredit Plaintiff while failing and refusing to enforce court custody orders and refusing to charge Brittany and Dawna for custodial interference.

339.   Said actions caused Plaintiff and his law practice significant financial harm in an amount at or exceeding $250,000.00.

340.   Thus, Plaintiff is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

341.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

342.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## SIXTH CAUSE OF ACTION

*(Violations of Substantive Due Process Rights v. City of Mesa, Town of Glbert,*

*County of Maricopa, Roessler, Bullock, Ferer, Wakefield, Marvin L. Davis)*

343.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 342 of this complaint as if fully set forth hereat.

344.   The actions of these Defendants as set forth in this Complaint were intended to deprive Plaintiff of his due process rights by depriving him of his rights to his child pursuant to the UCCJEA and by depriving him of his rights to adjudicate for his child.

345.   Further, said Defendants violated Plaintiff's rights by failing and refusing to investigate Brittany's criminal conduct including at least two attempts made on Plaintiff's life and her conduct in stealing money from Plaintiff and his law office, including the spoliation of evidence, all to cover up the criminal enterprises.

346.   As to the City of Phoenix, several of its officers acted in furtherance of the scheme operated by the City of Mesa when on November 3, 2020, said officers illegally traced Plaintiff's location through tracking his cell phone and then attempted to scare and intimidate him with the threat of false arrest.

347.   Said actions by the Phoenix officers further violated Plaintiff's substantive due process rights.

348.   Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

349.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

350.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## SEVENTH CAUSE OF ACTION

*(Violations of Procedural Due Process Rights v. Maricopa County, Marvin L. Davis,*

*Madison Hughes, Town of Gilbert, City of Mesa, City of Phoenix)*

351.   Plaintiff realleges Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 350 of this complaint as if fully set forth hereat.

352.   The acts of these Defendants in refusing to investigate Plaintiff's complaints of criminal wrongdoing so that Plaintiff could be compensated for his losses, and specifically, the actions of Marvin L. Davis in allowing his courtroom to be hijacked during the dissolution of marriage litigation with phony orders and a phony divorce decree to cover up the criminal enterprises constitutes a violation of Plaintiff's procedural due process rights.

353.   Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

354.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

355.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## EIGHTH CAUSE OF ACTION

*(Violations of Equal Protection/Selective Enforcement v. City of Mesa)*

356.   Plaintiff realleges Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 355 of this complaint as if fully set forth hereat.

357.   In addition to the actions set forth hereinabove, City of Mesa officials including members of the City Attorney's office and officers of the Mesa Police Department selectively chose to enforce illegally obtained and void restraining orders against Plaintiff while refusing to enforce the Family Court's February 20, 2020 Court custody order.

358.   Further, said Defendants violated Plaintiff's rights by failing and refusing to investigate Brittany's criminal conduct including at least two attempts made on Plaintiff's life and her conduct in stealing money from Plaintiff and his law office, including the spoliation of evidence, all to cover up the criminal enterprises.

359.   Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

360.    Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

361.    The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## NINTH CAUSE OF ACTION

*(Conversion vs. Brittany, Dawna, Cairo, Gadberry, LaFlesh, Kiffmeyer,*

*Greg Davis, Christopher Falbo and Nicoletta Falbo, JetClosings, Marvin L. Davis)*

362.    Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 362 of this complaint as if fully set forth hereat.

363.    Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 239 of this complaint as if fully set forth hereat.

364.    As alleged herein, in 2015 Thaler and Brittany purchased a home in Gilbert, Arizona. Thaler provided $38,400 toward the down payment and then made each and every mortgage payment through November 2019. At the time of making the purchase, Plaintiff and Brittany agreed that they each own the sole rights to the down payments and any and all equity would be divided equally between them.

365.    In or about January 2020, Thaler and Brittany agreed to sell the residence. But in fact, Brittany had no intention of selling the residence. Instead, she intended to falsify the sale, rent out the property and keep all of the equity and all of the rents for herself. In furtherance of this scheme, she and these Defendants conspired to falsify a sale using falsified and forged documents and thereafter reporting to Thaler that the property had been sold and that the proceeds from said sale in the amount of approximately $173,000 were being held by Defendant JetClosings Inc. and thereafter transferred to the Berkshire Law Office and then to Attorney Greg Davis.

366.   JetClosings, Gadberry and Berkshire on behalf of the Berkshire Law Office and Attorney Davis confirmed that each had received the proceeds of the sale per the purported arrangement. However, neither Berkshire nor Attorney Davis ever received any of the proceeds. And Plaintiff is informed and believes and thereon alleges that JetClosings never received any proceeds because in fact there was no sale.

367.   In truth, Brittany is beneficial owner of the property. Further, Brittany has received and continues to receive rent payments from the illegal owners of the property, Christopher Falbo and Nicoletta Falbo

368.   Moreover, these Defendants conspired to run up attorneys fees and thereafter submit fraudulent billing statements in the dissolution of marriage and to submit to the Court false and fraudulent documents to obtain an order for child support.  Said false documents grossly understated Brittany's income and grossly overstated Plaintiff's income.

369.   As to Marvin L. Davis, he then permitted Brittany and her attorneys to create their own orders for child support and attorneys fees based on the false and fraudulent information submitted.

370.   Plaintiff is informed and believes Judge Davis did this in exchange for his appointment to the bench as a "judge" and in exchange for other compensation.

371.   As such Defendants and each of them conspired to deprive Thaler and did deprive Thaler of his down payment monies in the sum of $38,400 and one half of the equity in the property in the sum exceeding $125,000 according to proof at time of trial.

372.   Additionally, Defendants and each of them conspired to deprive Thaler of one half of the rent received from Christopher Falbo and Nicoletta Falbo in an amount not yet ascertained but believed to be approximately $10,000.

373.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## TENTH CAUSE OF ACTION

*(Conspiracy to Defraud v. Brittany, Dawna, Kiffmeyer, Greg R. Davis, Roessler, City of Mesa)*

374.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 373 of this complaint as if fully set forth hereat.

375.   The representations to the Court regarding income were false and known to Defendants as false when said representations were made.

376.   The false representations were intended to conceal from Plaintiff the fact that the sale of the family residence was phony and conceal that the equity and his portion of the down payment were being stolen.

377.   Had Plaintiff known the sale was phony he would not have executed a warranty deed much less execute a stipulation prepared by Gadberry for the sale.

378.   As a direct and proximate result. Plaintiff has been damaged in the sum exceeding $125,000 in an amount according to proof at time of trial.

379.   In or about early July 2020 said referenced Defendants conspired to terminate Plaintiff's parental rights to distract Plaintiff from fully discovering the criminal enterprises.

380.   To divert attention and to terminate Plaintiff's rights, these Defendants conspired to have Brittany make false accusations of parental abuse against Plaintiff while refusing to make further exchanges claiming Kiffmeyer had instructed Brittany to keep McKinley.  For her part, Kiffmeyer agreed not to interfere with the plan nor report to the Court anything about the plan.

381.   Moreover, in exchange for payment through Greg R. Davis, Kiffmeyer agreed to provide the Court with a report that omitted pertinent positive facts about Plaintiff and omit the obvious disturbing facts about Brittany.

382.   Had Plaintiff known the true facts about this fraud, he would not have permitted Kiffmeyer to be appointed or for Kiffmeyer to participate in the dissolution proceedings.  Further, if Plaintiff had known that Marvin L. Davis intended to permit Brittany and other Defendants to issue orders and a phony decree in his name, Plaintiff would have disqualified Davis.

383.   As a result of this fraud, Plaintiff has been damaged in a sum at or exceeding $250,000.00.

384.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

385.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## ELEVENTH CAUSE OF ACTION

*(Invasion of Privacy v. Brittany, Dawna, Shauna Major, John Chavez, Roessler, Gadberry, Greg R. Davis, City of Mesa, City of Phoenix)*

386.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 385 of this complaint as if fully set forth hereat.

387.   Beginning in February 2015, Brittany began hacking into Plaintiff's computer to determine how much information Plaintiff had concerning Russian organized crime activities in Arizona. During 2011-2012, Plaintiff had obtained information on Russian organized crime in California, specifically on the smuggling of goods through Southern California and on methods used to create fake identities—from hospital records of patients in certain Arizona-based hospital chains.  Of the individuals participating in the scheme, Brittany had worked with two of them.

388.   During this hacking, Brittany stole confidential communications between Plaintiff and clients and she stole confidential communications with friends and family.

389.   In February 2016, fearing Plaintiff would figure out that she had created the fake Tarzana Falls judgment to extort money from him, Brittany hacked into Plaintiff's personal and business computers and placed viruses in them to erase information.

390.   In February 2017, Brittany stole a check belonging to Plaintiff's personal bank account, executed it in Plaintiff's name and deposited it into an account she controlled at Wells Fargo Bank in a phony name.

391.   Then on August 14, 2017, Brittany stole another check to Plaintiff's personal account at Chase Bank, this check bearing Plaintiff's previous Phoenix address.  She filled out the check complete with signature payable to the City of Phoenix for a water bill in another person's name.

392.   In September 2017, while five months pregnant, Brittany panicked that Plaintiff was discovering the extortion scheme and Plaintiff might discover that in September 2016, she had been pregnant but had a miscarriage.  She also feared that Plaintiff might discover the fate of Phillips.

393.   So Brittany attempted to erase 110,000 files from four separate computers belonging to Plaintiff by hacking into the computers and moving said files into the recycle bins of each so that they would be erased the next time he turned on the computers.

394.   In November 2018, after Plaintiff discovered the massive credit card charges, Dawna and Brittany concocted a scheme to place spyware in Plaintiff's cell phone and in his computers to determine what Plaintiff knew and to obtain any information they could find to extort Plaintiff into that which Plaintiff only understood at the time as being Brittany's bizarre behavior.

395.   Then came stealing Plaintiff's credit and debit cards in early 2019 and those of his law office, erasing files and documents belonging to clients and then poisoning Plaintiff in order to achieve a positive drug test in order to steal McKinley.

396.   With that, Brittany and Dawna stole from Plaintiff's office confidential client files and documents including the files Plaintiff was storing for his first wife, Melinda.  The information of these files has since been misused during the dissolution proceedings to try to embarrass and harass Plaintiff.  The documents were disseminated to Gadberry and to Greg R. Davis and to Marvin L. Davis who refused to return the same in violation of Arizona statutes.

397.   In September 2020, using the spyware placed on Plaintiff's phone, Dawna and Brittany and Shauna schemed to clone Plaintiff's phone and then send through the cloned phone messages to Dawna and to Brittany; thereafter they would claim that Plaintiff had violated the illegally obtained restraining orders.  The purpose in this was to run up fake charges to disrupt Plaintiff and his law practice and to take McKinley without Plaintiff being able to see his son.

398.    This plan was aided and abetted by Roessler who ensured the false reports would be presented to the Mesa City Attorney while reports of Brittany and Dawna interfering with custodial rights was not.

399.    This plan was further aided and abetted by members of the City Attorney's Office refusing to prosecute Dawna and Brittany while prosecuting Plaintiff for charges said Office knew were false and contrived and came from a cloned cell phone.

400.    On October 11, 2020 when the plan was not working as quickly as these Defendants wanted, Roessler, Brittany, Dawna and Shauna concocted a plan to have Plaintiff arrested for sending text messages to Dawna.  To that end, they used the cloned phone to send messages into Dawna's cell phone.  Then Roessler took photos of the fake text messages, and drove to Plaintiff's residence and walked onto his property with the intent of falsely arresting Plaintiff.

401.    Even after Plaintiff denied knowing anything about the text messages, Roessler lied in his arrest report stating falsely that Plaintiff had admitted sending them.

402.    Further, during late October through early November 2020, John Chavez sent messages to Plaintiff by MSN Messenger telling Plaintiff that if he stopped investigating the above matters, Plaintiff could see his son. Meanwhile, Roessler and other members of the Mesa police contacted Sprint pretending to be Plaintiff trying to get IMEI and other identifying information of Plaintiff's phone so that they could locate Plaintiff.

403.    On the night of November 3, 2020, officers of the Phoenix Police Department appeared at the residence where Plaintiff was watching election returns.  Though they stated they wished to ask Plaintiff questions, In fact, using more phony text messages from the cloned  cell phone, they intended to arrest Plaintiff again while falsifying reports to State that Plaintiff had admitted sending the messages.

404.    The aforementioned acts constitute an invasion of Plaintiff's rights and were intended to invade Plaintiff's privacy.

405.   The actions of these Defendants caused Plaintiff to have to sell his residence and leave the State of Arizona to stop the invasion and the illegal acts thereon all to his damage in an amount at or exceeding $100,000.00.

406.   Further, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

407.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## TWELFTH CAUSE OF ACTION

*(Intentional Infliction of Emotional Distress vs. All Defendants)*

408.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 407 of this complaint as if fully set forth hereat.

409.   The acts of these Defendants was outrageous.

410.   Said outrageous acts were intended to cause Plaintiff severe emotional distress.

411.   Said acts resulted in severe emotional distress to Plaintiff.

412.   The actions of these Defendants caused Plaintiff to require multiple hospitalization for high blood pressure spikes that were aided by Brittany's poisoning of Plaintiff all to his damage in a sum meeting or exceeding $50,000.00.

413.    Further, the outrageous conduct has caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

414.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**THIRTEENTH CAUSE OF ACTION**

*(Interference with Business/Prospective Economic Advantage v. All Defendants)*

415.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 413 of this complaint as if fully set forth hereat.

416.   The actions of Defendants were intended to damage Plaintiff's reputation and his law practice to extort him into stopping his investigation.

417.   And in fact, the acts set forth herein resulted in the loss of more than $75,000 in income and a loss of more than $175,000 in future income.

418.   Further, the outrageous conduct has caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

419.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**FOURTEENTH CAUSE OF ACTION**

*(Abuse of Process v. Brittany, Gadberry, Greg R. Davis)*

420.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 419 of this complaint as if fully set forth hereat.

421.   At the time Brittany married Plaintiff, she had executed various official documents under penalty of perjury that she was married to: Justin Chavez, or Justin Leonard, or Ricky Goodwin.

422.   Plaintiff is unaware and unable to locate any dissolution documents regarding Brittany and these individuals.

423.   Moreover, Brittany executed other official documents under penalty of perjury using assumed names and stating that the assumed name individual was married.

424.   Plaintiff is unable to locate any dissolution documents for these named couples.

425.   Plaintiff is informed and believes and thereon alleges that at the time Gadberry began her representation of Brittany and at the time Greg R. Davis began his representation of Brittany, they knew she was married to other individuals and that she intended to use the dissolution of marriage process in Arizona to cover up her felonious actions.

426.   Thereafter, Brittany, Gadberry and Greg R. Davis prosecuted a fraudulent dissolution action using the normal processes.

427.   Additionally, Brittany, Gadberry and Greg R. Davis further intended to use the court processes for the wrongful purpose of running up exorbitant legal expenses and thereafter lie to the Court about their necessity in order to cover up Brittany and Dawna's theft of the equity of the family residence.

428.   These acts constitute an abuse of process.

429.   And in fact, the acts set forth herein resulted in the loss of more than $400,000. .

430.   Further, the outrageous conduct has caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

431.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**WHEREFORE**, Plaintiff prays for damages as follows:

### FIRST CAUSE OF ACTION

1. For specific damages according to proof at time of trial;

2. For general damages according to proof at time of trial;

3. For punitive and exemplary damages in an amount to be determined at time of trial;

### SECOND CAUSE OF ACTION

4. For specific damages according to proof at time of trial;

5. For general damages according to proof at time of trial;

6.  For punitive and exemplary damages in an amount to be determined at time of trial;

7.  For a preliminary and permanent injunction requiring defendants to comply with the UCCJEA;

### THIRD CAUSE OF ACTION

5.  For specific damages according to proof at time of trial;

6.  For general damages according to proof at time of trial;

7.  For punitive and exemplary damages in an amount to be determined at time of trial;

### FOURTH CAUSE OF ACTION

8.  For specific damages according to proof at time of trial;

9.  For general damages according to proof at time of trial;

10. For punitive and exemplary damages in an amount to be determined at time of trial;

### FIFTH CAUSE OF ACTION

11. For specific damages according to proof at time of trial;

12. For general damages according to proof at time of trial;

13. For punitive and exemplary damages in an amount to be determined at time of trial;

### SIXTH CAUSE OF ACTION

14. For specific damages according to proof at time of trial;

15. For general damages according to proof at time of trial;

16. For punitive and exemplary damages in an amount to be determined at time of trial;

### SEVENTH CAUSE OF ACTION

17. For specific damages according to proof at time of trial;

18. For general damages according to proof at time of trial;

19. For punitive and exemplary damages in an amount to be determined at time of trial;

### EIGHTH CAUSE OF ACTION

20. For specific damages according to proof at time of trial;

21. For general damages according to proof at time of trial;

22. For punitive and exemplary damages in an amount to be determined at time of trial;

1   //

## NINTH CAUSE OF ACTION

23. For specific damages according to proof at time of trial;

24. For general damages according to proof at time of trial;

25. For punitive and exemplary damages in an amount to be determined at time of trial;

## TENTH CAUSE OF ACTION

26. For specific damages according to proof at time of trial;

27. For general damages according to proof at time of trial;

28. For punitive and exemplary damages in an amount to be determined at time of trial;

## ELEVENTH CAUSE OF ACTION

29. For specific damages according to proof at time of trial;

30. For general damages according to proof at time of trial;

31. For punitive and exemplary damages in an amount to be determined at time of trial

## TWELFTH CAUSE OF ACTION

32. For specific damages according to proof at time of trial;

33. For general damages according to proof at time of trial;

34. For punitive and exemplary damages in an amount to be determined at time of trial;

## THIRTEENTH CAUSE OF ACTION

35. For specific damages according to proof at time of trial;

36. For general damages according to proof at time of trial;

37. For punitive and exemplary damages in an amount to be determined at time of trial;

## FOURTEENTH CAUSE OF ACTION

38. For specific damages according to proof at time of trial;

39. For general damages according to proof at time of trial;

40. For punitive and exemplary damages in an amount to be determined at time of trial

//

//

**ALL CAUSES OF ACTION**

41. For costs of suit incurred herein;

42. For reasonable attorneys fees;

43. For prejudgment interest at the legal rate;

44. For all other relief this Court deems just and proper.

Date: March 25, 2021                                    HARRIS/THALER LAW

By:_____

JOHN H. THALER, Plaintiff