| Exhibit | Description |
| --- | --- |
| Exhibit A | Victim Letter in Case No. 2020-047858 |
| Exhibit B | Victim Letter in Case No. 2021-018183 |
| Exhibit C | Victim Letter in Case No. 2021-018310 |
| Exhibit D | Decree of Dissolution of Marriage |
| Exhibit E | September 2, 2020 Minute Entry |
| Exhibit F | September 3, 2020 Minute Entry |
| Exhibit G | December 9, 2020 Minute Entry Order |
| Exhibit H | February 25, 2021 Minute Entry Order |
| Exhibit I | Emergency Ex Parte Communication to Court Regarding Fraudulent and Forged Divorce Decree and Exhibits attached therewith |
| Exhibit J | Denial of Change of Judge for Cause |
| Exhibit K | April 5, 2021 Minute Entry Order |
| Exhibit L | Denial of Motion for Change of Judge for Cause Regarding Judge Rogers and Davis |
| Exhibit M | Complaint for Annulment (Nevada) |
| Exnibht N | Verified Complaint for Damages (California) |
| Exhibit O | Order Dismissing Case No. 21VECV00280 |
| Exhibit P | Complaint in Case No. 2:21-cv-02892 |
| Exhibit Q | Order TRANSFERRING Case to District of Arizona Due to Improper Venue |

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT A

 **Gmail**

**Brittany Thaler** ██████████████

# Victim Letter-Notice of Trial in Absentia-bench warrant issued: 013344118: 8/25/2021 4:24:23 PM

1 message

---

**Mesa City Pros** <MesaCityPros@mesaaz.gov>                    Wed, Aug 25, 2021 at 4:24 PM
To: " ████████████████████████████



250 E. First Avenue, Ste. 222
P.O. Box 1466
Mesa, AZ 85211-1466

CITY PROSECUTOR S OFFICE

VICTIM SERVICES

mesaaz gov

August 25,2021

Brittany Rae Thaler
9502 E Olla Cir
Mesa, AZ 85212

RE:  State vs. John Harris Thaler

   Case No. 2020047858

      Police Report No. 2020-201770116

      Date of Violation: 06/24/2020

      Location: 2430 S Ellsworth Rd  Mesa AZ

The defendant in the above mentioned case failed to appear for the scheduled trial date. The trial was held without the defendant present, and he/she was found guilty.

 **A WARRANT HAS BEEN ISSUED**

A bench warrant was issued for the arrest of the defendant.  No further action will occur and the warrant will remain until the defendant is arrested or voluntarily appears in Court.

 **RIGHT TO BE PRESENT AND HEARD**

As a victim, you have the right to be present and to be heard by the court prior to the sentence being imposed. If you want to invoke this right when the defendant does appear or is arrested on the warrant, notify Victim Services now to ensure you are notified of the sentencing date at (480) 644-2188.

 **VICTIM IMPACT STATEMENTS**

A Victim Impact Statement ensures your right to be heard even if you cannot appear for the sentencing. The Victim Impact Statement may include a description of what was done to you or your property, describe how the crime has impacted you and/or your family, describe how much economic loss you have suffered as a result of the crime, and the outcome or the sentence you would like to see imposed or that you feel is appropriate. Fax or mail your Victim Impact Statement to Victim Services **as soon as possible**.

 **RESTITUTION REQUESTS**

If you incurred out-of-pocket expenses as a direct result of this crime, you may be eligible to request restitution. Expenses may include, but are not limited to: repairs to damaged property or replacement costs, medical/dental bills, lost wages, and transportation to and from court hearings. If you plan to make a request, please call Victim Services **as soon as possible** and submit the restitution form with supporting documents.

**RESTITUTION LIENS**

If restitution is ordered by the court, you have the right to file a restitution lien. A restitution lien notifies all persons dealing with the defendant and/or the defendant's property listed in the lien of your claim for restitution. For more information on restitution liens and forms, please contact Victim Services.

Sincerely,

Emily

Emily
Senior Victim Services Assistant



**NOTICE OF ADDRESS CHANGE**

It i  your re pon ibility to notify our office of any change of addre   or contact information  If you move
or have a change of addre   , plea e contact Victim Service  to en ure that all future notice  are
received

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT B

 Gmail

**Brittany Thaler** ▆▆▆▆▆▆

# Victim Letter-Notice of Trial in Absentia-bench warrant issued: 013350194: 8/25/2021 5:51:00 PM

1 message

**Mesa City Pros** <MesaCityPros@mesaaz.gov>                    Wed, Aug 25, 2021 at 5:51 PM
To: ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆



250 E. First Avenue, Ste. 222
P.O. Box 1466
Mesa, AZ 85211-1466

CITY PROSECUTOR S OFFICE

VICTIM SERVICES

mesaaz gov

August 25,2021

Brittany Rae Thaler
9502 E Olla Cir
Mesa, AZ 85212

RE:  State vs. John Harris Thaler

Case No. 2021018183

Police Report No. 2020-70718

Date of Violation: 11/30/2020

Location: 2908 S Abbey  Mesa AZ

The defendant in the above mentioned case failed to appear for the scheduled trial date. The trial was held without the defendant present, and he/she was found guilty.

 **A WARRANT HAS BEEN ISSUED**

A bench warrant was issued for the arrest of the defendant.  No further action will occur and the warrant will remain until the defendant is arrested or voluntarily appears in Court.



## RIGHT TO BE PRESENT AND HEARD

As a victim, you have the right to be present and to be heard by the court prior to the sentence being imposed.  If you want to invoke this right when the defendant does appear or is arrested on the warrant, notify Victim Services now to ensure you are notified of the sentencing date at (480) 644-2188.



## VICTIM IMPACT STATEMENTS

A Victim Impact Statement ensures your right to be heard even if you cannot appear for the sentencing. The Victim Impact Statement may include a description of what was done to you or your property, describe how the crime has impacted you and/or your family, describe how much economic loss you have suffered as a result of the crime, and the outcome or the sentence you would like to see imposed or that you feel is appropriate.  Fax or mail your Victim Impact Statement to Victim Services **as soon as possible**.



## RESTITUTION REQUESTS

If you incurred out-of-pocket expenses as a direct result of this crime, you may be eligible to request restitution.  Expenses may include, but are not limited to: repairs to damaged property or replacement costs, medical/dental bills, lost wages, and transportation to and from court hearings. If you plan to make a request, please call Victim Services **as soon as possible** and submit the restitution form with supporting documents.

## RESTITUTION LIENS

If restitution is ordered by the court, you have the right to file a restitution lien.  A restitution lien notifies all persons dealing with the defendant and/or the defendant's property listed in the lien of your claim for restitution. For more information on restitution liens and forms, please contact Victim Services.

Sincerely,

Emily

Emily
Senior Victim Services Assistant



**<u>NOTICE OF ADDRESS CHANGE</u>**

It i  your re pon ibility to notify our office of any change of addre    or contact information   If you move
or have a change of addre   , plea  e contact Victim Service   to en  ure that all future notice   are
received

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT C

 Gmail                                    **Brittany Thaler** ▮▮▮▮▮▮▮▮▮

---

## Victim Letter-Notice of Trial in Absentia-bench warrant issued: 013350228: 8/25/2021 5:52:30 PM

1 message

---

**Mesa City Pros** <MesaCityPros@mesaaz.gov>                    Wed, Aug 25, 2021 at 5:52 PM
To: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



250 E. First Avenue, Ste. 222
P.O. Box 1466
Mesa, AZ 85211-1466

CITY PROSECUTOR S OFFICE

VICTIM SERVICES
mesaaz gov

August 25,2021

Brittany Rae Thaler
9502 E Olla Cir
Mesa, AZ 85212

RE: State vs. John Harris Thaler

Case No. 2021018310

Police Report No. 2020-87087

Date of Violation: 12/25/2020

Location: 2908 S Abbey  Mesa AZ

The defendant in the above mentioned case failed to appear for the scheduled trial date. The trial was held without the defendant present, and he/she was found guilty.

 **A WARRANT HAS BEEN ISSUED**

A bench warrant was issued for the arrest of the defendant.  No further action will occur and the warrant will remain until the defendant is arrested or voluntarily appears in Court.



## RIGHT TO BE PRESENT AND HEARD

As a victim, you have the right to be present and to be heard by the court prior to the sentence being imposed. If you want to invoke this right when the defendant does appear or is arrested on the warrant, notify Victim Services now to ensure you are notified of the sentencing date at (480) 644-2188.



## VICTIM IMPACT STATEMENTS

A Victim Impact Statement ensures your right to be heard even if you cannot appear for the sentencing. The Victim Impact Statement may include a description of what was done to you or your property, describe how the crime has impacted you and/or your family, describe how much economic loss you have suffered as a result of the crime, and the outcome or the sentence you would like to see imposed or that you feel is appropriate. Fax or mail your Victim Impact Statement to Victim Services **as soon as possible**.



## RESTITUTION REQUESTS

If you incurred out-of-pocket expenses as a direct result of this crime, you may be eligible to request restitution. Expenses may include, but are not limited to: repairs to damaged property or replacement costs, medical/dental bills, lost wages, and transportation to and from court hearings. If you plan to make a request, please call Victim Services **as soon as possible** and submit the restitution form with supporting documents.

## RESTITUTION LIENS

If restitution is ordered by the court, you have the right to file a restitution lien. A restitution lien notifies all persons dealing with the defendant and/or the defendant's property listed in the lien of your claim for restitution. For more information on restitution liens and forms, please contact Victim Services.

Sincerely,

*Emily*

Emily
Senior Victim Services Assistant



## <u>NOTICE OF ADDRESS CHANGE</u>

It is your responsibility to notify our office of any change of address or contact information.  If you move or have a change of address, please contact Victim Services to ensure that all future notices are received.

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT D

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

### HONORABLE MARVIN DAVIS

Brittany R Thaler
      Petitioner

Case Number:  **FC2019-098211**

AND

John H Thaler
      Respondent

# DECREE OF DISSOLUTION OF MARRIAGE

The Evidentiary hearing in this matter occurred on 12/29/2020. The Court has considered the evidence which includes where applicable/presented, the demeanor of the witnesses, reviewed the exhibits as well as the case history, and considered the parties' arguments and agreements.

The Court makes the following findings and enters the following orders:

## JURISDICTIONAL FINDINGS

**THE COURT FINDS** as follows:

- At the time this action was commenced at least one of the parties was domiciled in the State of Arizona and that said domicile had been maintained for at least 90 days prior to filing the Petition for Dissolution of Non-Covenant Marriage.
- The conciliation provisions of A.R.S. § 25-381.09 have either been met or do not apply.
- The parties were married on April 13, 2016. By operation of law, the marital community is deemed to have terminated on December 23, 2019.
- This was not a covenant marriage.
- The marriage is irretrievably broken and there is no reasonable prospect for reconciliation.
- Brittany Thaler is not pregnant.
- To the extent that it has jurisdiction to do so, the court has considered, approved and made provision for the maintenance of each spouse and the division of property and debts.
- There is a minor child common to the parties, namely: Mckinley H Thaler [DOB 12/12/2017].
- Arizona was the child's home state on the date the petition was filed or was the child's home state within six months before the filing and the child is absent from this state but a parent or person acting as a parent continues to live in this state.
- The federal Parental Kidnapping Prevention Act does not apply and that no international law concerning the wrongful abduction or removal of children applies.

## DISSOLUTION OF MARRIAGE

**IT IS ORDERED** dissolving the marriage of the parties and restoring each party to the status of a single person.

## PATERNITY

**Thaler and  Thaler**                          Case Number: **FC2019-098211**

**THE COURT FINDS** that based on the testimony and evidence presented, John Thaler is parent of the following minor child:

Mckinley H Thaler born on 12/12/2017 to Brittany Thaler

**IT IS ORDERED** declaring that John Thaler is the legal parent of the following minor ***child***:

Mckinley H Thaler born on 12/12/2017 to Brittany Thaler

**IT IS FURTHER ORDERED** that the parties shall take all necessary steps to have the birth certificate of the minor child amended in accordance with this order if the correct information does not now appear on the original certificate. Information for amendment of a birth certificate may be obtained from the Office of Vital Records, Department of Health Services, 1818 W. Adams, Phoenix, Arizona 85007; Phone (602) 364-1300. A certified copy of this minute order may be obtained after ten days of receipt of same, and shall then be provided, together with all other required documents and fees, to the Office of Vital Records, so that the birth certificate can be amended or supplemented as ordered.

## LEGAL DECISION-MAKING AND PARENTING TIME

### Best Interest Findings: A.R.S. § 25-403

A.R.S. § 25-403(A) enumerates specific factors for the Court to consider, among all factors that are relevant to the child's physical and emotional well-being. The best interest of a child is the primary consideration in awarding legal decision-making authority and parenting time. *Hays v. Gama*, 205  99, 102, ¶ 18, 67 P.3d 695, 698, ¶ 18 (2003).

In making the legal decision making and parenting time determination, the Court is mindful that as a matter of public policy, absent evidence to the contrary, "it is in a child's best interest: (1) To have substantial, frequent, meaningful and continuing parenting time with both parents[; and] (2) To have both parents participate in decision making about the child." *See* A.R.S. § 25-103(B).

As a precursor to the analysis of the child's best interest and because of the parents' inability to reach an agreement, the Court considers the following issues regarding the parents.  See A.R.S. § 25-403.01.

- *Whether a parent's lack of agreement is unreasonable or is influenced by an issue not related to the child's best interests.*
  Father's unwillingness to engage in reasonable negotiations, coupled with the frivolous pleadings he has filed, demonstrate that Father is motivated or influenced by an issue not related to the child's best interests.

- *The past, present and future abilities of the parents to cooperate in decision-making about the children to the extent required by the order of joint legal decision-making.*
  Given Father's inappropriate and unreasonable behavior, and his questionable mental health status, the parties are not able to cooperate in decision-making regarding the child.

- *Whether the joint legal decision-making arrangement is logistically possible.*
  At this time, the Court is very concerned about Father's mental health status; in addition, Father's specific whereabouts are unknown; thus, a joint legal decision-making arrangement is not logistically possible without more information.

Thaler and Thaler                                    Case Number: **FC2019-098211**

**THE COURT FINDS** as follows regarding the child's best interests pursuant to A.R.S. § 25-403(A):

1  *The past, present and potential future relationship between the parent and the child.*
Mother testified that Father has not exercised any of his parenting time since the Temporary Orders were entered on October 20, 2020. Mother also testified that the child has not asked to see Father in the last two months. Mother reports that the child loves swimming, gymnastics and was participating in a musicology program before the COVID-19 pandemic.

The Court finds that Mother has a strong, loving bond with the child.

2  *The interaction and interrelationship of the child with the child's parent or parents, the child's siblings and any other person who may significantly affect the child's best interest.*
No information was provided regarding the child's interaction with extended family or any other third parties.

3  *The child's adjustment to home, school and community.*
The child in this matter is just three years of age and is too young to be enrolled in school. The Court finds that the child is well adjusted to Mother's home.

4  *If the child is of suitable age and maturity, the wishes of the child as to legal decision-making and parenting time.*
The child in this case is not of suitable age and maturity.

5  *The mental and physical health of all individuals involved.*
Mother testified that she is physically and mentally healthy despite father's allegations to the contrary. Mother also reports that Father never completed the court-ordered psychological examination, and Father's recent emails and allegations corroborate the fact that he is not mentally stable.

The Court finds that the physical and mental health of Mother and the child are stable. Father's mental health is of serious concern to the Court at this point. The Court notes that Father was ordered to undergo a psychological evaluation but he has blatantly refused to do so. In addition, Father's pleadings and comments towards Mother, the Court, opposing counsel and the CAA have been extreme, disrespectful, delusional and erratic. Moreover, Father's behavior in this matter raises additional concerns regarding the child's safety while in Father's care.

6  *Which parent is more likely to allow the child frequent meaningful and continuing contact with the other parent. (This paragraph does not apply if the Court determines that a parent is acting in good faith to protect the child from witnessing an act of domestic violence or being the victim of domestic violence or child abuse.)*
Mother testified that she wants Father's help and she wants Father to be involved in the child's life but Father needs to get healthy first. Mother reports that Father did not follow previous court orders and took the child out of the state. Mother also reports that Father threatened to remove the child from the United States.

The Court finds that Mother is the parent who is more likely to allow the child frequent, meaningful and continuing contact with Father.

7  *Whether one parent intentionally misled the Court to cause an unnecessary delay, to increase the cost of litigation or to persuade the Court to give legal decision-making or parenting time preference to that parent.*

**Thaler and Thaler**                                   Case Number: **FC2019-098211**

The Court finds that Father has intentionally misled the Court with respect to the baseless and unfounded allegations that Father has included in his pleadings, which include conspiracy theories that allege Mother, opposing counsel, the Court (including various judges), the CAA, and the Judicial Assistant are engaged in a nefarious and illegal scheme to defraud. These pleadings and allegations are completely baseless/unfounded and were clearly drafted and filed with the intent to mislead the Court, increase the cost of litigation or to persuade the Court to give a legal decision-making or parenting time preference to Father.

8   *Whether there has been domestic violence or child abuse pursuant to A.R.S. § 25-403.03.*
Mother testified that she, along with her Mother, obtained an Order of Protection against Father. Mother further testified that Father has violated this Order of Protection on several occasions.

9   *The nature and extent of coercion or duress used by a parent in obtaining an agreement regarding legal decision-making or parenting time.*
No agreement was reached in this matter.

10   *Whether a parent has complied with chapter 3, article 5 of title 25, Arizona Revised Statutes.*
The domestic relations education provision of A.R.S. § 25-352 have not been fully satisfied. John H Thaler has not completed the Parent Education Program requirements of A.R.S. § 25-352 and/or presented proof of completion as required. John H Thaler shall have 30 days to complete an approved Parent Education Program and file proof of completion with the Clerk of Court.

Any party who has not completed the Parent Education Program requirements of A.R.S. § 25-352 as ordered may be held in contempt of court, and shall not file any subsequent pleadings to modify or enforce any provisions of this Judgment until he or she has filed proof of completion. A "Parent Information Program Notice" is available to the parties at the Law Library Resource Center and the Family Court filing counter. The notice details the program requirements and includes a list of approved parent information classes.

11   *Whether either parent was convicted of an act of false reporting of child abuse or neglect under A.R.S. § 13-2907.02.*
No information was presented regarding this factor.

In addition to the foregoing, the Court must also consider any history of domestic violence or child abuse (A.R.S. § 25-403.03), any substance abuse issues (A.R.S. § 25-403.04) and any sexual offender issues (A.R.S. § 25-403.05).

**Domestic Violence**

Brittany Thaler has alleged that John Thaler has committed domestic violence. Therefore, the Court further considers the award of legal decision-making authority and parenting time in light of the alleged presence of domestic violence under A.R.S. § 25-403.03. Arizona's law establishes the following:

A person commits an act of domestic violence if that person has: (1) intentionally, knowingly or recklessly caused or attempted to cause sexual assault or serious physical injury; (2) placed a person in reasonable apprehension of imminent serious physical injury to any person; or (3) engaged in a pattern of behavior for which the court may issue an ex parte order to protect the other parent who is seeking legal decision-making authority or to protect the child or the child's siblings. [A.R.S. § 25-403-03(B)].

The court shall consider evidence of domestic violence as being contrary to the best interests of the child. The court shall consider the safety and well-being of the child and of the victim of the act of domestic violence to be of primary importance. The court shall consider a perpetrator's history of causing or threatening to cause physical harm to another person [A.R.S. § 25-403.03(B)].

In accordance with A.R.S. § 25-403.03(C), the Court has considered the following factors and makes the following findings to determine whether domestic violence has been committed:

1. *Findings from another court of competent jurisdiction.*
   Mother presented Orders from the Gilbert Municipal Court regarding Father's pending cases; these Orders were issued on November 12, 2020 and November 19, 2020. In the November 12th report, the Gilbert Court ordered the following: " The defendant shall have no contact with Brittany Rae Thaler. The defendant shall not leave the State of Arizona without prior court approval. The defendant shall not go on or near the residence or workplace of Brittany Rae Thaler. The defendant shall not possess or consume alcohol or drugs without a valid prescription. The defendant shall not possess or control any firearms, ammunition or other deadly weapons. The defendant must surrender any firearms currently in his possession or control to the Gilbert Police Department for safekeeping within 24 hours. The defendant shall provide proof that he is handling the cases in CA that are referred to in his motion to continue."

   The November 19th report stated (in part) the following: "At the November 12, 2020, pretrial conference, this court was informed that since the time of the arraignment, the defendant has had other charges of Violation of Court Order (Domestic Violence) filed against him. In addition, the contents of the motions, and the manner in which the motions are presented, causes the court concern."

2. *Police reports.*
   Mother presented numerous police reports from the Mesa Police Department involving alleged violations of Orders of Protection by Father. Mother also submitted a "List of Involvements with Mesa police Department" involving Father (Ex. 50). According to this document, Father, since December 13, 2019, has been involved with the Mesa PD on 28 occasions. All of these "involvements," with the exception of two, involve charges/allegations of interference with judicial proceedings, custodial interference or an Order of Protection (against Father).

3. *Medical reports.*
   No information was presented regarding this factor.

4. *Department of Child Safety records.*
   No information was presented regarding this factor.

5. *Domestic violence shelter records.*
   No information was presented regarding this factor.

6. *School records.*
   No information was presented regarding this factor.

7. *Witness testimony.*
   See Section 8 above.

**THE COURT FINDS** that based on the above, John Thaler has engaged in acts of domestic violence against Brittany Thaler.

**Thaler and  Thaler**                           Case Number: **FC2019-098211**

Having found the existence of domestic violence, the Court addresses the admonition in A.R.S. § 25-403.03 (A), which states that notwithstanding the presumption in subsection D, "joint custody shall not be awarded if the court makes a finding of the existence of <u>significant</u> domestic violence pursuant to A.R.S. § 13-3601 or if the court finds by a preponderance of the evidence that there has been <u>significant</u> domestic violence." A.R.S. § 25-403.03(A) (emphasis added).

Meaning, a finding of significant domestic violence or a history of significant domestic violence precludes an award of joint legal decision making or an award of sole legal decision making to the parent who committed the significant act of domestic violence. *See Hurd v. Hurd*, 223 Ariz. 48, 51, 219 P.3d 258, 261 (App. 2009) (construing A.R.S. § 25-403.03 before 2012 change from legal custody to legal decision making). Further, "when the party that committed the act of violence has not rebutted the presumption that awarding [legal decision making] to that person is contrary to the best interest of the child, the court need not consider all the other best-interest factors in A.R.S. § 25-403.A." See id.

Any domestic violence is serious and cause for concern, particularly when directed at another parent. However, the admonition in subsection A applies only to "significant domestic violence". Significance is a product of three factors: (1) The seriousness of the particular incident of domestic violence, (2) the frequency or pervasiveness of the domestic violence, (3) and the passage of time and its impact. Here, the evidence establishes that by a preponderance of the evidence, there has been domestic violence by John Thaler.

**THE COURT FURTHER FINDS** that though the Court by no means condones the actions found in this case, those acts in the spectrum of domestic violence do not constitute significant as contemplated by statute.

**THE COURT THEREFORE FINDS** by a preponderance of evidence that John Thaler has not engaged in "significant domestic violence" such that the prohibition on awarding joint legal decision-making authority does not apply.

The Court next considers A.R.S. § 25-403 (D), which provides as follows:

> If the Court determines that a parent who is seeking sole or joint decision-making authority has committed an act of domestic violence against the other parent, there is a rebuttable presumption that an award of sole or joint decision-making authority to the parent who committed the act of domestic violence is contrary to the child's best interests. This presumption does not apply if both parents have committed an act of domestic violence. (Emphasis added).

Here the presumption applies because John Thaler committed at least one act of domestic violence against Brittany Thaler, and Brittany Thaler has not committed domestic violence. To determine whether John Thaler has overcome the presumption, the Court considers the following factors in A.R.S. § 25-403.03 (E).

1. *Whether the parent has demonstrated that being awarded sole or joint legal decision-making authority or substantially equal parenting time is in the child's best interests.*
   Father presented no information regarding this factor.

2. *Whether the parent has successfully completed a batterer's prevention program.*
   No information was presented regarding this factor.

3. *Whether the parent has successfully completed a program of alcohol or drug abuse counseling, if the court determines that counseling is appropriate.*
   No information was presented regarding this factor.

Thaler and Thaler                                    Case Number: **FC2019-098211**

4. *Whether the parent has successfully completed a parenting class, if the court determines that a parenting class is appropriate.*
No information was presented regarding this factor.

5. *If the parent is on probation, parole or community supervision, whether the parent is restrained by a protective order that was granted after a hearing.*
No information was presented regarding this factor.

6. *Whether the parent has committed any further acts of domestic violence.*
No additional information was presented regarding this factor.

**THE COURT FINDS** that based upon the above, John Thaler has not rebutted the presumption under A.R.S. § 25-403.03 (D).

### Substance Abuse

A.R.S. § 25-403.04 requires further analysis if a parent has abused drugs or alcohol or has been convicted of any drug offense under title 13, chapter 34 or any violation of A.R.S. § 28-1381, A.R.S. § 28-1382, or A.R.S. § 28-13783 within twelve months before the petition or request for legal decision-making authority or parenting time is filed.

In this case Brittany Thaler has alleged that the other party has abused drugs or alcohol or was convicted of the offense.

**THE COURT FINDS** that the following supports its determination that John Thaler has not abused drugs or alcohol or was convicted of the offense:

Mother has alleged that Father abused drugs but there were no time frames testified to regarding the alleged drug use. As such, the Court cannot conclude that there was any drug abuse within the twelve months preceding the filing of the Petition as required by statute.

### Sex Offenders

Neither party has presented any evidence to require consideration of the provision of A.R.S. § 25-403.05 (A).

# Legal Decision-Making

*Legal decision-making authority,* as defined by A.R.S. § 25-401(3), means the legal right and responsibility to make all non-emergency legal decisions for a child including those regarding education, health care, religious training and personal care decisions. For the purpose of interpreting or applying any international treaty, federal law, a uniform code or the statutes of other jurisdictions of the United States, legal decision-making means legal custody.

### For Mckinley Thaler

**THE COURT FINDS** that based upon the above, it is in the child's best interest that Brittany Thaler be awarded sole legal decision-making authority.

**IT IS THEREFORE ORDERED** awarding Brittany Thaler sole legal decision-making authority regarding Mckinley Thaler, as defined in A.R.S. § 25-401(6). For the purpose of this order,

"Sole legal decision-making" means one parent has the legal right and responsibility to make major decisions for the child.

HONORABLE MARVIN DAVIS

**Thaler and  Thaler**                                    Case Number: **FC2019-098211**

**IT IS FURTHER ORDERED** that Father has not rebutted the presumption against joint legal decision-making as a result of the domestic violence findings.  In addition, Father has failed to submit to a court-ordered psychological evaluation and the Court is therefore unable to ascertain whether or not Father is mentally healthy and able to care for the child.  As stated above, the Court is very concerned about Father's mental health given the manner in which Father has conducted himself during these proceedings.  Unless or until the Court can determine (through a psychiatric/psychological evaluation) whether or not Father is mentally stable/healthy enough to make decisions on the child's behalf, and whether the child is safe in Father's care, Mother shall have sole legal decision-making authority.

## Parenting Time

The Court has awarded sole legal decision making of the child to Brittany Thaler. John Thaler, nonetheless, "is entitled to reasonable parenting time to ensure that the minor child has substantial, frequent, meaningful and continuing contact with the parent unless the Court finds, after a hearing, that parenting time would endanger the child's physical, mental, moral or emotional health."

**THE COURT FINDS** that the parenting time of John Thaler must be supervised to protect the child's physical, mental, or emotional health. *See* A.R.S. § 25-403.01(D) and A.R.S. § 25-411(D); *see also Hart v. Hart*, 220 Ariz. 183, ¶16, 204 P.3d 441, ¶16 (App. 2009)

**THE COURT FURTHER FINDS** that Father's mental health status is of concern to the Court given the misconduct Father has engaged in during these proceedings.  Such conduct includes threatening and harassing Mother, opposing counsel, and the CAA. In addition, Father's pleadings and allegations in this matter do not appear to be tethered to reality.  Father has also been aggressive, vulgar and belligerent towards everyone involved in this case, including court staff.   Father was ordered to undergo a psychological evaluation but has refused to do so.  As previously stated, the Court is unable to ascertain whether or not Father is mentally stable/healthy enough to care for the child, which raises safety concerns for the child during any unsupervised parenting time for Father.

**THE COURT THEREFORE FINDS** that allowing John Thaler to have unsupervised parenting time with the child would or could endanger seriously the child's physical, mental, or moral health or would significantly impair the child's emotional development.

**THE COURT FINDS** specifically that Father's mental stability is uncertain and questionable at best, necessitating the need for supervised parenting time for Father to ensure the safety of the child.

**IT IS THEREFORE ORDERED** as follows:

1.  Effective December 31, 2020, all parenting time assigned to John Thaler shall be supervised by an agency.
2.  As applied here, supervision requires that all parenting time exercised by Father be monitored by an official, licensed facility such as Arizonans for Children.
3.  At no time shall John Thaler attempt to secure any unsupervised parenting time with the child.
4.  John Thaler's parenting time shall be: twice per week for up to two hours per session at a licensed, official agency.  If Father wishes to exercise his parenting time, he must give Mother 48 hours notice.

**Thaler and Thaler**                          Case Number: **FC2019-098211**

5. These terms shall continue to apply until modified by court order. For the Court to consider lifting the restrictions in this order, John Thaler shall undergo a psychological/psychiatric evaluation by a forensically trained/informed psychologist/psychiatrist before the legal decision-making and parenting time orders in this matter can be modified.

6. Brittany Thaler shall be responsible for 0% and John Thaler shall be responsible for 100% of all costs associated with supervised parenting time.

**Holiday Schedule:** The Holiday Schedule does not apply at this time.

**Summer/Vacation:** Parents will follow regular weekday/weekend parenting time schedule.

**IT IS ORDERED** that the following terms shall apply:

1. **Parental Access To Records And Information:** Both parents are entitled to have equal access to prescription medication, documents, and other information concerning the child's, education and physical, mental, moral and emotional health including medical, school, police, court and other records directly from the custodian of the records or from the other parent. A person who does not comply with a reasonable request shall reimburse the requesting parent for court costs and attorney fees incurred by that parent to force compliance with this subsection. A parent who attempts to restrict the release of documents or information by the custodian, without a prior court order, is subject to appropriate legal sanctions.

2. **Prescription Medications:** A parent with joint legal decision-making authority shall not designate one pharmacy in a single location as the only source of the child's prescription medication without agreement of the other parent. A parent who attempts to withhold prescription medication without a prior court order is subject to appropriate legal sanctions.

3. **Relocation:** Neither Brittany Thaler nor John Thaler shall relocate the residence of the child outside of the state of Arizona or to a distance greater than 100 miles from the current residential locations without compliance with A.R.S. § 25-408. Any findings that a party has failed to comply may result in sanctions against that party pursuant to the same statute.

4. **Mediation Or Conciliation Services:** The parties are required to participate in mediation through a private mediator as agreed or through this Court's Conciliation Services to attempt to resolve any disputes, problems or proposed changes regarding legal decision-making or parenting time before an evidentiary hearing on any legal decision-making or parenting time issues.

5. **Periodic Review:** It is recognized that the needs of the child may change over time. At a minimum, the parents shall review the terms of this overall plan at least every 12 months to address whether any changes may be appropriate.

6. **Sex Offenders:** In accordance with A.R.S. § 25-403.05(B), a parent must notify the other parent immediately if the parent knows that a convicted or registered sex offender or a person who has been convicted of a dangerous crime against children (as defined in A.R.S. § 13-705) may have access to the child. The parent must provide notice by first class mail (return receipt requested), by electronic means to an electronic mail address that the recipient provided to the parent for notification purposes or by other communication accepted by the Court.

7. **Notify Other Parent of Address Change**: Each parent will inform the other parent of any change of address and/or phone number in advance or within 14 days of the change.

8. **Notify Other Parent of Emergency:** Both shall promptly inform the other parent of any emergency or other important event that involves the minor child.

9. **Cooperate and Work Together**: Both parents shall exert their best efforts to work cooperatively in future plans consistent with the best interests of the minor child and to amicably resolve such disputes as may arise.

10. **Notify Other Parent of Problems with Parenting Time Ahead of Time**: If either parent is unable to follow through with the Parenting Time arrangements involving the minor child, that parent shall notify the other parent as soon as possible.

## CHILD SUPPORT

**THE COURT FINDS that:**

- The relevant financial factors and the discretionary allowances and adjustments which the Court will allow for a current calculation of child support pursuant to the Arizona Child Support Guidelines are set forth in the Child Support Worksheet and order which the Court hereby incorporates and adopts as its findings with respect to child support.
- **Child Support:** John Thaler is obligated to pay child support to Brittany Thaler pursuant to the Arizona Child Support Guidelines in the amount of $1,341.00 per month.
- **Past Support:** It is appropriate to award Brittany Thaler an additional judgment for past support in the amount of $9,342.00 for appropriate past support from the date of filing of the current petition until today.

**IT IS THEREFORE ORDERED that:**

- **Child Support:** John Thaler shall pay child support to Brittany Thaler in the sum of $1,341.00 per month, payable on the 1st day of each month commencing 01/01/2021 by income withholding order.
- **Past Support:** Brittany Thaler is also granted judgment against John Thaler in the additional amount of $9,342.00. John Thaler shall pay the additional sum of $300.00 per month towards this judgment, payable on the first (1st) day of each month beginning 01/01/2021 until paid in full.

## DIVISION OF PROPERTY AND DEBTS

### Community/Sole and Separate Property Claims and Debts

The Court shall divide any disputed property in accordance with the property's character. Property is characterized by the time of its acquisition. If acquired by either spouse before marriage or acquired during marriage by gift, devise, or descent, property is characterized as separate property. A.R.S. § 25-213(A). The Court shall assign each spouse's sole and separate property to that spouse. A.R.S. § 25-318(A).

Property acquired by either spouse during marriage is characterized as community property (with the exceptions of property acquired by gift, devise, or descent). A.R.S. § 25-211(A). There is a presumption that any property acquired by either spouse during marriage is community property, unless demonstrated otherwise by clear and convincing evidence. *See Sommerfield v. Sommerfield*, 121 Ariz. 575, 578, 592 P.2d 771, 774 (1979). Any property acquired by either spouse outside of Arizona shall be deemed to be community property if such property would have been characterized as community property had it been initially acquired in Arizona. A.R.S. § 25-318(A).

### Equitable Division

HONORABLE MARVIN DAVIS

Thaler and Thaler                                    Case Number: **FC2019-098211**

The Court shall divide community property equitably, although not necessarily in kind, without any regard to marital misconduct. A.R.S. § 25-318(A). As a general presumption, equitable division requires that community property be divided substantially equally. *See Toth v. Toth*, 190 Ariz. 218, 221, 946 P.2d 900, 903 (1997). However, the court may order an unequal division of community property in consideration of excessive or abnormal expenditures or the destruction, concealment, or fraudulent disposition of property. A.R.S. § 25-318(C).

When dividing property, the Court may consider all related debts and obligations. A.R.S. § 25-318(B). To determine property's value, the court shall select a valuation date. The selection of this valuation date rests within the wide discretion of the trial court and shall be tested upon review by the fairness of the result. *See Sample v. Sample*, 152 Ariz. 239, 242-43, 731 P.2d 604, 607-08 (App. 1986).

## Unequal Division of Property

Only rarely is unequal division of community property appropriate to achieve equity. *See Toth*, 190 Ariz. at 221, 946 P.2d at 903 (unequal division of property was appropriate because one spouse contributed substantially disproportionate separate funds compared to the other's contribution); *see also Flower v. Flower*, 223 Ariz. 531, 531, 225 P.3d 588, 588 (App. 2010) (unequal division of property was appropriate because the parties incurred substantial community debt to benefit one spouse's separate property). *But see Inboden v. Inboden*, 223 Ariz. 542, 547, 225 P.3d 599, 604 (App. 2010) (vacating an order for the unequal division of property because each spouse had contributed separate funds to joint property).

The Court shall consider all equitable factors before ordering an unequal division of community property, including: the length of the marriage, the contributions of each spouse to the community, the source of funds used to acquire the property to be divided, the allocation of debt, and any other factor that may affect the outcome. *See Inboden*, 223 Ariz. at 547, 225 P.3d at 604.

**THE COURT FINDS** that this case does not present a unique set of facts or circumstances. Therefore, an equal division of community property is appropriate to achieve equity.

## Real Property

**THE COURT FINDS** that the parties do not own real property subject to division.

## Personal Property

**IT IS ORDERED:**

- Brittany R Thaler is awarded as sole and separate property, subject to any liens or encumbrances on the property, all vehicles, household furniture, furnishings and appliances, and other personal property in his/her possession.
- John H Thaler is awarded as sole and separate property, subject to any liens or encumbrances on the property, all vehicles, household furniture, furnishings and appliances, and other personal property in his/her possession.

## Financial Accounts

**THE COURT FINDS** that there are no financial accounts containing community property that require allocation.

**Thaler and Thaler**                                    Case Number: **FC2019-098211**

## Debts

**THE COURT FINDS** that the following community debts were identified:

| Type of Debt | Description | Amount | Details |
|---|---|---|---|
| Personal Loan | Suntrust/Lightstream | $7,540.03 | Pool Loan |
| Credit Card | Chase | $21,055.30 | |
| Credit Card | Discover Card | $25,635.71 | |

**IT IS ORDERED** that in fairly and equitably allocating the community assets and the community debts, the responsibility for the debts shall be divided as follows:

- Brittany Thaler shall be responsible for paying 50% and John Thaler shall be responsible for paying 50% of the Personal Loan - Suntrust/Lightstream.
- Brittany Thaler shall be responsible for paying 50% and John Thaler shall be responsible for paying 50% of the Credit Card - Chase.
- Brittany Thaler shall be responsible for paying 50% and John Thaler shall be responsible for paying 50% of the Credit Card - Discover Card.

**IT IS FURTHER ORDERED**:

- Brittany Thaler shall be solely responsible for any credit card or debt in their name incurred after service of the Petition.
- John Thalershall be solely responsible for any credit card or debt in their name incurred after service of the Petition.
- Any community debts that were not identified at the time of the trial shall be divided equally between the parties.
- Brittany Thaler shall ensure that John Thaler's name is removed from all credit accounts assigned to them in this Decree by February 13, 2021.
- John Thaler shall ensure that Brittany Thaler's name is removed from all credit accounts assigned to them in this Decree by February 13, 2021.
- Mother is requesting that Father be held responsible for his portion of the community debt that Mother has maintained since December 12, 2019 under the Bobrow case/analysis. Mother testified that the total amounts she has paid since December of 2019 is $14,178.88. $14,178.88 divided by 2 = $7,089.44. Mother also testified that she has paid $268.30 per month for Father's health insurance premiums for the last 12 months. Twelve months multiplied by $268.30 = $3,219.60 divided by 2 =$1,609.8. $7,089.44 + $1,609.8 = $8,699.24. Father shall pay Mother $8,699.24 for his portion of the community debt that has been maintained by Mother, and for his portion of the health insurance premiums that were also maintained by Mother. Father shall pay Mother $8,699.24 no later than April 1, 2021. This amount shall accrue interest at the maximum legal/statutory rate.
- Each party shall pay any debt incurred by him or her respectively since the date of service of the Petition in the matter.
- Each party shall indemnify and hold harmless from any and all debts designated as the responsibility of that party by the terms set forth in this Decree.

## ATTORNEY FEES AND COSTS

Brittany Thaler has requested an award of attorney fees and costs. An award of attorney fees and costs is

Thaler and Thaler        Case Number: **FC2019-098211**

governed by A.R.S. § 25-324. A.R.S. § 25-324 provides as follows:

> A. The court from time to time, after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings, may order a party to pay a reasonable amount to the other party for the costs and expenses of maintaining or defending any proceedings under this chapter or chapter 4, article 1 of this title. On request of a party or another court of competent jurisdiction, the court shall make specific findings concerning the portions of any award of fees and expenses that are based on consideration of financial resources and that are based on consideration of reasonableness of positions. The court may make these findings before, during or after the issuance of a fee award.

> B. If the court determines that a party filed a petition under one of the following circumstances, the court shall award reasonable costs and attorney fees to the other party:

> 1. The petition was not filed in good faith.
> 2. The petition was not grounded in fact or based on law.
> 3. The petition was filed for an improper purpose, such as to harass the other party, to cause an unnecessary delay or to increase the cost of litigation to the other party.

> C. For the purpose of this section, costs and expenses may include attorney fees, deposition costs and other reasonableness expenses as the court finds necessary to the full and proper presentation of the action, including any appeal.

> D. The court may order all amounts paid directly to the attorney, who may enforce the order in the attorney's name with the same force and effect, and in the same manner, as if the order had been made on behalf of any party to the action.

**THE COURT FINDS** that there is substantial disparity of financial resources between the parties. Because of the disparity John Thaler has considerably more resources available to contribute toward Brittany Thaler's attorney fees and costs.

**THE COURT FURTHER FINDS** that John Thaler acted unreasonably in the litigation. Specifically, John Thaler acted unreasonably by doing the following: Throughout the litigation in this matter, Father has refused to engage in discovery/disclosure and has not complied with the Court's order to undergo a psychological evaluation. Father, who is an attorney, was unprofessional as well as disrespectful and belligerent towards everyone involved in this case including Mother, her counsel, the CAA, the Court and judicial staff. Father repeatedly filed pleadings that were incoherent/delusional and contained allegations that were clearly baseless. The Court finds that Father filed pleadings that he knew contained false or inaccurate information. The Court further finds that Father filed these pleadings solely for the purposes of threatening and harassing everyone involved in this case..

**THE COURT FURTHER FINDS** that the provisions of A.R.S. § 25-324(B) do not apply.

**THE COURT FURTHER FINDS** that John Thaler knowingly presented a false claim, knowingly accused the other parent of making a false claim, or violated a court order compelling disclosure or discovery such that an award of attorney fees and costs is appropriate under A.R.S. § 25-415.

**IT IS THEREFORE ORDERED granting** Brittany Thaler's request for attorney fees and costs.

**Thaler and Thaler**                    Case Number: **FC2019-098211**

    **IT IS FURTHER ORDERED** that John Thaler shall pay a portion of Brittany Thaler's reasonable attorney fees and costs. Not later than 01/18/2021, counsel for Brittany Thaler shall submit all necessary and appropriate documentation to support an application for an award of attorney fees and costs, including a *China Doll* Affidavit and a form of order. By no later than 01/29/2021, John Thaler shall file any written objection. If Brittany Thaler's counsel fails to submit the documentation by 01/18/2021, no fees or costs will be awarded. The Court shall determine the award and enter judgment upon review of the Affidavit as well as any objections.

## **ADDITIONAL ORDERS**

**Thaler and Thaler**                    Case Number: **FC2019-098211**

**IT IS ORDERED** Marital Home: Mother testified that she purchased the marital home prior to marriage and that Father gifted her $34,400 (half of the down payment) to purchase the home. The home was sold in April of 2020 resulting in $173,970.06 in equity. The equity was placed into Mother's attorney's trust account. Mother was subsequently awarded $25,000 from this amount to cover her interim attorney's fees, which left $148,970.06 in counsel's trust account. Mother concedes that the community does have an equitable lien on the property. Based on the evidence and testimony provided regarding the Drahos formula, the Court calculates the community lien to be $24,462.24 (A = $99,300, B = $341,931, C = $18957.24). Father's share of the community lien would therefore be $12,231.12. However, the total costs to prepare the property for sell was $2,902.10. Father's portion of this amount is $1,451.10. In addition, Father was ordered to reimburse Mother $1,000 for the CAA fee. This bring Father's amount of the community lien to $9,780.02. Mother was awarded $25,000 in attorney's fees that was to be taken from Father's share of the community lien. However, Father's portion of the lien is only $9,780.02, which leaves $15,219.98 as a judgment against Father. This amount ($15,219.98) shall be paid no later then April 1, 2021 and shall accrue interest at the maximum legal/statutory rate. Mother shall receive all remaining funds contained in her attorney's trust account immediately.

Retirement/Financial Accounts: Disposition of any retirement/financial accounts will be addressed at a later date pursuant to ARS 25-318(D) as Father provided no information regarding his financial accounts.

The parties were awarded all personal property currently in their possession with the exception of the following: Husband shall return the following items to wife: Wife's Ipad, flash drives, external hard drives, scrapbooks, the child's beanie baby collection and all items belonging to the child or that were purchased for the child. Husband shall make arrangements through wife's attorney and shall return the items within 30 days from the date of this Order.

Mother filed a Petition for Contempt regarding Father's failure to pay the required CAA fees and complete a psychological evaluation. The Court issued the Order for Father to complete a psychological evaluation on February 20, 2020, and again on October 20, 2020. Father never completed the psychological evaluation that he was ordered to complete. Father was interviewed by CAA Kiffmeyer where he "discussed the court-ordered psychological evaluation." In this interview, Father indicated that "[h]e will only submit to testing (a psychological evaluation) if Mother also submits testing.

Based on a review of the record, and the evidence and testimony presented, the Court finds that: 1) Father was ordered on two occasions to submit to a psychological evaluation; 2) Father was aware of the Court Orders regarding the psychological evaluation; 3) Father had the ability to comply with the Court's Order and 4) Father willfully failed to comply with the Court's Order

THE COURT FINDS Father in Contempt of Court for failing to comply with the Court's Order regarding the psychological evaluation.

IT IS ORDERED that Father shall pay a reasonable portion of Mother's attorney's fees and costs as a sanction.

The Court must decide the amount of attorney's fees and costs to be awarded but finds there is no just reason to delay making a final order. **IT IS THEREFORE ORDERED** pursuant to Rule 78(b), Arizona Rules of Family Law Procedure, that this is a final judgment/decree and it shall be entered by the Clerk. The time for appeal begins upon entry of this judgment by the Clerk. For more information on appeals, see Rule 8 and other Arizona Rules of Civil Appellate Procedure.

**IT IS FURTHER ORDERED** denying any affirmative relief sought before the date of this Order that is not expressly granted above.

# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

HONORABLE MARVIN DAVIS

**Thaler and  Thaler**                    Case Number: **FC2019-098211**

Done in open Court on: <u>12/31/2020</u>

<u>Marvin L. Davis</u>
Judge Marvin Davis

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY
### HONORABLE MARVIN DAVIS

Thaler and  Thaler

Case Number: **FC2019-098211**

**Brittany R Thaler**

(Petitioner)

AND

**John H Thaler**

(Respondent)

**Case Number:  FC2019-098211**

**Atlas Number:**

**CHILD SUPPORT ORDER**

**THE COURT FINDS that:**

1. Brittany Thaler and John Thaler owe a duty to support the following child:

    **Child Name**      **Date of Birth**
    Mckinley Thaler      12/12/2017

2. **Child Support Guidelines:** The required financial factors and any discretionary adjustments pursuant to the Arizona Child Support Guidelines are as set forth in the Child Support Worksheet, attached and incorporated herein by reference.

3. **Child Support:** John Thaler is obligated to pay child support to Brittany Thaler pursuant to the Arizona Child Support Guidelines in the amount of $1,341.00 per month.

4. **Support Arrears:** Arrears not addressed.

5. **Past Support:** It is appropriate to award Brittany Thaler an additional judgment for past support in the amount of $9,342.00 for appropriate past support from the date of filing of the current petition until today.

**IT IS ORDERED that:**

1. **Child Support:** John Thaler shall pay child support to Brittany Thaler in the sum of $1,341.00 per month, payable on the 1st day of each month commencing 01/01/2021 by income withholding order.

2. **Arrearage Judgment:** No additional judgment for child support arrears is entered.

3. **Past Support:** Brittany Thaler is also granted judgment against John Thaler in the additional amount of $9,342.00. John Thaler shall pay the additional sum of $300.00 per month towards this judgment, payable on the first (1st) day of each month beginning 01/01/2021 until paid in full

4. **Total Monthly Payments:** John Thaler shall make total monthly payments to Brittany Thaler of $1,649.00 per month payable on the 1st day of each month commencing 01/01/2021 as follows:

    | | |
    |---|---|
    | Current Child Support payment as ordered above: | $1,341.00 |
    | Child Support Arrearage payments: | $300.00 |
    | Current Spousal Maintenance payment: | $0.00 |
    | Past Due Spousal Maintenance payment: | |
    | Clearinghouse Handling Fee: | $8.00 |
    | Total Monthly Payment: | $1,649.00 |

**Thaler and Thaler**                                    Case Number: **FC2019-098211**

5. **Clearinghouse:** All payments shall be made through the Support Payment Clearinghouse pursuant to an income withholding order signed this date. Any time the full amount of support is not withheld, John Thaler remains responsible for the full monthly amount ordered. Payments not made directly through the Support Payment Clearinghouse shall be considered *gifts* unless otherwise ordered. All payments shall be made payable to and mailed directly to:

**Support Payment Clearinghouse**
**P.O. Box 52107**
**Phoenix, AZ 85072-2107**

**Payments must include the Payor's name, ATLAS number, and Social Security Number.**

6. **Current Address:** Pursuant to A.R.S. § 25-322, the parties shall submit current address information in writing to the Clerk of the Superior Court and the Support Payment Clearinghouse immediately. John Thaler shall submit the names and addresses of their employers or other payors within 10 days. The parties shall submit address changes within 10 days of the change.

7. **Medical Insurance:** Brittany R Thaler shall be individually responsible for providing medical insurance for the minor child, and shall continue to pay premiums for any medical, dental and vision policies covering the child that are currently in existence.

8. **Uninsured Costs:** The costs of medical, dental and vision expenses not paid by insurance shall be shared as follows:

Brittany Thaler: 30%                          John Thaler: 70%

9. **Travel Costs:** The costs of travel related to parenting time over 100 miles away shall be shared as follows:

Brittany Thaler: 30%                          John Thaler: 70%

10. **Tax Deductions:** The federal and state tax exemptions for the dependent Children are allocated as follows:

**Parent Entitled To Deduction Per Schedule**

| Child Name | DOB | Age | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Mckinley Thaler | 12/12/2017 | 3.1 | John Thaler | John Thaler | John Thaler | Brittany Thaler | Brittany Thaler |

Each Year, John Thaler may claim exemptions allocated from above only if all child support and arrears ordered for the year are paid by December 31 of that year.

11. **Information Exchange:** The parties shall exchange financial information including copies of tax returns, earnings statements, a Parent's Worksheet for Child Support Amount, residential addresses and the names and addresses of their employers every 24 months.

## IMPORTANT INFORMATION

12. **Other Orders:** If this is a modification of child support, all other prior orders of this Court not modified remain in full force and effect.

**Thaler and Thaler**                    Case Number: **FC2019-098211**

13. **Emancipation:** Generally the obligation to pay child support in the full amount ordered herein continues until the court formally modifies this order with a new order upon request of one of the parties or when the youngest child is emancipated. A child is emancipated:

    On the date of the child's marriage.

    On the child's 18th birthday and graduation from high school or age 19 (whichever comes first).

    When the child is adopted.

    When the child dies.

14. The back child support amount was calculated using the $660 monthly child support amount that was established in June of 2020. The total amount for these tens months (up to October) is $6,660. For November and December Father shall a total of $2,682 ($1,341 per month) for a grand total of $9,342.

Even though there are orders regarding medical insurance and the allocation of the right to claim a child as a dependent for the purposes of federal taxes contained in this judgment, this is not binding on the IRS. Under the Affordable Care Act, the parent who claims the child as a dependent on a federal tax return has the obligation to ensure that the child is covered by medical insurance and may be penalized by the IRS for failing to do so.

No further claims or issues remain for the Court to decide. Therefore, **IT IS FURTHER ORDERED** pursuant to Rule 78(C), Arizona Rules of Family Law Procedure, this final judgment/decree is signed by the Court and it shall be entered by the Clerk. The time for appeal begins upon entry of this judgment by the Clerk. For more information on appeals, see Rule 8 and other Arizona Rules of Civil Appellate Procedure.

**IT IS FURTHER ORDERED** denying any affirmative relief sought before the date of this Order that is not expressly granted above.

Dated: 12/31/2020

Judge Marvin Davis

# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY
# HONORABLE MARVIN DAVIS

### CHILD SUPPORT WORKSHEET

**Petitioner:**  Brittany R Thaler

**Respondent:**  John H Thaler

**Case No:  FC2019-098211**

**ATLAS No:**

**Total Number of Children:**     1
**Presumptive Termination Date:** 5/31/2036

| | Brittany Thaler | John Thaler |
|---|---|---|
| **GROSS MONTHLY INCOME:** | **$6,666.67** | **$15,583.33** |
| Spousal Maintenance (Paid/Rec'vd): | | |
| Court Ordered Child Support of Other Relationships (Paid): | | |
| Custodian of Other Child Subject of Order: | | |
| Support of Other Natural or Adopted Children NOT Ordered: | $0.00 | $0.00 |
| **ADJUSTED GROSS INCOME:** | **$6,666.67** | **$15,583.33** |
| **Combined Adjusted Gross Income:** | | $22,250.00 |
| **Primary Residential Parent is:**  Brittany R Thaler | | |
| **BASIC CHILD SUPPORT OBLIGATION FOR 1 CHILD** | | **$1,744.00** |
| **Plus Costs for:** | | |
| Adjustment for 0 child over age 12 at (10.00)%: | | $0.00 |
| Medical, Dental, and Vision Insurance: | $200.00 | |
| Monthly childcare costs for 1 child: | | |
| *Less Federal Tax Credit to Custodian of (25.00)%:* | | $0.00 |
| Extra Education Expenses: | | |
| Extraordinary (Gifted or Handicapped) Child Expenses: | | |
| **TOTAL CHILD SUPPORT OBLIGATION** | | **$1,944.00** |
| Each Parent's Proportionate Percentage of Combined Income: | 29.96% | 70.04% |
| Each Parent's Proportionate Share of the Total Support Obligation: | **$582.48** | **$1,361.52** |
| Parenting Time Costs Adjustment for: John Thaler | | |
| *Parenting Time Table (A) for (12) days at (1.20)%:* | | **$20.92** |
| **Total Additions to Child Support Obligation paid by each parent:** | **($200.00)** | **$0.00** |
| **PRELIMINARY CHILD SUPPORT OBLIGATION:** | **$382.48** | **$1,340.59** |

**SELF SUPPORT RESERVE TEST**

| | |
|---|---|
| John Thaler Adjusted Gross Income: | $15,583.33 |
| Less Paid Arrearages Allowed: | |
| Less Self Support Reserved Amount: | $1,663.97 |
| Discretionary Income: | $13,919.36 |

**FINAL CHILD SUPPORT OBLIGATION PAYABLE BY John Thaler:**          **$1,341.00**

HONORABLE MARVIN DAVIS

**Thaler and Thaler**                    Case Number: **FC2019-098211**

# ENDORSEMENT PAGE

CASE NUMBER: FC2019-098211

E-FILING ID #: 12381942

SIGNATURE DATE: 12/31/2020

FILED DATE: 1/8/2021 8:00:00 AM

GREG R DAVIS

BARB KIFFMEYER
4001 E MOUNTAIN SKY AVE STE 200 PHOENIX AZ
85044

JOHN H THALER
18521 E QUEEN CREEK RD STE 105-173 QUEEN
CREEK AZ 85142

AZ DEPARTMENT OF VITAL RECORDS

FAMILY SUPPORT SERVICES-CCC

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT E

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FC 2019-098211                                                    09/02/2020

CLERK OF THE COURT
HONORABLE MARVIN L. DAVIS                           L. Mitchell
                                                                 Deputy

IN RE THE MARRIAGE OF
BRITTANY R THALER                        GREG R DAVIS

AND

JOHN H THALER                            JOHN H THALER
                                         18521 E QUEEN CREEK RD STE 105-
                                         173
                                         QUEEN CREEK AZ  85142


                                         BARB KIFFMEYER
                                         4001 E MOUNTAIN SKY AVE STE 200
                                         PHOENIX AZ  85044
                                         JUDGE MARVIN DAVIS


MINUTE ENTRY


The Court has before it Petitioner's *Motion for Ex Parte Order Suspending All Response Times Where Father's Motions are Concerned and Motion for Order That Father File No More Motions Until Such Time as He Has Actually Undergone the Psychological Evaluation He was Ordered to Undergo,* filed on August 17, 2020.

**IT IS ORDERED** Petitioner's motion for an ex parte order is denied.  The Court believes it is appropriate at this time to order that Petitioner does not have to respond to any further motions from Respondent until the Court has reviewed Respondent's motions going forward and determines that a response is warranted.  The Court takes this action due to the repetitive nature and claims contained in Respondent's motions.  All other requested relief is denied.

FC 2019-098211                                    09/02/2020


All parties representing themselves must keep the Court updated with address changes.
A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT F

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FC 2019-098211                                        09/03/2020

                                              CLERK OF THE COURT
HONORABLE MARVIN L. DAVIS                          L. Mitchell
                                                    Deputy

IN RE THE MARRIAGE OF
BRITTANY R THALER                        GREG R DAVIS

AND

JOHN H THALER                            JOHN H THALER
                                         18521 E QUEEN CREEK RD STE 105-
                                         173
                                         QUEEN CREEK AZ  85142


                                         BARB KIFFMEYER
                                         4001 E MOUNTAIN SKY AVE STE 200
                                         PHOENIX AZ  85044
                                         JUDGE MARVIN DAVIS



                        MINUTE ENTRY


        The Court has read and considered Petitioner's *Motion for Interim Award of Attorney's Fees* filed July 16, 2020 and *Respondent's Opposition to Petitioner's Request for Fees* filed by Respondent on August 7, 2020.

        **IT IS ORDERED** granting Petitioner's *Motion for Interim Award of Attorney's Fees* and awarding Petitioner interim attorney's fees in the amount of $25,000.00, to be released to Petitioner from Respondent's portion of the equity from the sale of the marital home.

FC 2019-098211                                    09/03/2020


**IT IS FURTHER ORDERED** signing this minute entry as a formal order of this Court pursuant to Rule 78(c), *Arizona Rules of Family Law Procedure.* No further claims or issues remain for the Court to decide.


HONORABLE MARVIN L. DAVIS
JUDGE OF THE SUPERIOR COURT


All parties representing themselves must keep the Court updated with address changes. A form may be downloaded at:

http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT G

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FC 2019-098211                                    12/09/2020

CLERK OF THE COURT
HONORABLE MARVIN L. DAVIS                         L. Frazee
                                                 Deputy


IN RE THE MATTER OF
BRITTANY R THALER                    GREG R DAVIS

AND

JOHN H THALER                        JOHN H THALER
                                     18521 E QUEEN CREEK RD STE 105-
                                     173
                                     QUEEN CREEK AZ  85142


                                     JUDGE MARVIN DAVIS



                            MINUTE ENTRY


        The Court has received and reviewed Petitioner/Mother's October 27, 2020 Application
for Attorney's Fees and Costs.

        **IT IS THEREFORE ORDERED** granting Petitioner/Mother's request and entering an
award for attorney fees and costs in favor of Petitioner, Brittany R. Thaler, and against Respondent,
John H. Thaler, in the amount of $8,755.00.

        All parties representing themselves must keep the Court updated with address changes.
A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT H

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FC 2019-098211                                      02/25/2021

                                         CLERK OF THE COURT
HONORABLE MARVIN L. DAVIS                      L. Mitchell
                                                 Deputy

IN RE THE MARRIAGE OF
BRITTANY R THALER                  GREG R DAVIS

AND

JOHN H THALER                      JOHN H THALER
                                   18521 E QUEEN CREEK RD STE 105-
                                   173
                                   QUEEN CREEK AZ  85142


                                   BARB KIFFMEYER
                                   4001 E MOUNTAIN SKY AVE STE 200
                                   PHOENIX AZ  85044
                                   JUDGE MARVIN DAVIS


                          MINUTE ENTRY


       The Court is in receipt of Petitioner's *Application for Attorney's Fees and Costs* filed on
January 18, 2021.  Having received no response from Respondent,

       **IT IS ORDERED** granting Petitioner's request.

       **IT IS FURTHER ORDERED** that Respondent shall pay $58,021.02 in attorney's fees
to Petitioner by no later than April 1, 2021.  Interest shall accrue at the maximum legal rate.

FC 2019-098211                                    02/25/2021

**IT IS FURTHER ORDERED** signing this minute entry as a formal order of this Court pursuant to Rule 78(c), *Arizona Rules of Family Law Procedure*. No further claims or issues remain for the Court to decide.

*Marvin L. Davis*

_____
HONORABLE MARVIN L. DAVIS
JUDGE OF THE SUPERIOR COURT

All parties representing themselves must keep the Court updated with address changes. A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT I

1  John H. Thaler

2  In Pro Per
   18521 E. Queen Creek Road
3  Suite 105-173
   Queen Creek, AZ 85142
4  818-219-0807
   jhtlaw@msn.com

5  Respondent, In Pro Per

6

7

8              ARIZONA SUPERIOR COURT

9                MARICOPA COUNTY

10

11

12

13  BRITTANY THALER,                Superior Court Case No: FC2019-098211

14                    PETITIONER,   EMERGENCY

    v.
15
                                    EX PARTE COMMUNICATION TO
16  JOHN HARRIS THALER,             COURT REGARDING FRAUDULENT
                                    AND FORGED DIVORCE DECREE AND
17            Respondent.           EXHIBITS ATTACHED THEREWITH

18                                    [Assigned to the Honorable Marvin
                                    Davis]
19

20

21

22

23                        I

24                        _____

25                        JOHN H. THALER,

26                        Respondent

27

28

CLERK OF THE
SUPERIOR COURT
FILED
M. MESSMER, DEP

2021 JAN 15 PM 12: 10

**SUPERIOR COURT OF ARIZONA**

222 Javelina

Mesa, Arizona 85210

**ATTENTION: JUDGE MARVIN DAVIS**

**Family Court Division**

| TO: | The Honorable Judge Marvin Davis |
|-----|----------------------------------|
| **FROM:** | John H. Thaler |
| **RE:** | ***Fraudulent Divorce Decree*** |

January 13, 2021

Dear Your Honor,

Enclosed herewith find a letter from the State Bar (Exhibit 2) and two orders allegedly coming from your Court. The first, unsigned and dated December 21, 2020 proports to be an order from you stating that a previous order is fake and the signature on said order is a forgery. The second order appears to be a divorce decree dated December 31, 2020. The decree proports to be signed by you. Every section favors Brittany in the exact manner and scope stated by her and her attorney, Gregory Davis, on December 29.2020. In fact, you might say it is as if Mr. Davis wrote it himself.

The only problem is that the signature on the alleged decree is the same fraudulent and forged signature referred to in your December 21, 2020 order included with the Bar Letter. Simply put we now have a phony divorce decree with a forged and fraudulent signature dated December 31, 2020. That is seven days prior to your order freezing any decision in the case for sixty days and sealing the materials we provided to you including letters from myself, Jacqueline S. Breger and John J. Stanley, on December 31, 2020.

As evidenced by Exhibit 1 which has two of your forged and phony signatures on Orders, two of your forged and phony signatures on Deeds (one of which has a phony notary stamp and notarization) and one from the forged and phony divorce decree attached as part of Exhibit 2.

Additional evidence that the decree is fraudulent is found in the Section entitled PATERNITY which orders that I am the legal parent and further orders the birth certificate to be changed to reflect the same. There is no issue of parentage in this case. We were married at the time of conception and at the time of delivery. Instead, the decree appears to be similar to those used by Brittany and Dawna as part of their ongoing child support fraud. As Mr. Stanley and I previously reported to this court the 098400's series of case numbers are fraudulent cases, mostly between two unmarried adults where mother seeks child support. Obviously, in those cases, a decree is entered modifying the birth certificate to reflect parentage as it is the parentage that serves as the basis for the order of child support. In their haste to create a fake decree by December 31, 2020 or alternatively to create a fake decree and backdate it for apparent authenticity, they failed to proofread their own document. As a result, they left in at least one entire section that is totally inapplicable to the matter at bar.

Even more confusing is the apparent order from this Court, unsigned, dated January 8,2021 the same date that the decree appears to have been mailed refusing the request in the sealed documents for a meeting with Your Honor as evidenced by Exhibit 3. While it is possible that Petitioner, her Counsel and / or her mother or other

participants in the fraudulent scheme to have viewed the documents prior to them being sealed, only the Court knows whether the same is possible. Either at some point prior to sealing the record these documents were seen resulting in the phony decree and subsequent January 8, 2021 order as evidenced by Exhibit 4, or participants in the scheme have still not been shut out of the computer file regarding this case.

With respect to the bar complaint, adding to the confusion, while I served as in-house counsel and was a member of the State Bar In-House Counsel division through 2019, I did not renew my membership as the Company was intending to terminate the business and in essence has been defunct since March 2020 due to Covid-19 virus. Oddly, Matthew McGregor, an investigator for the State Bar, is fully aware that I do not currently have an active membership in the Arizona State Bar and informed Brittany of the same, both orally and in writing in or about March 2020 after she filed phony complaints against me with the Bar.

Your Honor should note that Brittany's activities in filing complaints against me with state bars, includes at least three phony complaints with the California State Bar. On two occasions, Brittany, using assumed names, pretended to be disgruntled clients. On one occasion she pretended to be a judge issuing a sanction and reporting the same to the bar.

According to this Arizona State Bar letter, which comes not from an investigator, but from a senior counsel member, Barbara Kiffmeyer filed the complaint. Since Ms. Kiffmeyer does not appear to have provided a copy of the order with the questionable signature that goes with the order of December 12, 2020, the Arizona State Bar has no way of comparing the signature on the decree to a signature you have already stated is a forgery. The Court should further note that at according to the ECR system the decree was mailed at 8:00 AM on January 8, 2021. So, it is most likely that at the time this decree someone found its way to the mail neither Kiffmeyer nor petitioner nor Mr. Davis was aware that you had issued a 60-day STAY or that you had received the three letters / declarations or that you had sealed the same. Again, simply put, they did not know that you had been apprised of the fraud or that you had taken any actions to investigate the matter before issuing any further orders or decisions.

More importantly, the fact that they were able to create a fake divorce degree backdated to December 31, 2020, send the same out by mail on January 8, 2021 while having Ms. Kiffmeyer make a claim with the State Bar and the State Bar attempt to investigate the same when I am not even a member of the bar evidence both a high level of fraud and a high level of desperation. The two most important points of the fake order, after justifying preventing McKinley from being with his father has been and is to steal all equity in the house while obtaining a support order that cannot be justified by any facts whatsoever and none were presented. Request is made that the Court issue an order informing parties and their counsel, Ms. Kiffmeyer, and the Arizona State Bar that this matter is under review and that no decree of any kind has been issued by this Court. Further, request is made that this matter be reported to the District Attorney's office for further investigation of criminal fraud.

Finally, it should occur to this Court that the security systems in place to prevent these problems is a total abject failure and frankly is embarrassing. The last thing I should be required to do is to send these letters with further evidence of widespread fraud that is taking place within the Maricopa County Superior Court. It is incumbent upon this court to determine alternative methods by which its communications are secure, and its receipt of communications are secure. This cannot be allowed to happen again.

Very Truly Yours

_____

**John H. Thaler**

# Forgery Templates
# Judge Marvin J. Davis





**STATE BAR OF ARIZONA**

**Due to COVID-19, the State Bar may have limited or delayed access to mail. You must respond via email to Craig.Henley@staff.azbar.org and Karen.Calcagno@staff.azbar.org in addition to placing a hard copy of your response in the mail.**

Via Email Only: jhtlaw@msn.com

January 13, 2021

**PERSONAL AND CONFIDENTIAL**

John Harris Thaler
Independent Events, Inc.
18521 E Queen Creek Rd
Ste 105-173
Queen Creek, AZ 85142-5824

**Re: File No:** 20-2797
**Complainant:** State Bar of Arizona

Dear Mr. Thaler:

The State Bar has received information concerning your professional conduct that warrants a screening investigation pursuant to Rule 55(b), Ariz. R. Sup. Ct. At this point, the matter is not considered a formal complaint, but rather a "bar charge" that is being investigated through a "screening investigation." Your participation in the screening investigation is extremely important, as Bar Counsel will make a recommendation at the end of the investigation as to the disposition of this matter. Pursuant to ER 8.1(b) and Rule 54(d), Ariz. R. Sup. Ct., you have a duty to cooperate with this investigation. Failure to fully and honestly respond to, or cooperate with, the investigation is, in itself, grounds for discipline.

A copy of the information received by the State Bar has been included with this letter. Please assure that a written response to the enclosed information is in the State Bar's office, directed to my attention, by:

**5:00 pm, February 3, 2021**

In addition to your written response, an investigator from our office or I may contact you to discuss this matter. Do not send your written response or a copy of your response directly to the Complainant. If you cannot file a timely response, you should contact my office immediately. Please also include the above-referenced file number on all correspondence concerning this matter. You must submit **an original and one copy** of your written response. If you do not submit a copy with your response, you will be charged $.25 per page for copying your response.

The ethical rules that should be addressed in your response include, but are not limited to: Rule 41(g), Rule 42, ER 1.1, ER 3.1, ER 3.3(a)(3), ER 3.4(b) ER 3.5(a), ER 4.1, ER 8.4(b), ER 8.4(c), and ER 8.4(d).

A copy of your response will be sent to the Complainant and may become public record upon disposition of the matter. You may make a request that certain information in your response remain confidential pursuant to Rule 70(g) Ariz. R. Sup. Ct. **Any such request must be made in a letter separate from your response** and must set forth the reason for the request. We will forward your request to the Presiding Disciplinary Judge who will rule on it. You must specify whether you want to keep the information from the public, but not the complainant, or from both the public <u>and</u> the complainant. At the time you make such a request, you must submit the information for which confidentiality is requested as part of your request. You should also submit a redacted copy to remain in the public portion of the file, as the rules require some type of response to remain in the public portion of the file. Requests for confidentiality are only granted sparingly and only upon good cause shown. If your request for confidentiality is denied, the information or documents in question will not be returned to you, but will become public upon disposition of the matter.

The State Bar has a diversion program which, in some cases, may provide an alternative to traditional discipline. Diversion is a confidential rehabilitative program available to lawyers whose ethical misconduct is of a non-serious nature and who may benefit from one or more of the State Bar's remedial programs, such as the Member Assistance Program (MAP) or the Law Office Management Assistance Program (LOMAP). Diversion is not available in cases of serious misconduct or for conduct involving dishonesty, self-dealing, or breach of a fiduciary duty. Participation in diversion is voluntary. If you would like more information about the State Bar's diversion program, you may review the Diversion Guidelines on-line at:

### http://www.azbar.org/media/1742140/DiversionGuidelines.pdf

If, after reviewing the guidelines, you believe your case may qualify for diversion, please submit a written request with a statement of why you believe diversion is appropriate along with your response.

Thank you for your anticipated cooperation.

Sincerely,

/s/ *Craig D. Henley*

Craig D. Henley
Senior Bar Counsel

CDH/kec

Enclosure

L. Mitchell, Deputy
1/8/2021 8:00:00 AM
Filing ID 12381942

Brittany R Thaler
      Petitioner

AND

John H Thaler
      Respondent

Case Number: **FC2019-098211**

# DECREE OF DISSOLUTION OF MARRIAGE

The Evidentiary hearing in this matter occurred on 12/29/2020. The Court has considered the evidence which includes where applicable/presented, the demeanor of the witnesses, reviewed the exhibits as well as the case history, and considered the parties' arguments and agreements.

The Court makes the following findings and enters the following orders:

## JURISDICTIONAL FINDINGS

**THE COURT FINDS** as follows:

- At the time this action was commenced at least one of the parties was domiciled in the State of Arizona and that said domicile had been maintained for at least 90 days prior to filing the Petition for Dissolution of Non-Covenant Marriage.
- The conciliation provisions of A.R.S. § 25-381.09 have either been met or do not apply.
- The parties were married on April 13, 2016. By operation of law, the marital community is deemed to have terminated on December 23, 2019.
- This was not a covenant marriage.
- The marriage is irretrievably broken and there is no reasonable prospect for reconciliation.
- Brittany Thaler is not pregnant.
- To the extent that it has jurisdiction to do so, the court has considered, approved and made provision for the maintenance of each spouse and the division of property and debts.
- There is a minor child common to the parties, namely: Mckinley H Thaler [DOB 12/12/2017].
- Arizona was the child's home state on the date the petition was filed or was the child's home state within six months before the filing and the child is absent from this state but a parent or person acting as a parent continues to live in this state.
- The federal Parental Kidnapping Prevention Act does not apply and that no international law concerning the wrongful abduction or removal of children applies.

## DISSOLUTION OF MARRIAGE

**IT IS ORDERED** dissolving the marriage of the parties and restoring each party to the status of a single person.

## PATERNITY

**Thaler and Thaler**                                    Case Number: **FC2019-098211**

**THE COURT FINDS** that based on the testimony and evidence presented, John Thaler is parent of the following minor child:

Mckinley H Thaler born on 12/12/2017 to Brittany Thaler

**IT IS ORDERED** declaring that John Thaler is the legal parent of the following minor _**child**_:

Mckinley H Thaler born on 12/12/2017 to Brittany Thaler

**IT IS FURTHER ORDERED** that the parties shall take all necessary steps to have the birth certificate of the minor child amended in accordance with this order if the correct information does not now appear on the original certificate. Information for amendment of a birth certificate may be obtained from the Office of Vital Records, Department of Health Services, 1818 W. Adams, Phoenix, Arizona 85007; Phone (602) 364-1300. A certified copy of this minute order may be obtained after ten days of receipt of same, and shall then be provided, together with all other required documents and fees, to the Office of Vital Records, so that the birth certificate can be amended or supplemented as ordered.

## LEGAL DECISION-MAKING AND PARENTING TIME

### Best Interest Findings: A.R.S. § 25-403

A.R.S. § 25-403(A) enumerates specific factors for the Court to consider, among all factors that are relevant to the child's physical and emotional well-being. The best interest of a child is the primary consideration in awarding legal decision-making authority and parenting time. _Hays v. Gama_, 205  99, 102, ¶ 18, 67 P.3d 695, 698, ¶ 18 (2003).

In making the legal decision making and parenting time determination, the Court is mindful that as a matter of public policy, absent evidence to the contrary, "it is in a child's best interest: (1) To have substantial, frequent, meaningful and continuing parenting time with both parents[; and] (2) To have both parents participate in decision making about the child." _See_ A.R.S. § 25-103(B).

As a precursor to the analysis of the child's best interest and because of the parents' inability to reach an agreement, the Court considers the following issues regarding the parents. See A.R.S. § 25-403.01.

- _Whether a parent's lack of agreement is unreasonable or is influenced by an issue not related to the child's best interests._
  Father's unwillingness to engage in reasonable negotiations, coupled with the frivolous pleadings he has filed, demonstrate that Father is motivated or influenced by an issue not related to the child's best interests.

- _The past, present and future abilities of the parents to cooperate in decision-making about the children to the extent required by the order of joint legal decision-making._
  Given Father's inappropriate and unreasonable behavior, and his questionable mental health status, the parties are not able to cooperate in decision-making regarding the child.

- _Whether the joint legal decision-making arrangement is logistically possible._
  At this time, the Court is very concerned about Father's mental health status; in addition, Father's specific whereabouts are unknown; thus, a joint legal decision-making arrangement is not logistically possible without more information.

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY
## HONORABLE MARVIN DAVIS

**Thaler and Thaler**                    Case Number: **FC2019-098211**

**THE COURT FINDS** as follows regarding the child's best interests pursuant to A.R.S. § 25-403(A):

1 *The past, present and potential future relationship between the parent and the child.*
Mother testified that Father has not exercised any of his parenting time since the Temporary Orders were entered on October 20, 2020. Mother also testified that the child has not asked to see Father in the last two months. Mother reports that the child loves swimming, gymnastics and was participating in a musicology program before the COVID-19 pandemic.

The Court finds that Mother has a strong, loving bond with the child.

2 *The interaction and interrelationship of the child with the child's parent or parents, the child's siblings and any other person who may significantly affect the child's best interest.*
No information was provided regarding the child's interaction with extended family or any other third parties.

3 *The child's adjustment to home, school and community.*
The child in this matter is just three years of age and is too young to be enrolled in school. The Court finds that the child is well adjusted to Mother's home.

4 *If the child is of suitable age and maturity, the wishes of the child as to legal decision-making and parenting time.*
The child in this case is not of suitable age and maturity.

5 *The mental and physical health of all individuals involved.*
Mother testified that she is physically and mentally healthy despite father's allegations to the contrary. Mother also reports that Father never completed the court-ordered psychological examination, and Father's recent emails and allegations corroborate the fact that he is not mentally stable.

The Court finds that the physical and mental health of Mother and the child are stable. Father's mental health is of serious concern to the Court at this point. The Court notes that Father was ordered to undergo a psychological evaluation but he has blatantly refused to do so. In addition, Father's pleadings and comments towards Mother, the Court, opposing counsel and the CAA have been extreme, disrespectful, delusional and erratic. Moreover, Father's behavior in this matter raises additional concerns regarding the child's safety while in Father's care.

6 *Which parent is more likely to allow the child frequent meaningful and continuing contact with the other parent. (This paragraph does not apply if the Court determines that a parent is acting in good faith to protect the child from witnessing an act of domestic violence or being the victim of domestic violence or child abuse.)*
Mother testified that she wants Father's help and she wants Father to be involved in the child's life but Father needs to get healthy first. Mother reports that Father did not follow previous court orders and took the child out of the state. Mother also reports that Father threatened to remove the child from the United States.

The Court finds that Mother is the parent who is more likely to allow the child frequent, meaningful and continuing contact with Father.

7 *Whether one parent intentionally misled the Court to cause an unnecessary delay, to increase the cost of litigation or to persuade the Court to give legal decision-making or parenting time preference to that parent.*

**Thaler and Thaler**                                        Case Number: **FC2019-098211**

The Court finds that Father has intentionally misled the Court with respect to the baseless and unfounded allegations that Father has included in his pleadings, which include conspiracy theories that allege Mother, opposing counsel, the Court (including various judges), the CAA, and the Judicial Assistant are engaged in a nefarious and illegal scheme to defraud. These pleadings and allegations are completely baseless/unfounded and were clearly drafted and filed with the intent to mislead the Court, increase the cost of litigation or to persuade the Court to give a legal decision-making or parenting time preference to Father.

8  *Whether there has been domestic violence or child abuse pursuant to A.R.S. § 25-403.03.*
Mother testified that she, along with her Mother, obtained an Order of Protection against Father. Mother further testified that Father has violated this Order of Protection on several occasions.

9  *The nature and extent of coercion or duress used by a parent in obtaining an agreement regarding legal decision-making or parenting time.*
No agreement was reached in this matter.

10  *Whether a parent has complied with chapter 3, article 5 of title 25, Arizona Revised Statutes.*
The domestic relations education provision of A.R.S. § 25-352 have not been fully satisfied. John H Thaler has not completed the Parent Education Program requirements of A.R.S. § 25-352 and/or presented proof of completion as required. John H Thaler shall have 30 days to complete an approved Parent Education Program and file proof of completion with the Clerk of Court.

Any party who has not completed the Parent Education Program requirements of A.R.S. § 25-352 as ordered may be held in contempt of court, and shall not file any subsequent pleadings to modify or enforce any provisions of this Judgment until he or she has filed proof of completion. A "Parent Information Program Notice" is available to the parties at the Law Library Resource Center and the Family Court filing counter. The notice details the program requirements and includes a list of approved parent information classes.

11  *Whether either parent was convicted of an act of false reporting of child abuse or neglect under A.R.S. § 13-2907.02.*
No information was presented regarding this factor.

In addition to the foregoing, the Court must also consider any history of domestic violence or child abuse (A.R.S. § 25-403.03), any substance abuse issues (A.R.S. § 25-403.04) and any sexual offender issues (A.R.S. § 25-403.05).

**Domestic Violence**

Brittany Thaler has alleged that John Thaler has committed domestic violence. Therefore, the Court further considers the award of legal decision-making authority and parenting time in light of the alleged presence of domestic violence under A.R.S. § 25-403.03. Arizona's law establishes the following:

A person commits an act of domestic violence if that person has: (1) intentionally, knowingly or recklessly caused or attempted to cause sexual assault or serious physical injury; (2) placed a person in reasonable apprehension of imminent serious physical injury to any person; or (3) engaged in a pattern of behavior for which the court may issue an ex parte order to protect the other parent who is seeking legal decision-making authority or to protect the child or the child's siblings. [A.R.S. § 25-403-03(B)].

**Thaler and  Thaler**                                    Case Number: **FC2019-098211**

The court shall consider evidence of domestic violence as being contrary to the best interests of the child. The court shall consider the safety and well-being of the child and of the victim of the act of domestic violence to be of primary importance. The court shall consider a perpetrator's history of causing or threatening to cause physical harm to another person [A.R.S. § 25-403.03(B)].

In accordance with A.R.S. § 25-403.03(C), the Court has considered the following factors and makes the following findings to determine whether domestic violence has been committed:

1. *Findings from another court of competent jurisdiction.*
   Mother presented Orders from the Gilbert Municipal Court regarding Father's pending cases; these Orders were issued on November 12, 2020 and November 19, 2020.  In the November 12th report, the Gilbert Court ordered the following: " The defendant shall have no contact with Brittany Rae Thaler. The defendant shall not leave the State of Arizona without prior court approval.  The defendant shall not go on or near the residence or workplace of Brittany Rae Thaler.  The defendant shall not possess or consume alcohol or drugs without a valid prescription.  The defendant shall not possess or control any firearms, ammunition or other deadly weapons.  The defendant must surrender any firearms currently in his possession or control to the Gilbert Police Department for safekeeping within 24 hours.  The defendant shall provide proof that he is handling the cases in CA that are referred to in his motion to continue."

   The November 19th report stated (in part) the following: "At the November 12, 2020, pretrial conference, this court was informed that since the time of the arraignment, the defendant has had other charges of Violation of Court Order (Domestic Violence) filed against him. In addition, the contents of the motions, and the manner in which the motions are presented, causes the court concern."

2. *Police reports.*
   Mother presented numerous police reports from the Mesa Police Department involving alleged violations of Orders of Protection by Father.  Mother also submitted a "List of Involvements with Mesa police Department" involving Father (Ex. 50).  According to this document, Father, since December 13, 2019, has been involved with the Mesa PD on 28 occasions.  All of these "involvements," with the exception of two, involve charges/allegations of interference with judicial proceedings, custodial interference or an Order of Protection (against Father).

3. *Medical reports.*
   No information was presented regarding this factor.

4. *Department of Child Safety records.*
   No information was presented regarding this factor.

5. *Domestic violence shelter records.*
   No information was presented regarding this factor.

6. *School records.*
   No information was presented regarding this factor.

7. *Witness testimony.*
   See Section 8 above.

**THE COURT FINDS** that based on the above, John Thaler has engaged in acts of domestic violence against Brittany Thaler.

**Thaler and Thaler**                                    Case Number: **FC2019-098211**

Having found the existence of domestic violence, the Court addresses the admonition in A.R.S. § 25-403.03 (A), which states that notwithstanding the presumption in subsection D, "joint custody shall not be awarded if the court makes a finding of the existence of <u>significant</u> domestic violence pursuant to A.R.S. § 13-3601 or if the court finds by a preponderance of the evidence that there has been <u>significant</u> domestic violence." A.R.S. § 25-403.03(A) (emphasis added).

Meaning, a finding of significant domestic violence or a history of significant domestic violence precludes an award of joint legal decision making or an award of sole legal decision making to the parent who committed the significant act of domestic violence. *See Hurd v. Hurd*, 223 Ariz. 48, 51, 219 P.3d 258, 261 (App. 2009) (construing A.R.S. § 25-403.03 before 2012 change from legal custody to legal decision making). Further, "when the party that committed the act of violence has not rebutted the presumption that awarding [legal decision making] to that person is contrary to the best interest of the child, the court need not consider all the other best-interest factors in A.R.S. § 25-403.A." See id.

Any domestic violence is serious and cause for concern, particularly when directed at another parent. However, the admonition in subsection A applies only to "significant domestic violence". Significance is a product of three factors: (1) The seriousness of the particular incident of domestic violence, (2) the frequency or pervasiveness of the domestic violence, (3) and the passage of time and its impact. Here, the evidence establishes that by a preponderance of the evidence, there has been domestic violence by John Thaler.

**THE COURT FURTHER FINDS** that though the Court by no means condones the actions found in this case, those acts in the spectrum of domestic violence do not constitute significant as contemplated by statute.

**THE COURT THEREFORE FINDS** by a preponderance of evidence that John Thaler has not engaged in "significant domestic violence" such that the prohibition on awarding joint legal decision-making authority does not apply.

The Court next considers A.R.S. § 25-403 (D), which provides as follows:

> If the Court determines that a parent who is seeking sole or joint decision-making authority has committed an act of domestic violence against the other parent, there is a rebuttable presumption that an award of sole or joint decision-making authority to the parent who committed the act of domestic violence is contrary to the child's best interests. This presumption does not apply if both parents have committed an act of domestic violence. (Emphasis added).

Here the presumption applies because John Thaler committed at least one act of domestic violence against Brittany Thaler, and Brittany Thaler has not committed domestic violence. To determine whether John Thaler has overcome the presumption, the Court considers the following factors in A.R.S. § 25-403.03 (E).

1. *Whether the parent has demonstrated that being awarded sole or joint legal decision-making authority or substantially equal parenting time is in the child's best interests.*
   Father presented no information regarding this factor.

2. *Whether the parent has successfully completed a batterer's prevention program.*
   No information was presented regarding this factor.

3. *Whether the parent has successfully completed a program of alcohol or drug abuse counseling, if the court determines that counseling is appropriate.*
   No information was presented regarding this factor.

**Thaler and Thaler**                    Case Number: **FC2019-098211**

4. *Whether the parent has successfully completed a parenting class, if the court determines that a parenting class is appropriate.*
No information was presented regarding this factor.

5. *If the parent is on probation, parole or community supervision, whether the parent is restrained by a protective order that was granted after a hearing.*
No information was presented regarding this factor.

6. *Whether the parent has committed any further acts of domestic violence.*
No additional information was presented regarding this factor.

**THE COURT FINDS** that based upon the above, John Thaler has not rebutted the presumption under A.R.S. § 25-403.03 (D).

## Substance Abuse

A.R.S. § 25-403.04 requires further analysis if a parent has abused drugs or alcohol or has been convicted of any drug offense under title 13, chapter 34 or any violation of A.R.S. § 28-1381, A.R.S. § 28-1382, or A.R.S. § 28-13783 within twelve months before the petition or request for legal decision-making authority or parenting time is filed.

In this case Brittany Thaler has alleged that the other party has abused drugs or alcohol or was convicted of the offense.

**THE COURT FINDS** that the following supports its determination that John Thaler has not abused drugs or alcohol or was convicted of the offense:

Mother has alleged that Father abused drugs but there were no time frames testified to regarding the alleged drug use. As such, the Court cannot conclude that there was any drug abuse within the twelve months preceding the filing of the Petition as required by statute.

## Sex Offenders

Neither party has presented any evidence to require consideration of the provision of A.R.S. § 25-403.05 (A).

# Legal Decision-Making

*Legal decision-making authority*, as defined by A.R.S. § 25-401(3), means the legal right and responsibility to make all non-emergency legal decisions for a child including those regarding education, health care, religious training and personal care decisions. For the purpose of interpreting or applying any international treaty, federal law, a uniform code or the statutes of other jurisdictions of the United States, legal decision-making means legal custody.

## For Mckinley Thaler

**THE COURT FINDS** that based upon the above, it is in the child's best interest that Brittany Thaler be awarded sole legal decision-making authority.

**IT IS THEREFORE ORDERED** awarding Brittany Thaler sole legal decision-making authority regarding Mckinley Thaler, as defined in A.R.S. § 25-401(6). For the purpose of this order,

"Sole legal decision-making" means one parent has the legal right and responsibility to make major decisions for the child.

Thaler and Thaler                                      Case Number: **FC2019-098211**

**IT IS FURTHER ORDERED** that Father has not rebutted the presumption against joint legal decision-making as a result of the domestic violence findings. In addition, Father has failed to submit to a court-ordered psychological evaluation and the Court is therefore unable to ascertain whether or not Father is mentally healthy and able to care for the child. As stated above, the Court is very concerned about Father's mental health given the manner in which Father has conducted himself during these proceedings. Unless or until the Court can determine (through a psychiatric/psychological evaluation) whether or not Father is mentally stable/healthy enough to make decisions on the child's behalf, and whether the child is safe in Father's care, Mother shall have sole legal decision-making authority.

## Parenting Time

The Court has awarded sole legal decision making of the child to Brittany Thaler. John Thaler, nonetheless, "is entitled to reasonable parenting time to ensure that the minor child has substantial, frequent, meaningful and continuing contact with the parent unless the Court finds, after a hearing, that parenting time would endanger the child's physical, mental, moral or emotional health."

**THE COURT FINDS** that the parenting time of John Thaler must be supervised to protect the child's physical, mental, or emotional health. *See* A.R.S. § 25-403.01(D) and A.R.S. § 25-411(D); *see also Hart v. Hart*, 220 Ariz. 183, ¶16, 204 P.3d 441, ¶16 (App. 2009)

**THE COURT FURTHER FINDS** that Father's mental health status is of concern to the Court given the misconduct Father has engaged in during these proceedings. Such conduct includes threatening and harassing Mother, opposing counsel, and the CAA. In addition, Father's pleadings and allegations in this matter do not appear to be tethered to reality. Father has also been aggressive, vulgar and belligerent towards everyone involved in this case, including court staff. Father was ordered to undergo a psychological evaluation but has refused to do so. As previously stated, the Court is unable to ascertain whether or not Father is mentally stable/healthy enough to care for the child, which raises safety concerns for the child during any unsupervised parenting time for Father.

**THE COURT THEREFORE FINDS** that allowing John Thaler to have unsupervised parenting time with the child would or could endanger seriously the child's physical, mental, or moral health or would significantly impair the child's emotional development.

**THE COURT FINDS** specifically that Father's mental stability is uncertain and questionable at best, necessitating the need for supervised parenting time for Father to ensure the safety of the child.

**IT IS THEREFORE ORDERED** as follows:

1. Effective December 31, 2020, all parenting time assigned to John Thaler shall be supervised by an agency.
2. As applied here, supervision requires that all parenting time exercised by Father be monitored by an official, licensed facility such as Arizonans for Children.
3. At no time shall John Thaler attempt to secure any unsupervised parenting time with the child.
4. John Thaler's parenting time shall be: twice per week for up to two hours per session at a licensed, official agency. If Father wishes to exercise his parenting time, he must give Mother 48 hours notice.

**Thaler and Thaler**                                    Case Number: **FC2019-098211**

5. These terms shall continue to apply until modified by court order. For the Court to consider lifting the restrictions in this order, John Thaler shall undergo a psychological/psychiatric evaluation by a forensically trained/informed psychologist/psychiatrist before the legal decision-making and parenting time orders in this matter can be modified.

6. Brittany Thaler shall be responsible for 0% and John Thaler shall be responsible for 100% of all costs associated with supervised parenting time.

**Holiday Schedule:** The Holiday Schedule does not apply at this time.

**Summer/Vacation:** Parents will follow regular weekday/weekend parenting time schedule.

**IT IS ORDERED** that the following terms shall apply:

1. **Parental Access To Records And Information:** Both parents are entitled to have equal access to prescription medication, documents, and other information concerning the child's, education and physical, mental, moral and emotional health including medical, school, police, court and other records directly from the custodian of the records or from the other parent. A person who does not comply with a reasonable request shall reimburse the requesting parent for court costs and attorney fees incurred by that parent to force compliance with this subsection. A parent who attempts to restrict the release of documents or information by the custodian, without a prior court order, is subject to appropriate legal sanctions.

2. **Prescription Medications:** A parent with joint legal decision-making authority shall not designate one pharmacy in a single location as the only source of the child's prescription medication without agreement of the other parent. A parent who attempts to withhold prescription medication without a prior court order is subject to appropriate legal sanctions.

3. **Relocation:** Neither Brittany Thaler nor John Thaler shall relocate the residence of the child outside of the state of Arizona or to a distance greater than 100 miles from the current residential locations without compliance with A.R.S. § 25-408. Any findings that a party has failed to comply may result in sanctions against that party pursuant to the same statute.

4. **Mediation Or Conciliation Services:** The parties are required to participate in mediation through a private mediator as agreed or through this Court's Conciliation Services to attempt to resolve any disputes, problems or proposed changes regarding legal decision-making or parenting time before an evidentiary hearing on any legal decision-making or parenting time issues.

5. **Periodic Review:** It is recognized that the needs of the child may change over time. At a minimum, the parents shall review the terms of this overall plan at least every 12 months to address whether any changes may be appropriate.

6. **Sex Offenders:** In accordance with A.R.S. § 25-403.05(B), a parent must notify the other parent immediately if the parent knows that a convicted or registered sex offender or a person who has been convicted of a dangerous crime against children (as defined in A.R.S. § 13-705) may have access to the child. The parent must provide notice by first class mail (return receipt requested), by electronic means to an electronic mail address that the recipient provided to the parent for notification purposes or by other communication accepted by the Court.

7. **Notify Other Parent of Address Change:** Each parent will inform the other parent of any change of address and/or phone number in advance or within 14 days of the change.

Thaler and Thaler                                    Case Number: **FC2019-098211**

8. <u>**Notify Other Parent of Emergency:**</u> Both shall promptly inform the other parent of any emergency or other important event that involves the minor child.

9. <u>**Cooperate and Work Together**</u>: Both parents shall exert their best efforts to work cooperatively in future plans consistent with the best interests of the minor child and to amicably resolve such disputes as may arise.

10. <u>**Notify Other Parent of Problems with Parenting Time Ahead of Time**</u>: If either parent is unable to follow through with the Parenting Time arrangements involving the minor child, that parent shall notify the other parent as soon as possible.

## CHILD SUPPORT

**THE COURT FINDS that:**

- The relevant financial factors and the discretionary allowances and adjustments which the Court will allow for a current calculation of child support pursuant to the Arizona Child Support Guidelines are set forth in the Child Support Worksheet and order which the Court hereby incorporates and adopts as its findings with respect to child support.
- **Child Support:** John Thaler is obligated to pay child support to Brittany Thaler pursuant to the Arizona Child Support Guidelines in the amount of $1,341.00 per month.
- **Past Support:** It is appropriate to award Brittany Thaler an additional judgment for past support in the amount of $9,342.00 for appropriate past support from the date of filing of the current petition until today.

**IT IS THEREFORE ORDERED that:**

- **Child Support:** John Thaler shall pay child support to Brittany Thaler in the sum of $1,341.00 per month, payable on the 1st day of each month commencing 01/01/2021 by income withholding order.
- **Past Support:** Brittany Thaler is also granted judgment against John Thaler in the additional amount of $9,342.00. John Thaler shall pay the additional sum of $300.00 per month towards this judgment, payable on the first (1st) day of each month beginning 01/01/2021 until paid in full.

## DIVISION OF PROPERTY AND DEBTS

### Community/Sole and Separate Property Claims and Debts

The Court shall divide any disputed property in accordance with the property's character. Property is characterized by the time of its acquisition. If acquired by either spouse before marriage or acquired during marriage by gift, devise, or descent, property is characterized as separate property. A.R.S. § 25-213(A). The Court shall assign each spouse's sole and separate property to that spouse. A.R.S. § 25-318(A).

Property acquired by either spouse during marriage is characterized as community property (with the exceptions of property acquired by gift, devise, or descent). A.R.S. § 25-211(A). There is a presumption that any property acquired by either spouse during marriage is community property, unless demonstrated otherwise by clear and convincing evidence. *See Sommerfield v. Sommerfield*, 121 Ariz. 575, 578, 592 P.2d 771, 774 (1979). Any property acquired by either spouse outside of Arizona shall be deemed to be community property if such property would have been characterized as community property had it been initially acquired in Arizona. A.R.S. § 25-318(A).

### Equitable Division

**Thaler and Thaler**        Case Number: **FC2019-098211**

The Court shall divide community property equitably, although not necessarily in kind, without any regard to marital misconduct. A.R.S. § 25-318(A). As a general presumption, equitable division requires that community property be divided substantially equally. *See Toth v. Toth*, 190 Ariz. 218, 221, 946 P.2d 900, 903 (1997). However, the court may order an unequal division of community property in consideration of excessive or abnormal expenditures or the destruction, concealment, or fraudulent disposition of property. A.R.S. § 25-318(C).

When dividing property, the Court may consider all related debts and obligations. A.R.S. § 25-318(B). To determine property's value, the court shall select a valuation date. The selection of this valuation date rests within the wide discretion of the trial court and shall be tested upon review by the fairness of the result. *See Sample v. Sample*, 152 Ariz. 239, 242-43, 731 P.2d 604, 607-08 (App. 1986).

## Unequal Division of Property

Only rarely is unequal division of community property appropriate to achieve equity. *See Toth*, 190 Ariz. at 221, 946 P.2d at 903 (unequal division of property was appropriate because one spouse contributed substantially disproportionate separate funds compared to the other's contribution); *see also Flower v. Flower*, 223 Ariz. 531, 531, 225 P.3d 588, 588 (App. 2010) (unequal division of property was appropriate because the parties incurred substantial community debt to benefit one spouse's separate property). *But see Inboden v. Inboden*, 223 Ariz. 542, 547, 225 P.3d 599, 604 (App. 2010) (vacating an order for the unequal division of property because each spouse had contributed separate funds to joint property).

The Court shall consider all equitable factors before ordering an unequal division of community property, including: the length of the marriage, the contributions of each spouse to the community, the source of funds used to acquire the property to be divided, the allocation of debt, and any other factor that may affect the outcome. *See Inboden*, 223 Ariz. at 547, 225 P.3d at 604.

**THE COURT FINDS** that this case does not present a unique set of facts or circumstances. Therefore, an equal division of community property is appropriate to achieve equity.

## Real Property

**THE COURT FINDS** that the parties do not own real property subject to division.

## Personal Property

**IT IS ORDERED:**

- Brittany R Thaler is awarded as sole and separate property, subject to any liens or encumbrances on the property, all vehicles, household furniture, furnishings and appliances, and other personal property in his/her possession.
- John H Thaler is awarded as sole and separate property, subject to any liens or encumbrances on the property, all vehicles, household furniture, furnishings and appliances, and other personal property in his/her possession.

## Financial Accounts

**THE COURT FINDS** that there are no financial accounts containing community property that require allocation.

**Thaler and Thaler**                    Case Number: **FC2019-098211**

## Debts

**THE COURT FINDS** that the following community debts were identified:

| Type of Debt | Description | Amount | Details |
|---|---|---|---|
| Personal Loan | Suntrust/Lightstream | $7,540.03 | Pool Loan |
| Credit Card | Chase | $21,055.30 | |
| Credit Card | Discover Card | $25,635.71 | |

**IT IS ORDERED** that in fairly and equitably allocating the community assets and the community debts, the responsibility for the debts shall be divided as follows:

- Brittany Thaler shall be responsible for paying 50% and John Thaler shall be responsible for paying 50% of the Personal Loan - Suntrust/Lightstream.
- Brittany Thaler shall be responsible for paying 50% and John Thaler shall be responsible for paying 50% of the Credit Card - Chase.
- Brittany Thaler shall be responsible for paying 50% and John Thaler shall be responsible for paying 50% of the Credit Card - Discover Card.

### IT IS FURTHER ORDERED:

- Brittany Thaler shall be solely responsible for any credit card or debt in their name incurred after service of the Petition.
- John Thalershall be solely responsible for any credit card or debt in their name incurred after service of the Petition.
- Any community debts that were not identified at the time of the trial shall be divided equally between the parties.
- Brittany Thaler shall ensure that John Thaler's name is removed from all credit accounts assigned to them in this Decree by February 13, 2021.
- John Thaler shall ensure that Brittany Thaler's name is removed from all credit accounts assigned to them in this Decree by February 13, 2021.
- Mother is requesting that Father be held responsible for his portion of the community debt that Mother has maintained since December 12, 2019 under the Bobrow case/analysis. Mother testified that the total amounts she has paid since December of 2019 is $14,178.88. $14,178.88 divided by 2 = $7,089.44. Mother also testified that she has paid $268.30 per month for Father's health insurance premiums for the last 12 months. Twelve months multiplied by $268.30 = $3,219.60 divided by 2 =$1,609.8. $7,089.44 + $1,609.8 = $8,699.24. Father shall pay Mother $8,699.24 for his portion of the community debt that has been maintained by Mother, and for his portion of the health insurance premiums that were also maintained by Mother. Father shall pay Mother $8,699.24 no later than April 1, 2021. This amount shall accrue interest at the maximum legal/statutory rate.
- Each party shall pay any debt incurred by him or her respectively since the date of service of the Petition in the matter.
- Each party shall indemnify and hold harmless from any and all debts designated as the responsibility of that party by the terms set forth in this Decree.

## ATTORNEY FEES AND COSTS

Brittany Thaler has requested an award of attorney fees and costs. An award of attorney fees and costs is

governed by A.R.S. § 25-324. A.R.S. § 25-324 provides as follows:

A. The court from time to time, after considering the financial resources of both parties and the reasonableness of the positions each party has taken throughout the proceedings, may order a party to pay a reasonable amount to the other party for the costs and expenses of maintaining or defending any proceedings under this chapter or chapter 4, article 1 of this title. On request of a party or another court of competent jurisdiction, the court shall make specific findings concerning the portions of any award of fees and expenses that are based on consideration of financial resources and that are based on consideration of reasonableness of positions. The court may make these findings before, during or after the issuance of a fee award.

B. If the court determines that a party filed a petition under one of the following circumstances, the court shall award reasonable costs and attorney fees to the other party:

1. The petition was not filed in good faith.
2. The petition was not grounded in fact or based on law.
3. The petition was filed for an improper purpose, such as to harass the other party, to cause an unnecessary delay or to increase the cost of litigation to the other party.

C. For the purpose of this section, costs and expenses may include attorney fees, deposition costs and other reasonableness expenses as the court finds necessary to the full and proper presentation of the action, including any appeal.

D. The court may order all amounts paid directly to the attorney, who may enforce the order in the attorney's name with the same force and effect, and in the same manner, as if the order had been made on behalf of any party to the action.

**THE COURT FINDS** that there is substantial disparity of financial resources between the parties. Because of the disparity John Thaler has considerably more resources available to contribute toward Brittany Thaler's attorney fees and costs.

**THE COURT FURTHER FINDS** that John Thaler acted unreasonably in the litigation. Specifically, John Thaler acted unreasonably by doing the following: Throughout the litigation in this matter, Father has refused to engage in discovery/disclosure and has not complied with the Court's order to undergo a psychological evaluation. Father, who is an attorney, was unprofessional as well as disrespectful and belligerent towards everyone involved in this case including Mother, her counsel, the CAA, the Court and judicial staff. Father repeatedly filed pleadings that were incoherent/delusional and contained allegations that were clearly baseless. The Court finds that Father filed pleadings that he knew contained false or inaccurate information. The Court further finds that Father filed these pleadings solely for the purposes of threatening and harassing everyone involved in this case..

**THE COURT FURTHER FINDS** that the provisions of A.R.S. § 25-324(B) do not apply.

**THE COURT FURTHER FINDS** that John Thaler knowingly presented a false claim, knowingly accused the other parent of making a false claim, or violated a court order compelling disclosure or discovery such that an award of attorney fees and costs is appropriate under A.R.S. § 25-415.

**IT IS THEREFORE ORDERED granting** Brittany Thaler's request for attorney fees and costs.

**Thaler and Thaler**                                     Case Number: **FC2019-098211**

    **IT IS FURTHER ORDERED** that John Thaler shall pay a portion of Brittany Thaler's reasonable attorney fees and costs. Not later than 01/18/2021, counsel for Brittany Thaler shall submit all necessary and appropriate documentation to support an application for an award of attorney fees and costs, including a *China Doll* Affidavit and a form of order. By no later than 01/29/2021, John Thaler shall file any written objection. If Brittany Thaler's counsel fails to submit the documentation by 01/18/2021, no fees or costs will be awarded. The Court shall determine the award and enter judgment upon review of the Affidavit as well as any objections.

## **ADDITIONAL ORDERS**

Thaler and Thaler                                    Case Number: **FC2019-098211**

**IT IS ORDERED** Marital Home: Mother testified that she purchased the marital home prior to marriage and that Father gifted her $34,400 (half of the down payment) to purchase the home. The home was sold in April of 2020 resulting in $173,970.06 in equity. The equity was placed into Mother's attorney's trust account. Mother was subsequently awarded $25,000 from this amount to cover her interim attorney's fees, which left $148,970.06 in counsel's trust account. Mother concedes that the community does have an equitable lien on the property. Based on the evidence and testimony provided regarding the Drahos formula, the Court calculates the community lien to be $24,462.24 (A = $99,300, B = $341,931, C = $18957.24). Father's share of the community lien would therefore be $12,231.12. However, the total costs to prepare the property for sell was $2,902.10. Father's portion of this amount is $1,451.10. In addition, Father was ordered to reimburse Mother $1,000 for the CAA fee. This bring Father's amount of the community lien to $9,780.02. Mother was awarded $25,000 in attorney's fees that was to be taken from Father's share of the community lien. However, Father's portion of the lien is only $9,780.02, which leaves $15,219.98 as a judgment against Father. This amount ($15,219.98) shall be paid no later then April 1, 2021 and shall accrue interest at the maximum legal/statutory rate. Mother shall receive all remaining funds contained in her attorney's trust account immediately.

Retirement/Financial Accounts: Disposition of any retirement/financial accounts will be addressed at a later date pursuant to ARS 25-318(D) as Father provided no information regarding his financial accounts.

The parties were awarded all personal property currently in their possession with the exception of the following: Husband shall return the following items to wife: Wife's Ipad, flash drives, external hard drives, scrapbooks, the child's beanie baby collection and all items belonging to the child or that were purchased for the child. Husband shall make arrangements through wife's attorney and shall return the items within 30 days from the date of this Order.

Mother filed a Petition for Contempt regarding Father's failure to pay the required CAA fees and complete a psychological evaluation. The Court issued the Order for Father to complete a psychological evaluation on February 20, 2020, and again on October 20, 2020. Father never completed the psychological evaluation that he was ordered to complete. Father was interviewed by CAA Kiffmeyer where he "discussed the court-ordered psychological evaluation." In this interview, Father indicated that "[h]e will only submit to testing (a psychological evaluation) if Mother also submits testing.

Based on a review of the record, and the evidence and testimony presented, the Court finds that: 1) Father was ordered on two occasions to submit to a psychological evaluation; 2) Father was aware of the Court Orders regarding the psychological evaluation; 3) Father had the ability to comply with the Court's Order and 4) Father willfully failed to comply with the Court's Order

THE COURT FINDS Father in Contempt of Court for failing to comply with the Court's Order regarding the psychological evaluation.

IT IS ORDERED that Father shall pay a reasonable portion of Mother's attorney's fees and costs as a sanction.

The Court must decide the amount of attorney's fees and costs to be awarded but finds there is no just reason to delay making a final order. **IT IS THEREFORE ORDERED** pursuant to Rule 78(b), Arizona Rules of Family Law Procedure, that this is a final judgment/decree and it shall be entered by the Clerk. The time for appeal begins upon entry of this judgment by the Clerk. For more information on appeals, see Rule 8 and other Arizona Rules of Civil Appellate Procedure.

**IT IS FURTHER ORDERED** denying any affirmative relief sought before the date of this Order that is not expressly granted above.

**Thaler and Thaler**                    Case Number: **FC2019-098211**

Done in open Court on: <u>12/31/2020</u>

_Marvin L. Davis_
_____
Judge Marvin Davis

# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY
### HONORABLE MARVIN DAVIS

Thaler and Thaler

Brittany R Thaler
(Petitioner)

AND

John H Thaler
(Respondent)

Case Number: **FC2019-098211**

Case Number: **FC2019-098211**
Atlas Number:

**CHILD SUPPORT ORDER**

## THE COURT FINDS that:

1. Brittany Thaler and John Thaler owe a duty to support the following child:

| Child Name | Date of Birth |
|---|---|
| Mckinley Thaler | 12/12/2017 |

2. **Child Support Guidelines:** The required financial factors and any discretionary adjustments pursuant to the Arizona Child Support Guidelines are as set forth in the Child Support Worksheet, attached and incorporated herein by reference.

3. **Child Support:** John Thaler is obligated to pay child support to Brittany Thaler pursuant to the Arizona Child Support Guidelines in the amount of $1,341.00 per month.

4. **Support Arrears:** Arrears not addressed.

5. **Past Support:** It is appropriate to award Brittany Thaler an additional judgment for past support in the amount of $9,342.00 for appropriate past support from the date of filing of the current petition until today.

## IT IS ORDERED that:

1. **Child Support:** John Thaler shall pay child support to Brittany Thaler in the sum of $1,341.00 per month, payable on the 1st day of each month commencing 01/01/2021 by income withholding order.

2. **Arrearage Judgment:** No additional judgment for child support arrears is entered.

3. **Past Support:** Brittany Thaler is also granted judgment against John Thaler in the additional amount of $9,342.00. John Thaler shall pay the additional sum of $300.00 per month towards this judgment, payable on the first (1st) day of each month beginning 01/01/2021 until paid in full

4. **Total Monthly Payments:** John Thaler shall make total monthly payments to Brittany Thaler of $1,649.00 per month payable on the 1st day of each month commencing 01/01/2021 as follows:

| | |
|---|---|
| Current Child Support payment as ordered above: | $1,341.00 |
| Child Support Arrearage payments: | $300.00 |
| Current Spousal Maintenance payment: | $0.00 |
| Past Due Spousal Maintenance payment: | |
| Clearinghouse Handling Fee: | $8.00 |
| Total Monthly Payment: | $1,649.00 |

**Thaler and Thaler**                Case Number: **FC2019-098211**

5. **Clearinghouse:** All payments shall be made through the Support Payment Clearinghouse pursuant to an income withholding order signed this date. Any time the full amount of support is not withheld, John Thaler remains responsible for the full monthly amount ordered. Payments not made directly through the Support Payment Clearinghouse shall be considered *gifts* unless otherwise ordered. All payments shall be made payable to and mailed directly to:

**Support Payment Clearinghouse**
**P.O. Box 52107**
**Phoenix, AZ 85072-2107**

**Payments must include the Payor's name, ATLAS number, and Social Security Number.**

6. **Current Address:** Pursuant to A.R.S. § 25-322, the parties shall submit current address information in writing to the Clerk of the Superior Court and the Support Payment Clearinghouse immediately. John Thaler shall submit the names and addresses of their employers or other payors within 10 days. The parties shall submit address changes within 10 days of the change.

7. **Medical Insurance:** Brittany R Thaler shall be individually responsible for providing medical insurance for the minor child, and shall continue to pay premiums for any medical, dental and vision policies covering the child that are currently in existence.

8. **Uninsured Costs:** The costs of medical, dental and vision expenses not paid by insurance shall be shared as follows:

Brittany Thaler: 30%                John Thaler: 70%

9. **Travel Costs:** The costs of travel related to parenting time over 100 miles away shall be shared as follows:

Brittany Thaler: 30%                John Thaler: 70%

10. **Tax Deductions:** The federal and state tax exemptions for the dependent Children are allocated as follows:

**Parent Entitled To Deduction Per Schedule**

| Child Name | DOB | Age | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| Mckinley Thaler | 12/12/2017 | 3.1 | John Thaler | John Thaler | John Thaler | Brittany Thaler | Brittany Thaler |

Each Year, John Thaler may claim exemptions allocated from above only if all child support and arrears ordered for the year are paid by December 31 of that year.

11. **Information Exchange:** The parties shall exchange financial information including copies of tax returns, earnings statements, a Parent's Worksheet for Child Support Amount, residential addresses and the names and addresses of their employers every 24 months.

## IMPORTANT INFORMATION

12. **Other Orders:** If this is a modification of child support, all other prior orders of this Court not modified remain in full force and effect.

**Thaler and Thaler**                    Case Number: **FC2019-098211**

13. **Emancipation:** Generally the obligation to pay child support in the full amount ordered herein continues until the court formally modifies this order with a new order upon request of one of the parties or when the youngest child is emancipated. A child is emancipated:

      On the date of the child's marriage.

      On the child's 18th birthday and graduation from high school or age 19 (whichever comes first).

      When the child is adopted.

      When the child dies.

14. The back child support amount was calculated using the $660 monthly child support amount that was established in June of 2020. The total amount for these tens months (up to October) is $6,660. For November and December Father shall a total of $2,682 ($1,341 per month) for a grand total of $9,342.

    Even though there are orders regarding medical insurance and the allocation of the right to claim a child as a dependent for the purposes of federal taxes contained in this judgment, this is not binding on the IRS. Under the Affordable Care Act, the parent who claims the child as a dependent on a federal tax return has the obligation to ensure that the child is covered by medical insurance and may be penalized by the IRS for failing to do so.

    No further claims or issues remain for the Court to decide. Therefore, **IT IS FURTHER ORDERED** pursuant to Rule 78(C), Arizona Rules of Family Law Procedure, this final judgment/decree is signed by the Court and it shall be entered by the Clerk. The time for appeal begins upon entry of this judgment by the Clerk. For more information on appeals, see Rule 8 and other Arizona Rules of Civil Appellate Procedure.

    **IT IS FURTHER ORDERED** denying any affirmative relief sought before the date of this Order that is not expressly granted above.

Dated: 12/31/2020

_Marvin L. Davis_
Judge Marvin Davis

# SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY
## HONORABLE MARVIN DAVIS

### CHILD SUPPORT WORKSHEET

**Petitioner:**     Brittany R Thaler            **Case No: FC2019-098211**

**Respondent:**    John H Thaler             **ATLAS No:**

**Total Number of Children:**     1

**Presumptive Termination Date:** 5/31/2036

|  | Brittany Thaler | John Thaler |
|---|---|---|
| **GROSS MONTHLY INCOME:** | **$6,666.67** | **$15,583.33** |
| Spousal Maintenance (Paid/Rec'vd): | | |
| Court Ordered Child Support of Other Relationships (Paid): | | |
| Custodian of Other Child Subject of Order: | | |
| Support of Other Natural or Adopted Children NOT Ordered: | $0.00 | $0.00 |
| **ADJUSTED GROSS INCOME:** | **$6,666.67** | **$15,583.33** |
| **Combined Adjusted Gross Income:** | | **$22,250.00** |

                      **Primary Residential Parent is:** Brittany R Thaler

| | Brittany Thaler | John Thaler |
|---|---|---|
| **BASIC CHILD SUPPORT OBLIGATION FOR 1 CHILD** | | **$1,744.00** |
| **Plus Costs for:** | | |
| Adjustment for 0 child over age 12 at (10.00)%: | | $0.00 |
| Medical, Dental, and Vision Insurance: | $200.00 | |
| Monthly childcare costs for 1 child: | | |
| *Less Federal Tax Credit to Custodian of (25.00)%:* | | $0.00 |
| Extra Education Expenses: | | |
| Extraordinary (Gifted or Handicapped) Child Expenses: | | |
| **TOTAL CHILD SUPPORT OBLIGATION** | | **$1,944.00** |
| Each Parent's Proportionate Percentage of Combined Income: | 29.96% | 70.04% |
| Each Parent's Proportionate Share of the Total Support Obligation: | **$582.48** | **$1,361.52** |
| Parenting Time Costs Adjustment for: John Thaler | | |
| *Parenting Time Table (A) for (12) days at (1.20)%:* | | **$20.92** |
| **Total Additions to Child Support Obligation paid by each parent:** | **($200.00)** | **$0.00** |
| **PRELIMINARY CHILD SUPPORT OBLIGATION:** | **$382.48** | **$1,340.59** |

```
┌ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─
│ SELF SUPPORT RESERVE TEST
│   John Thaler Adjusted Gross Income:          $15,583.33
│   Less Paid Arrearages Allowed:
│   Less Self Support Reserved Amount:           $1,663.97
│   Discretionary Income:                       $13,919.36
└ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─ ─
```

**FINAL CHILD SUPPORT OBLIGATION PAYABLE BY John Thaler:**       **$1,341.00**

**Thaler and Thaler**

Case Number: **FC2019-098211**

CASE NUMBER: FC2019-098211

E-FILING ID #: 12381942

SIGNATURE DATE: 12/31/2020

FILED DATE: 1/8/2021 8:00:00 AM

GREG R DAVIS

BARB KIFFMEYER
4001 E MOUNTAIN SKY AVE STE 200 PHOENIX AZ
85044

JOHN H THALER
18521 E QUEEN CREEK RD STE 105-173 QUEEN
CREEK AZ 85142

AZ DEPARTMENT OF VITAL RECORDS

FAMILY SUPPORT SERVICES-CCC

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

FC 2019-098211                                    12/21/2020


HONORABLE MARVIN L. DAVIS                CLERK OF THE COURT
                                         V. Felix
                                         Deputy


IN RE THE MATTER OF
BRITTANY R THALER              GREG R DAVIS

AND

JOHN H THALER                  JOHN H THALER
                               18521 E QUEEN CREEK RD STE 105-
                               173
                               QUEEN CREEK AZ 85142



                               BARB KIFFMEYER
                               4001 E MOUNTAIN SKY AVE STE 200
                               PHOENIX AZ 85044
                               JUDGE MARVIN DAVIS



### MINUTE ENTRY


    On December 21, 2020, the Court was made aware of a fraudulent minute entry that was forwarded to the Court-Appointed Advisor (CAA) Barb Kiffmeyer from Mr. John Thaler. Mr. Thaler is the Respondent in the above-mentioned cause number, which is currently pending before this Court. The minute entry contains several grammatical errors and also lists Hearing dates and filing dates that are incongruent with one another. For example, the Hearing date on this fraudulent minute entry is December 14, 2020, but the filing date is December 10, 2020, which is an impossibility. The minute entry states the following:

    "The Court has received and reviewed *Respondent's Motion for Reconsideration* regarding the Court's October 20, 2020 Custody Modification Order.

FC 2019-098211                                        12/21/2020

**IT IS ORDERED** granting Respondent's Motion. and orders that the parties immediately return to the scheduled set fourth in the Temporary Custody Order dated February 20, 2020."

The minute entry includes language regarding Rule 78(c) of ARFLP and has this judicial officer's forged signature at the bottom of page one.  This Court did not create this minute entry and never entered the Orders contained in this fraudulent document.  The minute entry should be disregarded and shall have no effect as it was not created, nor approved, by this Court.

All parties representing themselves must keep the Court updated with address changes. A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

FC 2019-098211                                                01/07/2021

HONORABLE MARVIN L. DAVIS

CLERK OF THE COURT
L. Mitchell
Deputy

IN RE THE MARRIAGE OF
BRITTANY R THALER

GREG R DAVIS

AND

JOHN H THALER

JOHN H THALER
18521 E QUEEN CREEK RD STE 105-
173
QUEEN CREEK AZ 85142


BARB KIFFMEYER
4001 E MOUNTAIN SKY AVE STE 200
PHOENIX AZ 85044
JUDGE MARVIN DAVIS


MINUTE ENTRY


The Court before it Respondent's *Emergency Ex-Parte Application for Meeting With the Court in Chambers* filed on December 31, 2020.

No good cause appearing,

**IT IS ORDERED** denying Respondent's motion.

All parties representing themselves must keep the Court updated with address changes.
A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT J

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FC 2019-098211                                                11/16/2020

CLERK OF THE COURT
HONORABLE BRUCE R. COHEN                            B. Lopez-Mori
Deputy

IN RE THE MATTER OF
BRITTANY R THALER                        GREG R DAVIS

AND

JOHN H THALER                            JOHN H THALER
                                         18521 E QUEEN CREEK RD STE 105-
                                         173
                                         QUEEN CREEK AZ  85142


                                         BARB KIFFMEYER
                                         4001 E MOUNTAIN SKY AVE STE 200
                                         PHOENIX AZ 85044
                                         JUDGE BRUCE COHEN
                                         JUDGE MARVIN DAVIS


**DENIAL OF CHANGE OF JUDGE FOR CAUSE**

The Court has reviewed Mr. Thaler's *"Emergency Notice of Motion To Disqualify Judge Marvin L Davis"* and the attachments thereto filed on November 6, 2020. In the Motion, Mr. Thaler alleges that Judge Davis cannot remain fair and impartial because of alleged conduct on the part of his judicial assistant. Thus, pursuant to ARS section 12-409 and Rule 6.1, Arizona Rules of Family Law Procedure, Mr. Thaler requests that a different judicial officer be assigned to this case.

"Bias and prejudice means a hostile feeling or spirit of ill-will, or undue friendship or favoritism, towards one of the litigants." *In re Guardianship of Styer*, 24 Ariz. App. 148, 151, 536 P.2d 717, 720 (1975). Judicial officers are "presumed to be free of bias and prejudice." *State v. Rossi,* 154 Ariz. 245, 247, 741 P.2d 1223, 1225 (1987). Thus, a party who requests that a judicial officer be changed for cause has the burden of proving bias, prejudice, or interest by a

preponderance of the evidence. *See* Ariz. R. Civ. P. 42.2(b) and (e)(4); *Magic Ranch Estates Homeowners Assoc. v. Huffman*, 2019 WL 6332422, ¶ 19 (Ariz. App. Mem. Dec. 11/22/19); *cf. Costa v. Mackey*, 227 Ariz. 565, 571, ¶ 12, 261 P.3d 449, 455 (App. 2011) (holding that a criminal case defendant who moves "for a change of judge for cause based on bias or prejudice has the burden of proving those facts by a preponderance of evidence"). Moreover, "[u]nder A.R.S. § 12-409(B)(5), the sufficiency of any 'cause to believe' must be determined by an objective standard, not by reference to the affiant's subjective belief." "A change of judge for cause is not warranted if based merely on 'speculation, suspicion, apprehension, or imagination.'" *Costa*, 227 Ariz. at 571, ¶ 12, 261 P.2d 455 (quoting *State v. Ellison*, 213 Ariz. 116, 128, ¶ 37, 140 P.3d 899, 911 (2006)).

Rule 6.1, ARFLP, expressly authorizes the presiding judge to decide the issue raised in an affidavit of change of judge for cause with or without first holding a hearing. To warrant a hearing, the affidavit must demonstrate "disqualifying *facts that warrant an honest belief that the judge is biased." Id.* (italics in original). *Mervyn's v. Super. Ct. for Maricopa County*, 179 Ariz. 359, 361, 879 P.2d 367, 369.

While no allegations are directed at Judge Davis, the motion suggests that Judge Davis' continued tenure on this case is somehow tainted arising from allegations made against his judicial assistant. However, the Motion fails to make a *prima facie* showing of sufficient grounds to disqualify Judge Davis. Mr. Thaler claims to provide "facts" but even a cursory review of the "facts" demonstrates that they are not supported.

This court is choosing not to summarize the scurrilous claims made against Judge Davis' judicial assistant as memorializing them herein might give the mistaken impression that the claims have credence. They have none. But an example is worth setting forth to establish that the motion does not warrant any further proceedings.

Mr. Thaler alleges that Judge Davis' judicial assistant secured a mortgage on a home and that the circumstances surrounding that mortgage were nefarious and were related somehow to Petitioner in this case. Mr. Thaler attaches to his motion a copy of the deed of trust and (through Ms. Fine-Berger) he alleges that Judge Davis's judicial assistant somehow secured a Deed of Trust to a property in Scottsdale with the assistance of Petitioner. However, the Deed of Trust itself establishes that it involved a person other than Judge Davis' judicial assistant. First, Judge Davis' judicial assistant is a woman, but yet the Deed of Trust involves a "married man." Second, the middle initial of the person who secured the Deed of Trust is not the same middle initial of the person who works as the judicial assistant for Judge Davis. Therefore, all innuendos made from the inclusion of this deed of trust are baseless as the submission itself was either made without due care or was designed to mislead.

FC 2019-098211                                      11/16/2020

In addition, Mr. Thaler claims that Judge Davis may now be a witness in a separate federal proceeding that he either is or which he may become involved in to address what he claims are multiple civil rights violations. Mr. Thaler fails to cite the court to any existing litigation and, even if he had done so, utterly fails to provide how those proceedings would involve Judge Davis at any level or why his potential as a witness would create a basis for bias or prejudice in these proceedings.

As noted above, there are other claims made by Mr. Thaler but no further comment is warranted at this time. Accordingly, based upon the failure to establish any basis for the claims of bias or prejudice,

**IT IS ORDERED DENYING Mr. Thaler's motion for change of judge for cause.** It is noted, however, that nothing contained herein impacts Mr. Thaler's ability to have Judge Davis address claims made by Mr. Thaler involving other professionals involved in this litigation.

**IT IS FURTHER ORDERED** referring this matter back to Judge Davis for all further proceedings.

All parties representing themselves must keep the Court updated with address changes. A form may be downloaded at: http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT K

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FC 2019-098211                                          04/05/2021

CLERK OF THE COURT
HONORABLE JOSEPH C. WELTY                    C. Troxel
                                                                     Deputy

IN RE THE MATTER OF
BRITTANY R THALER                    GREG R DAVIS

AND

JOHN H THALER                    JOHN H THALER
                                             18521 E QUEEN CREEK RD STE 105-
                                             173
                                             QUEEN CREEK AZ  85142


                                             BARB KIFFMEYER
                                             4001 E MOUNTAIN SKY AVE STE 200
                                             PHOENIX AZ 85044
                                             JUDGE BRUCE COHEN
                                             JUDGE MARVIN DAVIS
                                             JUDGE WELTY


MINUTE ENTRY

The Court has received and reviewed Respondent's Motion to Disqualify Judge Marvin L. Davis, Judge Joshua D. Rogers and Judge Bruce Cohen as well as the attached affidavits and exhibits.

A party requesting the disqualification of a judicial officer bears the burden of proving bias, prejudice, or interests by a preponderance of the evidence. *See* Ariz. R. Civ. P. 42.2(b) and (e)(4); *Magic Ranch Estates Homeowners Assoc. v. Huffman*, 2019 WL 6332422 (Ariz. App. Mem. Dec. 11/22/19); cf. *Costa v. Mackey*, 227 Ariz. 565, 571 (2011). Rule 6.1, ARFLP, expressly authorizes the presiding judge to decide the issue raised in an affidavit of change of judge for cause with or without first holding a hearing. To warrant a hearing, the affidavit must demonstrate

"disqualifying facts that warrant an honest belief that the judge is biased." *Mervyn's v. Super Ct for Maricopa County*, 179 Ariz. 359 (1994)

As the Presiding Judge of the Judicial Branch in Maricopa County, this court has appointed the Hon. Bruce Cohen as the Presiding Judge of the Family Department in Maricopa County and delegated the responsibility of assigning Family Department matters to that office. Absent proof by a preponderance of evidence that Judge Cohen should be removed from that role in this case for bias and prejudice he will continue in that role.

Respondent's motion, affidavit and exhibits contain no such proof. With respect to Judge Cohen, the Respondent simply points out that Judge Cohen denied a prior motion to disqualify Judge Davis and attacks the reasoning of that denial. The Court takes judicial notice of its own records, and has reviewed Judge Cohen's November 16, 2020 order denying Respondent's November 6, 2020 Emergency Notice To Disqualify Judge Marvin L Davis. The Court finds nothing of substance or reasoning in that order that establishes bias or prejudice on Judge Cohen's behalf to any degree.

Accordingly,

**THE COURT FINDS** based upon a review of the Affidavit, no hearing is warranted in this matter with respect to claims made against Judge Cohen.

**IT IS ORDERED** denying Respondent's Motion to Disqualify Judge Marvin L. Davis, Judge Joshua D. Rogers and Judge Bruce Cohen with respect to Judge Bruce Cohen only.

**IT IS FURTHER ORDERED** referring all other aspects of the Motion to Judge Bruce Cohen, the Presiding Judge of the Family Department in Maricopa County.

All parties representing themselves must keep the Court updated with address changes. A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT L

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

FC 2019-098211                                      05/24/2021

                                         CLERK OF THE COURT
HONORABLE BRUCE R. COHEN                      B. Lopez-Mori
                                                Deputy

IN RE THE MATTER OF
BRITTANY R THALER                   GREG R DAVIS

AND

JOHN H THALER                       JOHN H THALER
                                    18521 E QUEEN CREEK RD STE 105-
                                    173
                                    QUEEN CREEK AZ  85142


                                    BARB KIFFMEYER
                                    4001 E MOUNTAIN SKY AVE STE 200
                                    PHOENIX AZ  85044
                                    AG-CHILD SUPPORT-EAST VALLEY
                                    OFFICE
                                    JUDGE BRUCE COHEN
                                    JUDGE MARVIN DAVIS


**DENIAL OF MOTION FOR CHANGE OF JUDGE FOR CAUSE REGARDING
JUDGES ROGERS AND DAVIS**


On March 30, 2021, Mr. Thaler filed his successive motion to disqualify. Judge Welty subsequently addressed the part of the motion that related to this undersigned judicial officer. Thereafter, due to an oversight, Judge Davis denied the remainder of the motion (minute entry of April 29, 2021). That order has since been rescinded and the matter has been forwarded to the Family Department Presiding Judge for determination.

Having reviewed the motion as well as the remainder of the record, including the rationale followed by Judge Welty in his denial of part of this relief sought, this court is summarily **denying**

FC 2019-098211                                              05/24/2021

the additional relief sought by Mr. Thaler, both as to Judge Davis and Judge Rogers. By this reference, this court is incorporating all prior orders that have been issued on this same requested relief.

All parties representing themselves must keep the Court updated with address changes. A form may be downloaded at:
http://www.superiorcourt.maricopa.gov/SuperiorCourt/LawLibraryResourceCenter/

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT M

COMA
Your Name: John Harris Thaler
Address: 2510 E. Sunset Blvd., Suite 6
City, State, Zip: Las Vegas, NV 89120
Phone: 818-206-4402
Email: jhtlaw@msn.com
Self-Represented Plaintiff

**DISTRICT COURT**
**CLARK COUNTY, NEVADA**

| | |
|---|---|
| **John Harris Thaler** | CASE NO.: _____ |
| Plaintiff, | |
| vs. | DEPT NO.: _____ |
| **Brittany Rae Chavez** | |
| Defendant. | |

**COMPLAINT FOR ANNULMENT OR IN THE ALTERNATIVE FOR DIVORCE AND**
**UCCJEA DECLARATION**
**(With Children)**

Plaintiff respectfully states:

1. **Jurisdiction.** (☒ *check all that apply*)

   ☐ The parties were married in the State of Nevada on (*date of marriage*)

   _____.

   ☒ The following spouse has been a resident of the State of Nevada for at least six weeks prior to filing this Complaint and intends to make Nevada his/her home for an indefinite period of time: (*name of Nevada resident*) John Harris Thaler _____. The parties were married on (*date of marriage*) April 13, 2016 _____ in (*city*) Antigua _____, (*state*) Lesser Antilles _____.

© 2020 Family Law Self-Help Center   Complaint for Annulment (With Children)

* You are responsible for knowing the law about your case. For more information on the law, this form, and free classes, visit www.familylawselfhelpcenter.org or the Family Law Self Help Center at 601 N. Pecos Road. To find an attorney, call the State Bar of Nevada at (702) 382-0504.

**2. Reason for Annulment.** (☒ *check all that apply*)

☐ There is a close enough blood relationship between the parties that the marriage is prohibited by law.

☐ Plaintiff was married to someone else on the day of the wedding ceremony.

☒ Defendant was married to someone else on the day of the wedding ceremony.

☐ Plaintiff was under the age of 18 at the time of the marriage ceremony and did not get the proper consent from the parents, guardians, and/or district court. This Complaint is being filed within one year of Plaintiff reaching 18 years of age, and the parties have not freely cohabited since that time.

☐ Plaintiff lacked understanding of his/her actions to the extent that he/she was incapable of agreeing to the marriage because (*explain*):

_____

_____

_____

☐ Plaintiff was insane at the time of the wedding ceremony and has regained sanity. The parties have not freely cohabited since Plaintiff regained sanity.

☒ Plaintiff's consent to the marriage was obtained by fraud because (*describe the fraud*):

## See Attached

_____

_____

Plaintiff has not freely cohabited with the other party since learning of the fraud.

**3. Pregnancy.** (☒ *check one*)

☒ Neither spouse is pregnant.

☐ The following spouse is pregnant: (*name of pregnant spouse*) _____.
The other spouse ☐ is / ☐ is not the parent of the unborn child. The child is due to be born on (*date*): _____.

☐ It is unknown whether either spouse is currently pregnant.

4. **Children.** There are (*number*) 1_____ minor children in common born to or adopted by the parties. The name(s) and information is listed below:

| Child's Name | Date of Birth | State of Residence | How long child lived in the state | Disability |
|---|---|---|---|---|
| McKinley Thaler | 12/12/17 | AZ | 3 years | No |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

5. **UCCJEA Declaration.** Have the children lived in Nevada the last six months, or since birth? (☒ *check all that apply*)

☐ Yes, the child(ren) have lived in Nevada for the past six months, or since birth.

☒ No, the child(ren) have NOT lived in Nevada for the past six months.

a. **Living Arrangements Last 5 Years**. The children have lived with the following persons in the following places within the last five years:

| Time Period (mo/yr – mo/yr) | Name of Person the Child(ren) Lived With | City and State | Child's Name (if not all children) |
|---|---|---|---|
| 10/20 - present | Brittany Thaler | Mesa, AZ |  |
| 12/17 - 9/20 | Both parents | Gilbert, AZ |  |
| ____ - ____ |  |  |  |
| ____ - ____ |  |  |  |
| ____ - ____ |  |  |  |

The names and current addresses of each non-parent the children lived with during the last five years are: _____

_____

**b. Participation in Other Cases.** Have you ever participated in any case concerning these children as a party, witness, or in some other capacity? (☒ *check one*)

    ☐ No.

    ☒ Yes, I have participated in the following cases concerning these children (*provide all specifics including the state, the court name, children involved, the case number and the date of the child custody order, if any*): Maricopa County Superior Court, Case No. FC2019-098211, McKiinley Thaler, temporary order dated February 20, 2020.

**c. Knowledge of Other Cases.** Do you know of any other case that could affect this case, such as other custody cases, domestic violence cases, protection order cases, or adoptions/terminations? (☒ *check one*)

    ☐ No.

    ☐ Yes, the following cases that could affect this case (*give all specifics including the state, the court name, the parties involved, the case number and the type of case*):

    _____

    _____

    _____

**d. Person(s) Who Claim Custody / Visitation.** Is there anyone other than yourself or other parties to this case who has custody of the children or who can claim a right to custody or visitation with the children? (☒ *check one*)

    ☐ No.

    ☐ Yes, the following people have custody or can claim custody/visitation of the children: (*list names and addresses of anyone who claims custody/visitation rights*): _____

    _____

    _____

**6. Legal Custody.** *Legal custody refers to the ability to make major decisions about the child, such as medical care, education, and religious upbringing.* (☒ *check one*)

    ☐ The parties should share joint legal custody of the child(ren).

    ☒ Plaintiff should have sole legal custody of the child(ren).

    ☐ Defendant should have sole legal custody of the child(ren).

    ☐ Nevada is not the "home state" of the child(ren) and cannot enter custody orders.

7. **Physical Custody.** *Physical custody refers to the amount of time the child spends with each parent.* (☒ *check one*)

- ☐ **Joint Custody.** The parties should share <u>joint</u> physical custody of the child(ren) (each parent must have the child(ren) roughly 40% of the time, or 146 days per year). A proposed parenting timeshare and holiday schedule is attached as Exhibit 1.

- ☒ **Primary Custody.** The (☒ *check one*) ☒ Plaintiff / ☐ Defendant should have primary physical custody of the child(ren). A proposed parenting timeshare and holiday schedule is attached as Exhibit 1.

- ☐ **Sole Custody.** The (☒ *check one*) ☐ Plaintiff / ☐ Defendant should have sole physical custody of the child(ren).

- ☐ Nevada is not the "home state" of the child(ren) and cannot enter custody orders.

8. **Other Considerations.** The Court should consider the following issues in determining custody: (☒ *check all that apply*)

- ☒ Domestic Violence
- ☒ CPS Involvement
- ☐ Military Deployment
- ☐ State of Residency
- ☒ Other: <u>Defendant's mental illness</u>

9. **Public Assistance.** Has either party ever received public assistance?(☒ *check one*)

☒ No, the parties in this case have never received public assistance.

☐ Yes, one or more parties now receives or has received public assistance.

10. **Parties' Incomes.** *The court needs to know both parties' gross monthly incomes to make sure child support is set correctly.*

<u>*Gross monthly income includes*</u> *money received from work, social security, unemployment, pension/retirement, interest/investments, veteran's benefits, military allowances, etc.*

<u>*It does not include*</u> *SSI, SNAP, TANF, cash benefits from the county, or child support received.*

My gross monthly income is (*insert amount*): $2,300 / OR ☐ unknown.

The other parent's gross monthly income is (*insert amount*): $15,000 / OR ☐ unknown.

**11. Child Support.** *Use the attached worksheet to figure out how much child support the court should order.* **Complete the worksheet before filling out this section.** (☒ *check one*)

☒ Child support should be paid by (*name of parent who should <u>pay</u> child support*)

<u>Defendant</u> in the amount of $<u>1,480</u> per month.

This is based on: (☒ *check one*)

 ☒ The Child Support Worksheet calculation attached.
 ☐ The amount already established by the District Attorney, Family Support
  Division, case (*insert case number*) R_____.

☐ No child support is requested. (*Explain why not*): _____

_____

☐ I'm not sure how much child support should be paid, and ask the court to set support.

**12. Wage Withholding.** Should child support be paid through a wage garnishment? (☒ *check one*)

☒ Yes, a wage withholding order should be entered to secure payment of support.

☐ No, a wage withholding order should not be entered.

**13. Back Child Support.** Should back child support ("arrears") be ordered? (☒ *check one*)

☐ No, no back child support or arrears are requested.

☐ Child support arrears are being handled by the District Attorney, Family Support

 Division, case (*insert case number*) R_____ and should continue as

 ordered in that case.

☒ Yes, back child support should be paid by (*name of parent who should <u>pay</u> back child*

*support*) <u>Brittany Rae Thaler</u> from (*date back child support*

*should begin*) <u>12/13/19</u> to present.

**14. Child Care.** Are there child care expenses? (☒ *check one*)

☒ No, there are no child care costs for either parent.

☐ Yes, the monthly child care costs for the child(ren) are: $_____. This amount

 should be paid by ☐ me only ☐ the other parent only ☐ both parents equally.

**15. Medical Coverage.** Medical support (medical, vision, and/or dental) must be provided for the child(ren). How will the children get medical support/insurance?

☐ Medicaid.

☒ Private / Employer Insurance. The monthly premium should be paid by ☐ me only

☒ the other parent only ☐ both parents equally.

☐ Other: _____

**16. Unreimbursed Medical Expenses.** How will medical expenses get paid if insurance does not cover a medical cost? (☒ *check one*)

☐ Any expenses not covered by insurance should be paid equally by both parties.

☒ Any expenses not covered by insurance should be paid by (*name of parent*)
   Brittany Rae Thaler _____ due to the following extraordinary circumstances:
   (*explain*) Defendant committed fraud and conversion. _____

**17. "30/30 Rule."** The "30/30 Rule" provides that if a parent pays a medical or dental expense for a child that is not paid by insurance, that parent must send proof of payment of the expense to the other parent within 30 days of paying the expense. The other parent then has 30 days to reimburse the paying parent ½ the cost. Do you want the 30/30 rule ordered in your case? (☒ *check one*)

☒ Yes, the Court should order the 30/30 Rule for payment of all unreimbursed medical / dental expenses.

☐ No, the Court should not order the 30/30 Rule for payment of unreimbursed medical / dental expenses.

**18. Tax Deduction.** *IRS rules state that the custodial parent usually has the right to claim the child on their taxes. The custodial parent can waive this right by filling out IRS Form 8332. Talk to a tax professional if you are not sure what to do.* (☒ *check all that apply*)

☐ Plaintiff should claim the following children as dependents for tax purposes every year: (*insert child(ren)'s names*): _____

☐ Defendant should claim the following children as dependents for tax purposes every year: (*insert child(ren)'s names*): _____

☒ The tax deduction should alternate, with Plaintiff claiming the child(ren) in (☒ *check one*) ☒ even / ☐ odd years, and Defendant claiming the child(ren) the other years.

☐ The tax deduction should be allocated per federal law.

**19. Name Change.** (☒ *check one*)

    ☒ Plaintiff does not request a name change.

    ☐ Plaintiff would like to be restored to his/her former name of (*insert former name you would like to go back to*) _____.

**20. Alternate Request for Divorce.** (☒ *check one*)

    ☐ Plaintiff does not want to include a claim for divorce as part of this case. (*Skip remaining sections and sign pages 9-10*)

    ☒ If the Court does not grant an annulment, Plaintiff requests a divorce. The parties are incompatible.

**21. Community Property.** If a divorce is granted: (☒ *check one*)

    ☐ There is no community property to divide.

    ☐ Any community property has already been divided.

    ☐ I do not know the full extent of the community property.

    ☒ The community property should be divided as follows:

        **Plaintiff:**

            1.   Sale of Residence, $173,000 _____

            2.   _____

            3.   _____

            4.   _____

        **Defendant:**

            1.   _____

            2.   _____

            3.   _____

            4.   _____

**22. Community Debt.** If a divorce is granted: (☒ *check one*)

    ☐ There is no community debt to divide.

    ☐ Any community debt has already been divided.

    ☐ I do not know the full extent of the community debt.

    ☒ The community debt should be divided as follows:

<u>**Plaintiff:**</u>

1. _____
2. _____
3. _____
4. _____

<u>**Defendant:**</u>

1. <u>All community credit card debt, approximately $65,000</u>
2. _____
3. _____
4. _____

**23. Alimony.** If a divorce is granted: (☒ *check one*)

☐ No spousal support is requested.

☐ Plaintiff should pay $_____ per month in spousal support for the next (*number*) _____ years.

☒ Defendant should pay $<u>1,500</u> per month in spousal support for the next (*number*) <u>2</u> years.

**24.** If Plaintiff is able to hire counsel, attorney's fees and costs are requested.

**Plaintiff requests**:

1. That the marriage existing between Plaintiff and Defendant be declared null and void and/or dissolved, and that Plaintiff be granted an absolute Decree of Annulment and/or Decree of Divorce, and that each of the parties be restored to the status of a single, unmarried person;

2. That the Court grant the relief requested in this Complaint; and

3. For such other relief as the Court finds to be just and proper.

DATED (*month*) <u>12</u>_____ (*day*) <u>14</u>, 20<u>20</u>.

Submitted By: (*your signature*) ▸ <u>/s/ John Harris Thaler</u>

(*print your name*) <u>John Harris Thaler</u>

## **VERIFICATION**

Under penalty of perjury, I declare that I am the Plaintiff in the above-entitled action; that I have read the foregoing Complaint and know the contents thereof; that the pleading is true of my own knowledge, except for those matters therein contained stated upon information and belief, and that as to those matters, I believe them to be true.

**I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true and correct.**

DATED (*month*) 12_____ (*day*) 14___, 20_20__ .

Submitted By: (*your signature*) ▸ /s/ John Harris Thaler _____

(*print your name*)  John Harris Thaler _____

## EXHIBIT 1: Parenting Timeshare and Holiday Schedule

☐ No Visitation Requested Because: (*explain*) _____

| | |
|---|---|
| **Regular Schedule:**<br>***Be very specific. Include the times and days of the week for each parent's timeshare.***<br>(*ex.: <u>Mom</u>: Saturday 7pm – Wednesday 3pm,*<br>    *<u>Dad</u>: Wednesday 3pm – Saturday 7pm*) | |
| **Summer Schedule:** | ☒ Same as the regular schedule.<br>☐ Other: _____ |
| **Mother's Day and Mother's Birthday:** | ☒ Mother every year from 9am – 7pm.<br>☐ Other: _____ |
| **Father's Day and Father's Birthday:** | ☒ Father every year from 9am – 7pm.<br>☐ Other: _____ |
| **Child's Birthday:** | ☐ *<u>Even years</u>* with (*parent*) _____.<br>  *<u>Odd years</u>* with (*parent*) _____.<br>  *Time shall be from 9am – 7pm.*<br>☒ Other: <u>9 am to 3 pm to parent not having custody/visitation that day</u> |
| **3 Day Weekends:** | ☐ *<u>Even Years</u>*: MLK Jr. Day, Memorial Day, Labor Day with (*parent*) _____,<br>  President's Day, Independence Day, Nevada Admissions Day with the other parent.<br>  *<u>Odd Years</u>*: MLK Jr. Day, Memorial Day, Labor Day with (*parent*) _____,<br>  President's Day, Independence Day, Nevada Admissions Day with the other parent.<br>*Time begins when school lets out the day before the holiday weekend (or 3pm if no school), and ends the day following the holiday weekend when school resumes (or 9am).*<br>**If Independence Day falls on a Tuesday, Wednesday, or Thursday, the time shall be from July 3 at 9am until July 5 at 9am.**<br>☒ Other: <u>Not to be inclucded re: monitored visitation for mother</u> |

| | |
|---|---|
| **Easter / Spring Break:** | ☐ Even years with (*parent*) _____. <br> Odd years with the other parent. <br> *Time shall begin the day school lets out until noon the day before school resumes.* <br> ☒ Other: <u>Not to be inclucded re: monitored visitation for mother</u> |
| **Thanksgiving:** | ☐ Odd years with (*parent*) _____. <br> Even years with the other parent. <br> *Time shall begin the day school lets out until noon the day before school resumes.* <br> ☒ Other: <u>Not to be inclucded re: monitored visitation for mother</u> |
| **Winter Break / Christmas:** | ☐ Segment 1 (Christmas) consists of the day school lets out until December 26 at noon. <br> Segment 2 (New Year's) consists of December 26 at noon until noon the day before school resumes. <br> <u>*Even years*</u>: segment 1 with (*parent*) _____, <br> segment 2 with the other parent. <br> <u>*Odd years*</u>: segment 1 with (*parent*) _____, <br> segment 2 with the other parent. <br> ☒ Other: Not to be inclucded re: monitored visitation for mother |
| **Other Holidays:** | |
| **Vacation:** | ☐ The parents will not establish a formal vacation plan, and will instead mutually agree on vacation days and times with the child(ren). <br> ☐ Each parent may have up to (*number*) _____ vacation days per year with the child(ren). The parent shall notify the other parent of the vacation and provide a general vacation itinerary at least (*number*) _____ days before the planned vacation. **Vacation time is not allowed during a holiday allotted to the other parent.** |

# Child Support Worksheet

## ① **The Other Parent's Information**

**How much money does the other parent make every month?** (Estimate if you do not know. A GMI worksheet is attached if you need help.)

*Figure out the other parent's gross monthly income. This includes money received from employment, social security, unemployment, pension/retirement, interest/investments, etc.*
*It does not include SSI, SNAP, TANF, cash benefits from the county, or child support received.*

**I believe the other parent makes $ 15,000** **per month** (this is "Gross Monthly Income")
*If this number is more than $6000, STOP. This worksheet will not apply.*
Visit nvchildsupportguidelinescalculator.azurewebsites.net/getobligation.aspx to find the appropriate amount.

**Determine what the other parent's child support obligation would be:**

Gross Monthly Income *(from above)* **X**  **.16** (for 1 child)  **=**
$ 15,000  **.22** (for 2 children)
 **.26** (for 3 children)
 **.28** (for 4 children)
Add .02 for each additional child

| Regular Child Support: |
| $ _____ |

**Does this parent earn less than $1595 per month?**

☐ No. (skip to ②)
☐ Yes. The court may use the low-income child support schedule instead. (check the attached chart to find the right number to enter. Use this number in steps ③④ & ⑤)

| Low Income Child Support: |
| $ _____ |

----

## ② **Your Information** (complete this section even if you expect the other parent to pay child support)

**How much money do you make every month?** (A GMI worksheet is attached if you need help.)

*Include money you get from employment, social security, unemployment, pension/retirement, interest / investments, etc. Do not include SSI, SNAP, TANF, cash benefits from the county, or child support received.*

**I make $ 2,300** **per month** (this is "Gross Monthly Income")
*If this number is more than $6000, STOP. This worksheet will not apply.*
Visit nvchildsupportguidelinescalculator.azurewebsites.net/getobligation.aspx to find the appropriate amount.

**Determine what your child support obligation would be:**

Gross Monthly Income *(from above)* **X**  **.16** (for 1 child)  **=**
$ 2,300  **.22** (for 2 children)
 **.26** (for 3 children)
 **.28** (for 4 children)
Add .02 for each additional child

| Regular Child Support: |
| $ _____ |

**Do you earn less than $1595 per month?**

☐ No. (skip to ③)
☐ Yes. The court may use the low-income child support schedule instead. (check the attached chart to find the right number to enter. Use this number in steps ③④ & ⑤)

| Low Income Child Support: |
| $ _____ |

③ **Joint Custody.** Only fill out this section if you are asking for Joint Physical Custody. Skip to ④ if you are asking for primary custody, sole custody, or visitation only.

**Subtract** the lower earning parent's amount of child support from the higher earning parent's amount.

| Higher $ _____ | − | Lower $ _____ | = | Child Support Obligation $ 0.00 _____ | paid by | Name of higher income parent: _____ |

④ **Adjustments.**

- If <u>you</u> want primary or sole physical custody, the court uses the number in ① as the standard amount of child support the other parent would pay.

- If you want <u>the other parent</u> to have primary or sole physical custody, the court uses the number in ② as the standard amount of child support you would pay.

- If you want <u>both parents</u> to have joint physical custody, the court uses the number in ③ as the standard amount of child support.

You can ask for more or less child support than the amount in ① ② or ③ if you think any of the following factors apply. (☒ *check all that apply, or skip to ⑤ if none if these reasons apply*)

☐ Special educational needs
☐ A parent's legal responsibility to support others
☐ The value of services contributed by either parent
☐ Public assistance paid to support the child

☐ Cost of transportation to and from visitation
☐ The relative income of both households
☐ Any other necessary expenses for the benefit of the child
☐ The obligor's ability to pay

▸ Explain: _____
_____
_____
_____

⑤ **Final Child Support Amount Requested:**

$ 1,480 _____ paid by (*name*) Defendant _____

# TO DETERMINE A PARENT'S GROSS MONTHLY INCOME ("GMI") FROM EMPLOYMENT

| Annual Income | $ |
|---|---|
| ÷ by 12 months = **GMI** | $ 0.00 |

| Biweekly Income | $ |
|---|---|
| X 26 pay periods per year | 0.00 |
| ÷ by 12 months = **GMI** | $ 0.00 |

| Weekly Income | $ |
|---|---|
| X 52 pay periods per year | 0.00 |
| ÷ by 12 months = **GMI** | $ 0.00 |

| Hourly Wage | $ |
|---|---|
| # of hours worked per week | |
| Subtotal = hourly wage X # of hours per week | $ 0.00 |
| X 52 pay periods per year | 0.00 |
| ÷ by 12 months = **GMI** | $ 0.00 |

## LOW INCOME CHILD SUPPORT SCHEDULE
## FOR PARENTS WHO EARN LESS THAN $1595 PER MONTH

### Child Support Obligation of Low-Income Payers
### at 75% to 150% of the 2020 Federal Poverty Guidelines

| Monthly Income Up To | One Child | | Two Children | | Three Children | | Four Children | | Five Children | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Percent | Child Support Amount | Percent | Child Support Amount | Percent | Child Support Amount | Percent | Child Support Amount | Percent | Child Support Amount |
| $798 | 10.56% | $84 | 14.52% | $116 | 17.16% | $137 | 18.48% | $147 | 19.80% | $158 |
| $826 | 10.75% | $89 | 14.79% | $122 | 17.48% | $144 | 18.82% | $155 | 20.16% | $167 |
| $854 | 10.95% | $94 | 15.05% | $129 | 17.79% | $152 | 19.16% | $164 | 20.53% | $175 |
| $883 | 11.14% | $98 | 15.32% | $135 | 18.11% | $160 | 19.50% | $172 | 20.89% | $184 |
| $911 | 11.34% | $103 | 15.59% | $142 | 18.42% | $168 | 19.84% | $181 | 21.26% | $194 |
| $940 | 11.53% | $108 | 15.86% | $149 | 18.74% | $176 | 20.18% | $190 | 21.62% | $203 |
| $968 | 11.73% | $114 | 16.12% | $156 | 19.05% | $185 | 20.52% | $199 | 21.99% | $213 |
| $997 | 11.92% | $119 | 16.39% | $163 | 19.37% | $193 | 20.86% | $208 | 22.35% | $223 |
| $1,025 | 12.11% | $124 | 16.66% | $171 | 19.69% | $202 | 21.20% | $217 | 22.71% | $233 |
| $1,054 | 12.31% | $130 | 16.92% | $178 | 20.00% | $211 | 21.54% | $227 | 23.08% | $243 |
| $1,082 | 12.50% | $135 | 17.19% | $186 | 20.32% | $220 | 21.88% | $237 | 23.44% | $254 |
| $1,111 | 12.70% | $141 | 17.46% | $194 | 20.63% | $229 | 22.22% | $247 | 23.81% | $264 |
| $1,139 | 12.89% | $147 | 17.73% | $202 | 20.95% | $239 | 22.56% | $257 | 24.17% | $275 |
| $1,168 | 13.09% | $153 | 17.99% | $210 | 21.26% | $248 | 22.90% | $267 | 24.54% | $287 |
| $1,196 | 13.28% | $159 | 18.26% | $218 | 21.58% | $258 | 23.24% | $278 | 24.90% | $298 |
| $1,225 | 13.47% | $165 | 18.53% | $227 | 21.90% | $268 | 23.58% | $289 | 25.26% | $309 |
| $1,253 | 13.67% | $171 | 18.79% | $236 | 22.21% | $278 | 23.92% | $300 | 25.63% | $321 |
| $1,282 | 13.86% | $178 | 19.06% | $244 | 22.53% | $289 | 24.26% | $311 | 25.99% | $333 |
| $1,310 | 14.06% | $184 | 19.33% | $253 | 22.84% | $299 | 24.60% | $322 | 26.36% | $345 |
| $1,339 | 14.25% | $191 | 19.60% | $262 | 23.16% | $310 | 24.94% | $334 | 26.72% | $358 |
| $1,367 | 14.45% | $197 | 19.86% | $272 | 23.47% | $321 | 25.28% | $346 | 27.09% | $370 |
| $1,396 | 14.64% | $204 | 20.13% | $281 | 23.79% | $332 | 25.62% | $358 | 27.45% | $383 |
| $1,424 | 14.83% | $211 | 20.40% | $290 | 24.11% | $343 | 25.96% | $370 | 27.81% | $396 |
| $1,453 | 15.03% | $218 | 20.66% | $300 | 24.42% | $355 | 26.30% | $382 | 28.18% | $409 |
| $1,481 | 15.22% | $225 | 20.93% | $310 | 24.74% | $366 | 26.64% | $395 | 28.54% | $423 |
| $1,510 | 15.42% | $233 | 21.20% | $320 | 25.05% | $378 | 26.98% | $407 | 28.91% | $436 |
| $1,538 | 15.61% | $240 | 21.47% | $330 | 25.37% | $390 | 27.32% | $420 | 29.27% | $450 |
| $1,567 | 15.81% | $248 | 21.73% | $340 | 25.68% | $402 | 27.66% | $433 | 29.64% | $464 |
| $1,595 | 16.00% | $255 | 22.00% | $351 | 26.00% | $415 | 28.00% | $447 | 30.00% | $479 |

© 2020 Family Law Self-Help Center

# ATTACHMENT 2A

ATTACHMENT 2A

Plaintiff seeks an annulment of the marriage based on a fraud and concealment of material facts in the inducement.

The facts regarding said fraud and concealment are set forth in the following declaration of Plaintiff and in the attached declaration filed in the Los Angeles County Superior Court, Case No. LC 104303.

## DECLARATION

I, John Harris Thaler do declare:

1. I am the Plaintiff in this matter. I submit the following declaration and attached declaration in support of my Complaint for Annulment and request for sole legal and physical custody.
2. Brittany, her mother, Dawna Chavez, father, John Chavez, brother, Johnny Chavez, and most members of the Chavez family are career criminals. They are racketeers who regularly participate in real estate fraud, money laundering, insurance fraud, mortgage fraud, tampering with official records, bribery, forgery and extortion.
3. Brittany began acting independently in these enterprises when she was 15. For reasons set forth more specifically on Attachment 2B and 2C, Brittany lied about facts material to our being married and concealed other facts to induce the marriage.
4. In addition to her criminal history, Brittany suffers from Deficit Schizophrenia. When off of her medication for prolonged periods, Brittany goes into hypersexual and manic states. It is exacerbated by using designer drugs such as MDNA to stave off the effects of the illness.
5. Being off medication also causes Brittany to become paranoid and to act violently toward others while believing falsely that she is acting in self-defense.
6. Prior to the marriage, Brittany concealed her history and participation in criminal enterprises. And she concealed her mental illness.
7. During the marriage, she attempted to cover up her illness and criminal activity by:

•Hacking into my law office corporation's computers to review e-mails between clients and me and then moving the e-mails to the draft folder of one of her gmail accounts.

•Hacking into the law office computers to destroy files and erase briefs.

•Hacking into my personal and business cell phones in order to gain passwords to then hack into other business and personal accounts.

•Hacking into the computer of at least one client in California.

•Placing viruses into the law office computers so that files would be destroyed.

•Stealing law office and personal credit cards and then giving them to others to use.

•Stealing ATM debit cards belonging to the law office and then giving them to others to use and to debit cash from ATM machines.

•Having an old loan from 2004-2010 that my ex-spouse and I had prior to divorce placed on my Experian credit report so as to prevent me from purchasing a new home.

1

•After the discovery of the Experian fraud and the removal of the loan, then having the loan placed on Equifax and Transunion reports.

•Puncturing the tire to my rental vehicle on April 20, 2019 to prevent me from going to California for a client meeting.

•Providing to me brewed ice tea containing Ambien just before I left for California on July 7, 2019 so that I would not be able to attend a court hearing the following day.

•Hiding keys, wallet, contact lenses and other necessities belonging to me just prior to trips to California to prevent me from being able to leave.

8. As the above was being discovered and banks were notified and police were about to be notified on October 7, 2019, Brittany instituted a plan to discredit me. The plan has included the following:

±Gving false information to her former therapist, Donna Turner, that I hated her mother and was trying to frame her mother for the credit card fraud, for credit fraud and for identity theft (when in fact Brittany was involved in these activities and has been involved since she was employed at Best Buy when she was 18);

±Purchasing and installing a gps locator on her vehicle and registering it in my name to make the phony claim that she was being stalked by me. This plan was discovered when the device sent messages to my cell phone telling me that its battery was running low;

±Making a phony 911 call and a false police report on October 7, 2019 at 6:30 a.m. (the day Brittany knew I was intending to file a police report) that I was exhibiting "manic and erratic" behavior when in fact the only such behavior was exhibited by Brittany. (See Exhibits 15, 16);

±Taking our two-year-old child on his birthday and refusing to return him to our house or to let me see him for the next two weeks in order to ensure her mom could spend time with our child at the expense of dad and to ensure a "manic and erratic" episode that would *prove* her false claims;

±Filing for an Order of Protection based on false claims of erratic behavior and false claims that I threw objects at her and her and McKinley.

±Having failed to obtain an OOP over McKinley, filing a custody motion AND an emergency motion to obtain the exact relief she was denied the previous day before this Court without informing this Court that the request had been made and denied;

±Filing multiple emergency motions bootstrapped onto the perjury in an attempt to harass me and to prejudice the Court prior to the scheduled custody hearing.

± Making false claims that she is the sole owner of our residence and then offering to trade fifty percent of the equity in the residence if I give her sole legal and physical custody of our son.

±Filing false police reports after exchanges of McKinley claiming she is being harassed at the exchanges;

±Making false claims that after McKinley spends time with me that McKinley is suffering from... whatever ailment she could conjure.

±Constantly interfering in arrangements being made for me to have McKinley by rejecting reasonable scheduling and time accommodations—essentially being difficult anytime attempts to create a schedule were made. Brittany does this so that she can claim we cannot co-parent and thus she should be given sole legal custody. *Brittany does not understand that legal custody has little to do with her intended meddling and obnoxious behavior.*

9. McKinley thrives when with me. We play music every day. McKinley plays a number of different instruments including drums (we have two electronic sets, one for me and one for him), congas, bongos, keyboards, guitar, bass and an array of percussion instruments. His tastes in music run from Neil Young to Lady Antebellum. His favorite album is Genesis' "Trick of the Tail." Recently, he saw a xylophone and decided to try it.

10. We visit museums and the zoo and the aquarium and music stores. We go to festivals and parades. Recently we went to the Mesa Martin Luther King Jr. Day parade. I am currently living two blocks from the Natural History Museum. McKinley and I have visited the museum seven times in the past month to hang out with the dinosaurs. We are always respectful to let them fall asleep in the late afternoon and let them sleep until a reasonable time in the morning. Last week, we panned for gold and practiced our archaeological skills looking for fossils. This week we visited living creatures at the zoo (an activity McKinley and I planned for his birthday before his mother chose to take him and hide him.

11. McKinley eats healthy meals. He loves steak. He gets plenty of nap time and sleep at night. We go to Bookman's and get age and story appropriate books. McKinley enjoys books about science. Brittany joined us for two hours at Bookman's on December 29, 2019 only to remember the next day that being with me and McKinley was contrary to her plan. When sick, Dada takes good care of him. Everyone who has seen McKinley and me together recognizes the special bond we share. Everyone. So does Brittany. That's the bond she is trying to break as a result of her own insecurities.

12. To break it, she has acted as follows:
   - Hacking into my law office e-mail and then moving the same to the "draft" folder of her personal e-mail;
   - Attempting to erase over 110,000 law office files overnight by dumping them into the Recycle Bins of the computers where they were saved;
   - Hacking into my business/law office computer to erase draft of documents, move files, change text in briefs and titles of briefs;
   - Following me to California to determine if I were having an extramarital relationship;
   - Having others follow me locally and to California to determine whether I was engaged in an extramarital affair.

- Withdrawing at least $300-400 per month from her community bank account at Wells Fargo and concealing the same;
- Charging over $800 per week on average for grocery/Target/Amazon when in fact Brittany was actually a) purchasing goods for friends and taking back cash in exchange and thereafter concealing the cash; and b) holding the goods and thereafter returning the goods for cash for the purposes of concealing the cash;
- Selling nude and semi-nude selfies for the purpose of earning cash that could be concealed and in fact was concealed from me.
- After denying me access to our son for two weeks, artificially and unilaterally limiting visits to two hours and demanding a monitor to advance the false manic/erratic narrative and in the hope that I would act in such a manner in response to such an egregious action;

13. Brittany is not just a mother, she is the mother of our child. McKinley, who just turned two, needs his mother especially in having an older father. But Brittany is self-destructive at best. She needs to acknowledge what happens to her. She needs to acknowledge that the episodes are getting worse and lasting longer. She needs to recognize that without proper treatment, she will suffer from a plethora of neurological issues and will deteriorate. Her life expectancy will decrease.

14. All of the above has been made worse by Brittany's mother, Dawna Chavez. Having seriously damaged her daughter and son, she has become obsessed with McKinley. She will not let me see him. She will not facilitate calls with him. She is currently extorting Brittany with threats of cutting her off financially if Brittany does not capitulate to her whims concerning McKinley.

15. More than anything else, Brittany fears someone else being placed in charge of her and being in charge of her life. It is the *not in control* feeling that governs her behavior at all times... except when in a manic state where she sets out to prove that she can do anything... with impunity and where she becomes paranoid that she has to do so..

16. I am requesting that this Court award temporary legal custody to me. I intend for Brittany to have our son, McKinley, up to one-half of the time. However, Brittany's extremely erratic behavior and her poor choices, especially those that affect McKinley, render her unable to make reasoned decisions at this time. I also request temporary child support and temporary spousal support. I am seeking an annulment of the marriage based on several independent frauds in the inducement of marriage choreographed and carried out by Brittany. In the meantime, I am requesting that the Court set aside and vacate Brittany's Petition until such time as her competence to pursue a dissolution of marriage is established.

Executed on this 15th day of December 2020 at Las Vegas, Nevada.

JOHN HARRIS THALER

# ATTACHEMENT 2B

**John H. Thaler, In Pro Per**
c/o HARRIS/THALER LAW
18034 Ventura Boulevard, #289
Encino, CA 91316
Tel. 818-206-4402

Plaintiff, In Pro Per

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, NORTHWEST DISTRICT

| | |
|---|---|
| JOHN THALER, an individual, | **CASE NO. LC 104303** |
| Plaintiff, | **PLAINTIFF'S DECLARATION REQUESTING CASE MANAGEMENT CONFERENCE.** |
| v. | |
| TARZANA FALLS HOMEOWNERS ASSOCIATION, INC., a California non-profit corporation et al. | [Assigned to Department U] |
| Defendants. | |

## DECLARATION OF JOHN H. THALER

I, John H. Thaler, do you declare:

1. I am an attorney duly licensed to practice law before all of the courts in the State of California and I am the plaintiff in this matter.

2. On or about May 31, 2012, an alleged judgment was taken in the Superior Court for the state of California, County of Los Angeles, limited jurisdiction, under case number 11E11652. The application for the judgment purports to be signed attorney named Paul Tokeshi. The judgment appears to have been executed and entered by Judge Leland Harris.

3. The judgment is a fake. There is not now nor has there ever been a judgment.

4. Parts of the proposed judgment, which also purports to have been prepared by Mr. Tokeshi, have places to fill in the various figures making up the total of the judgment. Those blanks are filled in by hand printing. Judge Harris' signature also consists of a hand printing and not a handwriting or a stamp.

5. Further, there appears to be a certification of the judgment prepared in or about 2014.

6. These judgment documents were then used to apply for a sister state judgment in Maricopa County, Arizona Superior Court as a "foreign state judgment." Said term is similar to a sister state judgment in California.

7. At the time of the entry in California, which purports to be in June 2012, I resided in Phoenix, Arizona. Phoenix is within Maricopa County.

8. The state of Arizona requires that any application for entry of a foreign state judgment be mailed to the last known address of the judgment debtor. In this case, that did not occur. Though I was living in Phoenix, Arizona, none of the documents were mailed to my residence. Further, the documents were not mailed to my business address and were not mailed to my previous address in Tarzana Falls.

9. Many of the documents used to obtain the default and default judgment are fraudulent. For example, the proofs of service show that the documents were mailed to a residence in Tarzana CA that I had not lived in since 2007. In addition to being mailed to the wrong address, the proof of service also show my name is misspelled as T-H-A-Y-L-OR.

10. In or about late July 2015, as is described more fully below, I learned about the sister state judgment in Arizona while selling my residence in Phoenix. The title company handling the transaction at that time called to inform me that a judgment had been recorded. It had no other information than a Maricopa County case number. The title company only had the name of the case and a case number.

11. Upon confirming the entry of the foreign state judgment and its origins, I immediately sent a letter to the attorney in Arizona, Marc Lammers, who had been retained to enter the judgment and collect on it. Mr. Lammers' office is in Tucson, Arizona.

12. While it seemed curious that no effort had been undertaken to collect on the judgment in 2014 or through the first half of 2015, I never considered it to be significant.

13. On or about August 4, 2015, I sent to Lammers a request for information regarding the application and application documents along with any and all papers related to the entry of the judgment in California.

14. With respect to Tarzana Falls, in March 2011, a dispute arose between myself and the HOA regarding its failure to make needed unnecessary repairs from rain damage occurring in February and March 2011. During the course of the dispute, I discovered that the books and records of Tarzana falls were fraudulent and that the annual pro formas provided to owners were entirely fiction. I also discovered that numerous annual special assessments not only were fraudulent but the monies paid by the residents could not be traced to any Tarzana Falls account.

15. Because I was in the process of moving to Phoenix, Arizona, I did not press the matter other than to demand repair of my unit so that it could be prepared for sale while refusing to pay a new special assessment and demanding refunds for past special assessments. The HOA, having failed to undertake the repairs, made it impossible for the unit to sell as a portion of it had become uninhabitable. To this date, the repairs still have never been made to that unit.

16. As is discussed more fully below, in late 2017, I received documents from a resident of Tarzana Falls who was involved in a legal action on the same failure to repair issues. Those documents clearly show that the board members of the HOA and property management company owners of Ross Morgan (who are named as defendants herein) embezzled more than $4 million over the period of 2001 through 2018 .

17. The documents also confirm that the special assessments were fraudulent and the monies collected were diverted.  More on these issues is described below.

18. As of today, Tarzana Falls is broke. As of July 2018, the Association bank accounts totaled less than $2,000.00.  The owners and new board, which seized control in July 2018, cannot locate or trace the embezzled money. The defendants herein all claim total ignorance, something that is totally impossible.   The absurdity is found in the pro formas they produced each year that were totally and completely fraudulent and fictional.

19. To be kind about it, certain defendants in this litigation are criminals who should be charged with multiple felonies.

20. Despite sending the letter on or about August 4, 2015 to Lammers, I did not receive a response from his associate, Sarah Epperson, until November 4, 2015. She stated simply that the judgment in California was valid and that her firm had been hired to collect. No comment was made on the failure to serve the application properly or the plethora of issues that were materializing about the validity of the judgment.

21. This Court should note that the failure to mail the Application to the correct address is a fatal flaw in Arizona. No comment was made as to whether the Arizona firm had verified any of the judgment or any information before receiving it. In fact, it was unclear how the information got to Lammers.

22. This Court should note that the one exception to the one judgment rule in California is judicial foreclosure where one judgment concerns the foreclosure and a second judgment, which must be obtained within 90 days of the foreclosure, concerns any additional monies owed under the judgment that were not collected in the foreclosure sale. The phony judgment covers the foreclosure sale and specifically provides for the judgment creditor to apply for the required deficiency hearing per the applicable statute. The failure to apply within the 90 days permanently extinguishes the debt.

23. As no application was ever made, even if the judgment were valid, the debt was extinguished by September 2012. As a result, the application for a sister state/foreign state judgment constituted a fraud on the Maricopa County Superior Court.

24. It turns out that even the method by which the alleged judgment got to Tucson was fraudulent. Lammers received a letter from allegedly from board member/attorney Defendant Steven Buchwalter stating that he was writing the letter on behalf of the board and not in his capacity as an attorney. It stated that he and the board determined I owned property in Maricopa County and wanted him to take all necessary steps to collect on this judgment.

25. Conspicuously absent was any board resolution or board authorization to pursue this judgment. There was a reason for that. When title to the unit was transferred on or about June 12,

2012, all issues regarding any unpaid assessments by me were resolved in a deal made by the HOA with the buyer.

26. In fact, The Tarzana Falls Ledger for June 30, 2012 confirms that no debt was owed by me to the Tarzana Falls HOA as of that date. On the continuing ledgers thereafter the same zero balance is stated. Even Defendant Tony Donato has stated openly that all matters regarding my unit any monies owed to the HOA, were resolved in June 2012.

27. With the fraudulent Arizona judgment in Arizona holding up the sale of my property, I filed a motion challenging the entry of the foreign state judgment. When it became obvious that the alleged California judgment was fraudulent, Lammers and I agreed to stay all proceedings in Arizona to determine what exactly had occurred in California. A bogus second lawsuit filed in Arizona in late December 2015 for fraudulent conveyance along with a lis pendens filed and recorded with it was dismissed by Lammers at that time.

28. In California, procedurally this started with a motion to set aside the California judgment. But, as the court knows, discovery is not available to a defendant litigant after a judgment has been taken. As a result, with the limited information available at the time, any full explanation was not available and hence the motion was denied.

29. Thereafter, the within litigation was filed. Because of the sensitivity of the matter, which at that point included the belief (later proved to be true) that no one named Paul Tokeshi ever applied for the California judgment, previous judges sitting in this court delayed the requirement of serving the named defendants so that further unfettered investigation could occur.

30. Meanwhile, in late 2014, I became engaged to Brittany Rae Chavez. In April 2015 we made a deposit payment on a home to be built in Gilbert, Arizona. The home was completed in September 2015 wherein we made the requisite down payment and took out a mortgage. The sale of my residence was incident to this purchase.

31. During the course of the within litigation a number of irregularities came to light concerning Brittany's activities. Evidence now exists that implicates Brittany in insurance fraud, money laundering, extortion, embezzlement, tax evasion, tampering with official records and documents, bankruptcy fraud, creating fake and phony judgments for the purposes of carrying out the extortion

1  schemes and related racketeering activities. Brittany's family has been involved in such activities

2  since at least 1986.

3  32. Brittany is an experienced trial paralegal having performed such services in more than 23

4  major trials and arbitrations over the past 10 years. She is fully versed in legal procedure in both

5  California and in Arizona. She has prepared numerous documents for filings in both states.

6  33. In addition to creating phony judgments, Brittany has been part of a network of individuals

7  involved in the aforementioned criminal enterprises that has paid off court officers, officials and

8  employees, including lawyers, paralegals, clerks of the court, court reporters, judges, and in

9  Arizona, judges assistants.

10  34. Even worse, Brittany's co-conspirators include computer engineers who designed, created

11  and maintain State and County databases within Arizona and Maricopa County. This permits the

12  participants to enter said databases and then add/enter or subtract information. Arizona and

13  Maricopa County have made data breaches easy by using only one central database for all state

14  programs and only one database for all county programs.

15  35. But Arizona is not the only state where the systems have been breached. Other states

16  include Florida, New Mexico, Texas, Pennsylvania, Ohio, Michigan, Maryland, Minnesota, and

17  Wisconsin. And California.

18  36. In these states, participants have put into employment or otherwise paid off court clerks and

19  court reporters and have infiltrated the California State Bar computer system. To that end, the

20  ability to upload to the attorney rolls phantoms—names of individuals who do not exist and of

21  course are not attorneys. Paul Tokeshi is one of these phantom attorneys. Partners at Wolf, Rifkin

22  confirm that no one named Paul Tokeshi was ever employed at the firm.

23  37. The California State bar has been aware of this phantom problem since 2011. It is one of the

24  reasons why the State Bar of California instituted in 2018 the fingerprint program using LiveScan

25  for all active attorneys.

26  38. Unfortunately, because the State Bar did not keep the original fingerprint cards at the time

27  of admission, the newly obtained prints cannot be used to compare previously received fingerprint

28  cards.

39. In Arizona the problem is far worse. As stated above, the access into the computer databases concerns the entirety of the state of Arizona which operates through one singular database and the County of Maricopa which also operates off of only one singular database. That has permitted real individuals to obtain licenses in fields where they do not have and have never had the requisite degrees or training.

40. Simply, one could become a licensed social worker having never actually gone to college or attended any courses in social work. Since the state university database operates through the state system and database, it is likely that individuals are receiving degrees that they never earned or at least receiving credits for classes never attended.

41. Within the court system, this has meant that judge's assistants, who essentially act as paralegal to the judge and act as calendar clerk thus controlling all paperwork (which is electronically filed), can change or remove motions or oppositions to motions and can edit or create court judgments without the judge having any knowledge of the same.

42. This scheme had mostly been used in criminal cases either to prosecute those who might become enemies of the individuals involved in the criminal enterprises or to remove charges or lessen the severity of charges on those who have been arrested for crimes relating to these enterprises.

43. To say this is something of a disaster and total meltdown of trusted institutions is being kind. But it gets worse.

44. In reviewing phony documents executed by Brittany and recorded with the Maricopa County Recorder, I discovered that certain signatures used by Brittany on documents recorded with the Maricopa County Recorder's Office contain a signature matching the Paul Tokeshi signature on the Request for Entry of Default and Application for Default Judgment. Obviously, the name is not Paul Tokeshi. But the signatures are a spot on match so much so that the signatures used to apply for the California judgment allegedly in 2012 can be overlaid on the signatures on the documents recorded in Maricopa County. **They are identical**.

45. It should be noted that the Paul Tokeshi signatures amassed consist of at least five different handwritings. Though the State Bar has an address for a Paul Tokeshi, it does not have a telephone

number or a fax number or an email address and no one has been able to actually locate Paul Tokeshi. The only consistent handwritings are those on the default and default judgment applications.

46. In fact, the United States Census Bureau reports that there is no one now or who has ever lived in the United States under the name Paul Tokeshi. And to add to the insult, Wolf, Rifkin partner/founding member Daniel C. Shapiro founded the firm the same year Tarzana Falls was built and has a long friendship with Defendant and Ross Morgan founder Brian Davidoff. Go figure.

47. I met Brittany for the first time in October 2014. One month earlier, the foreign state judgment had been perfected in Maricopa County. Documents from Los Angeles counties database show that the judgment was certified in early 2014 so that it could be entered as a foreign state judgment in Arizona that year.

48. As I said above, referring to the judgment application documents in California, spaces are left blank to fill in handwritten numbers making up the total of the proposed judgment. The printing of the numbers belongs to Brittany. The alleged signature of Judge Harris is not a signature but rather a handprinted signature version. The hand printing belongs to Brittany.

49. Moreover, Judge Harris has confirmed that he did not enter any judgment in any such case and that in addition to the form of the proposed and entered judgment being prepared in an unacceptable manner, he has never hand printed or had a clerk hand print his name on a judgment ever in his entire career. He confirms that the entirety of the judgment is phony. Judge Harris, who is now retired, is willing to testify and to provide declaration upon request.

50. With all of that said, here is what actually happened:

51. Beginning in 1986, Russian organized crime created a presence in Southern California. Most of its operations concerned the movement of smuggled materials, any smuggled materials. If you got it into the country, this group would hide/store it and then ship it to its final destination. The operation was assisted by brokers working out of the Lee & Associates commercial brokerage office in Sherman Oaks, California who bought and were the "legal" owners of multiple storage facilities throughout Southern California where the smuggled materials would be placed. The design and set up and algorithms used to determine the storage locations of the goods were created

1   by Atomic Computers in Canoga Park, California and assisted throughout the country by BCS

2   Recycling which also has its headquarters in Canoga Park, California.

3       52. Tarzana Falls was built in 1986 with monies provided through Defendant Brian Davidoff.

4   At that time, he was an accountant. His client supplying the money was the Russian organized

5   crime operation. During construction, Davidoff was given a seat on the original board. When

6   enough buyers had completed their purchases, Davidoff resigned and formed Ross Morgan &

7   Company. He took with him a property management contract that remained until the 2018 coup.

8   Ross Morgan, which has grown by leaps and bounds over the past 34 years, was designed to

9   launder proceeds of the criminal enterprise.

10       53. But as the profits grew, Ross Morgan could not handle the large cash flow alone. So

11   Brittany's family and their criminal associates got the job.

12       54. When I discovered the fraud and its extent, Ross Morgan was threatened with exposure.

13   Hence the reaction and lawsuit. Also threatened with exposure was the manner in which fake

14   identities of existing and non-existing individuals were being created as part of the money

15   laundering schemes. That method concerns at least one IT head for a major hospital chain based in

16   Arizona and its electronic storage facility based in San Diego, California. Working together,

17   private patient data and information is siphoned off and used to create new identities. The

18   "directors" working for the department head of IT worked with Brittany in the Geek Squad of Best

19   Buy from 2004 through 2007. Brittany's relationship with them continues as evidenced by their

20   presence on her LinkedIn profile through 2018.

21       55. In 2018, I discovered the link between Brittany and the IT employees and the medical

22   records storage facility while investigating an unrelated case where a connection to the storage

23   facility had arisen. Having investigated the Russian organized crime situation in California in 2015

24   and having discovered the link in 2018 between the hospital IT department and storage facility and

25   Russian and Armenian organized crime, I revisited the Tarzana Falls situation from that perspective

26   to find that the Tarzana Falls judgment and Brittany in fact had some link. Earlier this year, when

27   the Tokeshi signature matched a series of signatures from Brittany, I could be sure the matters were

28   directly linked.

56. There are conflicting possibilities as to why the judgment was fraudulently taken and then entered in Maricopa County but the most likely scenario is not what one might expect:

57. In 2010, the State of Arizona commissioned a private accounting firm to conduct an audit of state government agencies that indicated significant corruption. The report released in or about 2011 provided evidence of the corruption and of Russian organized crime involvement in money laundering schemes where officials were being bribed in a manner that permitted the laundering to go on unfettered by state and local government agencies.

58. The report included facts concerning the laundering activities of the exactly the same modus operandi as is the currently going on by Brittany, her family and their associates. The report led to numerous arrests and convictions. Documents provided by investigators and experts prove the connection between Brittany and at least one family member to the participants in the Russian money laundering and corruption scheme.

59. Though she was not charged in 2011, these events scared Brittany who decided she wanted out.

60. From 2012 through 2013, Brittany broke from her family and greatly reduced her involvement in the criminal enterprises. Because of her relationship with the IT employees, she was aware that I had been integrally involved in investigating the link between Russian organized crime and redirected hospital records during 2011 through 2012. Searching for a more permanent way to avoid participating in criminal activity, Brittany believed that the prospect of dating and marrying me (and with that, the prospect that I might catch on to the criminal enterprise) would prevent anyone from requiring her involvement in the criminal schemes.

61. As insurance, Brittany had a backup plan. By setting up one her "extortion" schemes using a phony judgment, Brittany could steer me into discovering at her whim and on her timetable evidence of the larger criminal fraud. By having a child with me after we married, she calculated that I would not press charges against her but instead would do so against others.

62. And that is what she did. In or about late April 2018, Brittany could not back out of a certain series of criminal enterprises without dire consequences. So she began providing to me evidence of the criminal schemes including the genesis of the Tarzana Falls phony judgment.

63. The Tarzana Falls action was filed after ignoring the Davis-Stirling pre-requites. It was intended to prevent me from discovering the money laundering operation. That lawsuit was filed in November 2011 and was never served. The proofs of service show invalid service on their face and contain phony and fraudulent signatures under the name of an actual registered process server. The phony proofs of service do not show service in Arizona.

64. When the deal was made with the purchaser of my unit in early June 2012 concerning any and all dues the HOA claimed were owed, apparently the legal action was supposed to be dismissed. Maybe it was; maybe it wasn't.

65. With the ability to remove documents from databases both in Arizona and in California, it appears the dismissal was removed and instead, it was substituted with the application for judgment which more than likely was prepared and reset into the database in early 2014 but showing a date of May 31, 2012—just before the ownership transfer of the property less than two weeks later.

66. The criminal matters discussed above are being investigated by several federal agencies and include undercover agents operating in the State of Arizona. The insurance fraud amounts to more than $50 million collected on phony claims over the past 17 years. The graft and corruption within the State of Arizona and the County of Maricopa amounts to hundreds of millions of dollars over several decades. The graft and corruption implicates both high ranking officials (including judges) and lower level clerks. It also implicates hundreds of individuals, some properly licensed and some improperly licensed as accountants, lawyers, psychologists, social workers and the like.

67. I apologize to this court for not informing it and the other parties more quickly. During 2019 several attempts were made on my life which included staging a potentially fatal car crash and outright poisoning a beverage in a thermos provided to me. Fortunately, the injuries from these actions has not been severe but has resulted in five brief hospitalizations from late 2019 through November 2020.

68. To preserve evidence of those issues, to prevent disclosure of evidence regarding the criminal enterprises and their participants, to protect federal law enforcement operations and to ensure that the facts provided to this court would be as accurate as possible, I could not previously provide a meaningful declaration to the court.

69. By this declaration I am requesting of the courts the following: that with the agreement of the remaining parties, all matters in this case be stayed; and that this court set a case management conference to take place at the court's earliest convenience but in camera, either in person or telephonically as events permit so that Your Honor and attorneys for the parties can ask questions about the matters set forth above and so that we can figure out where to go from here.

70. There are numerous issues in the complaint that are not simply subject to the phony judgment. Simply, there are matters to litigate here. However, under the circumstances, I hope that the parties and I may reach an accord with the help of the court on how to proceed or how to resolve and settle this case.

I declare under penalty of perjury that the foregoing is true and correct and if called as a witness, I could and would testify competently thereto.

Executed on this 7th day of December, 2020 at Idaho Falls, Idaho.

JOHN N. THALER

# **ATTACHMENT 2C**

| DATE | LIE / CONCEALMENT | DETAILS |
|---|---|---|
| Prior to October 2014 | Brittany involved in a scheme which directly affects John | Brittany sets up an extortion scheme through the creation of a fake DEFAULT JUDGEMENT on a property owned by John **(written proof available upon request)** |
| October 13, 2014 | Planned? Probably | John and Brittany meet |
| 2014 | Brittany lied about Eric Whittaker. | She stated that she dated him from Fall 2004 to Sprint 2005 and had no contact with him since that time. TOTALLY FALSE. In Dec 2004 she set up his LLC for his Porn Empire, starting in 2005-2008 she set up another 3 LLC's for him to launder money through Real Estate transactions. Not only did she lie about that, but she lied that when she met him, he was an Insurance Agent, when in fact he was a Real Estate Agent. She has continued to maintain the LLC books and records to the present. Her phone records contain at least 4 different numbers belonging to him, for which she has telephone calls over the last three years. **(written proof available upon request)** |
|  | Brittany lied by saying she did not take drugs | Except that her phone records show multiple calls with multiple known drug suppliers and concealed her involvement in money laundering schemes now found hundreds of Fake signature deeds, with her as a party to the transaction, with her as a Notary or both. **(written proof available upon request)** |
|  | Brittany concealed that she was selling drugs | Brittany failed to mention that she was selling drugs because her driving records indicate that she was doing just that. **(written proof available upon request)** |
|  | Brittany concealed her involvement in criminal activity | Brittany did not bother to mention that she and her mother (Dawna) were involved in extensive Insurance Fraud where claims were made under fake identities against the MedPay portion of the |

| | | policy. (*written proof available upon request*) |
|---|---|---|
| | | |
| February 2019 | Brittany steals John's credit and debit cards | Prior to that, getting mostly in February 2019 she rotationally stole credit cards and debit cards from John and handed them off to others (at least one other) to use. (*written proof available upon request*) |
| October 7, 2019 | Brittany made a false Police Report | Brittany called the police and reported John was being Manic and Erratic. John had been neither, and the audio from that day shows that only she was being Manic and Erratic. (*written proof available upon request*) |
| 2019 | Brittany denies any involvement in any criminal activity | Brittany purposely indicates that others could be involved in stealing the credit cards – Broses, her father etc. (*written proof available upon request*) |
| December 12, 2019 | Brittany lies about taking McKinley to celebrate his birthday | Brittany does leave the house with McKinley that morning, but she goes to file for Dissolution and gets an OOP order against John. She does not contact John at all and does not return home. (*written proof available upon request*) |
| | | |
| January 2020 | Brittany lies about what Rich Brose said to her | Rich Brose called Brittany out and told her that she is messing with everyone's lives... She tells her mother that Rich said he fully supports her and continued to fabricate the conversation, instead of stating what actually took place (*written proof available upon request*) |
| | Brittany lies to the Police and tells them that John made the exchange and came too close to her | Brittany omitted to let the police know that Rich Brose was actually the one who brought McKinley to the car and John just waited on the other side of the road (*written proof available upon request*) |
| | Brittany lied to the Police and told them John was living with McKinley in a one | John was renting a high-end three-bedroom cottage from a business associate who usually rents this out for $300 per night. It is a fully furnished, fully equipped cottage with a full kitchen, three |

| | | |
|---|---|---|
| | bedroom place with no kitchen …. | bedrooms, a living room and all the amenities one needs for a short-term rental. Brittany, not having seen it, sent the police to do a well check because she told them it was a one-bedroom place with no kitchen and described it in such a way as to make it appear as if he was having McKinley stay in a hell hole, which it most definitely is not. ***(written proof available upon request)*** |
| February 20th Hearing: | Brittany lied and said John refused to take the psyche evaluation | John refused to do mutual psych evaluations – FALSE in January 2020 he agreed to do mutual psych evaluations and never heard back ***(written proof available upon request)*** |
| | Brittany lied and said that John disagreed with her choice of Preschool | John both disagreed with her choice for McKinley's Preschool and stated that John intended to disregard her choice and enroll him elsewhere. This is completely false. In fact, John agreed with her choice, but given that McKinley had remained on the wait list since Aug 2019, he asked Dawna in Jan 2020 if she knew of other choices in case he did not come off the wait list by mid-February (which was when he was supposed to have started Pre-School) ***(written proof available upon request)*** |
| | Brittany incorrectly stated that John ***never*** brought Mc to the Doctor or otherwise refused to take him to the Dr when he was supposed to go | John took him to the Doctor in Oct 2019 when he needed to go and had either taken him to the Dr or gone with her to the doctor on multiple other occasions. More importantly, John was the one who cared for him since he was born, primarily when he was sick, along with caring primarily for her when she was sick. ***(written proof available upon request)*** |
| | Concealed that John was the primary caretaker | She concealed the fact that John was his primary caregiver and had been since he was born. |
| | Concealed the fact that John has a 19-year-old son from previous marriage | She concealed the fact that John has a 19-year-old for whom I was his primary caregiver until the age of 15 ***(written proof available upon request)*** |
| | False Financial | Her financial disclosures is completely false as it |

| | | |
|---|---|---|
| | Disclosures | states that the only money earned by her is from her employment with iPro.<br>*(written proof available upon request)* |
| | Incorrect Medical Diagnosis and Treatment for McKinley | Brittany claimed that McKinley had athletes foot and he did not<br>*(written proof available upon request)* |
| April 4, 2020 | Withheld McKinley – excuse: John flew on a plane and needed to quarantine for 14 days | John never flew on any plane in April, 2020 |
| June 10, 2020 Hearing | Brittany lied about her income and Johns contributions to household expenses | Brittany lies about her income again and lied about the expenses John paid, concealing from the court that John had paid about 55% of the household expenses.<br>*(written proof available upon request)* |
| | Lied that John was on drugs | Brittany lied about John taking drugs and that he owned drug pipes. John does not take drugs or even drink alcohol and the pipes found supposedly in the bathroom did not and never have belonged to John. |
| | Lied that she did NOT take drugs | Brittany concealed that she was the one taking drugs |
| | Lied to DPS<br>**FALSE REPORT SUBMITTED TO DCPS** | Brittany filed a FALSE DCPS Report indicating that John was not a fit father, whereas when DPS did their investigation, they found that every single allegation was FALSE and that he was perfectly fit to be a father to McKinley<br>*(written proof available upon request)* |
| | Lied about locking McKinley in his room | McKinley's door does not lock, so John could not lock him in his room. John has and would ***NEVER*** lock his two-year-old in his room for any reason. Practically, the room has two entrances leading into it as it connects to the Jack and Jill Bathroom between the two additional bedrooms and both bedrooms have a door to the actual room so he could get out anytime.<br>*(photo proof available upon request)* |

| | Not taking care of McKinley as in not feeding him or diapering him | Dad is very attentive and is always making sure McKinley's needs are addressed. He goes with dad to the supermarket and choses the foods he likes. McKinley's diaper is changed regularly. John was the **primary caregiver of his older son**, Matthew, who is now nineteen, studying Pre-Med at Boulder University, **John has a track record** of being able to take care of a child who today is a well-rounded, well-adjusted, bright young adult. ***(written proof available upon request)*** |
|---|---|---|
| October 4, 2020 Jacqui went to try talk to Brittany and Dawna | Lied during the conversation consistently *See Below* | |
| | Brittany lied about Johns relationship with his ex-wife | 1. Melinda (John's ex-wife) is afraid of him ***(written proof available upon request)*** |
| | Brittany lied about John's relationship with his sister | 2. Jennifer (John's sister) is afraid of him ***(written proof available upon request)*** |
| | Brittany lied that John told McKinley he has an allergy | 3. Mr. Thaler has convinced McKinley he is allergic to tomatoes ***(written proof available upon request)*** |
| | Brittany lied about how John parents this child | 4. Mr. Thaler does not take proper care of his child and has caused him to have severe diaper rash with blisters ***(written proof available upon request)*** |
| | Brittany lied that she did not have an accident | 5. She never had a car accident with McKinley in the car back in October 2019. ***(written proof available upon request)*** |
| | Brittany does not take drugs | 6. She does not do drugs and is not on any weight loss drugs ***(written proof available upon request)*** |
| | Lied about the conversation to the | 7. Brittany informed Jacqui that Barb Kiffmeyer had said she MUST keep McKinley and not |

| | MCSW – Barb Kiffmeyer | participate in the court ordered exchanges (hence advising her to VIOLATE the Court Order), Barb Kiffmeyer refuted these statements in writing to Mr. Thaler **(written proof available upon request)** |
|---|---|---|
| | Brittany said they are not involved in any criminal activity | 8. Mr. Thaler falsely accused them of being involved in Criminal Activity. **(written proof available upon request)** |
| | Brittany lied and stated that Jacqui was sent by John | 9. John sent Jacqui to talk to them as his representative. Jacqui went completely out of her own accord, due to her own concern for McKinley. **(written proof available upon request)** |
| | Brittany lied that Jacqui confronted her | 10. Jacqui went to confront her, which is not true. Jacqui went to make sure McKinley was ok and Jacqui's ONLY objective was to talk to Brittany and Dawna and see if she could find some way to reunite dad and son. Jacqui first got the door slammed in her face and then as she was walking away to her car, Brittany came outside the house and CONFRONTED her! **(written proof available upon request)** |
| | Brittany lied that Jacqui said John is violent and dangerous | 11. Jacqui NEVER stated in any way that if they did not hand over McKinley, John would become violent and dangerous. Jacqui never alluded to this or made any reference to such behavior whatsoever. 12. **(written proof available upon request)** |
| | Brittany lied about stating she would not hand over child to someone violent and dangerous because those words were never used in the conversation whatsoever | 13. Brittany did not say she would not hand over a child to someone who is violent and dangerous. She stated that John needs to have the psych evaluation before he could have McKinley. **(written proof available upon request)** |

|  | Brittany lied that John has had daily Facetime calls with McKinley | 14. John has NOT had daily Facetime calls with McKinley, in fact communication between John and Brittany has been withheld by Brittany for up to a week at a time. *(written proof available upon request)* |
|---|---|---|
|  |  |  |
| 10/18/20 | Lied about McKinley being sick | McKinley has Roseola *(written proof available upon request)* |
|  | Lied about only wanting mom | Clinging to mom and wants only mom *(written proof available upon request)* |
|  | Lied about John having a mental disorder | Brittany lied to the Police (both Gilbert and Mesa Departments), DCPS and the Court by saying that John has an undiagnosed mental health disorder that prevents him from caring for McKinley even though he has never been diagnosed or even suspected of such in 56 years and was the primary caregiver of McKinley while they were married (for the first two years). *(written proof available upon request)* |
|  | Lied about which medical practitioner he spoke to | Brittany said she spoke to the Pediatrician on call but in fact spoke to nurse *(written proof available upon request)* |
|  | She diagnosed McKinley with Roseola | Brittany lied that the on-call Pediatrician diagnosed McKinley with Roseola. When she actually spoke to the Nurse, the nurse did not even mention Roseola until Brittany ASKED her if it could be Roseola. To which the nurse replied, I guess it could be, but highly unlikely. He doesn't have a fever and the rash is extremely mild. *(written proof available upon request)* |
|  | Brittany made a second false report to DCPS **SECOND FALSE REPORT SUBMITTED TO DCPS** | Brittany made a second false report to DCPS, with absolutely outrageous accusations that the DCPS Child Welfare Investigator was even embarrassed to share them. *(written proof available upon request)* |
|  | Brittany lied to the Pediatrician | Brittany took McKinley to the Pediatrician in an attempt to "shop" for a diagnosis of some kind of |

| | | |
|---|---|---|
| | | abuse that she could then use to accuse John. She shared her fabricated concerns with the Pediatrician lying about these to try get some kind of diagnosis. The pediatrician said McKinley was absolutely fine<br>***(written proof available upon request)*** |
| | Brittany Lied to Phoenix Children's Hospital | Brittany took McKinley to PHOENIX CHILDREN'S HOSPITAL and immediately told them this was an "ABUSE CASE". This was yet another attempt to "shop" for a diagnosis of some kind of abuse that she could then use to accuse John. She shared her fabricated concerns with the Doctors at PCH lying about these to try get some kind of diagnosis. PCH said McKinley was absolutely fine<br>***(written proof available upon request)*** |
| | Brittany lied to the Gilbert Police Department | Brittany filed a complaint against John with the Gilbert Police, fabricating that he was abusing McKinley. The Gilbert Police Detective conducted a full FORENSIC EVALUATION of McKinley and said that he was absolutely FINE. There was absolutely NO abuse whatsoever.<br>***(written proof available upon request)*** |
| | Brittany lied to the Mesa Police | Brittany told the Mesa Police Officers that came to her door each time an exchange was missed that she was protecting her son as John was abusing him. She fabricated this story to justify her keeping McKinley and not participating in any exchanges since September 19, 2020<br>***(written proof available upon request)*** |

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT N

John H. Thaler, SBN 150290
HARRIS/THALER LAW
2150 E. Sunset Road, Suite 6-124
Las Vegas, NV 89120
Tel. 818-219-0807
e-mail: jhtlaw@msn.com

In Pro Per

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, NORTHWEST DISTRICT

| | |
|---|---|
| JOHN H. THALER, an individual, | CASE NO. |
| Plaintiff, | **VERIFIED COMPLAINT FOR DAMAGES:** |
| vs. | |
| BRITTANY RAE CHAVEZ aka BRITTANY RAE THALER, an individual and DOES 1 through 50, inclusive, | 1. **Fraud/Fraudulent Concealment;**<br>2. **Abuse of Process;**<br>3. **Malicious Prosecution;**<br>4. **Intentional Infliction of Emotional Distress;**<br>5. **Trespass to Chattels;**<br>6. **Battery.** |
| Defendants. | |
| | [Jury Trial Requested] |

## GENERAL ALLEGATIONS

1.      At all relevant times mentioned herein, Plaintiff was and is an attorney duly licensed by the State of California with his principal office in Encino, California.

2.      At all relevant times mentioned herein, Defendant Brittany Rae Chavez aka Brittany Rae Thaler ("Brittany"), was and is a resident of Maricopa County, Arizona but personally traveling to California and conducting business in the State of California under various assumed names and identities.  Said business includes commission of crimes while participating in numerous racketeering enterprises set forth in detail hereinbelow.

3.    Plaintiff is ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

4.    Plaintiffs are informed and believe in thereon allege that at all times here and mentioned, each of the Defendants sued herein was the agent an employee of each of the remaining Defendants and was at all times acting within the scope and purpose of such agency and employment.

5.    The operative facts alleged hereinafter are currently the subject of substantial federal court litigation between Plaintiff and multiple individual defendants and public entities including the State of Arizona, County of Maricopa, City of Mesa and Town of Gilbert.  Said litigation focuses on corruption and civil rights violations.  The within litigation concerns specific acts resulting in specific damages to Plaintiff and to Plaintiff's law office and clients and to the Los Angeles County Superior Court.

**Relevant Facts**:

6.    Brittany was born on April 14, 1987.  In 1990, Brittany's mother, Dawna Chavez, suffered a neurological incident that was nearly fatal.  The disability it created prevented her from working in her previous role as an executive secretary at Boeing.  It also meant that she could not contribute financially to the household.

7.    Meanwhile, John Chavez, aka Johnny Chavez, Brittany's father, refused to take medication for bipolar disorder.  This failure led to John spending monies the family did not have.  And that led to near poverty and starvation at times,

8.    Though Dawna and John had participated in criminal enterprises operated by other family members, the lack of money and lack of Dawna's ability to earn an income from regular employment resulted the decision to participate in the extended family's criminal enterprises and to enhance and create their own enterprises.

9.    The poverty greatly affected Brittany, especially during her teen years. Brittany became so afraid of poverty that in addition to assisting in the criminal enterprises, Brittany also

1  engaged in prostitution and engaged in sexual performances in videos and in photographs to earn

2  additional money.

3       10.     After two bouts with pre-cancerous HPV cervical cysts, the result of unprotected

4  sexual activity in furtherance of the prostitution, and two surgeries to remove said cysts in 2011 and

5  in 2013, Brittany focused her attention primary on the family's criminal enterprises until shortly

6  after becoming engaged to Thaler on December 29, 2014 at which time, she decided to stop her

7  involvement in said activities.

8       11.     However, after their son was born, Brittany's irrational fear of poverty caused her to

9  return to the enterprises and to other illegal methods of earning money.

10      12.     Said enterprises include:

11           A.     **Insurance Fraud**

12      13.     The first enterprise concerns insurance fraud. The insurance fraud concerns payment

13  to nonexistent parties for personal injury claims made under med pay provisions of homeowners'

14  policies and automobile policies. The med pay provision in these policies concerns provisions that

15  include no-fault payment of up to $5,000 for medical treatment for an individual other than the

16  policyholder.

17      14.     Simply put, if an individual visits another's home and slips and falls in that home,

18  his medical treatment up to $5,000 could be paid by the med pay provision without fault and

19  without any increase in premium to the homeowner.

20      15.     Since at least the mid-1970s, members of the Chavez family have been active

21  participants and in control over this enterprise.

22      16.     During the mid-1980s the volume of fraudulent claims through defendant Dawna's

23  control increased until 1990 and then tapered off until it picked up again in about 2002 to the

24  present with Brittany and Dawna in control over it.

25      17.     Arizona law provides for the recording of medical liens.  The recording of the liens

26  was designed to give hospitals the ability to recoup costs for treatment.  For this scheme, the

27  medical liens recorded as AHCCCS LIEN designation with the County Recorders' Office of

28  Maricopa County.

18.     Said fraud has netted more than $50 million in the past 15 years. It relies on phony medical bills plus the recording of the treatment lien. A coded bill with a copy of the lien is then sent it to the insurance company who then provides a check, believing that the check is being sent to the medical provider. However, the liens are all fraudulent and fake and are signed and executed by Dawna Chavez using an assumed name and by either Dawna Chavez or by Brittany Chavez as a fake notary under an assumed name.

19.     Thereafter, the proceeds of the insurance payments are laundered through property purchases. These property purchases involve certain real properties that exist and certain real properties that do not. To perfect this part of the scheme, Brittany creates multiple limited liability companies that appear to be a mortgage company, a title company, an escrow company, and inspection company, and a real estate agency.

20.     All of the normal paperwork involved in the purchase of a single-family residence is prepared and executed. However, the buyers and sellers are the signatures of Brittany and Dawna or other participants. On most occasions the notarization is executed by Dawna or Brittany using the name or a hybrid of the name of an existing notary to give the appearance that the actual notary who is licensed with the state of Arizona has certified documents. The fraudulent documentation is then recorded with the county recorder's office.

21.     In addition to Arizona, said defendants created similar schemes in California by illegally taking over law offices using the names of retired or deceased lawyers to create or continue "tort mills" where phony claims to insurers are mixed among a smattering of real claims. One such office includes the Law Offices of James Tenner located in North Hollywood, California.

**B.     Public Corruption: Skimming Government Funds**

22.     The second criminal enterprise concerns skimming money from state programs including collections programs such as child support. Monies from this and other similar programs, especially from monies that have been owed for a period of at least several years are diverted when paid into holding accounts and then transferred out of the holding accounts into accounts listed as being held by corporations or limited liability companies. Those monies are then used in the same laundering operation as are the insurance monies described above.

23. By example, with respect to stealing money from the Arizona state child support fund, Clerks in the office of the court clerk set aside certain case numbers for the purposes of Brittany and others filing phony dissolution of marriage cases and phony paternity/child support cases. The phony party is ultimately stipulate to a judgment that includes the payment of child support from father to mother. Mother then provides the order to the appropriate County office where it is processed and provided to the state office for payment and for collection from the father—except there is no father and no child or children.

24. Currently, for Maricopa County, case numbers ranging from 098400 to 098499 are being selected at random and used to foster this crime. Plaintiffs are informed him believe in there on allege that other series of numbers are being used in other counties within the state of Arizona in a similar fashion and are also being used in multiple counties within the state of California including San Diego County, Orange County, and Los Angeles County.

## C. **Narcotics Sales/Laundering**

25. The third prong of the enterprise concerns the sale of narcotics especially prescription and designer narcotics that are moved from Mexico through Calexico to Brawley to Salton City to Twenty-nine Palms to Bullhead City, Arizona, to Kingman, Arizona, to Flagstaff, to Phoenix, to Casa Grande, and then to Tucson, Arizona.

26. On or about December 20, 2014, Brittany met in Orlando FL with Roberto Lopez, who is known to the Drug Enforcement Administration as a significant importer and distributor of crystal methamphetamine. Though the scheme has been existing for more than a decade, Shortly after meeting with Mr. Lopez, in or about January 2015 Brittany assisted in revitalizing the scheme by placing individuals in residences in certain cities listed above including Brawley and Kingman. Thereafter, in or about January 2017, Brittany once again assisted in perfecting the scheme by using laundered monies received from drug sales to purchase properties in Twenty-Nine Palms and in Bullhead City.

27. Many of the operatives hired our current or retired military non-commissioned personnel who are discharged with transportation and/or logistics training. many are recruited from Camp Pendleton marine base and from Twentynine Palms Marine Air Ground Combat Center.

28. Other pharmaceuticals are moved from Miami, Florida to Orlando, Florida where they are then transported through Benton, Arkansas, Albuquerque, New Mexico, through Phoenix, Arizona to Southern California. Plaintiffs are informed and believe and thereon allege that recruiting for these transportation jobs comes mostly from the Naval Air Warfare Center in Orlando, Florida.

29. The cash collected from the drug sales is sent in whole or in part to Brittany and put through the same money laundering system as described above. Additionally, the houses are purchased with laundered money or for the purposes of laundering money through said purchases are constructed or modified with drop boxes set forth in the walls of the residents. These drop boxes are hidden and are nearly impossible to find on inspection. To give the appearance of legitimacy, these houses are put through phony sale transactions possibly every two to three years. The drop boxes are routinely serviced with portions of the cash being returned to the drug suppliers, with portions becoming capital contributions for the setup of the limited liability companies in subsequent schemes, and portions becoming investment capital for seemingly legitimate investments.

30. Plaintiff is informed and believes and thereon alleges that a drop box configuration was constructed into the family residence purchased by Thaler and Brittany in 2015. Further, Plaintiff is informed and believes and thereon alleges that during the course of their relationship, Brittany utilized the drop boxes consistently after making cash pickups from local drug dealers.

31. Additionally, Brittany set up a computer server and router under the "bigbootyhoes420.com" URL. The site contains short pornographic videos that in several of which Brittany performs sexual acts with a male performer. To launder money, said videos were made available for sale through debit card transactions from accounts holding illegally obtained money mostly from the sale of drugs. Through the "purchases" of these videos, said money is laundered and made clean.

**D. Public Corruption: Creating and/or Modifying Public Record**

32. In effecting the schemes set forth above, defendants created or obtained access to the Arizona state database and the Maricopa County database. By doing so, Defendants are able to

1 insert backdated records, remove records and modify existing records to meet their needs. these

2 records include the typical documents recorded with the Maricopa County recorder, court records,

3 arrest records, and collection records concerning State programs including the family support

4 program.

5      33.     In the matter of court records, Brittany and Dawna and the defendants herein have

6 participated in extortion of individuals who might prove harmful to the continuing of their

7 enterprises by creating false arrests or created and invented charges and fraudulent civil judgments.

8 with respect to Plaintiff, they have attempted to do both.

9       E. **Public Corruption: Bribing Public Officials**

10      34.     Also, in effecting the schemes set forth above, defendants have placed into positions

11 of hiring authority individuals who, for compensation, have been placed into various government

12 positions. Persons who can assist in the criminal schemes. This includes judges, police officers,

13 State police officers, judicial assistants, inspectors, assessors, and accountants.

14       F. **Corruption: Private Parties**

15      35.     In addition to public officials, monies are used to bribe licensed officials such as real

16 estate agents, real estate brokers, and court approved "experts."

17      36.     These enterprises existed long before Plaintiff and Brittany met, continued through

18 their relationship and have continued to date.

19      **G.**     **Bankruptcy Fraud**

20      37.     With the assistance of lawyers such as Michael Agruss (licensed in California and in

21 Illinois) and Brian Blum (licensed in Arizona), defendants Brittany and Dawna along with John and

22 Johnny and Fritz and Laura have engaged for more than ten years in creating fraudulent Chapter 7

23 Bankruptcy filings and phony creditor claims within Chapter 11 filings and phony adversary

24 actions within Chapter 7 filings.

25      38.     With respect to Agruss and his Chicago-based law firm, he and his firm, working

26 with Brittany and Dawna, have filed multiple phony creditor claims on behalf of themselves and

27 other members of the Chavez family in Chapter 11 reorganization cases.

28

39. One example is the Super Two Financial Services Corporation Chapter 11 filing bearing case number 17-10659 (JLG) in the Southern District in New York where "Dawn M. Chavez", "Monica Chavez" and "Vianey Chavez" made false creditor claims through the Agruss office.

40. Additionally, nearly one thousand Chapter 7 filings have been made throughout the country under the "Agruss" firm name for phony Chapter 7 filings for fake "Chavez's."

41. As to the phony Chapter 7 claims, the scheme has worked as follows: phony identities are created for real individuals and phony identities are created out of whole cloth from stolen medical records files stored in a medical records storage facility in San Diego, California. Using real Social Security numbers of the individuals whose identity has been stolen, new credit is obtained and used. Then a bankruptcy is filed to wipe out the debt.

42. Worse, if any creditor acts to collect in violation of the Federal Debt Collection Practices Act, the Agruss firm either sues in federal court on behalf of the individual or sues on behalf of an alleged "class" with the phony individual serving as the named class "member."

43. Plaintiff is informed and believes and thereon alleges that during 2019 through 2020, on at least three separate occasions, Agruss illegally obtained Thaler's credit information and then manipulated the same to reduce severely Thaler's FICO credit score in order to damage Thaler's ability to obtain credit for him and for his office all to Brittany's benefit during the dissolution of marriage proceedings in Arizona.

44. With respect to Brian Blum, during the period of 2013 through 2016, Blum assisted Brittany in filing Chapter 7 bankruptcy cases for individuals he knew were fake and helped her to file phony adversary actions within the very Chapter 7 cases he and she had filed.

45. The purpose of these phony filings and phony adversary actions were intended to clear assets that otherwise could be claimed in whole or in part by unsecured creditors. One such case includes the matter of Heidi Lee Boltz and Jeffrey Lee Boltz, case number 2:15-bk-17870-DPC. Neither "party" exists. Instead, property, real and business personal are placed in their names. Credit is obtained and then essentially converted to other uses. When creditors attempt to collect, a Chapter 7 bankruptcy is filed.

46. In the case of the "Boltz" couple, when the trustee refused to allow for the couple to retain a particular asset and instead intended to sell it to pay creditors, Brittany and Brian created a fake adversary (internal lawsuit) action against the couple—essentially suing themselves so that the fake adversary party, by its actions, would cause a halt in the sale process and then provide a way for the phony adversary to obtain control over the asset.

47. The plan worked. The entirety of the bankruptcy discharge was set aside and the bankruptcy case dismissed. The asset was preserved.

**H.    Creation of Fake Individuals, including Real Estate Agents and Attorneys in Arizona and in California:**

48. To operate these schemes, Defendants created fake state and local government employees in California and in Arizona. They also created fake "individuals" licensed through state agencies. For example, in California, "Arlene Chavez" was created as a real estate agent with an office allegedly located in La Mirada. "Arlene Chavez" is also licensed in Arizona. "Paul Tokeshi" was created as a fake attorney with an office in Santa Anita, California. Moreover, almost every "Brittany Chavez" allegedly residing in Arizona, California and New Mexico is a fake individual created by Brittany. Additionally, there is Brittany Smith, Brittany Young, Brittany Miller and Brittany Harris, to name a few. Then there are Bianca Chavez, Breana Chavez and Britni Chavez. All are alter ego creations of Brittany.

49. Plaintiffs are informed and believe and thereon allege that in addition to fake individuals presumptively operating under legitimate licenses, each state has real individuals operating under licenses that were never properly licensed through the state or local government agency or who failed to pass examinations or otherwise meet the requirements necessary for licensure.

**I.    Creation of tax evasion and money laundering schemes for family and friends.**

50. In addition to her criminal activities in support of the family business, Brittany created tax evasion and money laundering schemes for members of her maternal side of the family (Vanderpool) and for various friends including former boyfriends.

//

**J.     Creation of and implanting crypto-viruses into computer systems for ransom.**

51.     During her college years, Brittany was employed by Best Buy as a member of the "Geek Squad." Said group were computer experts who installed computer systems for individuals and for network users.

52.     While performing said services, Brittany learned techniques to extort money from customers by placing viruses into their systems and then charging to remove the same.

53.     After graduating from ASU and leaving her employment with Best Buy, Brittany continued to work with others to place viruses on computer systems including the placement of crypto-viruses on systems and then demanding ransom for a "key" to unlock files.

**State of Arizona 2010-2011 Investigations**

54.     From 2010 through 2011, State of Arizona conducted an investigation of public corruption. In doing so, the State hired outside accounting agencies and forensic accountants to perform an analysis on the income and expenses of certain public agencies. The investigative reports concluded that many of the State agencies had been corrupted through Russian organized crime. There were a number of targets of the investigation including individuals who are involved in phony real estate transactions of the same type and kind as set forth herein concerning the defendants.

55.     Moreover, said individual targets of the investigation, and specifically Cynthia Peterson aka Cynthia Valencia aka Cynthia Saenz aka Cyndi Beaman, has also been a participant with these defendants in the insurance fraud and in the mortgage fraud and money laundering enterprises.

56.     At the same time the State of Arizona was conducting its investigation, Plaintiff was investigating Russian organized crime involvement in the smuggling of illegal goods into the United States and the storage of the same in California prior to shipping said goods to those criminals who effected the initial importation.

57.     Unbeknownst to Plaintiff, one of the shipping companies out of Ontario, California was owned legally and beneficially by Brittany. Said company was disbanded in late 2019 shortly after Brittany filed for divorce from Plaintiff.

**Brittany's elimination of those who could/can reveal of her criminal conduct.**

58.     Brittany suffers from Dissociative Identity Disorder. It is the result of extreme poverty caused by her mother's severe neurological incident in 1990 followed by her father gambling away the family's money, and the result of extreme childhood sexual and physical abuse by family caregivers living in the home while her mother recovered.

59.     Brittany has at least four identifiable alter egos (personalities). Each personality has its own unique characteristics and DSM V diagnosable mental health condition. In her primary personality, Brittany is sociopathic and unable to connect empathically with anyone or anything. When threatened with exposure, she has done and will do anything to protect herself.

60.     When on her medication, Brittany maintains impulse control. When self-medicating, which Brittany does for extended periods of time, Brittany can appear to be sociable. But when not on her medication for prolonged periods, Brittany loses all social controls. Said impulses include questionable sexual behaviors and violent physical behaviors and passive aggressive violent acts.

61.     Dawna suffers from psychiatric concerns as a result of a neurological situation that occurred when Brittany was three. The often-fatal condition presents as a progressive explosion of blood vessels in the brain. If not immediately treated, the condition is fatal. Shortly after giving birth to Johnny, Brittany's brother, Dawna suffered this condition. She required immediate brain surgery and months of recovery. To date, Dawna is partially blind and has limited peripheral vision on her left side. Though she drives, she refuses to drive with anyone in her vehicle. Also, Dawna suffers from grand mal seizures.

62.     More significantly, Dawna suffers from periodic grand mal seizures. Also, the damage to her brain function causes sociopathic and psychopathic behaviors. Much of Brittany's actions as set forth herein are the result of being extorted or threatened into them by her mother – Dawna, who has sought to take advantage of Brittany's mental health issues to perpetuate money laundering and tax evasion schemes for Chavez (father's side) and Vanderpool (mother's side) relatives. These include threats of exposing Brittany's illness and exposing her exploits when off

of her medication. And it includes constant criticism and brow beating. Dawna controls Brittany's money and almost every aspect of her life.

63. In or about early 2012, after the conclusion of the State investigation combined with having had the first of two cervical cyst surgeries, Brittany decided she wanted to terminate her involvement in the criminal enterprises.

64. To prevent Dawna from forcing her participation, Brittany began dating Jeffrey Phillips. Mr. Phillips was an uneducated thug who threatened Dawna and other members of Brittany's family if they attempted to force her into participating in the criminal enterprises. Brittany wanted to end her participation so badly that in May 2013, on the one-year anniversary of their dating, Brittany tried to get Phillips to propose marriage. He did not. As a result, Brittany worked toward terminating the relationship.

65. Phillips was temperamental and violent at times such that he regularly physically and emotionally abused Brittany and sexually assaulted her (in part a product of Brittany's changing personalities from hypersexuality to innocence without Phillips knowing the difference). Afraid that Phillips would harm her if she broke up with him, Brittany paid a woman to seduce Phillips and have unprotected sex with him. Brittany intended to feign her discovery of Phillips' actions and then use the same to terminate the relationship.

66. And in November 2013 that is exactly what she did.

67. During the course of the relationship with Phillips, who was underemployed or unemployed most of the time, Brittany spent tens of thousands of dollars and ran up more than $35,000 in credit card debt. Afraid of poverty, during the first half of 2014, Brittany tried to get several male friends to marry her in a kind of arrangement wherein Brittany would have a life independent from the marriage which would be solely a convenience. This included business owner Albert Suh and attorney Jarin Geisler. However, neither situation worked out.

68. With respect to Suh, he and his parents owned dry cleaning shops in Gilbert, AZ and in Scottsdale, AZ. Brittany met Suh in or about 2006. From approximately 2008 through 2014, Brittany provided sexual favors to Suh acting as his "dominatrix" in exchange for laundering money through Suh's dry cleaning businesses.

69. In or about 2012, Brittany convinced Suh to set up computer servers offering pornographic live and taped "cam" shows for the purposes of making money and for the purposes of laundering money through membership fees and "purchases" of related pornographic recordings.

70. Suh participated and continues to participate in running the cam shows and in participating in the same under the stage name "Jimmyiceo."

71. Suh and Brittany also operate a server using the name "BigBootyHoes420." Said server "sells" low quality pornographic videos. However, said sales are false and designed to launder illegally obtained cash.

72. Said laundering activities continue to date.

73. It was during this time, that Brittany learned of Plaintiff. She learned that during 2011-2012, Plaintiff had been in a dispute with the HOA and property management company where he resided in Tarzana, California. Brittany and family had been engaged to launder money for the property management company, Ross Morgan & Company.

74. Brittany also learned that Plaintiff owned a residence in Phoenix, Arizona.

75. Thereafter, as discussed in detail infra, Brittany concocted a scheme to extort money from him by creating a phony California Judgment that would be perfected in Arizona as a foreign state judgment.

76. This was hardly the first time Brittany had concocted such a scheme. Prior to this time, Brittany had set up more than a thousand phony schemes using the courts in California and in Arizona to perfect phony default judgments and other phony monetary orders to obtain money from unsuspecting victims.

77. During the course of the relationship with Phillips, Brittany regularly took phentermine, a scheduled prescription weight loss amphetamine, to control her weight and weight gains caused by psychotropic medication intended to prevent episodes of switching personalities.

78. During the Summer of 2014, Brittany, still fearing poverty, contacted Phillips about whether he would participate in an illegal enterprise concerning the distribution and sale of prescription drugs including steroids and amphetamine-based weight loss products. In or about late July 2014, Brittany, Phillips, and a third party, formed a New Mexico corporation to handle the

"transactions." Said transactions were intended to be mostly with "weight loss" clinics in California, Arizona, New Mexico, and Texas.

79. Brittany intended to launder the money earned through fake property transactions used to launder monies in the family's criminal enterprises.

80. On or about August 2, 2014, Brittany met with Phillips and the third individual to discuss the operation and put it into effect. Brittany then prepared written agreements for the three and a standard form written agreement for medical clinics to which the pharmaceuticals would be sold.

81. Meanwhile, Brittany perfected the foreign state judgment against Plaintiff in September 2014. Unable to locate bank accounts or other assets, Brittany decided to meet Thaler on a "date." Shortly after meeting Thaler, Brittany informed Phillips and the other partner that she would no longer participate in the drug import scheme.

82. On or about October 26, 2014, Brittany met with Phillips at his residence in Phoenix. At that time, she reiterated to Phillips that she had no interest in continuing with the partnership.

83. Phillips became angry and threatened Brittany with bodily harm and threatened to tell Taylor about Brittany's history of illegal activities.

84. For the next five months Phillips continued to threaten Brittany with multiple voicemail messages and with multiple text messages. Brittany felt so threatened that she maintained recordings of the voicemail messages and provided them to her friend, Shane, instructing him to give them to the police in case anything should happen to her.

85. Despite Brittany ignoring the threats, Phillips continued. On or about April 14, 2015, Brittany's birthday, Phillips threatened to turn over information to state and local authorities and to Plaintiff regarding her illegal activities over the past decade if she did not return to the partnership.

86. Shortly thereafter, Brittany arranged to meet with Phillips on the guise of working out their differences and have her rejoining the partnership. In fact, Brittany did meet with Phillips. Brittany picked up Phillips from his residence in Phoenix and drove North toward Sedona. During the drive, Brittany provided to Phillips a beverage that she claimed was iced coffee. While the

1  beverage contained iced coffee it also contained a combination of narcotics intended to cause

2  Phillips' death.

3  87.  Plaintiff is informed and believes: Phillips drank the beverage without realizing that

4  the beverage had been poisoned and that he lost consciousness and shortly thereafter died.

5  **Brittany's connection to Plaintiff years before they met**.

6  88.  Beginning in 1985, Russian organized crime created a presence in Southern

7  California.  Most of its operations concerned the movement of smuggled materials, any smuggled

8  materials.  If you got it into the country, this group would hide/store it and then ship it to its final

9  destination.

10  89.  The operation was assisted by brokers working out of the Lee & Associates

11  commercial brokerage office in Sherman Oaks, California who bought and were the "legal" owners

12  of multiple storage facilities throughout Southern California where the smuggled materials would

13  be placed.  The design and set up and algorithms used to determine the storage locations of the

14  goods were created by Atomic Computers in Canoga Park, California and assisted throughout the

15  country by BCS Recycling which also has its headquarters in Canoga Park, California.

16  90.  Tarzana Falls was built in 1986 with monies provided through accountant Brian

17  Davidoff.  The funds belonged to a Los Angeles-based Russian organized crime operation.  During

18  construction, Davidoff was given a seat on the original board.  When enough buyers had completed

19  their purchases, Davidoff resigned and formed Ross Morgan & Company.

20  91.  The purpose of "Ross Morgan" was to launder monies and to convert collected

21  association fees in furtherance of criminal enterprises.

22  92.  Over the following decade, as profits grew, Ross Morgan could not handle the large

23  cash flow alone.  So Brittany's family and their participating associates got the job.

24  93.  In 2011, when Plaintiff discovered that Ross Morgan was stealing the assessment

25  payments from Tarzana Falls residents, it acted to force Plaintiff from Tarzana Falls.

26  94.  Also threatened with discovery and exposure by Plaintiff was the manner in which

27  fake identities of existing and non-existing individuals were being created as part of the money

28  laundering schemes.  That method concerns at least one IT head for a major hospital chain based in

Arizona and its electronic storage facility based in San Diego, California. Working together, private patient data and information is siphoned off and used to create new identities. The "directors" working for the department head of IT worked with Brittany in the Geek Squad of Best Buy from 2004 through 2007. Brittany's relationship with them continues as evidenced by their presence on her LinkedIn profile through 2018.

95. Plaintiff is informed and believes that the Russian organized crime groups routinely use the property "purchase" scheme to launder money. Further, Plaintiff is informed and believes that said crime groups routinely create or take over property management companies in various states including California and Arizona to use for the laundering of ill-gotten cash and that Brittany has participated in the laundering schemes in Arizona.

96. As part of the scheme to force Plaintiff out of Tarzana Falls, a lawsuit was filed on behalf of the HOA in or about November 2011. It was never served. And all issues between the parties were resolved by June 2012 when Plaintiff, who had moved to Phoenix in October 2011, sold his unit.

97. Court records for Los Angeles County Superior Court show that on or about May 31, 2012, an alleged judgment was taken in the Superior Court for the State of California, County of Los Angeles, limited jurisdiction, under case number 11E11652. The application for the judgment purports to be signed by an attorney named Paul Tokeshi. The judgment appears to have been executed and entered by Judge Leland Harris.

98. These records were falsified. The judgment is a fake. There is not now nor has there ever been such a judgment nor was there ever an application for such a judgment nor did any such application appear before Judge Harris nor did Judge Harris enter any judgment. Moreover, the signature on the application allegedly belonging to "Paul Tokeshi" is a forgery.

99. Parts of the proposed judgment, which also purport to have been prepared by Mr. Tokeshi, have places to fill in the various figures making up the total of the judgment. Those blanks are filled in by hand printing. Judge Harris' signature also consists of a hand printing and not a handwriting or a stamp. All of the printing and numbers belong to Brittany.

100. Further, there appears to be a certification of the judgment prepared in or about 2014. That stamp is a fake and the written information from Brittany's hand.

101. These judgment documents were then used to apply for a sister State judgment in Maricopa County, Arizona Superior Court as a "foreign State judgment." Said term is similar to a sister State judgment in California.

102. At the time of the entry in California, which purports to be in June 2012, Plaintiff resided in Phoenix, Arizona. Phoenix is within Maricopa County.

103. The State of Arizona requires that any application for entry of a foreign State judgment be mailed to the last known address of the judgment debtor. In this case, that did not occur. Though Plaintiff was living in Phoenix, Arizona, none of the documents were mailed to Plaintiff's residence. Further, the documents were not mailed to Plaintiff's business address and were not mailed to Plaintiff's previous address in Tarzana Falls.

104. Many of the documents used to obtain the default and default judgment are fraudulent. For example, the proofs of service show that the documents were mailed to a residence in Tarzana CA that Plaintiff had not lived in since 2007. In addition to being mailed to the wrong address, the proof of service also show Plaintiff's name is misspelled as T-H-A-Y-L-O-R.

105. Brittany surmised that she could form a social relationship with Plaintiff that would lead to marriage and having a child, that she could hide behind Plaintiff, his knowledge of Tarzana Falls, Ross Morgan and Russian organized crime involvement in property management companies.

106. Brittany then set up a scheme to meet Plaintiff and to engage him in a social relationship.

107. On or about October 13, 2014, Plaintiff and Brittany first communicated. On or about October 22, 2014, they met in person and had dinner together. Unbeknownst to Plaintiff and described in detail hereafter, Brittany already knew who Plaintiff in great detail, as earlier in the year she set up a scheme with others to extort money from him by creating a phony judgment in The Los Angeles County Superior Court and then having the same entered in Maricopa County, Arizona as a foreign state judgment.

108.    In or about late July 2015, as is described more fully below, Plaintiff learned about the sister State judgment in Arizona while selling Plaintiff's residence in Phoenix. The title company handling the transaction at that time called to inform Plaintiff that a judgment had been recorded.  It had no other information other than the name of the case and the Maricopa County case number.

109.    Upon confirming the entry of the foreign State judgment and its origins, Plaintiff immediately sent a letter to the attorney in Arizona, Mark Lammers, who had been retained to enter the judgment and collect on it. Mr. Lammers' office is in Tucson, Arizona.

110.    While it seemed curious that no effort had been undertaken to collect on the judgment in 2014 or through the first half of 2015, Plaintiff never considered it to be significant.

111.    On or about August 4, 2015, Plaintiff sent to Lammers a request for information regarding the application and application documents along with any and all papers related to the entry of the judgment in California.

112.    With respect to Tarzana Falls, in March 2011, a dispute arose between Plaintiff and the HOA regarding its failure to make needed unnecessary repairs from rain damage occurring in February and March 2011. During the course of the dispute, Plaintiff discovered that the books and records of Tarzana falls were fraudulent and that the annual pro formas provided to owners were entirely fiction. Plaintiff also discovered that numerous annual special assessments not only were fraudulent, but the monies paid by the residents could not be traced to any Tarzana Falls account.

113.    Because Plaintiff was in the process of moving to Phoenix, Arizona, Plaintiff did not press the matter other than to demand repair of Plaintiff's unit so that it could be prepared for sale, while refusing to pay a new special assessment and demanding refunds for past special assessments. The HOA, having failed to undertake the repairs, made it impossible for the unit to sell as a portion of it had become uninhabitable. To this date, the repairs still have never been made to that unit.

114.    As is discussed more fully below, in late 2017, Plaintiff received documents from a resident of Tarzana Falls who was involved in a legal action on the same failure to repair issues. Those documents clearly show that the board members of the HOA and property management

company owners of Ross Morgan (who are named as defendants herein) embezzled more than $4 million over the period of 2001 through 2018.

115. The documents also confirm that the special assessments were fraudulent and the monies collected were diverted. More on these issues is described below.

116. Despite sending the letter on or about August 4, 2015 to Lammers, Plaintiff did not receive a response from his associate, Sarah Epperson, until November 4, 2015. She stated simply that the judgment in California was valid and that her firm had been hired to collect. No comment was made on the failure to serve the application properly or the plethora of issues that were materializing about the validity of the judgment.

117. The failure to mail the Application to the correct address is a fatal flaw in Arizona. No comment was made as to whether the Arizona firm had verified any of the judgment or any information before receiving it. In fact, it was unclear how the information got to Lammers.

118. One exception to the one judgment rule in California is judicial foreclosure where one judgment concerns the foreclosure and a second judgment, which must be obtained within 90 days of the foreclosure, concerns any additional monies owed under the judgment that were not collected in the foreclosure sale. The phony judgment covers the foreclosure sale and specifically provides for the judgment creditor to apply for the required deficiency hearing per the applicable statute. The failure to apply within the 90 days permanently extinguishes the debt.

119. As no application was ever made, even if the judgment were valid, the debt was extinguished by September 2012. As a result, the application for a sister state/foreign state judgment constituted a fraud on the Maricopa County Superior Court.

120. It turns out that even the method by which the alleged judgment got to Tucson was fraudulent. Lammers received a letter allegedly from board member/attorney Steven Buchwalter stating that he was writing the letter on behalf of the board and not in his capacity as an attorney. It stated that he and the board determined Plaintiff owned property in Maricopa County and wanted him to take all necessary steps to collect on this judgment.

121. Conspicuously absent was any board resolution or board authorization to pursue this judgment. There was a reason for that. When title to the unit was transferred on or about June 12,

2012, all issues regarding any unpaid assessments by Plaintiff were resolved in a deal made by the HOA with the buyer.

122.  In fact, The Tarzana Falls Ledger for June 30, 2012 confirms that no debt was owed by Plaintiff to the Tarzana Falls HOA as of that date. On the continuing ledgers thereafter the same zero balance is stated. Even Defendant Tony Donato has stated openly that all matters regarding Plaintiff's unit and any monies owed to the HOA, were resolved in June 2012.

123.  With the fraudulent Arizona judgment in Arizona holding up the sale of Plaintiff's property, Plaintiff filed a motion challenging the entry of the foreign state judgment. When it became obvious that the alleged California judgment was fraudulent, Lammers and Plaintiff agreed to stay all proceedings in Arizona to determine what exactly had occurred in California. A bogus second lawsuit filed in Arizona in late December 2015 for fraudulent conveyance along with a lis pendens filed and recorded with it was dismissed by Lammers at that time.

124.  In California, procedurally this started with a motion to set aside the California judgment. But, as the court knows, discovery is not available to a defendant litigant after a judgment has been taken. As a result, with the limited information available at the time, any full explanation was not available and hence the motion was denied.

125.  Thereafter, the litigation was filed. Because of the sensitivity of the matter, which at that point included the belief (later proved to be true) that no one named Paul Tokeshi ever applied for the California judgment, previous judges sitting in this court delayed the requirement of serving the named defendants so that further unfettered investigation could occur.

126.  Meanwhile, in late 2014, Plaintiff became engaged to Brittany Rae Chavez. In April 2015, Plaintiff and Brittany made a deposit payment on a home to be built in Gilbert, Arizona. The home was completed in September 2015 wherein they made the requisite down payment and took out a mortgage. The sale of Plaintiff's residence was incident to this purchase.

127.  During the course of the litigation, a number of irregularities came to light concerning Brittany's activities. Evidence now exists that implicates Brittany in insurance fraud, money laundering, extortion, embezzlement, tax evasion, tampering with official records and documents, bankruptcy fraud, creating fake and phony judgments for the purposes of carrying out

the extortion schemes and related racketeering activities. Brittany's family has been involved in such activities since at least 1986.

128. Brittany is an experienced trial paralegal, having performed such services in more than 23 major trials and arbitrations over the past 10 years. She is fully versed in legal procedure in both California and in Arizona. She has prepared numerous documents for filings in both States.

129. In addition to creating phony judgments, Brittany has been part of a network of individuals involved in the aforementioned criminal enterprises that has paid off court officers, officials and employees, including lawyers, paralegals, clerks of the court, court reporters, judges, and in Arizona, judge's assistants.

130. At her last three law office employers, Poli & Ball, Andante Law Group, and Struck, Love et al., Brittany has used the resources of the firms to carry out portions of the criminal enterprises. For example, at Poli & Ball, Brittany manufactured evidence through manipulated court transcripts. at Andante, Brittany filed phony Chapter 7 bankruptcies on behalf of phantom individuals with the intent of stealing assets from creditors. At Struck Love, Brittany falsified evidence in favor of individuals employed by certain Counties and States in exchange for their assistance in the criminal enterprises. With the latter, it led to Brittany being fired from her job in January 2019.

131. Even worse, Brittany's co-conspirators include computer engineers who designed, created and continue to maintain State and County databases within Arizona and Maricopa County. This permits the participants to enter said databases and then add/enter or subtract information. Arizona and Maricopa County have made data breaches easy by using only one central database for all State programs and only one database for all County programs.

132. But Arizona is not the only State where the systems have been breached. Other States include Florida, New Mexico, Texas, Pennsylvania, Ohio, Michigan, Maryland, Minnesota, Wisconsin, and California.

133. In these States, participants have put into employment or otherwise paid off court clerks and court reporters and have infiltrated the California State Bar computer system. To that end, the ability to upload to the attorney rolls phantoms names of individuals who do not exist and

of course are not attorneys. Paul Tokeshi is one of these phantom attorneys. Partners at Wolf, Rifkin confirm that no one named Paul Tokeshi was ever employed at the firm.

134. The California State Bar has been aware of this phantom attorney problem since 2011. It is one of the reasons why the State Bar of California instituted in 2018 the fingerprint program using LiveScan for all active attorneys.

135. Unfortunately, because the State Bar did not keep the original fingerprint cards at the time of admission, the newly obtained prints cannot be used to compare previously received fingerprint cards.

136. In Arizona the problem is far worse. As stated above, the access into the computer databases concerns the entirety of the State of Arizona which operates through one singular database and the County of Maricopa which also operates off of only one singular database. That has permitted real individuals to obtain licenses in fields where they do not have and have never had the requisite degrees or training.

137. Simply, one could become a licensed social worker having never actually gone to college or attended any courses in social work. Since the State university database operates through the State system and database, it is likely that individuals are receiving degrees that they never earned or at least receiving credits for classes never attended.

138. Within the court system, this has meant that judge's assistants, who essentially act as paralegals to the judges and act as calendar clerks, thus controlling all paperwork (which is electronically filed), can change or remove motions or oppositions to motions and can edit or create court judgments without the judge having any knowledge of the same.

139. This scheme had mostly been used in criminal cases either to prosecute those who might become enemies of the individuals involved in the criminal enterprises or to remove charges or lessen the severity of charges on those who have been arrested for crimes relating to these enterprises.

140. To say this is something of a disaster and a total meltdown of trusted institutions is being kind. But it gets worse.

1    141.    In reviewing phony documents executed by Brittany and recorded with the Maricopa

2    County Recorder, Plaintiff discovered that certain signatures used by Brittany on documents

3    recorded with the Maricopa County Recorder's Office contain a signature matching the Paul

4    Tokeshi signature on the Request for Entry of Default and Application for Default Judgment.

5    Obviously, the name is not Paul Tokeshi. But the signatures are a spot-on match so much so that

6    the signatures used to apply for the California judgment allegedly in 2012 can be overlaid on the

7    signatures on the documents recorded in Maricopa County. **They are identical**.

8    142.    Though the California State Bar has an address for a Paul Tokeshi, it does not have a

9    telephone number or a fax number or an email address and no one has been able to actually locate

10   Paul Tokeshi. The only consistent handwritings are those on the default and default judgment

11   applications.

12   143.    In fact, the United States Census Bureau reports that there is no one now or who has

13   ever lived in the United States under the name Paul Tokeshi.  And to add to the insult, Wolf, Rifkin

14   partner/founding member Daniel C. Shapiro founded the firm the same year Tarzana Falls was built

15   and has a long friendship with Defendant and Ross Morgan founder, Brian Davidoff.  Go figure.

16   144.    Plaintiff met Brittany for the first time in October 2014. One month earlier, the

17   foreign State judgment had been perfected in Maricopa County. Documents from Los Angeles

18   counties database show that the judgment was certified in early 2014 so that it could be entered as a

19   foreign state judgment in Arizona that year.

20   145.    As Plaintiff said above, referring to the judgment application documents in

21   California, spaces are left blank to fill in handwritten numbers making up the total of the proposed

22   judgment. The printing of the numbers belongs to Brittany. The alleged signature of Judge Harris is

23   not a signature but rather a handprinted signature version. The hand printing belongs to Brittany.

24   146.    Moreover, Judge Harris has confirmed that he did not enter any judgment in any

25   such case and that in addition to the form of the proposed and entered judgment being prepared in

26   an unacceptable manner, he has never hand printed or had a clerk hand print his name on a

27   judgment ever in his entire career. He confirms that the entirety of the judgment is phony. Judge

28   Harris, who is now retired, is willing to testify and to provide declaration upon request.

**Plaintiff Discovers the Ross Morgan & Company/Property Management Companies**
**Connection**:

147.   With all of that said, here is what actually happened:

148.   In 2018, Plaintiff discovered the link between Brittany and the IT employees and the medical records storage facility while investigating an unrelated case where a connection to the storage facility had arisen. Having investigated the Russian organized crime situation in California in 2015 and having discovered the link in 2018 between the hospital IT department and storage facility and Russian and Armenian organized crime, Plaintiff revisited the Tarzana Falls situation from that perspective to find that the Tarzana Falls judgment and Brittany in fact had some link. Earlier this year, when the Tokeshi signature matched a series of signatures from Brittany, Plaintiff could be sure the matters were directly linked.

149.   There are conflicting possibilities as to why the judgment was fraudulently taken and then entered in Maricopa County but the most likely scenario is not what one might expect:

150.   In 2010, the State of Arizona commissioned a private accounting firm to conduct an audit of State government agencies that indicated significant corruption. The report released in or about 2011 provided evidence of the corruption and of Russian organized crime involvement in money laundering schemes where officials were being bribed in a manner that permitted the laundering to go on unfettered by State and local government agencies.

151.   The report included facts concerning the laundering activities of exactly the same modus operandi as is the currently going on by Brittany, her family and their associates. The report led to numerous arrests and convictions. Documents provided by investigators and experts prove the connection between Brittany and at least one family member to the participants in the Russian money laundering and corruption scheme.

152.   Though she was not charged in 2011, these events scared Brittany who decided she wanted out.

153.   From 2012 through 2013, Brittany broke from her family and greatly reduced her involvement in the criminal enterprises. Because of her relationship with the IT employees, she was aware that Plaintiff had been integrally involved in investigating the link between Russian

organized crime and redirected hospital records during 2011 through 2012. Searching for a more permanent way to avoid participating in criminal activity, Brittany believed that the prospect of dating and marrying Plaintiff (and with that, the prospect that Plaintiff might catch on to the criminal enterprise) would prevent anyone from requiring her involvement in the criminal schemes.

154. As insurance, Brittany had a backup plan. By setting up one her "extortion" schemes using a phony judgment, Brittany could steer Plaintiff into discovering at her whim and on her timetable evidence of the larger criminal fraud. By having a child with Plaintiff after getting married, she calculated that Plaintiff would not press charges against her but instead would do so against others.

155. And that is what she did. In or about late April 2018, Brittany could not back out of a certain series of criminal enterprises without dire consequences. So she began providing to Plaintiff evidence of the criminal schemes including the genesis of the Tarzana Falls phony judgment.

156. The Tarzana Falls action was filed after ignoring the Davis-Stirling prerequites. It was intended to prevent Plaintiff from discovering the money laundering operation. That lawsuit was filed in November 2011 and was never served. The proofs of service show invalid service on their face and contain phony and fraudulent signatures under the name of an actual registered process server. The phony proofs of service do not show service in Arizona.

157. When the deal was made with the purchaser of Plaintiff's unit in early June 2012 concerning any and all dues the HOA claimed were owed, apparently the legal action was supposed to be dismissed. Maybe it was; maybe it wasn't.

158. With the ability to remove documents from databases both in Arizona and in California, it appears the dismissal was removed and instead, it was substituted with the application for judgment which more than likely was prepared and reset into the database in early 2014, but showing a date of May 31, 2012—just before the ownership transfer of the property less than two weeks later.

159. On or about October 13, 2020, Plaintiff and Brittany first communicated.

160. On or about October 26, 2014, they had their first "date." On or about November 17, 2014, having researched Plaintiff, his family, and his previous relationships, including his relationship with his first wife, Melinda, with whom Plaintiff has a 19-year-old son, Brittany began planning to wed Plaintiff and to have a child with him. This was less than one month into their relationship and more than one month prior to the couple becoming engaged.

161. At that time, Brittany's desires to get married and have a child at a time were not known to Plaintiff. In fact, at no time has Brittany ever admitted to the fact that she planned on a wedding date of April 16, 2016 on November 17, 2014. However, on that date she prepared a small poster containing these anticipated dates and events.

162. In or about February 2015, the engaged couple decided to sell their respective residences and purchase a residence together in Gilbert Arizona. To that end, they went house hunting. In or about early April 2015, they agreed to purchase a residence to be custom built - Plaintiff's Meritage homes in the Gilbert complex known as The Bridges.

163. The Initial deposit of $400 to reserve the home site was paid for by Plaintiff. The couple agreed that they would pay a total of 20% down in order to secure the lowest possible interest rate without any private mortgage insurance. They further agreed that Brittany would pay approximately $25,000 and Plaintiff would pay approximately $35,000. In fact, Brittany paid approximately $27,000 and Plaintiff paid a total of $38,400.00 inclusive of the initial deposit.

164. However, when Plaintiff was in escrow with a buyer, he was informed by the title company of the California judgment perfected in Arizona in the amount of approximately $12,000.

165. Plaintiff was not concerned at the time about selling his residence because the amount of the judgment fell far below the protected homestead exemption. But Brittany did not want or intend for Plaintiff to be on title to the property, as she intended to use laundered money for her portion of the down payment.

166. To ensure Plaintiff could not sell his residence to obtain the down payment, Lammers was instructed to file a second lawsuit against Plaintiff alleging fraudulent conveyance for a transfer in 2014 of Plaintiff's Phoenix home from himself, individually, to his revocable living trust.

1     167.    This lawsuit constituted and abuse of process, in that transfers from individuals to

2    revocable living trusts do not constitute by express statutory terms, fraudulent transfers. In addition

3    to filing a second lawsuit, Lammers improperly recorded against Plaintiff's property a lis pendens

4    preventing Plaintiff from selling his property with clear title.

5     168.    That lawsuit ultimately was finally dismissed in March 2016 only after Plaintiff

6    threatened civil litigation against Lammers and his law firm.

7     169.    Plaintiff and defendant Brittany were married on April 13, 2016 in Antigua.

8    immediately upon returning home, Brittany demanded that the couple start trying to have a child.

9     170.    In or about September 2016, Brittany discovered that she was pregnant. However,

10    Brittany had not been taking her psychotropic medication since February 2016. Instead, she was

11    taking MDNA to control her antisocial behaviors and phentermine to control her weight and reduce

12    her bulimia.

13     171.    As a result of her drug taking, Brittany had a miscarriage. Although her OB GYN

14    records reflect this fact, Brittany failed to inform Plaintiff and still fails to discuss it with him

15     172.    Brittany became pregnant again on or about April 1, 2017.

16     173.    Again during the pregnancy, Brittany relied on MDNA and other drugs instead of

17    taking her psychotropic medication. To pay for the drugs, and to do so in such a way that her

18    mother would not detect it, Brittany purchased groceries using her debit card and then provided

19    some said groceries to her friends in exchange for cash.

20     174.    In early 2018, shortly after McKinley was born, Plaintiff decided to create an estate

21    plan in case anything should happen to Plaintiff or to Brittany. In doing so, he looked up the deed

22    Brittany had executed for their purchase of the Joshua tree Lane property. In doing so, he found

23    multiple deeds with Brittany's name on them. Many of these deeds showed her as being married to

24    various individuals.

25     175.    Additional research showed a plethora of irregularities in the deeds for her parents

26    and other family members.

27

28

176. Finally, Plaintiff's research showed that Brittany had signed deeds in other names and had notarized a plethora of deeds in other names. Most of the activity came between 2008 and 2012 but stretched from 2003 to that time.

177. Thereafter, in examining the properties which were the subject of the deeds, Plaintiff found numerous mortgage companies and escrow companies and title companies listed. A review of those companies with the Arizona Corporations Commission found that Brittany had prepared the paperwork and filed the documentation necessary to create said companies.

178. Having found all of these irregularities, Plaintiff attempted to discuss these findings with Brittany, however, Brittany refused comment.

179. By October 2018, Plaintiff had discovered Brittany's signature on hundreds of deeds, either as buyer or seller or notary or all three. He also found hundreds of corporations and limited liability companies involved either in home construction or residential finance created by Brittany, apparently for other individual.

180. Further, by October 2018, Plaintiff discovered that Brittany had lied about the extent of her personal and business relationships with certain individuals, including Eric Whittaker, a well-known pornographer and real estate investor. Even though Brittany had stated that Mr. Whitaker was an insurance agent, which he was not, and that she had broken off their social relationship in early 2015, in fact, Brittany had created at least four separate limited liability companies for Mr. Whittacker from December 2004 through 2008 and had continued to maintain the corporate and company books and records for those companies through to that date.

181. But that wasn't all. The manner in which she had set up the companies for Whitaker evidenced money laundering. Moreover, Brittany had set up similar schemes for friends and relatives.

182. At this time, Plaintiff Thaler had no idea that Brittany's involvement in organized crime and these criminal enterprises had anything to do with the 2010 / 2011 investigation, nor did he have any idea of her involvement in laundering money for drugs suppliers and dealers or for a massive insurance fraud operation or for public corruption and graft.

183.   In or about early November 2018, Thaler Discovered that Brittany had charged over $43,000 of household goods and services to two credit cards. Among the expenses between the credit cards and her Wells Fargo debit card were $800 per week in groceries, Target and Amazon charges. Brittany's apparent manic spending also included thousands of dollars in Starbucks gift card purchases and other related gift card purchases. Yet, their household did not show evidence of this volume of purchases.

184.   So Plaintiff confronted Brittany, but Brittany refused to have any rational explanation for her behavior. At that point, Plaintiff brought the credit card bills and ATM debit card charges to the attention of Dawna (Brittany's mother) one afternoon while Dawna was babysitting McKinley. Plaintiff asked Dawna if she knew why Brittany was manically spending money. Dawna reviewed the documents and then in an angry voice told Plaintiff that Brittany was her daughter and she would take care of the problem. Dawna then left the couples' residence and refused thereafter to have any conversation about the charges.

185.   What Dawna knew, but failed to mention, was that Brittany had stopped taking her psychotropic medication and that the manic spending was a side effect. Dawna also knew that the spending and the lack of goods being at the couples' residence meant Brittany was purchasing goods for others and then taking back the cash to purchase substitute medications such as phentermine and MDNA.

186.   Immediately thereafter, Dawna confronted Brittany with the financial documents. Dawna told Brittany that because of her conduct and the suspicions that were growing with Plaintiff, she would have to terminate the marriage. Dawna told Brittany that if she failed or refused to terminate the marriage, Dawna would cut off Brittany from her money and refuse any financial support from criminal charges or from any custody issues that would likely arise once Brittany's activities became known.

187.   Brittany, afraid she would lose her child and be penniless, agreed to her mother's demands.

188.    Thereafter, Dawna devised a plan intended to disrupt further investigation and to create scenarios where Plaintiff would not be believed even if he did discover their participation in the criminal enterprises.  The plan included the following actions:

a.    Stealing Plaintiff's credit and debit cards and stealing credit cards and debit cards belonging to Plaintiff's law office from Plaintiff's wallet and then providing them to others to use for in person sales, for ATM withdrawals, and for Internet purchases.

b.    In or about early April 2019, Dawna and Brittany placing a GPS device on Brittany's vehicle, but under an account in Plaintiff's name, in order to make a false claim of stalking.

c.    During 2019, Brittany purposefully misrepresented to Plaintiff the times she would be home to take care of McKinley and purposely made herself unavailable to take care of McKinley so as to increase the number of hours Plaintiff was required to take care of McKinley, hours where he could not service his clients.

d.    Also during 2019 taking items that Brittany knew Plaintiff required for business trips to Los Angeles and to Las Vegas and thereafter withholding them for several hours with the intent of causing Plaintiff to be late to attend meetings and court dates.

e.    Also during 2019, consistently hacking into Plaintiff's cell phone and into his business computers, and thereafter erasing files and moving files, with the intent of disrupting his office.  Said activities also included removing documents that Plaintiff was required to file by certain deadlines so that Plaintiff would miss the deadlines.

f.    On April 20, 2019, strategically cutting the right front tire of Plaintiff's rental automobile for the purpose of causing Plaintiff to have a severe incident, that at the very least would cause him to miss an important client meeting and thus lose the income from the same.

g.    Brewing iced tea and then placing pharmaceuticals and illicit narcotics in the same before serving it to Plaintiff for the purpose of trying to secure a positive blood test for the upcoming plan to take full custody of McKinley.

1    h.    On July 7, 2019, placing significant amounts of pharmaceuticals and illicit narcotics
2  in a thermos of brewed iced tea and then providing it to Plaintiff just as he was leaving by vehicle
3  to travel to California for a hearing involving the Tarzana falls litigation.

4    i.    In or about August 2019, moving defendant Cairo into Dawna's residence to prevent
5  Plaintiff from taking McKinley from Dawna's residence once Brittany and Dawna implemented
6  their plan to steal him, meanwhile preparing to move Brittany into Cairo's residence once the fake
7  sale of Brittany and Plaintiff's residence was completed.

8    j.    On October 7, 2019, the day Plaintiff intended to file a police report regarding the
9  stolen credit cards and debit cards, Brittany filed a fraudulent police report, wherein Brittany made
10  false claims that Plaintiff was acting "manic and erratic" during the early morning hours.

11    k.    In or about late November 2019, stealing Plaintiff's cell phone and having it
12  forensically mapped and cloned.

13    l.    Engaging in sexual acts with other men and women for money during the time of the
14  marriage and then ensuring that Plaintiff found evidence of the same just before stealing McKinley
15  on December 12, 2019.

16    m.    On December 12, 2019, obtaining by fraud, an order of protection, based on the
17  alleged manic and erratic behavior that never occurred.

18    n.    By that order, requiring Plaintiff to leave the residence with the additional purpose
19  in mind of removing a computer server used for money laundering, a drop box where cash collected
20  from drug sales was kept, and planting drug paraphernalia so that false claims of drug use against
21  Plaintiff could be made in the future, if necessary.

22    o.    Also by that order, stealing confidential client files and other related confidential
23  documents from the designated office section of the family residence and then using the same in
24  document disclosures and in briefs, all in violation of Arizona State Law.

25    p.    Stealing McKinley on December 12, 2019, his 2nd birthday, and then hiding behind
26  the phony order of protection to prevent Plaintiff from seeing his son that day.

27    q.    Failing and refusing thereafter, until December 21, 2019, to allow Plaintiff to see or
28  talk to McKinley.

1      r.       Having forensically mapped and cloned Plaintiff's cell phone, Brittany sending text

2 messages to herself, but making it appear to have come from Plaintiff's cell phone and thereafter

3 filing a plethora of fraudulent police reports claiming falsely that Plaintiff was violating the OOP

4 order.

5      s.       On December 25, 2019, allowing McKinley to visit with his father for Christmas,

6 but with the real intent of providing gifts from McKinley to his father that contained traces of CBD

7 oil, yet again to try to perfect a positive blood test, and thereafter gain sole custody of McKinley.

8      t.       Refusing Plaintiff any overnight visits with McKinley for approximately one month

9 and then attempting to limit plaintiffs time with McKinley to less than 25%.

10      u.       On February 20, 2020, committing perjury at the time of the child custody hearing

11 by making false claims that Plaintiff was being an uncooperative parent and by falsely stating that

12 Plaintiff was using illicit drugs.

13      v.       Also on February 20, 2020, Dawna committing perjury by falsely claiming that in

14 May 2019, she witnessed a drug transaction between Plaintiff and a friend.

15      w.       Also on February 20, 2020 at the time of the custody hearing, Dawna voluntarily

16 agreedto act as Facilitator of the 50/50 custody exchanges between the parties when in fact what

17 she intended to do, and did in fact do, was conspire with Brittany as set forth herein below to

18 prevent Plaintiff from being with his son.

19      x.       On or about February 21, 2020, Brittany, filed a fraudulent police report claiming

20 that she had discovered two glass pipes under Plaintiff's sink in the master bathroom.

21      y.       On or about April 3, 2020, falsely claiming that Plaintiff had travel on an airplane,

22 and therefore was required (which he was not required to do) to quarantine for 14 days, Brittany

23 withheld McKinley and refused to make exchanges in violation of the February 20, 2020 court

24 order.

25      z.       From February 20, 2020 to the present, failing and refusing to include Plaintiff in

26 any parenting decisions regarding education or medical care for their child, and in fact, despite a

27 50/50 custody order, failing and refusing to provide any information regarding the medical care

28

McKinley has received. Said failures also include failing to provide instructions for use of medications that have been prescribed by McKinley's pediatrician.

aa. In or about late April 2020, after Brittany violated the court's custody order, Dawna obtained under false pretenses, an order of protection so that the next time Brittany violated the order, Dawna would be able to hold McKinley at her house without Plaintiff being able to obtain him, all in violation of her agreement to act as facilitator.

bb. Preventing McKinley and Plaintiff from being together on Plaintiff's birthday, on Father's Day, and on the Jewish New Year (Rosh Hashanah).

cc. After failing to change the custody order on June 10, 2020, inventing false charges against Plaintiff, that Plaintiff was abusing McKinley in some unspecified manner, as a pretext for violating, yet again, the February 20, 2020 temporary child custody order.

dd. On September 19, 2020, refusing to make the exchange and thereafter, refusing to make any exchanges with Plaintiff in violation of the February 20, 2020 temporary child custody order.

ee. Filing on September 21, 2020, a brief stating falsely that the court appointed adviser agreed with Brittany that Plaintiff was unfit to parent McKinley and that Brittany was justified in refusing to make the September 19, 2020 exchange.

ff. On or about September 25, 2020, making false charges with the Gilbert Police Department that Plaintiff was in some manner, again unspecified, abusing McKinley as a way of justifying her violation of the Court's order.

gg. Thereafter, Donna failing and refusing to act as facilitator and instead, using the cloned phone of Plaintiff and a clone phone of Brittany, sending through Plaintiff's clone phone to Brittany's clone phone harassing messages and then reporting them as having come from Plaintiff, in order to have false charges filed against Plaintiff.

hh. From September 19, 2020 to the present, holding McKinley hostage under the demand that Plaintiff recant any and all statements he has made regarding the illegal activities that are set forth in this complaint, under the threat that he will never see his son again if he does not do so.

ii.     On December 12, 2020, failing and refusing any and all communications between Plaintiff and his son to wish his son a happy birthday, having refrained from permitting any communication since beginning of October 2020 and continuing to refuse to do so to this date.

jj.     Beginning in 2018 and continuing to the present, hiding assets including cash from Plaintiff, while running up significant credit card expenses and then trying to claim falsely that Plaintiff must reimburse her for 1/2 of said expenses.

189.   When all of the above failed to deter Plaintiff, Dawna and Brittany and Lawrence devised a scheme with law enforcement personnel employed by the City of Mesa including officer Jacob G. Roessler.

190.   The scheme included wherein using the cloned phones and the fraudulently obtained OOP orders to prevent Plaintiff from furthering his investigation or discovering the extent of the crimes and the individuals and institutions involved, and Defendants, and each of them, created a scheme against Plaintiff or otherwise conspired that that caused defendants, and each of them, to disrupt Thaler's law practice and his finances. violate multiple federal statutes and regulations including and especially Plaintiff's civil rights.

191.   As stated hereinabove, the multiple and pervasive violations of Plaintiff's federal civil rights are the subject of concurrent litigation in the Federal District Court, Central District of California.

### FIRST CAUSE OF ACTION

(Fraud/Fraudulent Concealment)

192.   Plaintiff realleges and incorporates herein by reference paragraphs 1 through 191 of his General Allegations as though fully set forth hereat.

193.   As alleged supra, in or about March 2014, Brittany created a scheme intended to extort money from Plaintiff by using an active but abandoned case filed in the Van Nuys court, limited jurisdiction section.

194.   Brittany then took the following actions: a) she created and then filed a phony set of Proofs of Service with phony server signatures appearing to be that of a licensed process server; b) she created and filed a phony Request for Entry of Default; c) she created and filed a phony

1  Request for Default Judgment and phony declaration of phantom attorney "Paul Tokeshi" to go

2  with it; and d) she created a phony "Judgment" with a phony block print signature of Judge Leland

3  Harris. Brittany also created a phony certification to go with the "Judgment."

4        195.    Thereafter, Brittany sent the phony documents to Tucson attorney Mark Lammers

5  with instructions for him to have the same entered as a foreign state judgment in Maricopa County

6  (Phoenix), Arizona.

7        196.    Plaintiff and Brittany got engaged in late December 2014. Shortly thereafter,

8  Brittany concocted a scheme that would assure for her money from the extortion scheme.

9        197.    The amended scheme would go as follows: Brittany would propose the couple sell

10  their homes and buy a home together. During the pendency of the sale of Plaintiff's home Brittany

11  would receive money from the fake judgment through the escrow process when title had to be

12  cleared for the sale. That way, Brittany could and would pay for her 50% share of the down

13  payment from Plaintiff's money.

14        198.    To that end, in or about February 2015, Brittany suggested to Plaintiff that they sell

15  their residences and purchase a home in Gilbert. In April 2015, the couple found a residence in the

16  Bridges Development in Gilbert, Arizona. Plaintiff paid the deposit of $400.00 with the new house

17  to be built over five months. The couple then placed their houses on the market.

18        199.    Shortly after accepting an offer and opening escrow, in July 2015, the title company

19  informed Plaintiff about the judgment which had been recorded against Plaintiff's property. But

20  before it became an issue, the buyer canceled the sale after failing to qualify for financing.

21        200.    No money for Brittany. So she instructed Lammers to obtain an order for judgment

22  debtor examination hoping that it would scare Plaintiff into offering to settle for a large portion of

23  the judgment. Brittany even instructed Lammers to serve Plaintiff at his Phoenix home where she

24  had been residing since late May 2015 when her property had been "sold."

25        201.    As is discussed infra, in fact Brittany's property never sold. Technically, it had

26  never been purchased. Rather, the townhome residence where Brittany lived and appeared as the

27  legal owner was one of the properties used to launder cash. The sale had been staged to appear

28

1    legitimate to prevent any suspicion by Plaintiff. It also provided Brittany the opportunity to move

2    into Plaintiff's home so that she would have access to his computer.

3        202.    By said access, Brittany intended to determine how much Plaintiff knew about

4    Tarzana Falls and her involvement in laundering money for Ross Morgan.

5        203.    In addition to extorting money from Plaintiff, Brittany also needed to launder cash

6    and intended to do so through the purchase of the couple's new home. By tying up Plaintiff's

7    Phoenix residence, Brittany intended to take sole legal ownership of the new residence so that the

8    "judgment" did not affect the new home.

9        204.    Further, Plaintiff providing a total of $38,400 in down payment. However, Brittany

10    falsely represented that because Plaintiff was not going on title due to the "judgment" issue, the

11    mortgage company told her that she had to account for said monies from Plaintiff as a "wedding

12    gift."

13        205.    So in addition to creating a fake judgment and concealing from Plaintiff that said

14    judgment was fake, Brittany lied to Plaintiff about the requirement that the funds he was providing

15    be accounted for as a "wedding gift."

16        206.    Brittany's concealment was intentional; Brittany's representations about the

17    "wedding gift" designation were false.

18        207.    Both the concealment and the false representations were intended to gain Plaintiff's

19    reliance on a set of facts that were not true all to Brittany's advantage.

20        208.    Plaintiff relied on the existence of the judgment not knowing that the same was fact

21    and invented by Brittany and he relied on her false representations regarding the "wedding gift" in

22    signing a gift letter for the mortgage company that stated said funds were a wedding gift.

23        209.    Plaintiff's reliance was reasonable in that he and Brittany were engaged to be

24    married and had no reason to believe that she would lie to him.

25        210.    Had Plaintiff known the true facts he would not have entered into any house

26    purchase and certainly would not have permitted Brittany to place the home only in her name on

27    the title and would not have executed a "gift letter" Brittany prepared defining Plaintiff's

28    contribution to the down payment as a "wedding gift."

211. Plaintiff did not discover the concealment of the true facts and did not discover that Brittany had lied about the alleged need for a gift letter until January 2020 shortly after Brittany filed for dissolution of marriage against Plaintiff and in doing so, claimed falsely that she was the sole owner of the property and that the down payment provided by Plaintiff was a "gift."

212. As a result of the fraudulent concealment and fraud committed by Brittany, Plaintiff has been damaged in the sum of $38,400.

213. As a further proximate result of Brittany's conduct, Plaintiff has suffered upset including, headache, stomach and general malaise all to his general damage in an amount according to proof at time of trial.

214. Brittany's actions in creating a fake judgment to extort monies from Plaintiff and then carrying out said plan, and then lying to Plaintiff that his contribution to the down payment had to be designated as a "wedding gift" in order to obtain the home loan were wanton and malicious and despicable conduct and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of exemplary and punitive damages in an amount to be determined at time of trial.

## SECOND CAUSE OF ACTION

(Abuse of Process)

215. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 191 of his General Allegations and paragraphs 193 through 211 of his First Cause of Action as though fully set forth hereat.

216. Brittany's acts in creating a fake judgment that she then had entered as a "foreign state judgment" in Maricopa County, Arizona constitute an abuse of process in that Brittany, by and through Mark Lammers, used process as said process is intended but abused the same by doing so in an attempt to extort money from Plaintiff.

217. Then it got worse. Plaintiff chose to fight the entry of the judgment in Arizona in December 2016. When Plaintiff discovered that the Arizona Homestead Act protected him from the "judgment," Brittany instructed Lammers to file a lawsuit claiming falsely that Plaintiff's

transfer of his Phoenix residence to a revocable living trust in September 2014 constituted a fraudulent conveyance.

218. In fact, under Arizona law, a transfer to a revocable living trust is never a fraudulent conveyance.

219. Nonetheless, the complaint was filed and served and an improper lis pendens was recorded on the property thus rendering it unmarketable.

220. Said lis pendens was expunged by Lammers in late March 2016 after Plaintiff threatened to sue Lammers and his law firm.

221. Plaintiff discovered that Brittany was behind the lawsuit and lis pendens and that the same were part of a scheme to defraud Plaintiff in January 2020 during the pendency of a dissolution of marriage filed by Brittany as set forth supra.

222. Brittany's acts in authorizing a frivolous lawsuit constitute an abuse of process in that Brittany, by and through Mark Lammers, used process as said process is intended but abused the same by doing so in an attempt to extort money from Plaintiff.

223. As a proximate result of Brittany's actions, Plaintiff was delayed for nearly nine months in selling his home. From September 2015 through April 2016, Plaintiff had to pay for two homes. The costs of continuing to pay for the Phoenix home exceed $25,000 in an amount according to proof at time of trial.

224. As a further proximate result of Brittany's actions, Plaintiff has suffered upset including, headache, stomach and general malaise all to his general damage in an amount according to proof at time of trial.

225. Brittany's actions in abusing process by creating a fake judgment to extort monies from Plaintiff and then filing and serving a frivolous lawsuit carrying out said extortion plan were wanton and malicious and despicable conduct and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of exemplary and punitive damages in an amount to be determined at time of trial.

//

//

## THIRD CAUSE OF ACTION

### (Malicious Prosecution)

226.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 191 of his General Allegations, paragraphs 193 through 211 of his First Cause of Action, and paragraphs 216 through 222 of his Second Cause of Action as though fully set forth hereat.

227.    The filing of the complaint in December 2015 was frivolous and its service intended to extort monies from Plaintiff.

228.    Thus, the filing and service constitutes malicious prosecution.

229.    As a proximate result of Brittany's actions, Plaintiff was delayed for nearly nine months in selling his home. From September 2015 through April 2016, Plaintiff had to pay for two homes. The costs of continuing to pay for the Phoenix home exceed $25,000 in an amount according to proof at time of trial.

230.    As a further proximate result of Brittany's actions, Plaintiff has suffered upset including, headache, stomach and general malaise all to his general damage in an amount according to proof at time of trial.

231.    Brittany's actions in filing and serving a frivolous lawsuit carrying out said extortion plan were wanton and malicious and despicable conduct and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of exemplary and punitive damages in an amount to be determined at time of trial.

### FOURTH CAUSE OF ACTION

### (Intentional Infliction of Emotional Distress)

232.    Plaintiff realleges and incorporates herein by reference paragraphs 1 through 191 of his General Allegations, paragraphs 193 through 211 of his First Cause of Action, and paragraphs 216 through 222 of his Second Cause of Action as though fully set forth hereat.

233.    The acts as alleged herein constitute outrageous conduct.

234.    Said conduct was intended to cause Plaintiff severe emotional distress and designed to do so in order to perfect the extortion scheme and then to steal from Plaintiff the monies he provided as 55% of the 20% down payment for the new residence in Gilbert, Arizona.

235. And in fact Plaintiff suffered severe emotional distress which included headache, stomach and general malaise all to his general damage in an amount according to proof at time of trial.

236. Further, Plaintiff was required to take action at great time and expense, including legal action, to prevent further distress in an amount according to proof at time of trial;

237. Brittany's actions in committing such outrageous conduct intended to cause severe emotional distress and causing said distress were wanton and malicious and despicable conduct and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of exemplary and punitive damages in an amount to be determined at time of trial.

## FIFTH CAUSE OF ACTION

### (Trespass to Chattels)

238. Plaintiff realleges and incorporates herein by reference paragraphs 1 through 191 of his General Allegations, paragraphs 193 through 211 of his First Cause of Action, paragraphs 216 through 222 of his Second Cause of Action, and paragraphs 233 through 235 of his Fourth Cause of Action as though fully set forth hereat.

239. Beginning in or about February 2016, Brittany attempted to cover her tracks by hacking into Plaintiff's business/law office computers and erasing files concerning Tarzana Falls.

240. But it did not stop there. With her extortion plan failing, Brittany not only destroyed files, she did so by planting or having others plant into Plaintiff's business/law office computers a crypto-virus. Such viruses traditionally are used to lock up files and then to seek a ransom for the "key" that unlocks the files.

241. Though Plaintiff was able to save many files from the virus, he was not able to save several thousand files including many Word documents in client files. However, he did save the Tarzana Falls files which had been separately backed up.

242. When Plaintiff received the ransom notice, he ignored the same.

243. At that time, Plaintiff had no idea that Brittany was responsible for setting off the virus or blackmailing him.

244.     The second attempt to destroy files came in September 2017 when Brittany hacked into four separate computers belonging to Plaintiff and his businesses/Law Office. Only two of the computers were using the Internet. The same occurred when Plaintiff was in Los Angeles on a court case concerning Tarzana Falls.

245.     Plaintiff returned later that night. When he turned on the computers, he found more than 110,000 files in total over all four computers had been moved to the Recycle Bins of each computer. Had the automatic deletion of the Recycle Bin been active, all of said files would have been erased permanently.

246.     During 2018-2019, Brittany constantly hacked into Plaintiff's computers erasing files and placing viruses in them all in an attempt to erase Tarzana Falls files and evidence.

247.     Said hacks and viruses damaged work in progress for clients.

248.     In addition, Brittany removed client documents, evidence and files including those of Tarzana Falls and Tarzana Falls related cases thus nearly completely disrupting Plaintiff's law practice.

249.     Said actions set forth above constitute trespass to chattels.

250.     As a result of said trespasses, Plaintiff suffered severe damage to his income especially during 2019 in amount according to proof but believed to be more than $100,000.00.

251.     Brittany's actions in setting off viruses and destroying files and knowingly disrupting Plaintiff's law practice to cover up her criminal wrongdoing were wanton and malicious and despicable conduct and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of exemplary and punitive damages in an amount to be determined at time of trial.

## SIXTH CAUSE OF ACTION

### (Battery)

252.     Plaintiff realleges and incorporates herein by reference paragraphs 1 through 191 of his General Allegations, paragraphs 193 through 211 of his First Cause of Action, paragraphs 216 through 222 of his Second Cause of Action, paragraphs 233 through 234 of his Fourth Cause of Action, and paragraphs 239 through 249 of his Fifth Cause of Action as though fully set forth hereat.

253. On the evening of April 20, 2019, Plaintiff intended to travel to Los Angeles from Gilbert, Arizona for a meeting with the FBI regarding a property fraud case.

254. However, Brittany, who was growing overly paranoid about Plaintiff's discoveries of her criminal behavior and her behaviors directed at him, believed that the subject of the meeting was her and the real estate frauds used to launder money.

255. Prior to Plaintiff leaving their residence, Brittany had another party make a strategic cut into the right front tire of vehicle Plaintiff had rented for the trip. The cut was designed to cause catastrophic failure at high speeds and especially during turns to the left.

256. Plaintiff discovered a problem with the tire shortly before reaching Quartzsite, Arizona. In Quartzsite, Plaintiff stopped the vehicle and examined the tire. He found the cut and had to replace the tire with a temporary spare and then return to the Phoenix area traveling at 45 mph on Interstate 10 for 148 miles on a temp tire intended to go no more than 50 miles in distance.

257. Had Plaintiff driven past Quartzsite toward Blythe, California, the tire would have failed while the car traveled at 75 mph going downhill toward the California border likely causing the right front rim to dig into the pavement and thus causing the car to tumble end over end diagonally, most likely killing Plaintiff.

258. Brittany's actions constitute actionable battery in that Brittany caused damage or ordered others to damage the vehicle she knew Plaintiff would be and was driving to Los Angeles.

259. By causing the damage, Plaintiff was unable to have the intended meeting.

260. Then, on July 7, 2019, Plaintiff was traveling to Loa Angeles for a court hearing in Van Nuys, California on a matter concerning Tarzana Falls.

261. Once again panicking over Plaintiff discovering her involvement in the Tarzana Falls legal debacle, Brittany gave to Plaintiff a beverage of iced tea that she had brewed for him. The beverage contained the same chemical compounds Brittany had provided to Jeffrey Phillips in 2015.

262. Plaintiff is further informed and believes that Brittany had another party tamper with the brakes of Plaintiff's vehicle such that the stopping distance and efficacy of the braking system was compromised.

263. During the course of the drive, Plaintiff drank a small portion of the iced tea thus ingesting the chemicals. Within fifteen minutes, Plaintiff realized something was wrong with his health and immediately contacted a friend who contacted several doctors.

264. Plaintiff then stopped at Chiriaco Summit in California while remaining on the phone with doctors to determine whether he needed immediate medical attention.

265. As Plaintiff had only ingested a small amount of the beverage and as his condition was improving, after several hours, he was able to drive further into California where medical assistance could be sought if needed.

266. However, Plaintiff was unaware that the brakes had been adjusted. In Santa Anita, when a vehicle stopped quickly in front of Plaintiff's car, he was unable to stop in time resulting in a collision between his vehicle and the vehicle in front of him.

267. The actions of Brittany in poisoning the iced tea and in having the brakes tampered with thus causing a collision all to prevent Plaintiff from attending the hearing constitute additional batteries.

268. The April 20, 2019 actions caused specific damages in an amount according to proof at time of trial.

269. The July 7, 2019 actions caused specific damages to Plaintiff's person and to his vehicle in an amount according to proof at time of trial.

270. All of the above caused severe damage to his income especially during 2019 in amount according to proof but believed to be more than $100,000.00.

271. As a further proximate result of Brittany's actions, Plaintiff has suffered upset including, headache, stomach and general malaise all to his general damage in an amount according to proof at time of trial.

272. Brittany's actions to cover up her criminal wrongdoing were wanton and malicious and despicable conduct and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of exemplary and punitive damages in an amount to be determined at time of trial.

//

//

**WHEREFORE, PLAINTIFF PRAYS FOR DAMAGES AND RELIEF AS FOLLOWS:**

### FIRST CAUSE OF ACTION

1. For specific damages in an amount according to proof;

2. For general damages in an amount according to proof;

3. For punitive and exemplary damages in an amount to be determined at time of trial;

### SECOND CAUSE OF ACTION

4. For specific damages in an amount according to proof;

5. For general damages in an amount according to proof;

6. For punitive and exemplary damages in an amount to be determined at time of trial;

### THIRD CAUSE OF ACTION

7. For specific damages in an amount according to proof;

8. For general damages in an amount according to proof;

9. For punitive and exemplary damages in an amount to be determined at time of trial;

### FOURTH CAUSE OF ACTION

10. For specific damages in an amount according to proof;

11. For general damages in an amount according to proof;

12. For punitive and exemplary damages in an amount to be determined at time of trial;

### FIFTH CAUSE OF ACTION

13. For specific damages in an amount according to proof;

14. For general damages in an amount according to proof;

15. For punitive and exemplary damages in an amount to be determined at time of trial;

### SIXTH CAUSE OF ACTION

16. For specific damages in an amount according to proof;

17. For general damages in an amount according to proof;

18. For punitive and exemplary damages in an amount to be determined at time of trial;

### ALL CAUSES OF ACTION

19. For costs of suit incurred herein;

20. For prejudgment interest at the legal rate;

1     21. For reasonable attorney's fees and costs;

2     22. For such other and further relief as the court may deem just and proper.

5   Date: February 28, 2021                 HARRIS/THALER LAW



By:_____

          JOHN H. THALER, In Pro Per

**VERIFICATION**

I, John H. Thaler, do declare:

1. That the content of this Complaint is true and correct;
2. That I have personal knowledge of all facts alleged herein except for those facts stated on information and belief;
3. As to those facts stated on information and belief, I have a reasonably basis for said belief;
4. If called as a witness, I could and would testify competently to the facts and allegations set forth in this Complaint.

I declare under penalty of perjury that the foregoing is true and correct.

Date: March 1, 2021, at Las Vegas, Nevada



_____
JOHN H. THALER

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT O

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
### Civil Division
Northwest District, Van Nuys Courthouse East, Department A

Judge: Honorable Huey P. Cotton       CSR: None
Judicial Assistant: R. Redmond         ERM: None
Courtroom Assistant: A. Ataryan       Deputy Sheriff: None

APPEARANCES:

For Plaintiff(s): John Thaler Via LaCourtConnect

For Defendant(s): Brittany Rae Chavez Via LaCourtConnect

**NATURE OF PROCEEDINGS:** Hearing on Motion to Dismiss; Case Management Conference

The matter is called for hearing.

The court has read and considered the moving papers, opposition, reply and supporting documents.

All parties are in receipt of the Court's tentative ruling.

The matter is argued.

After argument the Court adopts its tentative ruling as the Order of the Court.

The Defendant's Motion to Dismiss filed by Brittany Rae Chavez on 06/10/2021 is Granted.

MOTION TO DISMISS (MOTION TO QUASH SERVICE OF SUMMONS)

Date of Hearing: September 1, 2021 Trial Date:
Department: A Case No.: 21VECV00280

Moving Party: Defendant
Responding Party: Plaintiff

TENTATIVE RULING: THE MOTION IS GRANTED.

BACKGROUND

Plaintiff weaves an intricate tale starting at the birth of defendant and detailing her and her family's alleged involvement in criminal enterprises and immoral or immodest activities.

---

**21VECV00280**                                    September 1, 2021
**JOHN H THALER vs BRITTANY RAE CHAVEZ**                        8:30 AM

Judge: Honorable Huey P. Cotton          CSR: None
Judicial Assistant: R. Redmond           ERM: None
Courtroom Assistant: A. Ataryan          Deputy Sheriff: None

Primarily the activities involve money laundering and fraud. There are accusations of falsifying court documents including those involving a child custody action between plaintiff and defendant. He also details romantic relationships of defendant. Plaintiff and defendant have been romantically involved and have a child in common.

Plaintiff alleges that in March 2014 defendant concocted a scheme to extort money from defendant. She created and filed phony proofs of service in an "active but abandoned case file" in a limited jurisdiction case venued in Van Nuys East. She allegedly filed phony Requests for Default and a Request for default judgment based on a declaration from a "phantom attorney" Paul Tokeshi. She allegedly then created a phony judgment with a phony block print signature of Judge Harris. Thereafter she sent the documents to an AZ attorney and used them to obtain a sister state judgment.

Plaintiff and defendant became engaged in December 2014. According to plaintiff, in February 2015, defendant suggested the couple sell their respective houses and purchase a home together in Gilbert, AZ. Plaintiff paid a deposit on a new home and put his house up for sale.

After plaintiff accepted an offer on his house and opened escrow, the title company informed plaintiff about a judgment recorded against his property. The buyer backed out of the deal for reasons unrelated to judgment. Ultimately the judgment delayed selling the house for 9 months. Plaintiff alleges that Chavez then instructed her attorney to schedule a judgment debtor exam hoping to scare plaintiff into a settlement.

Plaintiff also alleges that the purpose of the phony judgment, in addition to extorting money was to launder cash through the purchase of the new home and keep plaintiff off the title to the new property due to the judgment.

Plaintiff contributed $38,400 to the down payment on the property. Defendant told him falsely that the lender needed it to be categorized a "wedding gift" so he provided a gift letter. Apparently, they were eventually married and plaintiff did not discover the falsehoods until defendant filed for dissolution and claimed she was the sole owner of the property.

When plaintiff attempted to fight the sister state judgment in Az Court, defendant instructed her attorney to file a lawsuit falsely claiming he had transferred his property into a revocable living trust as a fraudulent transfer. She had her attorney record an unwarranted lis pendens against the property. Under Az law, a transfer to a revocable trust cannot be the basis for a fraudulent conveyance.
Plaintiff also alleges defendant hacked into his business and law office computer and erased files

**21VECV00280**                                          September 1, 2021
**JOHN H THALER vs BRITTANY RAE CHAVEZ**                    8:30 AM

| | |
|---|---|
| Judge: Honorable Huey P. Cotton | CSR: None |
| Judicial Assistant: R. Redmond | ERM: None |
| Courtroom Assistant: A. Ataryan | Deputy Sheriff: None |

having to do with Tarzana Falls to cover up her involvement in the embezzlement scheme with Ross Morgan. She also introduced a virus into the computer.

Defendant hired someone to strategically slash his tire when he was driving between Phoenix and Los Angeles. He discovered the problem in Quartzsite, AZ but had he continued he may have been in a serious accident. She attempted to poison him with ice tea laced with chemicals. She tampered with his breaks causing him to be involved in a serious accident.

Plaintiff filed his complaint on March 3, 2021, alleging:
1. Fraud/Fraudulent Concealment
2. Abuse of Process
3. Malicious Prosecution
4. Intentional Infliction of Emotional Distress
5. Trespass to Chattels
6. Battery

Defendant filed a motion to dismiss for lack of personal jurisdiction. She alleges she is a resident of Arizona, she was born and raised there, she has never lived outside of Arizona, and has never owned property in California. She states she has never purposefully availed herself of the privilege of conducting activity in California.

DISCUSSION

Defendant is a pro per litigant and has mislabeled her motion. She has styled her motion a motion to dismiss but actually seeks to quash service of summons based on lack of personal jurisdiction. She cites the correct statute that sets forth the jurisdictional limitations of California and analyzes the issue as if she had made a motion to quash. This court will overlook this procedurally misstep and treat the motion as a motion to quash.

CCP § 410.10 provides that a California court may exercise jurisdiction over non-resident defendants on any basis not inconsistent with the California or United States Constitutions. "When a motion to quash is properly brought, the burden of proof is placed upon the plaintiff to establish the facts of jurisdiction by a preponderance of the evidence. (Citation omitted.) This may be done through presentation of declarations, with opposing declarations received in response. " '[W]here there is a conflict in the declarations, resolution of the conflict by the trial court will not be disturbed on appeal if the determination of that court is supported by substantial evidence. [Citations.]' [Citation.]" (Ibid.)" Aquila, Inc. v. Superior Court (2007) 148 Cal. App. 4th 556, 568.

**21VECV00280**                                                    September 1, 2021
**JOHN H THALER vs BRITTANY RAE CHAVEZ**                            8:30 AM

Judge: Honorable Huey P. Cotton          CSR: None
Judicial Assistant: R. Redmond           ERM: None
Courtroom Assistant: A. Ataryan          Deputy Sheriff: None

Personal Jurisdiction – Minimum Contacts

In order to obtain personal jurisdiction over non-California residents, the plaintiff must show minimum contacts with the state so that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. Washington (1945) 326 U.S. 310, 316.

"The concept of minimum contacts embraces two types of jurisdiction-general and specific. General jurisdiction results where the defendant's contacts with the forum state are so 'systematic and so continuous as to make it consistent with traditional notions of fair play and substantial justice to subject the defendant to the jurisdiction of the forum, even where the cause of action is unrelated to the contacts.' [Citations.] Specific jurisdiction results when the defendant's contacts with the forum state, though not enough to subject the defendant to the general jurisdiction of the forum, are sufficient to subject the defendant to suit in the forum on a cause of action related to or arising out of those contacts. [Citations.] Specific jurisdiction exists if: (1) the defendant has purposefully availed itself of forum benefits with respect to the matter in controversy; (2) the controversy is related to or arises out of the defendant's contacts with the forum; and (3) the assertion of jurisdiction would comport with fair play and substantial justice." (Citation omitted.)

In analyzing the exercise of specific jurisdiction under these criteria, courts must additionally evaluate "the burden on the defendant of appearing in the forum, the forum state's interest in adjudicating the claim, the plaintiff's interest in convenient and effective relief within the forum, judicial economy, and 'the "shared interest of the several States in furthering fundamental substantive social policies." ' [Citation.]" (Vons, supra, 14 Cal.4th 434, 447–448.)

The trial court's ruling appropriately recognized that in deciding the motion to quash before it, plaintiffs had "the initial burden of demonstrating facts … justifying the exercise of jurisdiction. [Citation.]" The court also stated that once plaintiffs make such a showing of minimum contacts with the forum state, "the burden shifts to the defendant to present a compelling case demonstrating that the exercise of jurisdiction by our courts would be unreasonable," citing Automobile Antitrust, supra, 135 Cal.App.4th 100. The merits of the complaint are not yet at issue in that inquiry. (Citation omitted.)
Aquila, Inc., supra, 148 Cal. App. 4th at 568-70.

Defendant has properly challenged jurisdiction explaining that Defendant has never lived in the state of California or conducted business there. Defendant holds an Arizona driver's license and is registered to vote in Arizona. She has never owned property in California and lives exclusively

**21VECV00280**                                          September 1, 2021
**JOHN H THALER vs BRITTANY RAE CHAVEZ**                       8:30 AM

Judge: Honorable Huey P. Cotton          CSR: None
Judicial Assistant: R. Redmond           ERM: None
Courtroom Assistant: A. Ataryan          Deputy Sheriff: None

---

in Arizona. Plaintiff's own complaint confirms that the parties resided in Arizona and their dissolution action was filed in Arizona.

Plaintiff has the burden to show jurisdiction is proper. In response plaintiff submits a 50 paragraph declaration and numerous exhibits. His primary point is that defendant carries out a criminal enterprise in California including the scheme to have a phony judgment entered against him. Plaintiff offers as Exhibit A what appears to be an expert report submitted or prepared for a family law case performing handwriting analysis of documents and pleadings. The report is hearsay and no declaration is offered by the expert in this matter.

Exhibit B and C are documents that are potentially relevant to specific jurisdiction. In Exhibit B, plaintiff provides a copy of the request for default and invites the court to compare signatures of the attorney Tokeshi's signature with the signature of a Michele Thorne and conclude they were made by the person and that this person is defendant. This court is not a handwriting expert. To the naked eye there are some similarities in the signatures but no resemblance to the known signatures of defendants. The court can draw no conclusions from these documents that defendant signed the request for judgment at issue.

Exhibit C is the purported judgment in the case. Plaintiff states Judge Harris told an Arizona Judge that the signature is not his. This is hearsay. Plaintiff also states that the handwritten portions of the judgment are defendant's writing. He fails to lay a foundation and explain where he obtained the judgment. Plaintiff fails to provide evidence from which the court can conclude specific jurisdiction exists.

The remining exhibits appear to be offered to show defendant's involvement in various types of fraud. Most of the so-called fraud appears Arizona based. But more importantly, other than signatures the court is supposed to conclude belong to defendant, there is nothing connecting the documents definitively to defendant. Plaintiff makes a number of unsupported statements implying the defendant is being investigated or about to be indicted but does not support these claims with evidence.

Notably, plaintiff admits he was an Arizona Resident at the time of the events in the complaint. The alleged sister state judgment put a lien on Arizona property. The incidents of alleged battery and trespass to chattel occurred in Arizona. Defendant is a resident of Arizona. This court cannot exercise jurisdiction over the matter and even if it could, California would seem to be an inconvenient forum given the witnesses and documents appear to be primarily Arizona based.

Order to Show Cause Re: Dismissal is scheduled for 12/02/2021 at 08:30 AM in Department A

**21VECV00280**  
**JOHN H THALER vs BRITTANY RAE CHAVEZ**

September 1, 2021  
8:30 AM

Judge: Honorable Huey P. Cotton  
Judicial Assistant: R. Redmond  
Courtroom Assistant: A. Ataryan

CSR: None  
ERM: None  
Deputy Sheriff: None

at Van Nuys Courthouse East.

Certificate of Mailing is attached.

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT P

1

**John H. Thaler, SBN 150290**
c/o HARRIS/THALER LAW

2

18034 Ventura Boulevard, #289
Encino, CA 91316

3

Tel. 818-206-4402
jhtlaw@msn.com

4

5

**John Stanley, SBN 2020723**
John J. Stanley & Associates

6

Lankershim Blvd Suite 850
North Hollywood, CA 91601

7

818-769-5200
js@johnstanleylaw.com

8

FEDERAL DISTRICT COURT

9

CENTRAL DISTRICT OF CALIFORNIA

10

11

JOHN H. THALER, an individual,

CASE NO.

12

Plaintiffs,

**COMPLAINT FOR DAMAGES AND
FOR INJUNCTIVE RELIEF:**

13

v.

14

BRITTANY RAE THALER, an
individual, DAWNA RAE CHAVEZ, an

**1. VIOLATIONS OF 42 U.S.C.
§1983**

15

16

individual, LAWRENCE CAIRO, an
individual, JOHN RICHARD CHAVEZ,

**2. VIOLATIONS OF 42 U.S.C.
§1997**

17

an individual, SHAUNA MAJOR, an
individual, JASON LAFLESCH, an

18

individual, BARBARA KIFFMEYER,
an individual, GREG DAVIS, an

**3. CONSPIRACY TO VIOLATE
18 U.S.C. §241**

19

individual, ERICA GADBERRY, an

**4. CONSPIRACY TO VIOLATE
18 U.S.C. §242**

20

individual, MADISON HUGHES, an
individual, MARVIN J. DAVIS, an

21

individual, JACOB G. ROESSLER, an

**5. VIOLATION OF 42 U.S.C.
§14141**

22

individual, CHRISTOPHER FALBO,
an individual. NICOLETTA FALBO, an

23

individual, BRIAN BULLOCK, an

**6. VIOLATIONS OF
SUBSTANTIVE DUE PROCESS**

24

individual, MARK LAMMERS, an
individual, DAVID FERER, an

25

individual, CHRIS WAKEFIELD, an

**7. VIOLATIONS OF
PROCEDUREAL DUE PROCESS**

26

individual, COUNTY OF MARICOPA,
a County in the State of Arizona, CITY

27

OF PHOENIX, a chartered city in the

**8. VIOLATION OF EQUAL
PROTECTION**

28

County of Maricopa, State of Arizona, **CITY OF MESA, a chartered city in the County of Maricopa, State of Arizona, TOWN OF GILBERT, a chartered city in the County of Maricopa, State of Arizona, JETCLOSINGS, INC., a Corporation in the State of Washington, and DOES 1 through 150, inclusive, Defendants.**

**9.  CONVERSION**

**10.  CONSPIRACY TO DEFRAUD;**

**11.  INVASION OF PRIVACY;**

**12.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS;**

**13.  INTERFERENCE WITH BUSINESS;**

**14. ABUSE OF PROCESS.**

## **GENERAL ALLEGATIONS**

COMES NOW PLAINTIFF WHO ALLEGES THE FOLLOWING:

### **Parties**

1.     At all relevant times mentioned herein, Plaintiff John Harris Thaler was and is a resident of the State of Arizona and a resident of the State of California with a law practice based in the State of California.

2.     At all relevant times mentioned herein, Defendant Brittany Chavez a.k.a. Brittany Rae Chavez a.k.a. Brittany Thaler a.k.a. Brittany Phillips a.k.a. Brittany Harris a.k.a. Brittany Miller a.k.a. Bianca Chavez a.k.a. Brittany Johnson aka Brittany Leonard and other aliases ("Brittany")

1    was and is a resident of the County of Maricopa, City of Mesa, Arizona. Brittany currently

2    remains the spouse of Plaintiff. A dissolution of marriage/annulment is pending.

3    3.    At all relevant times mentioned herein, Defendant Dawna Chavez a.k.a. Dawna Chavez, aka

4    Dawna Marie Chavez, aka Dawna M. Chavez a.k.a. Dawn Chavez a.k.a. Daniel Chavez

5    ("Dawna") was and is a resident of the county of Maricopa, City of Mesa, Arizona.

6    4.    At all relevant times mentioned herein, Defendant John Chavez was and is a resident of the

7    County of Maricopa, City of Gilbert, Arizona

8    5.    At all relevant times mentioned herein, Defendant Jacob G. Roessler was and is a resident

9    of Maricopa County, Arizona and is employed as a police officer with the City of Mesa Police

10   Department.

11   6.    At all relevant times mentioned herein, Defendant Brian Bullock was and is a resident of

12   Maricopa County, Arizona and is employed as a police officer with the Town of Gilbert Police

13   Department.

14   7.    At all relevant times mentioned herein, Defendant David Ferer was and is a resident of

15   Maricopa County, Arizona and is employed as a police officer with the Town of Gilbert Police

16   Department

17   8.    At all relevant times mentioned herein, Defendant Chris Wakefield was and is a resident of

18   Maricopa County, Arizona and is employed as a police officer with the Town of Gilbert Police

19   Department

20   9.    At all relevant times mentioned herein, Defendant Lawrence Cairo was and is a resident of

21   the County of Maricopa, City of Mesa, Arizona.

22   10.    At all relevant times mentioned herein, Defendant Christopher Falbo was and is a resident

23   of the County of Maricopa, City of Gilbert, Arizona.

24   11.    At all relevant times mentioned herein, Defendant Nicoletta Falbo was and is a resident of

25   the County of Maricopa, City of Gilbert, Arizona.

26

27

28

12.     At all relevant times mentioned herein, Defendant Jason LaFlesch was and is a resident of the County of Maricopa and is licensed as a real estate agent with the Arizona Department of Real Estate.

13.     At all relevant times mentioned herein, Defendant Gregory R. Davis was and is a resident of the City of Gilbert, Maricopa County, Arizona and is an attorney licensed in the State of Arizona.

14.     At all relevant times mentioned herein, Defendant Erica Gadberry was and is a resident of Maricopa County, Arizona and is an attorney licensed in the State of Arizona.

15.     At all relevant times mentioned herein, Defendant Shauna Major was and is a resident of Arlington, Texas.

16.     At all relevant times mentioned herein, City of Mesa is a city Incorporated within the State of Arizona.

17.     At all relevant times mentioned herein, Town of Gilbert is a city incorporated in the State of Arizona.

18.     At all relevant times mentioned herein, City of Phoenix is a city incorporated in the State of Arizona.

19.     At all relevant times mentioned herein, Maricopa County is a recognized county in the State of Arizona.

20.     At all relevant times mentioned herein, Barbara Kiffmeyer is a licensed social worker (LMSW) operating as a Court Appointed Advisor for the County of Maricopa Superior Court system.

21.     At all relevant times mentioned herein, Madison Hughes was and is a resident of the County of Maricopa and is employed as a Judge's Assistant to Judge Marvin L. Davis in the Maricopa County Superior Court.

22.     At all relevant times mentioned herein, Marvin L. Davis was and is a resident of Maricopa County, Arizona and is a Judge of the Maricopa County Superior Court.

23.     At all relevant times mentioned herein, JetClosings, Inc. was and is a corporation in the State of Washington doing business in Arizona and in multiple other states.

24.    At all relevant times mentioned herein, Shauna Major was and is a resident of Arlington, Texas.

25.    At all relevant times mentioned herein, DOES 1 through 10 are residents of the State of Arizona and employees of the State of Arizona whom Plaintiff is not able at this time to identify by name. At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

26.    At all relevant times mentioned herein, DOES 11 through 20 are residents of the State of Arizona and employees of the State of Arizona whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

27.    At all relevant times mentioned herein, DOES 21 through 30 are residents of the State of Arizona and employees of the County of Maricopa whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

28.    At all relevant times mentioned herein, DOES 31 through 40 are residents of the State of Arizona and employees of the City of Mesa whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

29.    At all relevant times mentioned herein, DOES 41 through 50 are residents of the State of Arizona and employees of the City of Gilbert whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

30.    At all relevant times mentioned herein, DOES 51 through 60 are residents of the State of Arizona and employees of the City of Phoenix whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

31.     At all relevant times mentioned herein, DOES 61 through 100 are residents of the State of Arizona whom Plaintiff is not able at this time to identify by name.  At such time that Plaintiff is able to make such an identification, he shall seek leave to amend this Complaint.

32.     At all relevant times mentioned herein, DOES 101 through 150 are residents of the County of Los Angeles, State of California. State of Arizona whom Plaintiff is not able at this time to identify by name. At such time that Plaintiff is unable to make such an identification, he shall seek leave to amend this Complaint.

33.     At all relevant times mentioned herein, Defendants and each of them acted in concert and conspiracy so that the acts of each Defendant were on behalf of all Defendants.  Thus, each Defendant is liable for the acts of the others.

## **Subject Matter Jurisdiction**

34.     Plaintiff Thaler is an investigative attorney with thirty years of investigating "white collar" crime including racketeering, embezzlement, tax evasion and money laundering schemes.

35.     This action concerns Defendants' participation in a series of racketeering enterprises, Plaintiff's discovery of the same, and thereafter Defendants' efforts to conceal evidence of the rackets while discrediting Plaintiff.  In so acting, Defendants conspired to violate and violated Plaintiff's rights:

  a.   Violations of 42 U.S.C. §1983 by individuals, government employees and agencies covering up racketeering activities described in detail hereinbelow.

  b.   Violations of Equal Protection and Substantive and Procedural Due Process Rights as set forth in the Fifth Amendment of the U.S. Constitution and applicable to the States through the Fourteenth Amendment of the U.S. Constitution by state and local governments and their agencies.

  c.   Violations of 18 U.S.C. §241 relating to actions by all Defendants.

  d.   Violations of 18 U.S.C. §242 relating to actions by employees of state and local government agencies.

e.  Violations of 18 U.S.C. §14141 by state and local government agencies engaging in certain practices that have resulted in violating Plaintiff's civil rights and the rights of others similarly situated.

f.  Fourth, it concerns a series of criminal multi-state racketeering enterprises (described in greater detail hereinbelow) existing for more than twenty (20) years, and Defendants' participation in some or all of them at all times or various relevant times described herein. In addition to said named Defendants, the enterprises concern the participation of numerous employees of state and local government agencies including law enforcement agencies, court personnel and judges.

g.  Violations of the Uniform Child Custody Jurisdiction and Enforcement Act leading to the use and abuse of McKinley Harris Thaler, the three-year-old son of Plaintiff and Brittany.  Said abuse includes the abduction of McKinley by Defendants, Dawna (Brittany's mother) and Larry (mother's boyfriend), with the aid of the other named Defendants and having Brittany to stage a contrived custody battle with perjured testimony and falsified evidence to accomplish the following: a) extort Plaintiff into halting his investigating and/or reporting Defendants' activities to appropriate law enforcement; b) divert Plaintiff's attention from the criminal enterprises; c) damage Plaintiff's reputation with false abuse claims against his child and Brittany so as to damage his credibility; d) drain Plaintiff's financial resources through said custody battle and through phony support orders.

36.  Additionally, this matter concerns:

a.  Actions of the Court-Appointed Advisor re: custody, Barbara Kiffmeyer, and Greg R. Davis wherein Kiffmeyer agreed to falsify her "Court Appointed Advisor" reports in favor of Davis' clients in exchange for payment and other considerations.  With respect to the Thaler dissolution, Kiffmeyer and Davis conspired to falsify her report to the Court and to refrain from reporting Brittany and Davis' perjurious statements to the Court in unserved briefs.

  b.  The corrupt activities of Judge Marvin L. Davis

  c.   and other Maricopa County Judges in permitting participants in the scheme to use their authority including to create fake orders in the name of said Judges in furtherance of the criminal enterprises.

  d.  Extortion by means of fraudulent and fake default judgments, including an extortion attempt against Plaintiff that began in 2014 through a phony California judgement.

  e.  Election fraud including fraud during the November 3, 2020 election.  Specifically, it includes placing candidates into certain elected offices to perpetuate and/or protect the criminal enterprises through creating phony ballots and then using the County computer system to change results.

37.    Said acts confer jurisdiction under the following statutes: 42 U.S.C. §1997 (unlawful for state or local enforcement agencies to allow officers to engage in a pattern or practice of conduct the deprived persons rights); 18 U.S.C. §241 and §242 (deprivation of rights under color of law by willfully depriving or causing or to have caused to be deprived from any person rights their privileges or immunities protected by the Constitution); 18 U.S.C. §14141 (unlawful for any government authority or agent or person acting on behalf of the government authority engage in a pattern or practice of conduct that's a price versus rights privileges or immunities secured or protected by the Constitution).

38.    Also, this Court has jurisdiction to adjudicate issues concerning the actions described herein below as they constitutes racketeering defined in 18 U.S.C. §1961 (murder, kidnapping, robbery, bribery, extortion, or dealing in a controlled substance or listed chemical) and defined in: 18 U.S.C. §201 (relating to bribery), §224, §659 (relating to theft from interstate shipment), §664 (relating to embezzlement from pension and welfare funds), §891–894 (relating to extortionate credit transactions), §1028 (relating to fraud and related activity in connection with identification documents), §1341 (relating to mail fraud), §1343 (relating to wire fraud), §1344 (relating to financial institution fraud), §1503 (relating to obstruction of justice), §1510 (relating to obstruction of criminal investigations), §1511 (relating to the obstruction of state or local law enforcement),

§1512 (relating to tampering with a witness, victim, or an informant), §1513 (relating to retaliating against a witness, victim, or an informant), slavery, and trafficking in persons, §1831 and §1832, §1951 (relating to interference with commerce, robbery, or extortion), §1952 (relating to racketeering), §1956 (relating to the laundering of monetary instruments), §1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity), §1958 (relating to use of interstate commerce facilities in the commission of murder-for-hire), any offense involving fraud connected with a case under title 11 including importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance or listed chemical (as defined in §102 of the Controlled Substances Act), punishable under any law of the United States.

39.     Further, this Court has jurisdiction pursuant to Rule 4 of the Federal Rules of Civil Procedure, diversity of parties in multiple states.

**In Personam Jurisdiction**

40.     This Court has personal jurisdiction over the Defendants, and each of them, conspired with each other to commit criminal acts in multiple States including the States of California and Arizona.  Moreover, multiple Defendants committed the acts alleged herein while residing in the State of California or while in said State.  Finally, as part of the cover-up of their criminal wrongdoing, Defendants and each of them have committed acts to damage Plaintiff's California based law office.

**Venue**

41.     Pursuant to 28 U.S.C. §1391, venue is appropriate in the Central District of California as the originating fraudulent scheme against Plaintiff and against the Los Angeles County Superior Court as described in greater detail herein was orchestrated and carried out in Los Angeles, California and within this district and at a time when Plaintiff Thaler was a co-resident of California.  All Defendants have acted to harm Plaintiff Thaler's law practice in California.  Multiple criminal enterprises or portions of the enterprises discussed in detail herein were and are being carried out in Southern California and especially in Los Angeles County.  Many of the witnesses reside in California.  Multiple Defendant parties reside in Southern California. Moreover, the public

corruption set forth in detail in this complaint in the State of Arizona and especially in the County

of Maricopa, which includes the corruption infecting the State's judiciary including judges,

lawyers, clerks, court reporters and other court personnel prevents Plaintiff from obtaining a fair

hearing in the State of Arizona.

## GENERAL ALLEGATIONS

42.     This case concerns extortion.  In early 2018, Plaintiff discovered that his wife and his wife's

family were participants in several racketeering enterprises that included tax evasion and money

laundering.  By October 2019, Plaintiff had discovered that the size and scope of the racketeering

activities, as set forth in more detail infra, concerned multiple enterprises and ran into the hundreds

of millions of dollars. By December 2019, as many of the defendants named herein were acting to

cover up their participation, they set forth a scheme to extort Plaintiff by threatening to withhold

custody of Plaintiff and Brittany's then two -year-old child if Plaintiff proceeded to investigate

their activities or took any action thereon.  When Plaintiff failed to succumb to the pressure, they

acted on the extortion.  The details are as follows:

**The Criminal Enterprises**

43.     In 1990, Dawna suffered a neurological incident that was nearly fatal. The disability it

created prevented her from working in her previous role as a secretary at Boeing Corporation. It

also meant that she could not contribute financially to the household.

44.     Meanwhile, John Chavez refused to take medication for bipolar disorder. This failure led to

John spending monies the family did not have. And that led to near poverty and starvation at

times.

45.     Though Dawna and John had participated in criminal enterprises operated by other family

members, the lack of money and lack of Dawna's ability to earn an income from regular

employment resulted in the decision to participate in the extended family's criminal enterprises

and to enhance or create their own enterprises.  Said enterprises are discussed in detail infra.

46.     The poverty greatly affected Brittany, especially during her teen years. Brittany became so

afraid of poverty that in addition to assisting in the criminal enterprises, Brittany also engaged in

1   prostitution and engaged in sexual performances in videos and in photographs to earn additional

2   money.

3   47.     After two bouts with pre-cancerous HPV cervical cysts and their removal in 2011 and in

4   2013, Brittany focused her attention primarily on the family's criminal enterprises until shortly

5   after becoming engaged to Thaler.  However, after their son, McKinley, was born, Brittany's

6   irrational fear of poverty caused her to return to the enterprises and to other illegal forms of

7   earning money.

8   48.     Said enterprises include:

9      A.   <u>Money Laundering/Tax Evasion Schemes</u>

10   49.     At the heart of the enterprises is money laundering and tax evasion through true and phony

11   sales of real property, generally single-family residences in new construction developments,

12   mostly in Arizona, California, New Mexico, Texas and Colorado.  These schemes are used by the

13   participants of the criminal enterprises listed hereinbelow and by family and friends of Brittany

14   and Dawna.

15   50.     The money laundering is also accomplished through non-profit organizations included

16   schools and section 501(c)(4) companies such as mutual benefit organizations. Some of these

17   companies operate in a legitimate environment but place students on the rolls who do not exist.

18   The school is then "paid" tuition dollars which in fact are illegally earned monies being laundered.

19   By example, the Conservatory for Recording Arts & Sciences in Gilbert, Arizona has phony

20   students on its rolls.

21   51.     Other schools exist only on paper.  Such is the case with Jeb's Boxercise for Kids, a non-

22   profit LLC.  Another faux business includes B's Learn N' Play Childcare, LLC.  The "school"

23   consists of an old house is the west portion of Phoenix.  Listed occupants include Brittany Chavez

24   and Ricky Glenn Goodwin. As described more fully infra, in November 2018, as part of another

25   racketeering scheme, Brittany filed a fraudulent Chapter 7 bankruptcy with Ricky Glenn Goodwin

26   as husband and wife.  Additional documents capture Brittany as being married to Justin Chavez

27   and to Justin Thomas Leonard.

28

52.     Several other fraudulent businesses also are listed at the Childcare location including Alicia's Houses, LLC and Jeb's Upgrades and PC Repair.  Since 2010, the house has been owned by a series of LLC's created by Brittany.

53.     These businesses, and more than one thousand like them, are used to clean the illegally obtained cash.  Moreover, the LLC "owners" include "foreign" corporations except that the Certificate of Good Standing from the State of Incorporation is fraudulent.  Such is the case with SFR Investments I, LLC.

   B.   Insurance Fraud

54.     The second enterprise concerns insurance fraud. The insurance fraud concerns payment to nonexistent parties for personal injury claims made under med pay provisions of homeowners' policies and automobile policies. The med pay provision in these policies concerns provisions that include no-fault payment of up to $5,000 for medical treatment for an individual other than the policyholder.

55.     Simply put, if an individual visits another's home and slips and falls in that home, his medical treatment up to $5,000 could be paid by the med pay provision without fault and without any increase in premium to the homeowner.

56.     Since at least the mid-1970s, members of the Chavez family have been active participants and in control over this enterprise.

57.     During the mid-1980s the volume of fraudulent claims through Defendant Dawna's control increased until 1990 and then tapered off until it picked up again in about 2002 to the present with Brittany and Dawna in control over it.

58.     Arizona law provides for the recording of medical liens.  The recording of the liens was designed to give hospitals the ability to recoup costs for treatment.  For this scheme, the medical liens recorded as AHCCCS LIEN designation with the County Recorders' Office of Maricopa County.

59.     Said fraud has netted more than $50 million in the past 15 years. It relies on phony medical bills plus the recording of the treatment lien. A coded bill with a copy of the lien is then sent to the

1  insurance company who then provides a check, believing that the check is being sent to the

2  medical provider. However, the liens are all fraudulent and fake and are signed and executed by

3  Dawna Chavez using an assumed name and by either Dawna Chavez or by Brittany Chavez as a

4  fake notary under an assumed name.

5  60.      Thereafter, the proceeds of the insurance payments are laundered through property

6  purchases. These property purchases involve certain real properties that exist and certain real

7  properties that do not. To perfect this part of the scheme, Brittany creates multiple limited liability

8  companies that appear to be a mortgage company, a title company, an escrow company, and

9  inspection company, and a real estate agency.

10  61.      All of the normal paperwork involved in the purchase of a single-family residence is

11  prepared and executed. However, the buyers and sellers are the signatures of Brittany and Dawna

12  or other participants. On most occasions the notarization is executed by Dawna or Brittany using

13  the name or a hybrid of the name of an existing notary to give the appearance that the actual notary

14  who is licensed with the State of Arizona has certified documents. The fraudulent documentation

15  is then recorded with the county recorder's office.

16  62.      In addition to Arizona, said Defendants created similar schemes in California by illegally

17  taking over law offices using the names of retired or deceased lawyers to create or continue "tort

18  mills" where phony claims to insurers are mixed among a smattering of real claims.  One such

19  office includes the Law Offices of James Tenner located in North Hollywood, California.

20     C.  Public Corruption: Skimming Government Funds

21  63.      The third criminal enterprise concerns skimming money from State Programs including

22  collections programs such as child support. Monies from this and other similar programs,

23  especially from monies that have been owed for a period of at least several years, are diverted

24  when paid into holding accounts and then transferred out of the holding accounts into accounts

25  listed as being held by corporations or limited liability companies. Those monies are then used in

26  the same laundering operation as are the insurance monies described above.

27

28

64. By example, with respect to stealing money from the Arizona State Child Support Fund, clerks in the office of the court clerk set aside certain case numbers for the purposes of Brittany and others filing phony dissolution of marriage cases and phony paternity/child support cases. The phony party is ultimately stipulated to a judgment that includes the payment of child support from father to mother. Mother then provides the order to the appropriate County Office where it is processed and provided to the State Office for payment and for collection from the father—except there is no father and no child or children.

65. Currently, for Maricopa County, case numbers ranging from 098400 to 098499 are being selected at random and used to foster this crime. Plaintiff is informed and believe and thereon alleges that other series of numbers are being used in other Counties within the State of Arizona in a similar fashion and are also being used in multiple Counties within the State of California including San Diego County, Orange County, and Los Angeles County.

D. Narcotics Sales

66. The fourth prong of the enterprise concerns the sale of narcotics especially prescription and designer narcotics that are moved from Mexico through Calexico to Brawley to Salton City to Twenty-Nine Palms to Bullhead City, Arizona, to Kingman, Arizona, to Flagstaff, to Phoenix, to Casa Grande, and then to Tucson, Arizona.

67. On or about December 20, 2014, Brittany met in Orlando, Florida with Roberto Lopez, who is known to the Drug Enforcement Administration as a significant importer and distributor of crystal methamphetamine. Though the scheme has existed for more than a decade, shortly after meeting with Mr. Lopez, in or about January 2015 Brittany assisted in revitalizing the scheme by placing individuals in residences in certain cities listed above including Brawley and Kingman. Thereafter, in or about January 2017, Brittany once again assisted in perfecting the scheme by using laundered monies received from drug sales to purchase properties in Twenty-Nine Palms and in Bullhead City under assumed names.

68.    Many of the operatives hired are current or retired military non-commissioned personnel who are discharged with transportation and/or logistics training.  Many are recruited from Camp Pendleton Marine Base and from Twenty-Nine Palms Marine Air Ground Combat Center.

69.    Other pharmaceuticals are moved from Miami, Florida to Orlando, Florida where they are then transported through Benton, Arkansas, Albuquerque, New Mexico, through Phoenix, Arizona to Southern California. Plaintiff is informed and believes and thereon alleges that recruiting for these transportation jobs comes mostly from the Naval Air Warfare Center in Orlando, Florida.

70.    The cash collected from the drug sales is sent in whole or in part to Brittany and put through the same money laundering system as described above.  Additionally, the houses are purchased with laundered money or for the purposes of laundering money through said purchases are constructed or modified with drop boxes set forth in the walls of the residents. These drop boxes are hidden and are nearly impossible to find on inspection. To give the appearance of legitimacy, these houses are put through phony sale transactions possibly every two to three years. The drop boxes are routinely serviced with portions of the cash being returned to the drug suppliers, with portions becoming capital contributions for the setup of the limited liability companies in subsequent schemes, and portions becoming investment capital for seemingly legitimate investments.

71.    An example of a drop box house includes 6211 W. Indianola Avenue, Phoenix where B's Learn N' Play Childcare is located.

72.    Plaintiff is informed and believes and therefore alleges that a drop box configuration was constructed into the family residence purchased by Thaler and Brittany in September 2015. Further, Plaintiff is informed and believes and thereon alleges that during the course of their relationship, Brittany utilized the drop boxes consistently after making cash pickups from local drug dealers and others for whom she had set up laundering and tax evasion schemes including for friends and family.

73.    Additionally, Brittany set up a computer server and router scheme using pornography as a cover for the transfer of money.  One such site is under the URL "bigbootyhoes420.com." The site

contains short pornographic videos that in several of which Brittany appears to perform sexual acts with a male performer.  To launder money, said videos were/are made available for sale through debit card transactions from accounts holding illegally obtained money, mostly from the sale of drugs.  Through the "purchases" of these videos, said money is laundered and made clean.

E.   Public Corruption: Creating and/or Modifying Public Record

74.    In effecting the schemes set forth above, Defendants created or obtained access to the Arizona State database and the Maricopa County database. By doing so, Defendants are able to insert backdated records, remove records and modify existing records to meet their needs. these records include the typical documents recorded with the Maricopa County Recorder, court records, arrest records, and collection records concerning State Programs including the family support program.

75.    In the matter of court records, Brittany and Dawna and the Defendants herein have participated in extortion of individuals who might prove harmful to the continuing of their enterprises by creating false arrests or created and invented charges and fraudulent civil judgments. With respect to Plaintiff, they have attempted to do both.

F.   Public Corruption: Bribing Public Officials

76.    Also, in effecting the schemes set forth above, Defendants have placed into positions of hiring authority, individuals who, for compensation, have been placed into various government positions. Persons who can assist in the criminal schemes. This includes judges, police officers, State police officers, judicial assistants, inspectors, assessors, and accountants.

G.   Corruption: Private Parties

77.    In addition to public officials, monies are used to bribe licensed officials such as real estate agents, real estate brokers, and Court approved "experts."

78.    These enterprises existed long before Plaintiff and Brittany met, continued through their relationship, unbeknown to Plaintiff, and have continued to date.

//

//

H. <u>Bankruptcy Fraud</u>

79.     With the assistance of lawyers such as Michael Agruss (licensed in California and in Illinois) and Brian Blum (licensed in Arizona), Defendants Brittany and Dawna along with John and Johnny and Fritz and Laura have engaged for more than ten years in creating fraudulent Chapter 7 Bankruptcy filings and phony creditor claims within Chapter 11 filings and phony adversary actions within Chapter 7 filings.

80.     With respect to Agruss and his Chicago-based law firm, he and his firm, working with Brittany and Dawna, have filed multiple phony creditor claims on behalf of themselves and other members of the Chavez family in Chapter 11 reorganization cases.

81.     One example is the Super Two Financial Services Corporation Chapter 11 filing bearing case number 17-10659 (JLG) in the Southern District in New York where "Dawn M. Chavez", "Monica Chavez" and "Vianey Chavez" made false creditor claims through the Agruss office.

82.     Additionally, nearly one thousand Chapter 7 filings have been made throughout the country under the "Agruss" firm name for phony Chapter 7 filings for fake "Chavez's."

83.     As to the phony Chapter 7 claims, the scheme has worked as follows: phony identities are created for real individuals and phony identities are created out of whole cloth from stolen medical records files stored in a medical records storage facility in San Diego, California. Using real Social Security numbers of the individuals whose identity has been stolen, new credit is obtained and used.  Then a bankruptcy is filed to wipe out the debt.

84.     Worse, if any creditor acts to collect in violation of the Federal Debt Collection Practices Act, the Agruss firm either sues in Federal Court on behalf of the individual or sues on behalf of an alleged "class" with the phony individual serving as the named class "member."

85.     Plaintiff Thaler is informed and believes and thereon alleges that during 2019 through 2020, on at least three separate occasions, Agruss illegally obtained Thaler's credit information and then manipulated the same to reduce severely Thaler's FICO credit score in order to damage Thaler's ability to obtain credit for him and for his office all to Brittany's benefit during the dissolution of marriage proceedings in Arizona.

86.     With respect to Brian Blum, during the period of 2013 through 2016, Blum assisted Brittany in filing Chapter 7 bankruptcy cases for individuals he knew were fake and helped her to file phony adversary actions within the very Chapter 7 cases he and she had filed.

87.     The purpose of these phony filings and phony adversary actions were intended to clear assets that otherwise could be claimed in whole or in part by unsecured creditors. One such case includes the matter of Heidi Lee Boltz and Jeffrey Lee Boltz, case number 2:15-bk-17870-DPC. Neither "parties" exist. Instead, property, real and business personal are placed in their names. Credit is obtained and then essentially converted to other uses. When creditors attempt to collect, a Chapter 7 bankruptcy is filed.

88.     In the case of the "Boltz" couple, when the trustee refused to allow for the couple to retain a particular asset and instead intended to sell it to pay creditors, Brittany and Brian created a fake adversary (internal lawsuit) action against the couple—essentially suing themselves so that the fake adversary party, by its actions, would cause a halt in the sale process and then provide a way for the phony adversary to obtain control over the asset.

89.     The plan worked. The entirety of the bankruptcy discharge was set aside and the bankruptcy case dismissed. The asset was preserved.

90.     As stated above, another phony bankruptcy concerns Brittany and Ricky Glenn Goodwin where a Chapter 7 filing was made on or about November 2, 2018, Case No. 2:2018-bk-13500 (azb), with 341a hearing heard at 10:00 a.m. on December 13, 2018.  Brittany attended but did not announce her attendance when creditors appeared to ask questions of the alleged debtor couple.

I.     Election Fraud

91.     Defendants have access or have otherwise infiltrated the Maricopa County database and the State of Arizona database. Defendants conspired with other accomplices to fix elections within Maricopa County and within the State of Arizona through the creation of fake ballots and computer ballot counting manipulation.

92.     Said election fixing included various offices on the November 3, 2020 ballot including the seat for Maricopa County Recorder.

J.   Extortion by Computer Virus and Identity Theft

93.   Defendants conspired with other accomplices to create crypto-viruses and infect the computer systems of businesses and thereafter providing the encrypting code only after a ransom was paid.  Further, defendants have stolen private and confidential information from computer systems of individual and from systems of lawyers and law firms, including public defender and federal defender systems.

K.   Fake Employees on the Payroll Systems

94.   Defendants engaged in placing the names of phony individuals on the employment roles so that they could collect the paychecks and benefits.

**Creation of Fake Employees, including Attorneys**:

95.   To operate these schemes, Defendants created fake state and local government employees in California and in Arizona.  They also created fake "individuals" licensed through state agencies. For example, in California, "Arlene Chavez" was created as a real estate agent with an office allegedly located in La Mirada.  "Paul Tokeshi" was created as a fake attorney with an office in Santa Anita, California. His profile and "history" was uploaded into the State Bar computer to give the appearance of existence.

96.   In Arizona, several attorneys were created and placed into the State Bar database as a fake attorney operating out of Tucson, Arizona. Moreover, almost every "Brittany Chavez" other than Defendant Brittany is a fake individual.

97.   Plaintiff is informed and believes and thereon alleges that in addition to fake individuals presumptively operating under legitimate licenses, each State has real individuals operating under licenses that were never properly licensed through the state or local government agency or who failed to pass examinations or otherwise meet the requirements necessary for licensure.

**State of Arizona 2010-2011 Investigations**

98.   From 2010 through 2011, State of Arizona conducted an investigation of public corruption. In doing so, the State hired outside accounting agencies and forensic accountants to perform an analysis on the income and expenses of certain public agencies. The investigative reports

1  concluded that many of the State Agencies had been corrupted through Russian organized crime.

2  There were a number of targets of the investigation including individuals who are involved in

3  phony real estate transactions of the same type and kind as set forth herein concerning the

4  Defendants.

5  99.    Moreover, said individual, targets of the investigation, and specifically Cynthia Peterson

6  aka Cynthia Valencia aka Cynthia Saenz aka Cyndi Beaman, has also been a participant with these

7  Defendants in the insurance fraud and in the mortgage fraud and money laundering enterprises.

8  100.   At the same time the State of Arizona was conducting its investigation, Plaintiff was

9  investigating Russian organized crime involvement in the smuggling of illegal goods into the

10  United States and the storage of the same in California prior to shipping said goods to those

11  criminals who effected the initial importation.

12  101.   Unbeknownst to Plaintiff, one of the shipping companies out of Ontario, California was

13  owned legally and beneficially by Brittany.  Said company was disbanded in late 2019 shortly

14  after Brittany filed for divorce from Plaintiff.

15  102.   With the investigation, arrests and convictions resulting from the State investigation,

16  Brittany decided she wanted to terminate her participation in the schemes. Her exit strategy

17  entailed getting married and having a child.

18  **The Death of Jeffrey Phillips and Ensuing Cover Up**.

19  103.   To that end, Brittany joined various on-line dating services.  On May 25, 2012, Brittany

20  began to date Jeffrey Phillips, a high school dropout with a volatile temper.  Mr. Phillips was used

21  as a "bodyguard" to prevent her family from coercing her into continuing to participate in the

22  criminal enterprises.

23  104.   In November 2013, Brittany terminated the relationship.  Thereafter, she searched for a

24  "husband" without success.

25  105.   However, in or about May 2014, in need of cash, Brittany rekindled the relationship in order

26  to convince Phillips and a friend to participate in a criminal enterprise concerning the importation

27  of illegal prescription drugs to be sold to individuals and to low end medical clinics.

28

106.   Meanwhile, Plaintiff is informed and believes and thereon alleges that Brittany concocted her own extortion scheme against Plaintiff.  Said scheme is the subject of litigation in Los Angeles County Superior Court and is discussed in more detail hereinbelow.

107.   During the Summer of 2014, Brittany and her former boyfriend, Jeffrey Phillips, formed a New Mexico corporation with a third party.  Thaler is informed and believes that the purpose of the corporation was to sell illegal prescription narcotics imported from outside the United States with Brittany laundering the money earned through fake property transactions.

108.   On or about August 2, 2014, Brittany met with Phillips and the third individual to discuss the operation and put it into effect.  Brittany then prepared written agreements for the three and a standard form written agreement for medical clinics to which the pharmaceuticals would be sold.

109.   Plaintiff is informed and believes that Brittany and Phillips took large cash advances to make the purchase of the drugs.

110.   However, shortly after meeting Thaler, Brittany informed Phillips and the other partner that she would no longer participate in the scheme.  On or about October 26, 2014, Brittany met with Phillips at his residence in Phoenix.  At that time, she reiterated to Phillips that she had no interest in continuing with the partnership.

111.   Phillips became angry and threatened Brittany with bodily harm and threatened to tell Thaler about Brittany's history of illegal activities.  For the next five months Phillips continued to threaten Brittany with multiple voicemail messages and with multiple text messages.  Brittany felt so threatened that she maintained recordings of the voicemail messages and provided them to her friend, Shane, instructing him to give them to the police in case anything should happen to her.

112.   Despite Brittany ignoring the threats, Phillips continued. On or about April 14, 2015, Brittany's birthday, Phillips again threatened to turn over information to state and local authorities regarding her illegal activities over the past decade if she did not return to the partnership.

113.   Within weeks of these threats, Brittany moved into Plaintiff's residence using Plaintiff as a shield from Phillips.

114.   Brittany avoided Phillips for the next eight months.  After Brittany and Plaintiff moved into their new residence in Gilbert, Arizona, Brittany expressed to Plaintiff that she was terrified of Phillips and feared he would come to their residence.  But she refused to inform Plaintiff of the reason other than stating that Phillips was jealous.

115.   In or about late August 2016, Brittany became pregnant.  She discovered the same in or about mid-September 2016.  At that same time, Brittany and Phillips had additional vocal altercations with more threats from Phillips regarding exposure of criminal history.

116.   At the end of September 2016 and before Brittany could tell Plaintiff about the pregnancy, Brittany had a miscarriage.

117.   On October 2, 2016, Brittany arranged to meet with Phillips late that night on the guise of working out their differences and have her rejoining the partnership.  In fact, Brittany did meet with Phillips. Brittany met him, picked up Phillips from his residence in Phoenix, and drove North toward Sedona. During the drive, Brittany provided to Phillips a beverage that she claimed was iced coffee.  While the beverage contained iced coffee it also contained a combination of narcotics intended to cause Phillips' death.

118.   Without realizing that the beverage had been poisoned, Phillips drank from the container. He lost consciousness and shortly thereafter died.

119.   In the days prior to picking up Phillips, Brittany prepared a location off the Interstate 17 where she intended to bury Phillips' body.  After poisoning Phillips, Brittany in fact drove to the location intended for disposal and disposed of Phillips body.

**Defendant Brittany creates a scheme to extort money from Thaler**

120.   Court records for Los Angeles County Superior Court show that on or about May 31, 2012, an alleged judgment was taken in the Superior Court for the State of California, County of Los Angeles, limited jurisdiction, under case number 11E11652. The application for the judgment purports to be signed by an attorney named Paul Tokeshi. The judgment appears to have been executed and entered by Judge Leland Harris.

121. <u>These records were falsified. There is no one named "Paul Tokeshi." The judgment is a</u> <u>fake. On March 17, 2021, Judge Harris confirmed that there is not now nor has there ever been a</u> <u>judgment and that no such case was ever assigned to his courtroom.</u>

122. Parts of the proposed judgment, which also purport to have been prepared by Mr. Tokeshi, have places to fill in the various figures making up the total of the judgment. Those blanks are filled in by hand printing. All of the hand printing on the judgment and on the certification belongs to Brittany.

123. These judgment documents were then used to apply for a sister State judgment in Maricopa County, Arizona Superior Court as a "foreign State judgment." Said term is similar to a sister State judgment in California.

124. At the time of the entry in California, which purports to be in June 2012, Plaintiff resided in Phoenix, Arizona. Phoenix is within Maricopa County.

125. The State of Arizona requires that any application for entry of a foreign State judgment be mailed to the last known address of the judgment debtor. In this case, that did not occur. Though Plaintiff was living in Phoenix, Arizona, none of the documents were mailed to Plaintiff's residence. Further, the documents were not mailed to Plaintiff's business address and were not mailed to Plaintiff's previous address in Tarzana Falls.

126. Many of the documents used to obtain the default and default judgment are fraudulent. For example, the proofs of service show that the documents were mailed to a residence in Tarzana CA that Plaintiff had not lived in since 2007. In addition to being mailed to the wrong address, the proof of service also show Plaintiff's name is misspelled as T-H-A-Y-L-O-R.

127. Why Plaintiff? As set forth in detail below, Brittany knew that Plaintiff had been married to Dyan Reilly, a woman he had known for nearly thirty (30) years at the time of the wedding. Brittany knew that Plaintiff had discovered that Dyan suffered from schizo-affected disorder and that Dyan and members of her family had been involved directly in a criminal enterprise related to her money laundering and fake identity enterprises.

128.   Brittany also knew that upon discovering the same, Plaintiff protected Dyan and her two children, his stepchildren, from legal action and from harm threatened by those for whom Dyan and her family had performed such services.  Brittany surmised that she could form a social relationship with Plaintiff that would lead to marriage and having a child, that she could hide behind Plaintiff and his reputation until that time and thereafter; if necessary, after marriage and child, if she confided in Plaintiff, he would afford to her the same protection as he had Dyan.

129.   Brittany then set up a scheme to meet Plaintiff and to engage him in a social relationship.

130.   On or about October 13, 2014, Plaintiff and Brittany first communicated. On or about October 22, 2014, they met in person and had dinner together. Unbeknownst to Plaintiff and described in detail hereafter, Brittany already knew who Plaintiff was in great detail, as earlier in the year she set up a scheme with others to extort money from him by creating a phony judgment in The Los Angeles County Superior Court and then having the same entered in Maricopa County, Arizona as a foreign State judgment.

131.   In or about late July 2015, as is described more fully below, Plaintiff learned about the sister State judgment in Arizona while selling Plaintiff's residence in Phoenix. The title company handling the transaction at that time called to inform Plaintiff that a judgment had been recorded. It had no other information other than the name of the case and the Maricopa County case number.

132.   Upon confirming the entry of the foreign State judgment and its origins, Plaintiff immediately sent a letter to the attorney in Arizona, Marc Lammers, who had been retained to enter the judgment and collect on it.  Mr. Lammers' office is in Tucson, Arizona.

133.   While it seemed curious that no effort had been undertaken to collect on the judgment in 2014 or through the first half of 2015, Plaintiff never considered it to be significant.

134.   On or about August 4, 2015, Plaintiff sent to Lammers a request for information regarding the application and application documents along with any and all papers related to the entry of the judgment in California.

135.   With respect to Tarzana Falls, in March 2011, a dispute arose between Plaintiff  and the HOA regarding its failure to make needed and necessary repairs from rain damage occurring in

February and March 2011. During the course of the dispute, Plaintiff discovered that the books and records of Tarzana falls were fraudulent and that the annual pro formas provided to owners were entirely fiction. Plaintiff also discovered that numerous annual special assessments not only were fraudulent, but the monies paid by the residents could not be traced to any Tarzana Falls account.

136.   Because Plaintiff was in the process of moving to Phoenix, Arizona, Plaintiff did not press the matter other than to demand repair of Plaintiff's unit so that it could be prepared for sale, while refusing to pay a new special assessment and demanding refunds for past special assessments. The HOA, having failed to undertake the repairs, made it impossible for the unit to sell as a portion of it had become uninhabitable. To this date, the repairs still have never been made to that unit.

137.   As is discussed more fully below, in late 2017, Plaintiff received documents from a resident of Tarzana Falls who was involved in a legal action on the same failure to repair issues. Those documents clearly show that the board members of the HOA and property management company owners of Ross Morgan (who are named as Defendants herein) embezzled more than $4 million over the period of 2001 through 2018.

138.   The documents also confirm that the special assessments were fraudulent and the monies collected were diverted.  More on these issues is described below.

139.   Despite sending the letter on or about August 4, 2015 to Lammers, Plaintiff did not receive a response from his associate, Sarah Epperson, until November 4, 2015.  She stated simply that the judgment in California was valid and that her firm had been hired to collect. No comment was made on the failure to serve the application properly or the plethora of issues that were materializing about the validity of the judgment.

140.   The failure to mail the application to the correct address is a fatal flaw in Arizona.  No comment was made as to whether the Arizona firm had verified any of the judgment or any information before receiving it. In fact, it was unclear how the information got to Lammers.

141.   One exception to the one judgment rule in California is judicial foreclosure where one judgment concerns the foreclosure and a second judgment, which must be obtained within 90 days

1   of the foreclosure, concerns any additional monies owed under the judgment that were not

2   collected in the foreclosure sale. The phony judgment covers the foreclosure sale and specifically

3   provides for the judgment creditor to apply for the required deficiency hearing per the applicable

4   statute. The failure to apply within the 90 days permanently extinguishes the debt.

5   142.   As no application was ever made, even if the judgment were valid, the debt was

6   extinguished by September 2012. As a result, the application for a sister state/foreign state

7   judgment constituted a fraud on the Maricopa County Superior Court.

8   143.   It turns out that even the method by which the alleged judgment got to Tucson was

9   fraudulent. Lammers received a letter allegedly from board member/attorney Defendant Steven

10   Buchwalter stating that he was writing the letter on behalf of the board and not in his capacity as

11   an attorney. It stated that he and the board determined Plaintiff owned property in Maricopa

12   County and wanted him to take all necessary steps to collect on this judgment.

13   144.   Conspicuously absent was any board resolution or board authorization to pursue this

14   judgment. There was a reason for that. When title to the unit was transferred on or about June 12,

15   2012, all issues regarding any unpaid assessments by Plaintiff were resolved in a deal made by the

16   HOA with the buyer.

17   145.   In fact, The Tarzana Falls Ledger for June 30, 2012 confirms that no debt was owed by

18   Plaintiff to the Tarzana Falls HOA as of that date. On the continuing ledgers thereafter the same

19   zero balance is stated. Even Defendant Tony Donato has stated openly that all matters regarding

20   Plaintiff's unit and any monies owed to the HOA, were resolved in June 2012.

21   146.   With the fraudulent Arizona judgment in Arizona holding up the sale of Plaintiff's property,

22   Plaintiff filed a motion challenging the entry of the foreign State judgment. When it became

23   obvious that the alleged California judgment was fraudulent, Lammers and Plaintiff agreed to stay

24   all proceedings in Arizona to determine what exactly had occurred in California. A bogus second

25   lawsuit filed in Arizona in late December 2015 for fraudulent conveyance along with a lis pendens

26   filed and recorded with it was dismissed by Lammers at that time.

27

28

147.   In California, procedurally this started with a motion to set aside the California judgment. But, as the Court knows, discovery is not available to a Defendant litigant after a judgment has been taken. As a result, with the limited information available at the time, any full explanation was not available and hence the motion was denied.

148.   Thereafter, the litigation was filed. Because of the sensitivity of the matter, which at that point included the belief (later proved to be true) that no one named Paul Tokeshi Plaintiff ever applied for the California judgment, previous judges sitting in this Court delayed the requirement of serving the named Defendants so that further unfettered investigation could occur.

149.   Meanwhile, in late 2014, Plaintiff became engaged to Brittany Rae Chavez.  In April 2015 Plaintiff and Brittany made a deposit payment on a home to be built in Gilbert, Arizona. The home was completed in September 2015 wherein they made the requisite down payment and took out a mortgage. The sale of Plaintiff's residence was incident to this purchase.

150.   During the course of the litigation, a number of irregularities came to light concerning Brittany's activities. Evidence now exists that implicates Brittany in insurance fraud, money laundering, extortion, embezzlement, tax evasion, tampering with official records and documents, bankruptcy fraud, creating fake and phony judgments for the purposes of carrying out the extortion schemes and related racketeering activities. Brittany's family has been involved in such activities since at least 1986.

151.   Brittany is an experienced trial paralegal, having performed such services in more than 23 major trials and arbitrations over the past 10 years. She is fully versed in legal procedure in both California and in Arizona. She has prepared numerous documents for filings in both States.

152.   In addition to creating phony judgments, Brittany has been part of a network of individuals involved in the aforementioned criminal enterprises that has paid off court officers, officials and employees, including lawyers, paralegals, clerks of the court, court reporters, judges, and in Arizona, judge's assistants.

153.   At her last three law office employers, Poli & Ball, Andante Law Group, and Struck, Love et al., Brittany has used the resources of the firms to carry out portions of the criminal enterprises.

1    For example, at Poli & Ball, Brittany manufactured evidence through manipulated court

2    transcripts. at Andante, Brittany filed phony Chapter 7 bankruptcies on behalf of phantom

3    individuals with the intent of stealing assets from creditors. At Struck Love, Brittany falsified

4    evidence in favor of individuals employed by certain Counties and States in exchange for their

5    assistance in the criminal enterprises.  With the latter, it led to Brittany being fired from her job in

6    January 2019.

7    154.    Even worse, Brittany's co-conspirators include computer engineers who designed, created

8    and continue to maintain State and County databases within Arizona and Maricopa County.  This

9    permits the participants to enter said databases and then add/enter or subtract information.

10    Arizona and Maricopa County have made data breaches easy by using only one central database

11    for all State programs and only one database for all County programs.

12    155.    But Arizona is not the only State where the systems have been breached.  Other States

13    include Florida, New Mexico, Texas, Pennsylvania, Ohio, Michigan, Maryland, Minnesota,

14    Wisconsin, and California.

15    156.    In these States, participants have put into employment or otherwise paid off court clerks and

16    court reporters and have infiltrated the California State Bar computer system.  To that end, the

17    ability to upload to the attorney rolls phantoms names of individuals who do not exist and of

18    course are not attorneys. Paul Tokeshi is one of these phantom attorneys.  Partners at Wolf, Rifkin

19    confirm that no one named Paul Tokeshi was ever employed at the firm.

20    157.    The California State Bar has been aware of this phantom problem since 2011. It is one of

21    the reasons why the State Bar of California instituted in 2018 the fingerprint program using

22    LiveScan for all active attorneys.

23    158.    Unfortunately, because the State Bar did not keep the original fingerprint cards at the time

24    of admission, the newly obtained prints cannot be used to compare previously received fingerprint

25    cards.

26    159.    In Arizona the problem is far worse. As stated above, the access into the computer databases

27    concerns the entirety of the State of Arizona which operates through one singular database and the

28

County of Maricopa which also operates off of only one singular database. This has permitted real individuals to obtain licenses in fields where they do not have and have never had the requisite degrees or training.

160.   Simply, one could become a licensed social worker having never actually gone to college or attended any courses in social work. Since the State University database operates through the State system and database, it is likely that individuals are receiving degrees that they never earned or at least receiving credits for classes never attended.

161.   Within the Court system, this has meant that judge's assistants, who essentially act as paralegals to the judges and act as calendar clerks, thus controlling all paperwork (which is electronically filed), can change or remove motions or oppositions to motions and can edit or create court judgments without the judge having any knowledge of the same.

162.   This scheme had mostly been used in criminal cases either to prosecute those who might become enemies of the individuals involved in the criminal enterprises or to remove charges or lessen the severity of charges on those who have been arrested for crimes relating to these enterprises.

163.   To say this is something of a disaster and a total meltdown of trusted institutions is being kind. But it gets worse.

164.   In reviewing phony documents executed by Brittany and recorded with the Maricopa County Recorder, Plaintiff discovered that certain signatures used by Brittany on documents recorded with the Maricopa County Recorder's Office contain a signature matching the Paul Tokeshi signature on the Request for Entry of Default and Application for Default Judgment. Obviously, the name is not Paul Tokeshi. But the signatures are a spot-on match, so much so that the signatures used to apply for the California judgment allegedly in 2012 can be overlaid on the signatures on the documents recorded in Maricopa County. **They are identical**.

165.   Though the California State Bar has an address for a Paul Tokeshi, it does not have a telephone number or a fax number or an email address and no one has been able to actually locate

1    Paul Tokeshi. The only consistent handwritings are those on the default and default judgment

2    applications.

3    166.   In fact, the United States Census Bureau reports that there is no one now or who has ever

4    lived in the United States under the name Paul Tokeshi.  And to add to the insult, Wolf, Rifkin

5    partner/founding member Daniel C. Shapiro founded the firm the same year Tarzana Falls was

6    built and has a long friendship with Ross Morgan founder, Brian Davidoff.  Go figure.

7    167.   Plaintiff met Brittany for the first time in October 2014. One month earlier, the foreign State

8    judgment had been perfected in Maricopa County. Documents from the Los Angeles Counties'

9    database show that the judgment was certified in early 2014 so that it could be entered as a foreign

10   state judgment in Arizona that year.

11   168.   As Plaintiff said above, referring to the judgment application documents in California,

12   spaces are left blank to fill in handwritten numbers making up the total of the proposed judgment.

13   The printing of the numbers belongs to Brittany. The alleged signature of Judge Harris is not a

14   signature but rather a handprinted signature version. The hand printing belongs to Brittany.

15   169.   Moreover, Judge Harris has confirmed that he did not enter any judgment in any such case

16   and that, in addition to the form of the proposed and entered judgment being prepared in an

17   unacceptable manner, he has never hand printed or had a clerk hand print his name on a judgment

18   ever in his entire career. He confirms that the entirety of the judgment is phony. Judge Harris, who

19   is now retired, is willing to testify and to provide declaration upon request.

20   170.   With all of that said, here is what actually happened:

21   171.   Beginning in 1986, Russian organized crime created a presence in Southern California.

22   Most of its operations concerned the movement of smuggled materials, any smuggled materials.  If

23   you got it into the country, this group would hide/store it and then ship it to its final destination.

24   The operation was assisted by brokers working out of the Lee & Associates commercial brokerage

25   office in Sherman Oaks, California who bought and were the "legal" owners of multiple storage

26   facilities throughout Southern California where the smuggled materials would be placed.  The

27   design and set up and algorithms used to determine the storage locations of the goods were created

28

1   by Atomic Computers in Canoga Park, California and assisted throughout the country by BCS

2   Recycling which also has its headquarters in Canoga Park, California.

3   172.   Tarzana Falls was built in 1986 with monies provided through Defendant Brian Davidoff.

4   At that time, he was an accountant. His client supplying the money was the Russian organized

5   crime operation. During construction, Davidoff was given a seat on the original board. When

6   enough buyers had completed their purchases, Davidoff resigned and formed Ross Morgan &

7   Company. He took with him a property management contract that remained until the 2018 coup.

8   Ross Morgan, which has grown by leaps and bounds over the past 34 years, was designed to

9   launder proceeds of the criminal enterprise.

10   173.   But as the profits grew, Ross Morgan could not handle the large cash flow alone. So

11   Brittany's family and their criminal associates got the job.

12   174.   When Plaintiff discovered the fraud and its extent, Ross Morgan was threatened with

13   exposure. Hence the reaction and lawsuit. Also threatened with exposure was the manner in

14   which fake identities of existing and non-existing individuals were being created as part of the

15   money laundering schemes. That method concerns at least one IT head for a major hospital chain

16   based in Arizona and its electronic storage facility based in San Diego, California. Working

17   together, private patient data and information is siphoned off and used to create new identities.

18   The "directors" working for the department head of IT worked with Brittany in the Geek Squad of

19   Best Buy from 2004 through 2007. Brittany's relationship with them continues as evidenced by

20   their presence on her LinkedIn profile through 2018.

21   175.   In 2018, Plaintiff discovered the link between Brittany and the IT employees and the

22   medical records storage facility while investigating an unrelated case where a connection to the

23   storage facility had arisen. Having investigated the Russian organized crime situation in

24   California in 2015 and having discovered the link in 2018 between the hospital IT department and

25   storage facility and Russian and Armenian organized crime, Plaintiff revisited the Tarzana Falls

26   situation from that perspective to find that the Tarzana Falls judgment and Brittany in fact had

27

28

some link.  Earlier this year, when the Tokeshi signature matched a series of signatures from

Brittany, Plaintiff could be sure the matters were directly linked.

176.    There are conflicting possibilities as to why the judgment was fraudulently taken and then

entered in Maricopa County but the most likely scenario is not what one might expect:

177.    In 2010, the State of Arizona commissioned a private accounting firm to conduct an audit of

State government agencies that indicated significant corruption.  The report released in or about

2011 provided evidence of the corruption and of Russian organized crime involvement in money

laundering schemes where officials were being bribed in a manner that permitted the laundering to

go on unfettered by State and local government agencies.

178.    The report included facts concerning the laundering activities of exactly the same modus

operandi as is the situation that is currently going on by Brittany, her family and their associates.

The report led to numerous arrests and convictions.  Documents provided by investigators and

experts prove the connection between Brittany and at least one family member to the participants

in the Russian money laundering and corruption scheme.

179.    Though she was not charged in 2011, these events scared Brittany who decided she wanted

out.

180.    From 2012 through 2013, Brittany broke from her family and greatly reduced her

involvement in the criminal enterprises.  Because of her relationship with the IT employees, she

was aware that Plaintiff had been integrally involved in investigating the link between Russian

organized crime and redirected hospital records during 2011 through 2012.  Searching for a more

permanent way to avoid participating in criminal activity, Brittany believed that the prospect of

dating and marrying Plaintiff (and with that, the prospect that Plaintiff might catch on to the

criminal enterprise) would prevent anyone from requiring her involvement in the criminal

schemes.

181.    As insurance, Brittany had a backup plan.  By setting up one of her "extortion" schemes

using a phony judgment, Brittany could steer Plaintiff into discovering, at her whim and on her

timetable, evidence of the larger criminal fraud. By having a child with Plaintiff after getting

1    married, she calculated that Plaintiff would not press charges against her but instead would do so

2    against others.

3    182.   And that is what she did.  In or about late April 2018, Brittany could not back out of a

4    certain series of criminal enterprises without dire consequences. So she began providing to

5    Plaintiff evidence of the criminal schemes including the genesis of the Tarzana Falls phony

6    judgment.

7    183.   The Tarzana Falls action was filed after ignoring the Davis-Stirling pre-requites.  It was

8    intended to prevent Plaintiff from discovering the money laundering operation.  That lawsuit was

9    filed in November 2011 and was never served.   The proofs of service show invalid service on

10   their face and contain phony and fraudulent signatures under the name of an actual registered

11   process server.  The phony proofs of service do not show service in Arizona.

12   184.   When the deal was made with the purchaser of Plaintiff's unit in early June 2012

13   concerning any and all dues the HOA claimed were owed, apparently the legal action was

14   supposed to be dismissed.  Maybe it was; maybe it wasn't.

15   185.   With the ability to remove documents from databases both in Arizona and in California, it

16   appears the dismissal was removed and instead, it was substituted with the application for

17   judgment which more than likely was prepared and reset into the database in early 2014, but

18   showing a date of May 31, 2012—just before the ownership transfer of the property less than two

19   weeks later.

20   186.   On or about October 13, 2014, Plaintiff and Brittany first communicated.

21   187.   On or about October 26, 2014, they had their first "date." On or about November 17, 2014,

22   having researched Plaintiff, his family, and his previous relationships, including his relationship

23   with his first wife, Melinda, with whom Plaintiff has a 19 year old son, Brittany began planning to

24   wed Plaintiff and to have a child with him. This was less than one month into their relationship

25   and more than one month prior to the couple becoming engaged.

26   188.   At that time, Brittany's desires to get married and have a child at that time were not known

27   to Plaintiff. In fact, at no time has Brittany ever admitted to the fact that she planned on a wedding

28

1   date of April 16, 2016 on November 17, 2014.  However, on that date she prepared a small poster

2   containing these anticipated dates and events.

3   189.   In or about February 2015, the engaged couple decided to sell their respective residences

4   and purchase a residence together in Gilbert Arizona. To that end, they went house hunting. In or

5   about early April 2015, they agreed to purchase a residence to be custom built - Plaintiff's

6   Meritage homes in the Gilbert complex known as The Bridges.

7   190.   The Initial deposit of $400 to reserve the home site was paid for by Plaintiff. The couple

8   agreed that they would pay a total of 20% down in order to secure the lowest possible interest rate

9   without any private mortgage insurance. They further agreed that Brittany would pay

10   approximately $25,000 and Plaintiff would pay approximately $35,000.  In fact, Brittany paid

11   approximately $27,000 and Plaintiff paid a total of $38,400.00 inclusive of the initial deposit.

12   191.   However, when Plaintiff was in escrow with a buyer, he was informed by the title company

13   of the California judgment perfected in Arizona in the amount of approximately $12,000.

14   192.   Plaintiff was not concerned at the time about selling his residence because the amount of the

15   judgment fell far below the protected homestead exemption. But Brittany did not want or intend

16   for Plaintiff to be on title to the property, as she intended to use laundered money for her portion

17   of the down payment.

18   193.   To ensure Plaintiff could not sell his residence to obtain the down payment, Lammers was

19   instructed to file a second lawsuit against Plaintiff alleging fraudulent conveyance for a transfer in

20   2014 of Plaintiff's Phoenix home from himself, individually, to his revocable living trust.

21   194.   This lawsuit constituted an abuse of process, in that transfers from individuals to revocable

22   living trusts do not constitute, by express statutory terms, fraudulent transfers. In addition to filing

23   a second lawsuit, Lammers improperly recorded against Plaintiff's property a lis pendens

24   preventing Plaintiff from selling his property with clear title.

25   195.   That lawsuit ultimately was finally dismissed in March 2016 only after Plaintiff threatened

26   civil litigation against Lammers and his law firm.

27

28

196.   Plaintiff and Defendant Brittany were married on April 13, 2016 in Antigua. Immediately upon returning home, Brittany demanded that the couple start trying to have a child.

197.   In or about September 2016, Brittany discovered that she was pregnant. However, Brittany had not been taking her psychotropic medication since February 2016. Instead, she was taking MDNA to control her antisocial behaviors and phentermine to control her weight and reduce her bulimia.

198.   As a result of her drug taking, Brittany had a miscarriage. Although her OB GYN records reflect this fact, Brittany failed to inform Plaintiff at the time and still fails to discuss it with him.

199.   Brittany became pregnant again on or about April 1, 2017.

200.   Again during the pregnancy, Brittany relied on MDNA and other drugs instead of taking her psychotropic medication. To pay for the drugs, and to do so in such a way that her mother would not detect it, Brittany purchased groceries using her debit card and then provided some said groceries to her friends in exchange for cash.

201.   In early 2018, shortly after McKinley was born, Plaintiff decided to create an estate plan in case anything should happen to Plaintiff or to Brittany. In doing so, he looked up the deed Brittany had executed for their purchase of the Joshua Tree Lane property. In doing so, he found multiple deeds with Brittany's name on them. Many of these deeds showed her as being married to various individuals.

202.   Additional research showed a plethora of irregularities in the deeds for her parents and other family members.

203.   Finally, Plaintiff's research showed that Brittany had signed deeds in other names and had notarized a plethora of deeds in other names. Most of the activity came between 2008 and 2012 but stretched from 2003 to that time.

204.   Thereafter, in examining the properties which were the subject of the deeds, Plaintiff found numerous mortgage companies and escrow companies and title companies listed. A review of those companies with the Arizona Corporations Commission found that Brittany had prepared the paperwork and filed the documentation necessary to create said companies

205.   Having found a plethora of irregularities, Plaintiff attempted to discuss these findings with Brittany, however, Brittany refused comment or otherwise denied having knowledge of the documents.

206.   By October 2018, Plaintiff had discovered Brittany's signature on hundreds of deeds, either as buyer or seller or notary or all three. He also found hundreds of corporations and limited liability companies involved either in home construction or residential finance created by Brittany designed to aid in the money laundering and tax evasion schemes.

207.   Further, by October 2018, Plaintiff discovered that Brittany had lied about the extent of her personal and business relationships with certain individuals, including Jeffrey Phillips. Specifically, as to Phillips, Plaintiff had discovered that Brittany and Phillips and a third individual had set up a New Mexico corporation for the distribution of imported foreign made prescription drugs illegal in the United States.  The intent was to sell the drugs to medical clinics.

208.   Plaintiff discovered further that the corporation had received cash advances from clinics and during September 2014 through October 2014 Brittany had spent more than $35,000 of the money to cover significant debt she had run up on her credit cards.

209.   Plaintiff discovered Brittany had created a complex money laundering and tax evasion scheme for Eric Whittaker, a well-known pornographer (who named his most famous cite, "Back Room Casting Couch after her—Brittany Rae Chavez) and a real estate investor.  Even though Brittany had stated that Whitaker was an insurance agent, which he was not, and that she had broken off their social relationship in early 2005, in fact, Brittany had created at least four separate limited liability companies for Mr. Whittaker from December 2004 through 2008 and had continued to maintain the corporate and company books and records for those companies through to that date.

208. But that wasn't all. The manner in which she had set up the companies for Whitaker evidenced a money laundering scheme. Moreover, Brittany had set up similar schemes for friends and relatives.

209.   At this time, Plaintiff Thaler had no idea that Brittany's involvement in organized crime and these criminal enterprises had anything to do with the 2010 / 2011 investigation, nor did he have any idea of her involvement in laundering money for drugs suppliers and dealers or for a massive insurance fraud operation or for public corruption and graft.

210.   In or about early November 2018, Thaler Discovered that Brittany had charged over $43,000 of household goods and services to two credit cards. Among the expenses between the credit cards and her Wells Fargo debit card were $800 per week in groceries, Target and Amazon charges. Brittany's apparent manic spending also included thousands of dollars in Starbucks gift card purchases and other related gift card purchases. Yet, their household did not show evidence of this volume of purchases.

211.   So Plaintiff confronted Brittany, but Brittany refused to have any rational explanation for her behavior. At that point, Plaintiff brought the credit card bills and ATM debit card charges to the attention of Dawna (Brittany's mother) one afternoon while Dawna was babysitting McKinley. Plaintiff asked Dawna if she knew why Brittany was manically spending money. Dawna reviewed the documents and then in an angry voice told Plaintiff that Brittany was her daughter and she would take care of the problem. Dawna then left the couples' residence and refused thereafter to have any conversation about the charges.

212.   What Dawna knew, but refused to tell Plaintiff, was that Brittany was overcharging her credit cards to get goods and cash in exchange for the purchased goods to pay off others who had participated in the death of Phillips and others who were participating in the criminal enterprises she had devised.

213.   Immediately thereafter, Dawna confronted Brittany with the financial documents. Dawna told Brittany that because of her conduct and the suspicions that were growing with Plaintiff, she would have to file for dissolution and terminate the marriage.

214.   Dawna told Brittany that if she failed or refused to terminate the marriage, Dawna would cut Brittany off from her money and refuse any financial support from criminal charges or from

any custody issues that would likely arise once Brittany's activities became known.  Also, Dawna took control over Brittany's credit cards to ensure she could not pay others in secret.

215.   Brittany, afraid she would lose her child and be penniless, agreed to her mother's demands. However, Brittany then began stealing Plaintiff's credit cards and debit cards and using them to pay others and for others through their use.  This included gas and grocery and even parking for Chase Field (for a Diamondbacks games) on April 12, 2019.  Said scam involved stealing a card from Plaintiff's wallet and then providing the same to another party who used it for these expenses before returning it to Brittany who then returned it to Plaintiff's wallet.

216.   When in early April 2019 Dawna discovered Brittany was using Plaintiff's credit and debit cards, Dawna devised a plan intended to disrupt further investigation by Plaintiff and to create scenarios to discredit Plaintiff so that he would not be believed even if he did discover their participation in the criminal enterprises.  The plan included the following actions:

   a.  In or about early April 2019, Dawna and Brittany placing a GPS device on Brittany's vehicle, but under an account in Plaintiff's name, in order to make a false claim of stalking.

   b.  During 2019, Brittany purposefully misrepresented to Plaintiff the times she would be home to take care of McKinley and purposely made herself unavailable to take care of McKinley so as to increase the number of hours Plaintiff was required to take care of McKinley, hours where he could not service his clients.

   c.  Also, during 2019 taking items that Brittany knew Plaintiff required for business trips to Los Angeles and to Las Vegas and thereafter withholding them for several hours with the intent of causing Plaintiff to be late to attend meetings and court dates.

   d.  Also, during 2019, consistently hacking into Plaintiff's cell phone and into his business computers, and thereafter erasing files and moving files, with the intent of disrupting his office. Said activities also included removing documents that Plaintiff was required to file by certain deadlines so that Plaintiff would miss the deadlines.

e.  On April 20, 2019, strategically cutting the right front tire of Plaintiff's rental automobile for the purpose of causing Plaintiff to have a severe incident, that at the very least would cause him to miss an important client meeting and thus lose the income from the same.

f.  Brewing iced tea and then placing pharmaceuticals and illicit narcotics in the same before serving it to Plaintiff for the purpose of trying to secure a positive blood test for the upcoming plan to take full custody of McKinley.

g.  On July 7, 2019, placing significant amounts of pharmaceuticals and illicit narcotics, including PCP, the same concoction she had given to Phillips on October 2, 2016, in a thermos of brewed iced tea and then providing it to Plaintiff just as he was leaving by vehicle to travel to California for a hearing involving the Tarzana falls litigation.

h.  In or about August 2019, moving Defendant Cairo into Dawna's residence to prevent Plaintiff from taking McKinley from Dawna's residence once Brittany and Dawna implemented their plan to steal him, meanwhile preparing to move Brittany into Cairo's residence once the fake sale of Brittany and Plaintiff's residence was completed.

i.  On October 7, 2019, the day Plaintiff intended to file a police report regarding the stolen credit cards and debit cards, Brittany filed a fraudulent police report, wherein Brittany made false claims that Plaintiff was acting "manic and erratic" during the early morning hours.

j.  In or about late November 2019, stealing Plaintiff's cell phone and having it forensically mapped and cloned.

k.  Engaging in sexual acts with other men and women for money during the time of the marriage and then ensuring that Plaintiff found evidence of the same just before stealing McKinley on December 12, 2019.

l.  On December 12, 2019, obtaining by fraud, an order of protection, based on the alleged manic and erratic behavior that never occurred.

m.  By that order, requiring Plaintiff to leave the residence with the additional purpose in mind of removing a computer server used for money laundering, a drop box where cash that was collected from drug sales was kept, and planting drug paraphernalia so that false claims of drug use against Plaintiff could be made in the future, if necessary.

n.  Also, by that order, stealing confidential client files and other related confidential documents from the designated office section of the family residence and then using the same in document disclosures and in briefs, all in violation of Arizona State Law.

o.  Stealing McKinley on December 12, 2019, his 2nd birthday, and then hiding behind the phony order of protection to prevent Plaintiff from seeing his son that day.

p.  Failing and refusing thereafter, until December 21, 2019, to allow Plaintiff to see or talk to McKinley.

q.  Having forensically mapped and cloned Plaintiff's cell phone, Brittany sending text messages to herself , but making it appear to have come from Plaintiff's cell phone and thereafter filing a plethora of fraudulent police reports claiming falsely that Plaintiff was violating the OOP order.

r.  On December 25, 2019, allowing McKinley to visit with his father for Christmas, but with the real intent of providing gifts from McKinley to his father that contained traces of CBD oil, yet again to try to perfect a positive blood test, and thereafter gain sole custody of McKinley.

s.  Refusing Plaintiff any overnight visits with McKinley for approximately one month and then attempting to limit Plaintiff time with McKinley to less than 25%.

t.  On February 20, 2020, committing perjury at the time of the child custody hearing by making false claims that Plaintiff was being an uncooperative parent and by falsely stating that Plaintiff was using illicit drugs.

u.  Also on February 20, 2020, Dawna committing perjury by falsely claiming that in May 2019, she witnessed a drug transaction between Plaintiff and a friend.

v.  Also on February 20, 2020 at the time of the custody hearing, Dawna voluntarily agreeing to act as Facilitator of the 50/50 custody exchanges between the parties when in fact what she intended to do, and did in fact do, was conspire with Brittany as set forth herein below to prevent Plaintiff from being with his son.

w.  On or about February 21, 2020, Brittany filed a fraudulent police report claiming that she had discovered two glass pipes under Plaintiff's sink in the master bathroom.

x.  On or about April 3, 2020, falsely claiming that Plaintiff had travel on an airplane, and therefore was required (which he was not required to do) to quarantine for 14 days, Brittany withheld McKinley and refused to make exchanges in violation of the February 20, 2020 court order.

y.  From February 20, 2020 to the present, failing and refusing to include Plaintiff in any parenting decisions regarding education or medical care for their child, and in fact, despite a 50/50 custody order, failing and refusing to provide any information regarding the medical care McKinley has received.  Said failures also include failing to provide instructions for use of medications that have been prescribed by McKinley's pediatrician.

z.  In or about late April 2020, after Brittany violated the Court's custody order, Dawna obtained, under false pretenses, an order of protection so that the next time Brittany violated the order, Dawna would be able to hold McKinley at her house without Plaintiff being able to obtain him, all in violation of her agreement to act as facilitator.

aa.  Preventing McKinley and Plaintiff from being together on Plaintiff's birthday, on Father's Day, and on the Jewish New Year (Rosh Hashanah).

bb.  After failing to change the custody order on June 10, 2020, inventing false charges against Plaintiff, that Plaintiff was abusing McKinley in some unspecified manner, as a pretext for violating, yet again, the February 20, 2020 temporary child custody order.

cc. On September 19, 2020, refusing to make the exchange and thereafter, refusing to make any exchanges with Plaintiff in violation of the February 20, 2020 temporary child custody order.

dd. Filing on September 21, 2020, a brief stating falsely that the Court Appointed Adviser agreed with Brittany that Plaintiff was unfit to parent McKinley and that Brittany was justified in refusing to make the September 19, 2020 exchange.

ee. On or about September 25, 2020, making false charges with the Gilbert Police Department that Plaintiff was in some manner, again unspecified, abusing McKinley as a way of justifying her violation of the Court's order.

ff. Thereafter, Dawna failing and refusing to act as facilitator and instead, using the cloned phone of Plaintiff and a cloned phone of Brittany, sending through Plaintiff's cloned phone to Brittany's cloned phone, harassing messages and then reporting them as having come from Plaintiff, in order to have false charges filed against Plaintiff.

gg. From September 19, 2020 to the present, holding McKinley hostage under the demand that Plaintiff recant any and all statements he has made regarding the illegal activities that are set forth in this complaint, under the threat that he will never see his son again if he does not do so.

hh. On December 12, 2020, failing and refusing any and all communications between Plaintiff and his son to wish his son a happy birthday, having refrained from permitting any communication since beginning of October 2020 and continuing to refuse to do so to this date.

ii. Beginning in 2018 and continuing to the present, hiding assets including cash from Plaintiff, while running up significant credit card expenses and then trying to claim falsely that Plaintiff must reimburse her for 1/2 of said expenses.

217.  When all of the above failed to deter Plaintiff, Dawna and Brittany and Lawrence devised a scheme with law enforcement personnel employed by the City of Mesa including Defendant Roessler.

218.   The scheme included using the cloned phones and the fraudulently obtained OOP orders to prevent Plaintiff from furthering his investigation or discovering the extent of the crimes and the individuals and institutions involved, and Defendants, each of them, created a scheme against Plaintiff or otherwise conspired that caused Defendants, and each of them, to disrupt Thaler's law practice and his finances.   These actions violate multiple federal statutes and regulations including and especially Plaintiff's civil rights.   Said statutes include:

    a.   42 U.S.C. §1983 (civil rights violations)

    b.   42 U.S.C. §1997 (unlawful for state or local enforcement agencies to allow officers to engage in a pattern or practice of conduct the deprived persons rights);

    c.   18 U.S.C. §241 (deprivation of civil rights protected by the Constitution);

    d.   18 U.S.C. §242 (deprivation of rights under color of law by willfully depriving or causing or to have caused to be deprived from any person rights their privileges or immunities protected by the Constitution); and

    e.   18 U.S.C. §14141 (unlawful for any government authority or agent or person acting on behalf of the government or for them to engage in a pattern or practice of conduct that's a price versus rights privileges or immunities secured or protected by the Constitution).

219.   Using the resources already being utilized in the corruption of the Criminal Court system, Dawna, Brittany and Cairo set out to use them to meet Dawna's goal of using McKinley by keeping him and Plaintiff apart to extort Plaintiff into stopping his investigation.

220.   Said resources and actions include: access to County Database.   Part and parcel to the criminal activity has been access to the State run database and to the County run database for Maricopa County. For at least the past five years, Brittany has had unfettered access to said databases.   This access has allowed Brittany and others to backdate documents and insert them into the databases, create false documents and insert them into the databases, and remove documents already in said databases.

221.   With respect to the Maricopa County Criminal Court system, the entire system has been corrupted and infiltrated in furtherance of the criminal enterprises in multiple ways. Example:

1   when a Defendant is arrested who is part of the criminal enterprises, evidence is misplaced or lost

2   thus preventing prosecution.  In the case of drug possession, the middle name or middle initial of

3   the Defendant is switched on the City or County criminal complaint filing, so that it appears that

4   the individual arrested has never had any prior arrests. Thereafter, requests are made to the Court

5   for diversion, which are then granted. Further, when an individual appears to have gained

6   knowledge of the database access or other aspects of the criminal activities, he or she is falsely

7   arrested with their fingerprints used to set them up for other crimes never committed.

8   222.   In the matter of bar, on or about December 12, 2019, Gadberry filed with the court clerk a

9   dissolution of marriage petition on behalf of Brittany. She then took emergency orders to the

10   assigned courtroom. Brittany, Dawna, and Gadberry intended to obtain various restraining orders

11   against Plaintiff that would include forcing him out of the family residence. But the Court was not

12   available to review the orders at that time. So, on the afternoon of December 12, 2019, Brittany

13   filed for an Order of Protection on her behalf and on behalf of McKinley. Brittany failed to tell the

14   Court that a dissolution of marriage action was already pending and that these motions were

15   already pending before the Court assigned to the case.

16   223.   Every single "fact" set forth in Brittany's Order of Protection request was/is false and

17   known to Brittany as being false at the time that she wrote them. Of course, the OOP judge had no

18   way of knowing that the facts were false or that a petition for dissolution had been filed earlier that

19   day. The order was granted as to Brittany, but denied as to McKinley.  Thereafter, Brittany

20   returned to her mother's home and remained there while failing to communicate in any manner

21   with Plaintiff.  And despite it being McKinley's birthday, Brittany failed and refused to permit any

22   communication between Plaintiff and McKinley.

23   224.   Just after midnight, Brittany entered into the database and changed the date on the

24   dissolution filing To December 13, 2019 so that it would appear that the Order of Protection was

25   filed prior to the dissolution of marriage petition. That explains why the Order of Protection case

26   number is a higher number than the dissolution of marriage case number.

27

28

225.   The result of which is that the Order of Protection obtained by Brittany is null and void as the Order of Protection Court never had subject matter jurisdiction since jurisdiction had already been conferred on the Family Court.

226.   But it doesn't end there. In late December 2019 Brittany's original emergency motions were denied in favor of a fully noticed motion hearing.  And early January 2020, Brittany brought a series of additional motions including a January 3, 2020 motion for the drug testing of Plaintiff after having placed CBD oil and other narcotics in Christmas gifts delivered by her "on behalf of McKinley" on December 25, 2019.  These motions also were denied.

227.   At the conclusion of the February 20, 2020 custody hearing, commissioner Russell ruled that Plaintiff and Brittany should have equal 50/50 custody of McKinley. Unhappy with that order, Commissioner Russell was unceremoniously removed from the Department and replaced with newly appointed Judge Marvin L Davis.

228.   The placement of newly appointed Judge Marvin L. Davis and the removal of Commissioner Andrew Russell was intentional and engineered.

229.   Judge Davis had been appointed Commissioner of a Criminal Court in January 2017. At the same time, Madison Hughes, who had assisted Brittany and Dawna, and other Defendants in the insurance fraud enterprise, by coding phony medical bills and who had no college degree or background in law or any other qualifications for the job, was hired to act as commissioner Davis' Judge's Assistant. That gave Defendant Hughes control over all documents coming in and out of the Court, including falsified documents.  Moreover, Ms. Hughes provided to Brittany and Dawna, and the other Defendants, login information so that they could change and affect a change to various Criminal Court orders, as needed, to affect the criminal operations.

**City of Mesa/Town of Gilbert Corruption: Failing to Investigate/Spoliation of Evidence**.

230.   On or about December 12, 2019, Plaintiff contacted the Gilbert Police Department to report that Brittany had cut his tire on April 20, 2019 or had directed someone to do it.  He also reported her actions on July 7, 2019 in poisoning the thermos of iced tea.  And Plaintiff reported the bank card thefts occurring since January 2019.  The matter was assigned to Detective Brian Bullock.

Detective Bullock, on instruction, never investigated any of the allegations.  Thereafter, he falsified an investigation report claiming that Plaintiff was acting in a manic and erratic fashion during the telephone interview.  The result was a deliberate spoliation of the evidence.

231.   When Plaintiff discovered that Detective Bullock had not investigated the incidents reported, he supplied evidence of the same including a report he had obtained from an expert that the tire in the April 20 incident had been deliberately cut.

232.   The reported issues were then reassigned to Detective Chris Wakefield who also failed to investigate so that any videotape evidence would be spoliated.  Thereafter, in or about late March 2020, Detective David Frerer falsely claimed that there was insufficient evidence for his department to draw any conclusion as to who had committed the tire cut, the poisoning or the bank card fraud and therefore the investigation was concluded.  Thereafter, Gilbert detectives refused to review any further evidence or explain why they had failed to gather any evidence or investigate or why they permitted evidence to spoliate.

233.   But that did not stop Detective Brian Bullock from filing a series of false reports with the Gilbert City Attorney attempting to have Plaintiff charged falsely for violating Brittany's void restraining order.

234.   In or about August 20, 2020, the Gilbert City Attorney filed one charge of Plaintiff violating the phony December 12, 2019 restraining order obtained by Brittany under a phony unassigned case number.  The information in the charge alleged that on December 31, 2019, Plaintiff had texted Brittany.  It failed to mention that on that date, Plaintiff was at Banner Heart Hospital having an angiogram from an extreme high blood pressure incident caused by poisoning.

**Poisoning to achieve a positive drug test**.

235.   From birth to the date Brittany and Dawna stole McKinley, Plaintiff assumed the role of McKinley's primary caregiver.  In fact, for every 40 hours of the work week, Plaintiff spent 35 hours caring for his son.  After the failure of the poisoning on July 7, 2019, Brittany and Dawna devised a plot whereby Brittany would place small amounts of narcotics and CBD oil into brewed iced tea that she would serve Plaintiff and would add into other liquids such as Maple syrup and

1    SodaStream syrups. The purpose was to make false claims of manic and erratic behavior prior to

2    stealing McKinley and then obtain an order for a drug test which would come back with a false

3    positive result.

4    236.   In furtherance of the scheme, Brittany placed small amounts of narcotics and CBD oil in

5    said syrups and in the brewed iced tea and thereafter provided them to Plaintiff.  Without knowing

6    that his wife was poisoning him, Plaintiff ingested that which Brittany provided.

7    237.   Having done so for several months, and although not obtaining any effect other than an

8    allergic reaction and blood pressure spikes, nonetheless on October 7, 2019, at 6:30 AM, Brittany

9    contacted the Gilbert Police falsely claiming that Plaintiff was acting manic and erratic and that he

10   was yelling at her while "spinning" around their bedroom.

11   238.   In fact, at the time Brittany contacted the Gilbert police, Plaintiff was in the master bed half

12   asleep . At the time that the Gilbert police officers arrived at the house Plaintiff was holding

13   McKinley while giving him some breakfast.

14   239.   Later that day, and on the following day, Brittany admitted that Plaintiff had not acted in

15   any threatening manner, nor had he acted in a manic or erratic manner. In fact, Brittany apologized

16   for her actions in calling the Gilbert Police Department.

17   **Attempted Murder**.

18   240.   Prior to cutting Plaintiff's tire and prior to the poisoning of Plaintiff in July 2019, Brittany

19   insisted on Plaintiff obtaining a $200,000 life insurance policy.  Plaintiff did so.  Though the

20   policy was bound in February 2019, Brittany had not seen the confirming paperwork. On or about

21   July 2, 2019, Brittany insisted that Plaintiff show her the documents proving that the policy was in

22   effect. On July 6, 2019, Brittany hacked into Plaintiff's business computers and stole all passwords

23   to all password protected websites including but not limited to Plaintiff's personal and business

24   banks and bankcards companies.

25   **Fraudulent Home Sale**.

26   241.   In late February 2015, Brittany suggested to Plaintiff that they purchase a residence in

27   Gilbert, Arizona. At the time, Plaintiff did not yet know about the Tarzana Falls judgment lien.

28

242.   Brittany intended to collect between $10,000 and $15,000 on the assumption that Plaintiff needed to sell his Phoenix home to have money for the down payment needed for a new home and that he would be forced to pay the fake lien in order to complete the sale and a new purchase. In April 2015, Plaintiff and Brittany chose to purchase a house together in Gilbert, Arizona. Plaintiff paid the deposit of $400.00. In late July 2015, while selling his Phoenix house, Plaintiff discovered the lien. However, he had other resources from which to provide the down payment monies.

243.   In August, as the house was being built in the Bridges Meritage Homes development section, Plaintiff paid an additional $38,000.00 toward the down payment. But still trying to scam her fiancé, Brittany falsely represented to Plaintiff that he should remain off of the deed of trust and that his contribution needed to be classified as a "wedding gift."

244.   Meanwhile, also unknown to Plaintiff was that Brittany's purchase of her Scottsdale home came from illegally earned monies being laundered through the transaction. The proceeds coming from the alleged sale in May 2015 were then used along with an additional $10,000 of illegally earned monies to provide her share of the down payment on the Gilbert house.

245.   Brittany and Plaintiff agreed that the loan and trust deed would remain solely in Brittany's name but that once the "judgment" issue was resolved, a new deed would be executed that placed both names on title as joint tenants. In August 2018, Brittany executed a deed placing both names on the title as joint tenants.

246.   Upon filing the dissolution of marriage in December 2019, Brittany falsely claimed that she was the sole owner of the property. In late January 2020, Gadberry asked Plaintiff if he would agree to a stipulation to sell the Gilbert house with the proceeds being held by her firm until otherwise decided by the Court. Plaintiff agreed with the modification that the monies would remain with escrow for 90 days and then be transferred to the Berkshire Client Trust Account.

247.   The stipulation was a fraud. The scheme was a pretense. Brittany intended to steal the equity and launder money through a phony transaction wherein the "buyers" who were/are well acquainted with Defendant Cairo would pretend to make the purchase, but in fact, would rent the property. Dawna would then use monies appearing to have come from the sale to pay off her

1   residence on Olla Court in Mesa, Arizona.  LaFlesch would be paid a fee for assisting in the

2   transaction and Gadberry and Berkshire would be paid through a fraudulent application for

3   $25,000 in attorney's fees.

4   248.   The remainder of any monies that might otherwise go to Plaintiff would be removed

5   through additional phony fee orders based on overinflated and falsified billing statements so that

6   no one would ever have to account for the money.

7   249.   The Gilbert house was then placed for sale by Defendant LaFlesch.  But in fact, the house

8   was not actually for sale.  In fact, despite asking repeatedly for a copy of the listing agreement,

9   Plaintiff never received the same. As a result, Plaintiff did not see that the listing price was

10   approximately $25,000 below market value and that the Commission being paid to LaFlesch was

11   at least 1/2 percentage point higher than the standard rate for real estate agents.

12   250.   Within 10 days of the house allegedly being listed, Plaintiff was informed that a purchase

13   offer had been received for the full amount of the listing price. Plaintiff was further informed at

14   that time that the buyers were requesting a series of repairs and were requesting that all closing

15   costs be paid by seller.

16   251.   In fact, Dawna and Brittany did conspire with Gadberry and with LaFlesch to launder

17   money through the phony sale with Plaintiff. JetClosings handling the fake escrow and title

18   insurance. In fact, Defendants Christopher Falbo and Nicoletta Falbo, friends of Defendant Cairo,

19   did pretend to purchase the property, but in fact were and are renting the house with Brittany and

20   Dawna pocketing the proceeds to which Plaintiff is entitled to one half.

21   252.   In order to make the sale look real to Plaintiff, JetClosings had Plaintiff execute a warranty

22   deed in favor of the alleged buyers. However, the Defendants involved in the scheme had no

23   intention of ever recording Plaintiff's warranty deed.  Rather, they intended to deny that any such

24   deed was ever executed or recorded.  However, in June 2020, Plaintiff checked with the County

25   Recorder's Office to discover that all necessary documents had been recorded to effect the phony

26   sale, except for his warranty deed, which somehow never got recorded despite the fact that

27

28

1  Plaintiff traveled to the JetClosing's office in Phoenix and executed the papers with a notary

2  public present.

3  253.   Upon informing JetClosings of the intended error, the representative for JetClosings stated

4  that the same would be corrected immediately. But, in fact, it was not corrected immediately

5  because the deed executed by Plaintiff had been destroyed.  To make up for this, Dawna prepared

6  a phony warranty deed where she signed as the notary public under a phony name and then lifted a

7  signature belonging to Plaintiff, placing same on the signature line for him on the warranty

8  deed.  That deed was then recorded.

9  **Stealing Funds Through Frivolous Motions and Fake Orders**.

10  254.   In or about late May, 2020, Gadberry filed a motion with the Court seeking payment of the

11  $25,000 in attorney's fees to come from any proceeds that might otherwise have gone to

12  Plaintiff.  The same was opposed by Plaintiff whose opposition was never seen by the Court,

13  because Defendant Hughes made sure that it wasn't. Not a single factual allegation in the motion

14  was true and correct especially since no sale of the house had ever occurred.

15  255.   On or about June 10, 2020, Judge Davis heard arguments regarding child support and

16  regarding attorney's fees. Approximately two weeks later, a written decision was issued providing

17  $25,000 in attorney's fees to the Berkshire firm and providing child support to Brittany based on

18  the false statements made in the Gadberry brief. The signature on the order in fact is not that of

19  Judge Davis, but is that of Dawna Chavez. The decision fails to state any of the issues raised by

20  Plaintiff at the time of the hearing.

21  256.   Having reviewed the decision, but not having realized at the time that the decision was

22  fraudulent and not issued by the Court, Plaintiff immediately filed a motion for reconsideration

23  pointing out to the Court that the legal and factual bases of its ruling and Order were incorrect.  To

24  date, the Court has never issued a ruling on this motion for reconsideration. In fact, Defendant

25  Hughes hid it from the Court to ensure that Judge Davis did not see the motion, no opposition was

26  filed by Gadberry or subsequently by Greg Davis.

27

28

257.   In or about mid-June 2020, Gadberry filed a motion with the Court seeking to have the Court order the $1000 payment to retain Barbara Kiffmeyer as the Court Appointed Advisor come from the proceeds of the house sale.  Once again an order was issued appearing to have come from the Court for payment of the $1000 from the proceeds to Kiffmeyer.  In or about late June 2020, Kiffmeyer acknowledged to Plaintiff that she had received the retainer from Gadberry.

258.   However, yet again the Court order contained a phony signature, yet again that of Dawna Chavez.

259.   In or about early September 2020, Plaintiff sent a letter to attorney Davis asking him to confirm that he had received from The Berkshire Law Office the proceeds of the house sale held in trust per the terms of the stipulation between the parties. in response, Davis falsely represented that his firm had received the monies held in trust less $25,000 paid to The Berkshire Law Office and less $1000 paid from the proceeds held in trust to Barbara Kiffmeyer.

260.   Since receiving that response from Davis, Plaintiff has continually requested written confirmation that Davis' office in fact, has the proceeds, and is holding them in trust. Plaintiff has also continually requested an accounting of the same.  However, for nearly four months, Davis has refused to provide an accounting or provide a written confirmation that he has the proceeds.

261.   Moreover, in or about late December, 2020, Plaintiff requested from Gadberry and Berkshire, confirmation that they had received the proceeds of the sale per the terms of the stipulation and had turned over the same to the Davis office.  Rather than confirm these facts, Berkshire represented that his office had never received any of the proceeds from the sale of the property, thereafter refusing to make any further comment on the matter whatsoever.

262.   Plaintiff then demanded that Kiffmeyer confirm that she received the sum of $1000 from Gadberry and that she provide all documentation evidencing said confirmation.  Not only has Kiffmeyer refused to provide any information or even respond to the question, but instead, Kiffmeyer complained to the Court, falsely, that Plaintiff was harassing her while failing to mention that she was refusing to provide said relevant and material information.

**Stealing a Child, Part 1**.

263.   On or about March 28, 2020, Thaler Reminded Brittany and Dawna that per the terms of the custody schedule Thaler had custody of McKinley on Brittany's birthday. knowing that Brittany would want to spend time with their son on her birthday, Thaler sent to Brittany and Dawna a modified schedule so that Brittany could have McKinley beginning at noon on her birthday until noon the following day. Thaler Never received a response. Instead, on April 3, 2020, Dawna sent a text to Thaler stating that he was required to self-quarantine for the next 14 days to ensure he had not contracted Covid-19 because he had flown on a plane.

264.   In fact, Thaler had not flown on a plane and had not been in any location where quarantine was necessary. Moreover, pursuant to Arizona law and local rules neither Brittany nor Dawna had any authority whatsoever to impose a quarantine on Thaler.

265.   Brittany and Dawna pulled this stunt, which included holding McKinley for two weeks, for four reasons: the first was to provoke Thaler into violating Brittany's (void) restraining order; the second was to secure McKinley for Brittany's birthday; the third was to cause Thaler severe emotional distress; and the fourth was to test the system for the kidnapping yet to come in September.

266.   To ensure that Brittany could bring McKinley to Dawna's residence without Thaler interfering or removing his son during his custody time, Dawna obtained a fraudulent order of protection where every factual statement was false and known to her to be false. Simply, Dawna committed perjury just as she had done while testifying at the February 20, 2020 hearing.

267.   But that wasn't all.  With the use of the cloned phones Dawna intended to send and did send to herself various incendiary messages making them appear to have come from Thaler's phone.  Beginning in or about August 2020 in anticipation of kidnapping McKinley in September 2020, Dawna repeatedly sent rude text messages to Thaler.  In some of these she complained about him and in some of these she complained about Brittany.  Generally, Thaler tried to calm her down from what appeared to be genuine upset.

268.   But thereafter, Dawna used the cloned phones to send messages from Thaler's cloned phone to her phone.  Thereafter, Dawna contacted the Mesa Police Department and filed complaints

falsely alleging that Thaler had contacted her in violation of the order of protection. Each time Dawna made one of these false reports, she failed to mention to the Mesa police that she was the facilitator of communications and of exchanges for McKinley and that the Family Court order superseded restrictions in the Order of Protection with respect to effecting these issues.

269.   Through September 2020, this got Dawna one single charge filed against Thaler. That was not enough. So Dawna stepped up her campaign of sending phony messages through the cloned phone to her phone shortly before she had Brittany kidnapped McKinley on September 19, 2020.

**Stealing a Child, Part 2**.

270.   On September 19, 2020 Brittany failed and refused to make the exchange of McKinley citing unspecified "issues" she had with McKinley's care while in the presence of Thaler.

271.   In fact, the problem was not with Thaler, but rather with Brittany, who was deeply embedded in an episode from Deficit Schizophrenia.  Simply, the pressures put on her by her own actions and by the actions of her mother had worsened her paranoia and her misperceptions.  And it had clouded her own judgment concerning McKinley.

272.   By early October, 2020, Brittany's state of mind had become, and remains, so precarious that she reported her sense of some unspecified abuse to McKinley's Pediatrician, doctors at Phoenix Children's Hospital, the Department of Child Protective Services, and the Gilbert Police Department.

273.   All four individuals/agencies investigated these non-specific claims and all concluded that the claims were either the product of Brittany's mental illness or were fabricated.

274.   In fact, the Gilbert police told Brittany she needed to return McKinley immediately. She refused.

275.   Meanwhile, despite denying the phony fraudulent perjurious brief filed in secret by Defendant Attorney Davis attributing false statements to Defendant Kiffmeyer that Kiffmeyer had told Brittany that she was justified in keeping McKinley, Defendant Judge Davis failed and refused to execute multiple requests for an order requiring local law enforcement to obtain McKinley.

276.   Even worse, Defendant Officer Roessler not only refused to file custodial Interference reports, but also prevented Thaler from physically being able to see his child.  When Thaler complained about his conduct, Officer Roessler then set up a fake arrest of Thaler at his residence in Gilbert. Using the text messages being sent by Dawna from the cloned phone of Thaler to her phone that he knew were fake, Roessler falsely claimed them as having been sent by Thaler and falsely claimed that Thaler had admitted to the same.

277.   In addition to causing Thaler to spend a night in the Mesa jail, Roessler ensured additional phony charges were filed against Thaler, charges which remain today.

**False Reports to DCPS**:

278.   As part of the strategy to steal McKinley, Dawna and Brittany used state and local agencies including the Department of Child Protective Services. In or about early July 2020, Brittany falsely reported unspecified abuse was occurring during the time that Thaler had McKinley with him.  DCPS investigated the charges and interviewed Thaler and McKinley together at Thaler's home.  DCPS concluded that it was unable to substantiate even a single allegation made by Brittany.

**False reports to the Gilbert Police Department**.

279.   Brittany also made false reports to the Gilbert Police Department, again charging some unspecified abuses committed by Thaler.  This time, the detective in charge called in a forensic psychologist to interview McKinley. After conducting the interview, the detective called Thaler and apologized to him profusely for ever having believed any of the statements that Brittany had made. The detective stated that the interview found no evidence of any kind of any abuse and that she believed McKinley's relationship with his father was a productive and healthy one. She then informed Thaler that she would contact Brittany and tell her the results of the analysis and order her to return McKinley to Thaler forthwith.

280.   In fact, the detective did make the call.  But Brittany refused to return McKinley.

**The Kiffmeyer/Greg R. Davis Scam**.

281.   As part of the February 20, 2020 order, Commissioner Russell requested the appointment of a Court Appointed Advisor with the limited role of determining whether any changes should be made to his physical custody order of 50/50 parenting time.  Barbara Kiffmeyer was assigned to the position.

282.   Ms. Kiffmeyer purports to have a Masters degree in social work and is on the approved panel of Court Appointed Advisors.  So is Defendant Greg R. Davis.

283.   Plaintiff is informed and believes that over the past ten years, Davis and Kiffmeyer have had a personal social relationship and a business relationship wherein Davis compensated Kiffmeyer to fix reports to the Court in favor of Davis' clients.

284.   After Kiffmeyer's appointment, Brittany determined that Kiffmeyer was susceptible to bribes through Attorney Davis.

285.   In July 2020, Brittany replaced her attorney with Greg R. Davis.  Thereafter, Brittany and Dawna arranged through Davis for payment to Kiffmeyer for Kiffmeyer to do two things: a) allow Brittany and Davis to make false statements to the Court alleging that Kiffmeyer had concerns about Plaintiff's parenting skills when in fact she had no such concerns, and b) issue a report that omitted pertinent information about Brittany including her criminal conduct and mental health issues and omitted any positive information concerning Plaintiff, of which there was plenty, including that Plaintiff has a twenty year old son whom he successfully co-parented with his ex-wife.

286.    On September 19, 2020, Brittany refused to exchange McKinley claiming, in part, that Kiffmeyer had told her not to make the exchange. Brittany's statement was false and remained false when she and Davis filed a brief with the Court on September 21, 2020 stating the same.

287.   Subsequently, Kiffmeyer admitted that she had not told Brittany to refuse the exchange, but Kiffmeyer refused to report the same to the Court.

288.  Thereafter, Kiffmeyer authored a report that omitted the following:

a. Plaintiff has a nineteen year old son, with whose mother he co-parented successfully (who provided a declaration stating the same). Matthew attends University of Colorado in Boulder Colorado, where he is a Deans List candidate and a Premed Major.

b. Plaintiff was McKinley's primary care giver from birth to the time he was stollen on December 12, 2019 and then again from late January until the time he was stollen on September 19, 2020. Until September 19, 2020, neither Brittany nor her mother, Dawna, ever complained once about the care McKinley received from Plaintiff.

c. During the first half of 2019, Brittany encouraged Matthew to attend the University of Arizona, so that he could join her, Plaintiff and McKinley on weekends.

d. Plaintiff was married to Melinda (Matthew's mother) for seventeen years. They coparented Matthew from the time he was seven years old. They maintained residences approximately a quarter of a mile apart, and stayed in constant communication on all issues regarding their son. Moreover, Plaintiff and Melinda maintain a friendship to this day. Melinda has met McKinley on several occasions, including having him over for dinner with Plaintiff in her home in Tarzana, California.

e. The report omits Brittany's violation of the custody order on April 4, 2020 wherein Brittany withheld McKinley from Plaintiff for fourteen days.

f. Report omits that Brittany violated the custody order a second time when she refused to make the exchange with McKinley on September 19, 2020. Since that time she has not permitted McKinley to see or talk to his father.

g. The report omits that in their Brief dated September 21, 2020, which was kept from Plaintiff, Attorney Davis and Brittany lied to the Court when stating and implying that Ms. Kiffmeyer told Brittany several days earlier that she was within her rights to withhold.

McKinley from the September 19, 2020 exchange and that she should refuse to make the exchange.

h. The report further omits that DCPS interviewed Plaintiff with McKinley and concluded that there was NO evidence of any kind to support a single allegation made by Brittany.

i.  At no time did Ms. Kiffmeyer interview either parent with McKinley, despite being asked to do so on numerous occasions by Plaintiff.

j.  Lastly, Ms. Kiffmeyer omits the forensic psychologist examination of McKinley on behalf of the Gilbert Police Department where it was found that Brittany was either lying or paranoid.

**The Corruption of the Maricopa County Superior Court**.

289.  As set forth above, the evidence implicates multiple judges and Judge's Assistants in Criminal and Family Courts as aiding and abetting the criminal enterprises.  More significantly, it implicates those involved in the nominating process for judges and in the hiring process for judge's assistants.

**The Participation of Judge Marvin L. Davis and his Judge's Assistant, Madison Hughes**

290.  At the time the Petition for Dissolution of Marriage was filed on December 13, 2019, Marvin L. Davis was a Commissioner of the Criminal Court in Maricopa County.  He was neither a judge nor adjudging Family Law cases.

291.  The initial judge did not favor Brittany or her multitude of "emergency motions" denying all of them.  Before the initial custody hearing, she was replaced with Commissioner Andrew Russell.

292.  At the February 20, 2020 custody hearing Commissioner Russell awarded joint physical custody.  He set a follow up motion for April 30, 2020.

293.  Prior to said hearing, Commissioner Russell was replaced with newly appointed "Judge" Marvin L. Davis.

294.  During the period from his appointment to the present, Judge Davis has allowed his Courtroom to be taken over by Brittany and Dawna by and through Davis' "Judge's Assistant," Madison Hughes, who has provided Court database access to Brittany and Dawna.

295.  As a result of said access, at least nine "orders" were created that contain forged signatures of Marvin L. Davis.

296.   Further, as a result of said access, multiple motions filed by Plaintiff were ignored and received no ruling.  Meanwhile, oppositions to motions filed by Brittany and Greg R. Davis were ignored.

297.   Moreover, Judge Davis wrongfully denied writs of habeas corpus and ignored requests for contempt citations for Brittany and Dawna's wrongful acts in refusing to make exchanges or even allow Plaintiff to speak to McKinley.

298.   Finally, on or about January 8, 2021, a phony Divorce Decree complete with forged signatures of Marvin L. Davis was mailed to Plaintiff.

### FIRST CAUSE OF ACTION

*(Violations of 42 U.S.C. §1983 v. All Defendants)*

299.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 298 of this complaint as if fully set forth hereat.

300.   All Defendants named herein conspired with each other to violate Plaintiff's civil rights and did violate said rights as follows:

    a.   As to Dawna, Brittany and Cairo: they conspired to cause bodily injury to Plaintiff to prevent him from discovering the criminal enterprises; they conspired to steal money from Plaintiff by staging a phony sale of the family residence incident to the dissolution of marriage filed by Brittany; they then schemed to kidnap McKinley and to cover up their actions by making false accusations of abuse against Plaintiff; then they obtained, through fraud and perjury, restraining orders against Plaintiff to prevent him from retrieving his son; having cloned Plaintiff's cell phone, they sent text messages to Brittany's cell phone and to Dawna's cell phone falsely claiming the messages came from Plaintiff and then demanded the City Attorneys of Mesa and Gilbert file false charges against Plaintiff for violating the illegally obtained restraining orders; and they filed phony complaints with the State Bar of Arizona and State Bar of California often pretending to be Plaintiff's former clients in order to damage Plaintiff's reputation and to try to have his license suspended. Also, said Defendants took over the courtroom

where Marvin L. Davis presides. With the assistance of Madison Hughes and Marvin L. Davis, they infiltrated the Court's digital files and prepared fake orders all designed to remove Plaintiff's custody of his son and to steal money from him through phony support orders and attorneys' fees orders.

b.  As to Marvin L. Davis and Madison Hughes, they provided access to the Court's electronic file in case number FC2019-098211 with Davis allowing Brittany and Dawna to create fake court orders however they saw fit. That included nine separate orders and a phony divorce decree. Moreover, Davis failed to rule on multiple motions including writs of habeas corpus and contempt citations directed at Brittany for her refusal to make custody exchanges.

c.  As to Shauna Major, she assisted Brittany and Dawna in orchestrating the September 19, 2020 kidnapping of McKinley and aided and abetted their plan to discredit Plaintiff by assisting Brittany in making fake claims with the Gilbert Police that Plaintiff was taking illicit drugs and that drug paraphernalia found in the family residence belonged to Plaintiff. In fact, the paraphernalia belonged to Brittany.

d.  As to Greg R. Davis and Barb Kiffmeyer, they conspired to falsify the custody report Kiffmeyer provided to the Court regarding McKinley and they conspired to have Kiffmeyer ignore false statements made by Davis and Brittany in briefs filed with the Court all to impact negatively Plaintiff's custody rights. Further, Davis committed perjury and suborned perjury from Brittany as a means to prevent Plaintiff from having custody of his son. Further, Davis misrepresented having possession of the monies from the sale of Plaintiff's and Brittany's residence to cover up the fraudulent sale of said property.

e.  As to the Falbos, LaFlesch, Gadberry and JetClosings, these Defendants aided and abetted in the fraudulent sale of Plaintiff and Brittany's residence designed to steal the equity from Plaintiff. With respect to the Falbos, they acted as "buyers." With respect to Gadberry, she secured the stipulation between Plaintiff and her client for the sale of

1   the property.  As to LaFlesch, he acted as real estate agent and broker.  He set up the

2   phony sale with the phony buyers and reported the same to Plaintiff.  He also instructed

3   Plaintiff to sign the warranty deed after falsely representing that the sale had been

4   funded by a loan secured by deed of trust obtained by the buyers.  JetClosings handled

5   the phony escrow also falsely representing to Plaintiff that the "buyers'" loan had been

6   funded and that Plaintiff was required to execute a warranty deed to complete the

7   transaction.

8   f.   As to Gadberry, she set up the phony sale of the family residence by falsely representing

9   to Plaintiff that if he signed a stipulation for said sale her firm would hold the money

10  pending further order of the Court.  But there was no sale and would not be a sale and

11  the "profits" from said sale would be displaced by requests for fees and costs and child

12  support made to Marvin L. Davis once he could be put in charge of the divorce case.

13  Gadberry knew that Plaintiff would never see a dime of the money owed him and that

14  she and her firm would receive at least $25,000.00 for their "work."

15  g.   As to Lammers, he aided and abetted Brittany's 2014 extortion plan by having a phony

16  California judgment created by Brittany entered as a foreign state judgment in Maricopa

17  County.  Then in 2015, Lammers applied for and received judgment debtor examination

18  notices and tried to serve them on Plaintiff so that he and Brittany could discover all of

19  Plaintiff's assets and their locations.  On December 31, 2015, having been unsuccessful

20  serving the judgment debtor examination notices, Lammers filed a frivolous fraudulent

21  transfer action in order to record an illegal lis pendens on the Phoenix residence owned

22  by Plaintiff and thus prohibit its sale in furtherance of the extortion scheme.  To date,

23  Lammers has refused to dismiss the phony judgment.

24  h.   As to John Chavez, to prevent Plaintiff from discovering his involvement in the criminal

25  enterprises, on November 3, 2020 he communicated with Plaintiff promising Plaintiff

26  that if Plaintiff stopped investigating his family Plaintiff would be permitted to see his

27  son.  But in fact, it was a ruse to determine Plaintiff's location by using the IMEI

28

1    identification number of Plaintiff's cell phone so that the Mesa and Phoenix police could

2    harass Plaintiff to try to force him out of the State.

3    i.    As to the City of Mesa and Jacob G. Roessler, by policy design, both violate the

4          Uniform Child Custody Jurisdiction and Enforcement Act by refusing to enforce

5          custody orders such that if one party refuses to exchange a child, police departments of

6          these cities will not remove the child to effect any exchange.  Further, said police

7          departments state openly that they would refuse a direct court order demanding they

8          enforce custody rights.  In the matter at bar, on at least 12 separate occasions during

9          2019 through 2020, Plaintiff reported to the Mesa Police Department that Brittany had

10         refused to exchange McKinley.  In addition to failing and refusing to take action to

11         enforce the custody order of February 20, 2020, the Mesa Police Department ignored

12         reports made by Plaintiff that Brittany, Dawna and Larry were interfering with

13         Plaintiff's custody.  Said department failed and refused to file criminal charges for

14         custodial interference. These failures and refusals were carried out by Officer Jacob G.

15         Roessler who Plaintiff is informed and believes had been receiving compensation from

16         Dawna and Brittany to protect the criminal enterprises and specifically received

17         compensation to not write reports and to not provide information to the City Attorney.

18         Meanwhile, Roessler physically prevented Plaintiff from seeing his son or making an

19         exchange on October 3, 2020 and then, after Plaintiff complained to the department

20         about Roessler's conduct, on October 11, 2020, Roessler effected a false arrest of

21         Plaintiff at his residence in Gilbert using as the pretense of fake text messages from the

22         cloned phone into Dawna's cell phone.  Thereafter, the City of Mesa filed nine separate

23         charges of Plaintiff violating Dawna's illegally obtained restraining order all taken from

24         the phony text messages.  Plaintiff is informed and believes that members of the City

25         Attorney's office knew that the text messages came from a cloned phone but filed them

26         anyway to a) stop Plaintiff from pursuing the criminal enterprises; b) damage Plaintiff's

27         reputation so that he would not be believed if he reported the criminal enterprises and

28

the City of Mesa's involvement in them; and c) either convict Plaintiff or having Plaintiff plead guilty to misdemeanor charges that cumulatively might result in felonious conduct thus requiring Plaintiff to serve time in jail and lose his license to practice law.

j. As to Town of Gilbert, Bullock, Ferer, and Wakefield, Plaintiff provided credible reports and evidence that during 2019, Brittany stole credit and debit cards belonging to Plaintiff and his law office corporation and then gave them to others to use. He also provided evidence of an attempt to kill him or cause him bodily harm on April 20, 2019 when a strategic cut was made in the tire of his rental car, a cut that could have resulted in catastrophic failure of the tire. In furtherance thereof, Plaintiff provided an expert report regarding the tire cut and how it was made and how such a cut clearly was intended to cause Plaintiff grave bodily harm. And he provided credible evidence that on July 7, 2019, Brittany attempted to poison Plaintiff by giving him iced tea laced with chemicals. Officer Bullock ignored the reports and instead filed false charges that Plaintiff violated Brittany's illegally obtained restraining order on December 31, 2019. These alleged violations occurred while Plaintiff was receiving an angiogram as an in-patient at Banner Heart Hospital. Bullock knew Plaintiff was in the hospital and receiving an angiogram, but intentionally left that information out of his report. As to Ferer and Wakefield, they intentionally failed and refused to investigate and allowed for spoliation of the video surveillance evidence, at the locations where the fraudulent use of the debit and credit cards occurred.

k. As to the County of Maricopa and State of Arizona, employees of said County, including those who built the County's computer database, which controls all information in the court systems, civil and criminal, the Recorder's Office, the Assessor's Office, and all social welfare and benefits programs, infiltrated the system in furtherance of the criminal enterprises. Also, Brittany and other non-employees used the backdoor infiltration in furtherance of the criminal enterprises. This included placing phony pleadings under phony case numbers such as the 2014 foreign state

judgment extortion scheme against Plaintiff and then falsifying court orders regarding child custody of McKinley along with child support to be paid to Brittany and attorney's fees and costs to be paid to Brittany and/or her attorneys to cover up the fact that no sale of the family residence had occurred.  The State of Arizona has known since at least 2010 that its computer system and database had been infiltrated by organized criminals and employees of the State that also work for said criminals.  The State of Arizona has also known since 2010 that the computer database infiltration includes county databases including Maricopa, Pinal and Pima Counties. Despite the knowledge of this situation, and knowledge that the illegal infiltrations have resulted in the mass violations of civil rights of the victims of the criminal enterprises.  Yet, the County of Maricopa and the State of Arizona have failed and refused to make the necessary changes or act to protect the public and have failed to protect Plaintiff from the aforementioned violations of his civil rights.

l.  As to Dawna, Brittany, Shauna Major, and Roessler, these Defendants have engaged in a pattern of witness intimidation by directly threatening witnesses and third parties who have relevant information favorable to Plaintiff.  Said intimidation includes threatening to expose embarrassing information about the witness or, specifically in the case of Michael Grigsby, threatening his employment as an ordained minister.  Further, these defendants have used legal processes, including third party civil litigation on unrelated matters to disrupt the lives of potential witnesses.

301.  As a result of the violations by these Defendants, Plaintiff has been damaged in an amount at or exceeding $250,000.00 in losses from the fraudulent sale of his and Brittany's residence, from damage to his law practice, and damage to his reputation in an amount according to proof at time of trial.

302.  Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

303.    The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### SECOND CAUSE OF ACTION

*(Violations of 42 U.S.C.§1997 vs. City of Mesa, Town of Gilbert,*

*City of Phoenix and County of Maricopa, State of Arizona)*

304.    Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 303 of this complaint as if fully set forth hereat.

305.    The within Defendants as government agencies with independent police departments, City of Mesa, Town of Gilbert and County of Maricopa are obligated to prevent officers from engaging in a pattern or practice of conduct the deprive a person's right

306.    On April 4, 2020 and September 19, 2020, the State of Arizona was a signatory to the Uniform Child Custody and Jurisdiction Enforcement Act ("UCCJEA").

307.    Per the terms of said Act, which is effective in 49 states, Family Courts and law enforcement agencies are required to enforce custody orders.

308.    Defendant City of Mesa and Defendant Town of Gilbert, for at least the past five years, have chosen deliberately to ignore their obligations to enforce custody orders.  In simple terms, when a parent refuses to exchange a minor child, per the terms of a child custody order, the Mesa Police Department and the Gilbert Police Department refuse to intervene in the absence of visible and obvious physical harm to the child.

309.    Moreover, that refusal includes a stated policy wherein even if a Maricopa County Superior Court Judge specifically orders officers to remove the child, officers will refuse the court order.

310.    Additionally, the Maricopa County Superior Court honors the policies of Gilbert and Mesa by and through its judges who refuse to execute additional orders to enforce custody rights when one parent refuses to make an exchange.

311.   Thus, any parent residing in Mesa or Gilbert can refuse to exchange a child with total impunity from these Defendants.

312.   Said policy and its implementation violate the UCCJEA as codified in A.R.S. §25-1001 et seq.  Further, they violate 42 U.S.C. §1997 in that said local enforcement agency officers have engaged in a pattern and practice of conduct the deprives parents with custody rights.

313.   Said conduct further violates the rights of children per the terms of custody orders that remain unenforced.

314.   With respect to Plaintiff, Defendants named herein and/or their agents conspired to deprive Plaintiff of his son, McKinley, for three reasons: first, to cover up their involvement in the criminal enterprises; second, to create a pretense for contrived violations of illegally obtained restraining orders by Brittany and Dawna in order to discredit Plaintiff; third, to carry out an extortion attempt wherein if Plaintiff stopped his investigation into the criminal enterprises, Defendants would ensure custodial time with McKinley; and fourth, to cause Plaintiff to fear for his safety and thereby cause Plaintiff to leave the State - with the added benefit of Plaintiff being unable to appear personally at hearings on the phony violations and charges thereon.

315.   With respect to Defendant Roessler, most of the acts alleged in this cause of action were performed by him to the intended benefit of Brittany and Dawna.  Said acts include: a) taking reports of restraining order violations by Brittany and Dawna that he knew were false while hiding Plaintiff's reports that Brittany and Dawna had violated the February 20, 2020 temporary custody orders on many occasions; b) refusing to enforce child custody order by refusing to return McKinley to Plaintiff; c) harassing Plaintiff by refusing to take reports of Brittany's custody violations and refusing to perform welfare checks on Brittany and McKinley; and d) mischaracterizing in official police reports text messages Plaintiff allegedly sent to Dawna regarding her refusal and Brittany's refusal to return McKinley as Plaintiff "harassing" Dawna in violation of the restraining orders when he knew the texts pertained to the kidnapping of McKinley and violation of the custody order; and e) falsely arresting Plaintiff on October 11, 2020 after

1   conspiring with Dawna to send messages to her phone from a cloned cell phone—thus giving the

2   appearance that Plaintiff has sent the messages.

3   316.   Plaintiff is informed and believes that Defendant Roessler had been a participant in the

4   criminal enterprises by providing cover and misdirection from police investigations and that he

5   fabricated evidence or destroyed evidence to prevent discovery of the enterprises and Brittany and

6   Dawna's participation in them.

7   317.   As to the Mesa City Attorney's office, they failed and refused to prosecute Dawna with

8   felony interference with child custody.

9   318.   Said actions in allowing Brittany and Dawna to file false police reports alleging phony

10  violations of the restraining orders were intended to deprive Plaintiff of his civil rights including

11  those rights he had as a father and those rights as a parent granted to him by the Court on February

12  20, 2020.

13  319.   Thus, Plaintiff is entitled to an award of specific damages at or exceeding $250,000.00 for

14  all losses of income suffered in an amount according to proof at time of trial.

15  320.   Additionally, the violations alleged herein have caused Plaintiff general damages to his

16  health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount

17  according to proof at time of trial.

18  321.   The acts of these Defendants and each of them who acted in concert and as co-conspirators

19  is willful and wonton, malicious and oppressive and undertaken in conscious disregard for

20  Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute

21  in an amount to be determined at time of trial.

22                              **THIRD CAUSE OF ACTION**

23               *(Conspiracy to Violate 18 U.S.C.§241 vs All Defendants)*

24  322.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 321 of

25  this complaint as if fully set forth hereat.

26

27

28

323.   The within Defendants are subject to 18 U.S.C. §241 which provides that where two or more individuals conspire to threaten or intimidate, injure or oppress another, they are guilty of civil rights violations.

324.   Said statute also provides that where two or more individuals appear at the premises of another for the purposes of threatening or intimidating, injuring, or oppressing, or kidnapping another, they are guilty of criminal civil rights violations.

325.   The acts of all of the Defendants as alleged herein constitute a conspiracy to deprive Plaintiff of his civil rights.

326.   Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

327.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

328.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

//

//

//

**FOURTH CAUSE OF ACTION**

*(Conspiracy to Violate 18 U.S.C.§242 vs Marvin L. Davis, Kiffmeyer,*

*Hughes, Roessler, City of Mesa, Town of Gilbert, County of Maricopa)*

329.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 328 of this complaint as if fully set forth hereat.

330.   These within Defendants are parties subject to the terms of 18 USC §242 which provides in pertinent part that "whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person… to the deprivation of any rights, privileges, or immunities…" is guilty of a criminal act.

331.   The acts set forth in this complaint and specifically set forth in paragraph 317 violate said statute and are criminal.

332.   Thus, Plaintiff Thaler is entitled to an award of specific damages for all losses of income suffered in an amount according to proof at time of trial.

333.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

334.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### FIFTH CAUSE OF ACTION

*(Violations of 42 U.S.C. §14141 vs all Defendants)*

335.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 334 of this complaint as if fully set forth hereat.

336.   As set forth hereinabove, said individual Defendants and government entity Defendants have engaged in a pattern and practice of conduct designed to deprive individuals of their rights and privileges protected by the Constitution.

337.   With respect to Plaintiff, as alleged herein, said Defendants intentionally created schemes to deprive him of his rights and his liberties to cover up and conceal racketeering activities as set forth in 18 U.S.C.§1951, 1952, 1956, 1957 and 1958.

338.   Said schemes included falsifying court orders to deprive Plaintiff of his son and to steal his money, hacking into Plaintiff's business computers to damage his law practice and his clients,

hacking into his clients' computers to disrupt their businesses, filing phony charges of violating illegally obtained restraining orders to discredit Plaintiff while failing and refusing to enforce court custody orders and refusing to charge Brittany and Dawna for custodial interference.

339.   Said actions caused Plaintiff and his law practice significant financial harm in an amount at or exceeding $250,000.00.

340.   Thus, Plaintiff is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

341.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

342.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### SIXTH CAUSE OF ACTION

*(Violations of Substantive Due Process Rights v. City of Mesa, Town of Glbert,*

*County of Maricopa, Roessler, Bullock, Ferer, Wakefield, Marvin L. Davis)*

343.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 342 of this complaint as if fully set forth hereat.

344.   The actions of these Defendants as set forth in this Complaint were intended to deprive Plaintiff of his due process rights by depriving him of his rights to his child pursuant to the UCCJEA and by depriving him of his rights to adjudicate for his child.

345.   Further, said Defendants violated Plaintiff's rights by failing and refusing to investigate Brittany's criminal conduct including at least two attempts made on Plaintiff's life and her conduct in stealing money from Plaintiff and his law office, including the spoliation of evidence, all to cover up the criminal enterprises.

346.   As to the City of Phoenix, several of its officers acted in furtherance of the scheme operated by the City of Mesa when on November 3, 2020, said officers illegally traced Plaintiff's location through tracking his cell phone and then attempted to scare and intimidate him with the threat of false arrest.

347.   Said actions by the Phoenix officers further violated Plaintiff's substantive due process rights.

348.   Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

349.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

350.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Plaintiff's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## SEVENTH CAUSE OF ACTION

*(Violations of Procedural Due Process Rights v. Maricopa County, Marvin L. Davis,*

*Madison Hughes, Town of Gilbert, City of Mesa, City of Phoenix)*

351.   Plaintiff realleges Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 350 of this complaint as if fully set forth hereat.

352.   The acts of these Defendants in refusing to investigate Plaintiff's complaints of criminal wrongdoing so that Plaintiff could be compensated for his losses, and specifically, the actions of Marvin L. Davis in allowing his courtroom to be hijacked during the dissolution of marriage litigation with phony orders and a phony divorce decree to cover up the criminal enterprises constitutes a violation of Plaintiff's procedural due process rights.

353.   Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

354.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

355.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## EIGHTH CAUSE OF ACTION

*(Violations of Equal Protection/Selective Enforcement v. City of Mesa)*

356.   Plaintiff realleges Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 355 of this complaint as if fully set forth hereat.

357.   In addition to the actions set forth hereinabove, City of Mesa officials including members of the City Attorney's office and officers of the Mesa Police Department selectively chose to enforce illegally obtained and void restraining orders against Plaintiff while refusing to enforce the Family Court's February 20, 2020 Court custody order.

358.   Further, said Defendants violated Plaintiff's rights by failing and refusing to investigate Brittany's criminal conduct including at least two attempts made on Plaintiff's life and her conduct in stealing money from Plaintiff and his law office, including the spoliation of evidence, all to cover up the criminal enterprises.

359.   Plaintiff has suffered monetary damages from these actions. Thus, Plaintiff Thaler is entitled to an award of specific damages for all monetary losses suffered, which at this time meet or exceed $250,000.00 in an amount according to proof at time of trial.

360.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

361.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**NINTH CAUSE OF ACTION**

*(Conversion vs. Brittany, Dawna, Cairo, Gadberry, LaFlesh, Kiffmeyer,*

*Greg Davis, Christopher Falbo and Nicoletta Falbo, JetClosings, Marvin L. Davis)*

362.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 362 of this complaint as if fully set forth hereat.

363.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 239 of this complaint as if fully set forth hereat.

364.   As alleged herein, in 2015 Thaler and Brittany purchased a home in Gilbert, Arizona. Thaler provided $38,400 toward the down payment and then made each and every mortgage payment through November 2019. At the time of making the purchase, Plaintiff and Brittany agreed that they each own the sole rights to the down payments and any and all equity would be divided equally between them.

365.   In or about January 2020, Thaler and Brittany agreed to sell the residence. But in fact, Brittany had no intention of selling the residence. Instead, she intended to falsify the sale, rent out the property and keep all of the equity and all of the rents for herself. In furtherance of this scheme, she and these Defendants conspired to falsify a sale using falsified and forged documents and thereafter reporting to Thaler that the property had been sold and that the proceeds from said sale in the amount of approximately $173,000 were being held by Defendant JetClosings Inc. and thereafter transferred to the Berkshire Law Office and then to Attorney Greg Davis.

366. JetClosings, Gadberry and Berkshire on behalf of the Berkshire Law Office and Attorney Davis confirmed that each had received the proceeds of the sale per the purported arrangement. However, neither Berkshire nor Attorney Davis ever received any of the proceeds. And Plaintiff is informed and believes and thereon alleges that JetClosings never received any proceeds because in fact there was no sale.

367. In truth, Brittany is beneficial owner of the property. Further, Brittany has received and continues to receive rent payments from the illegal owners of the property, Christopher Falbo and Nicoletta Falbo

368. Moreover, these Defendants conspired to run up attorneys fees and thereafter submit fraudulent billing statements in the dissolution of marriage and to submit to the Court false and fraudulent documents to obtain an order for child support. Said false documents grossly understated Brittany's income and grossly overstated Plaintiff's income.

369. As to Marvin L. Davis, he then permitted Brittany and her attorneys to create their own orders for child support and attorneys fees based on the false and fraudulent information submitted.

370. Plaintiff is informed and believes Judge Davis did this in exchange for his appointment to the bench as a "judge" and in exchange for other compensation.

371. As such Defendants and each of them conspired to deprive Thaler and did deprive Thaler of his down payment monies in the sum of $38,400 and one half of the equity in the property in the sum exceeding $125,000 according to proof at time of trial.

372. Additionally, Defendants and each of them conspired to deprive Thaler of one half of the rent received from Christopher Falbo and Nicoletta Falbo in an amount not yet ascertained but believed to be approximately $10,000.

373. The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## TENTH CAUSE OF ACTION

*(Conspiracy to Defraud v. Brittany, Dawna, Kiffmeyer, Greg R. Davis, Roessler, City of Mesa)*

374.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 373 of this complaint as if fully set forth hereat.

375.   The representations to the Court regarding income were false and known to Defendants as false when said representations were made.

376.   The false representations were intended to conceal from Plaintiff the fact that the sale of the family residence was phony and conceal that the equity and his portion of the down payment were being stolen.

377.   Had Plaintiff known the sale was phony he would not have executed a warranty deed much less execute a stipulation prepared by Gadberry for the sale.

378.   As a direct and proximate result. Plaintiff has been damaged in the sum exceeding $125,000 in an amount according to proof at time of trial.

379.   In or about early July 2020 said referenced Defendants conspired to terminate Plaintiff's parental rights to distract Plaintiff from fully discovering the criminal enterprises.

380.   To divert attention and to terminate Plaintiff's rights, these Defendants conspired to have Brittany make false accusations of parental abuse against Plaintiff while refusing to make further exchanges claiming Kiffmeyer had instructed Brittany to keep McKinley.  For her part, Kiffmeyer agreed not to interfere with the plan nor report to the Court anything about the plan.

381.   Moreover, in exchange for payment through Greg R. Davis, Kiffmeyer agreed to provide the Court with a report that omitted pertinent positive facts about Plaintiff and omit the obvious disturbing facts about Brittany.

382.   Had Plaintiff known the true facts about this fraud, he would not have permitted Kiffmeyer to be appointed or for Kiffmeyer to participate in the dissolution proceedings.  Further, if Plaintiff had known that Marvin L. Davis intended to permit Brittany and other Defendants to issue orders and a phony decree in his name, Plaintiff would have disqualified Davis.

383.   As a result of this fraud, Plaintiff has been damaged in a sum at or exceeding $250,000.00.

384.   Additionally, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

385.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

### ELEVENTH CAUSE OF ACTION

*(Invasion of Privacy v. Brittany, Dawna, Shauna Major, John Chavez,*

*Roessler, Gadberry, Greg R. Davis, City of Mesa, City of Phoenix)*

386.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 385 of this complaint as if fully set forth hereat.

387.   Beginning in February 2015, Brittany began hacking into Plaintiff's computer to determine how much information Plaintiff had concerning Russian organized crime activities in Arizona. During 2011-2012, Plaintiff had obtained information on Russian organized crime in California, specifically on the smuggling of goods through Southern California and on methods used to create fake identities—from hospital records of patients in certain Arizona-based hospital chains.  Of the individuals participating in the scheme, Brittany had worked with two of them.

388.   During this hacking, Brittany stole confidential communications between Plaintiff and clients and she stole confidential communications with friends and family.

389.   In February 2016, fearing Plaintiff would figure out that she had created the fake Tarzana Falls judgment to extort money from him, Brittany hacked into Plaintiff's personal and business computers and placed viruses in them to erase information.

390.   In February 2017, Brittany stole a check belonging to Plaintiff's personal bank account, executed it in Plaintiff's name and deposited it into an account she controlled at Wells Fargo Bank in a phony name.

391. Then on August 14, 2017, Brittany stole another check to Plaintiff's personal account at Chase Bank, this check bearing Plaintiff's previous Phoenix address. She filled out the check complete with signature payable to the City of Phoenix for a water bill in another person's name.

392. In September 2017, while five months pregnant, Brittany panicked that Plaintiff was discovering the extortion scheme and Plaintiff might discover that in September 2016, she had been pregnant but had a miscarriage. She also feared that Plaintiff might discover the fate of Phillips.

393. So Brittany attempted to erase 110,000 files from four separate computers belonging to Plaintiff by hacking into the computers and moving said files into the recycle bins of each so that they would be erased the next time he turned on the computers.

394. In November 2018, after Plaintiff discovered the massive credit card charges, Dawna and Brittany concocted a scheme to place spyware in Plaintiff's cell phone and in his computers to determine what Plaintiff knew and to obtain any information they could find to extort Plaintiff into that which Plaintiff only understood at the time as being Brittany's bizarre behavior.

395. Then came stealing Plaintiff's credit and debit cards in early 2019 and those of his law office, erasing files and documents belonging to clients and then poisoning Plaintiff in order to achieve a positive drug test in order to steal McKinley.

396. With that, Brittany and Dawna stole from Plaintiff's office confidential client files and documents including the files Plaintiff was storing for his first wife, Melinda. The information of these files has since been misused during the dissolution proceedings to try to embarrass and harass Plaintiff. The documents were disseminated to Gadberry and to Greg R. Davis and to Marvin L. Davis who refused to return the same in violation of Arizona statutes.

397. In September 2020, using the spyware placed on Plaintiff's phone, Dawna and Brittany and Shauna schemed to clone Plaintiff's phone and then send through the cloned phone messages to Dawna and to Brittany; thereafter they would claim that Plaintiff had violated the illegally obtained restraining orders. The purpose in this was to run up fake charges to disrupt Plaintiff and his law practice and to take McKinley without Plaintiff being able to see his son.

398.   This plan was aided and abetted by Roessler who ensured the false reports would be presented to the Mesa City Attorney while reports of Brittany and Dawna interfering with custodial rights was not.

399.   This plan was further aided and abetted by members of the City Attorney's Office refusing to prosecute Dawna and Brittany while prosecuting Plaintiff for charges said Office knew were false and contrived and came from a cloned cell phone.

400.   On October 11, 2020 when the plan was not working as quickly as these Defendants wanted, Roessler, Brittany, Dawna and Shauna concocted a plan to have Plaintiff arrested for sending text messages to Dawna.  To that end, they used the cloned phone to send messages into Dawna's cell phone.  Then Roessler took photos of the fake text messages, and drove to Plaintiff's residence and walked onto his property with the intent of falsely arresting Plaintiff.

401.   Even after Plaintiff denied knowing anything about the text messages, Roessler lied in his arrest report stating falsely that Plaintiff had admitted sending them.

402.   Further, during late October through early November 2020, John Chavez sent messages to Plaintiff by MSN Messenger telling Plaintiff that if he stopped investigating the above matters, Plaintiff could see his son. Meanwhile, Roessler and other members of the Mesa police contacted Sprint pretending to be Plaintiff trying to get IMEI and other identifying information of Plaintiff's phone so that they could locate Plaintiff.

403.   On the night of November 3, 2020, officers of the Phoenix Police Department appeared at the residence where Plaintiff was watching election returns.  Though they stated they wished to ask Plaintiff questions, In fact, using more phony text messages from the cloned  cell phone, they intended to arrest Plaintiff again while falsifying reports to State that Plaintiff had admitted sending the messages.

404.   The aforementioned acts constitute an invasion of Plaintiff's rights and were intended to invade Plaintiff's privacy.

405.   The actions of these Defendants caused Plaintiff to have to sell his residence and leave the State of Arizona to stop the invasion and the illegal acts thereon all to his damage in an amount at or exceeding $100,000.00.

406.   Further, the violations alleged herein have caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

407.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

## TWELFTH CAUSE OF ACTION

*(Intentional Infliction of Emotional Distress vs. All Defendants)*

408.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 407 of this complaint as if fully set forth hereat.

409.   The acts of these Defendants was outrageous.

410.   Said outrageous acts were intended to cause Plaintiff severe emotional distress.

411.   Said acts resulted in severe emotional distress to Plaintiff.

412.   The actions of these Defendants caused Plaintiff to require multiple hospitalization for high blood pressure spikes that were aided by Brittany's poisoning of Plaintiff all to his damage in a sum meeting or exceeding $50,000.00.

413.   Further, the outrageous conduct has caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

414.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**THIRTEENTH CAUSE OF ACTION**

*(Interference with Business/Prospective Economic Advantage v. All Defendants)*

415.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 413 of this complaint as if fully set forth hereat.

416.   The actions of Defendants were intended to damage Plaintiff's reputation and his law practice to extort him into stopping his investigation.

417.   And in fact, the acts set forth herein resulted in the loss of more than $75,000 in income and a loss of more than $175,000 in future income.

418.   Further, the outrageous conduct has caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

419.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**FOURTEENTH CAUSE OF ACTION**

(Abuse of Process v. Brittany, Gadberry, Greg R. Davis)

420.   Plaintiff realleges and incorporates herein by reference as in paragraphs 1 through 419 of this complaint as if fully set forth hereat.

421.   At the time Brittany married Plaintiff, she had executed various official documents under penalty of perjury that she was married to: Justin Chavez, or Justin Leonard, or Ricky Goodwin.

422.   Plaintiff is unaware and unable to locate any dissolution documents regarding Brittany and these individuals.

423.   Moreover, Brittany executed other official documents under penalty of perjury using assumed names and stating that the assumed name individual was married.

424.   Plaintiff is unable to locate any dissolution documents for these named couples.

425.   Plaintiff is informed and believes and thereon alleges that at the time Gadberry began her representation of Brittany and at the time Greg R. Davis began his representation of Brittany, they knew she was married to other individuals and that she intended to use the dissolution of marriage process in Arizona to cover up her felonious actions.

426.   Thereafter, Brittany, Gadberry and Greg R. Davis prosecuted a fraudulent dissolution action using the normal processes.

427.   Additionally, Brittany, Gadberry and Greg R. Davis further intended to use the court processes for the wrongful purpose of running up exorbitant legal expenses and thereafter lie to the Court about their necessity in order to cover up Brittany and Dawna's theft of the equity of the family residence.

428.   These acts constitute an abuse of process.

429.   And in fact, the acts set forth herein resulted in the loss of more than $400,000. .

430.   Further, the outrageous conduct has caused Thaler general damages to his health and wellbeing including headache, stomach ache and Post Traumatic Stress in an amount according to proof at time of trial.

431.   The acts of these Defendants and each of them who acted in concert and as co-conspirators is willful and wonton, malicious and oppressive and undertaken in conscious disregard for Thaler's rights thus justifying an award of punitive and exemplary damages as set forth by statute in an amount to be determined at time of trial.

**WHEREFORE**, Plaintiff prays for damages as follows:

### FIRST CAUSE OF ACTION

1.   For specific damages according to proof at time of trial;

2.   For general damages according to proof at time of trial;

3.   For punitive and exemplary damages in an amount to be determined at time of trial;

### SECOND CAUSE OF ACTION

4.   For specific damages according to proof at time of trial;

5.   For general damages according to proof at time of trial;

6.   For punitive and exemplary damages in an amount to be determined at time of trial;

7.   For a preliminary and permanent injunction requiring defendants to comply with the UCCJEA;

**THIRD CAUSE OF ACTION**

5.   For specific damages according to proof at time of trial;

6.   For general damages according to proof at time of trial;

7.   For punitive and exemplary damages in an amount to be determined at time of trial;

**FOURTH CAUSE OF ACTION**

8.   For specific damages according to proof at time of trial;

9.   For general damages according to proof at time of trial;

10. For punitive and exemplary damages in an amount to be determined at time of trial;

**FIFTH CAUSE OF ACTION**

11. For specific damages according to proof at time of trial;

12. For general damages according to proof at time of trial;

13. For punitive and exemplary damages in an amount to be determined at time of trial;

**SIXTH CAUSE OF ACTION**

14. For specific damages according to proof at time of trial;

15. For general damages according to proof at time of trial;

16. For punitive and exemplary damages in an amount to be determined at time of trial;

**SEVENTH CAUSE OF ACTION**

17. For specific damages according to proof at time of trial;

18. For general damages according to proof at time of trial;

19. For punitive and exemplary damages in an amount to be determined at time of trial;

**EIGHTH CAUSE OF ACTION**

20. For specific damages according to proof at time of trial;

21. For general damages according to proof at time of trial;

22. For punitive and exemplary damages in an amount to be determined at time of trial;

1   //

2                       **NINTH CAUSE OF ACTION**

3       23. For specific damages according to proof at time of trial;

4       24. For general damages according to proof at time of trial;

5       25. For punitive and exemplary damages in an amount to be determined at time of trial;

6                       **TENTH CAUSE OF ACTION**

7       26. For specific damages according to proof at time of trial;

8       27. For general damages according to proof at time of trial;

9       28. For punitive and exemplary damages in an amount to be determined at time of trial;

10                    **ELEVENTH CAUSE OF ACTION**

11      29. For specific damages according to proof at time of trial;

12      30. For general damages according to proof at time of trial;

13      31. For punitive and exemplary damages in an amount to be determined at time of trial

14                    **TWELFTH CAUSE OF ACTION**

15      32. For specific damages according to proof at time of trial;

16      33. For general damages according to proof at time of trial;

17      34. For punitive and exemplary damages in an amount to be determined at time of trial;

18                  **THIRTEENTH CAUSE OF ACTION**

19      35. For specific damages according to proof at time of trial;

20      36. For general damages according to proof at time of trial;

21      37. For punitive and exemplary damages in an amount to be determined at time of trial;

22                  **FOURTEENTH CAUSE OF ACTION**

23      38. For specific damages according to proof at time of trial;

24      39. For general damages according to proof at time of trial;

25      40. For punitive and exemplary damages in an amount to be determined at time of trial

26   //

27   //

28

1

## ALL CAUSES OF ACTION

2      41. For costs of suit incurred herein;

3      42. For reasonable attorneys fees;

4      43. For prejudgment interest at the legal rate;

5      44. For all other relief this Court deems just and proper.

6  Date: March 25, 2021                          HARRIS/THALER LAW

7

8

9

10                                      By:_____

11                                          JOHN H. THALER, Plaintiff

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John H. Thaler vs. Brittany Rae Thaler et, al

Case No.: CV-21-01419-PHX-MHB

# EXHIBIT Q

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JOHN H. THALER,<br>Plaintiff,<br><br>v.<br><br>BRITTANY RAE THALER, et al.,<br>Defendants. | CV 21-2892 DSF (ASx)<br><br>Order TRANSFERRING Case to<br>District of Arizona Due to<br>Improper Venue |

Plaintiff John H. Thaler has filed this suit against 23 defendants. No defendant a resident of California and many are officials or entities of Arizona state and local government.  Three defendants have moved for dismissal for lack of personal jurisdiction.  Plaintiff has moved for leave to amend his complaint.

A review of the complaint and the proposed amended complaint shows that there is virtually no connection between Plaintiff's claims and this district, let alone that a "substantial part of the events or omissions giving rise to the claim" occurred in this district.  The only allegations related to this district – other than vague statements to the effect that similar things were occurring in California as were happening in Arizona – are related to alleged acts that happened around 2014 and are not the basis for any of Plaintiff's claims.  This type of background allegations cannot create proper venue in this district.

Because of this, the Court issued an order to show cause why this case should not be transferred because of improper venue.  Plaintiff filed responses on August 6 and August 15.  These filings are largely irrelevant to the issue and do not provide any support for the assertion

that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district. Plaintiff believes that some of the Defendants – particularly his ex-(or soon to be ex-)wife[1] – were involved in criminal activities in California. But these allegations do not involve acts against Plaintiff for which Plaintiff would have standing to raise a claim.

Dismissal or transfer for lack of venue, *sua sponte*, is appropriate in these circumstances because the lack of venue is obvious and will cause a massive waste of Defendants' and the Court's resources in preparing and ruling on the inevitable wave of separate personal jurisdiction or venue motions for the 23 defendants. See Costlow v. Weeks., 790 F.2d 1486, 1488 (9th Cir. 1986); see also Stich v. Rehnquist, 982 F.2d 88, 89 (2d Cir. 1992) (sua sponte venue dismissal appropriate under "extraordinary circumstances").[2]

The case is TRANSFERRED to the United States District Court for the District of Arizona.

IT IS SO ORDERED.


Date: August 16, 2021                    _____

                                          Dale S. Fischer
                                          United States District Judge



_____

[1] The Court is unclear whether Plaintiff's divorce is final or if divorce proceedings are still pending in Arizona.

[2] While some Defendants may have waived this issue by not raising it in their motions, most of the Defendants have not appeared and, therefore, their waiver has not occurred and the issue can be raised *sua sponte*. See Costlow, 790 F.2d at 1488 (waiver of improper venue has not occurred if no responsive pleading or motion has been filed).